PT:AAS/DMP/ICR
F. #2015R01787

**16 M 1000**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

DAN ZHONG and
LANDONG WANG,

Defendants.

- - - - - - - - - - - X

**FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
APPLICATION FOR
ARREST WARRANT

(8 U.S.C. §§ 1324(a)(1)(A)(v)(I),
1324(a)(1)(B)(i); 18 U.S.C. §§ 371
and 1594(b))

EASTERN DISTRICT OF NEW YORK, SS:

MATTHEW HARRIS, being duly sworn, deposes and states that he is a

Special Agent with the United States Department of Homeland Security, Homeland Security

Investigations, duly appointed according to law and acting as such.

In or about and between 2010 and the present, both dates being approximate

and inclusive, within the Eastern District of New York and elsewhere, the defendants DAN

ZHONG and LANDONG WANG, together with others, did knowingly and intentionally

conspire to provide and obtain the labor and services of one or more persons by means of

physical restraint, serious harm and threat of serious harm to such persons, abuse and

threatened abuse of law and legal process, and a scheme, plan and pattern intended to cause

such persons to believe that, if the person did not perform such labor and services, such

persons would suffer serious harm and physical restraint, contrary to Title 18, United States

Code, Section 1589(a).

(Title 18, United States Code, Section 1594(b))

In or about and between April 2015 and November 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAN ZHONG and LANDONG WANG, together with others, knowingly and in reckless disregard of the fact that one or more aliens had remained in the United States in violation of law, did knowingly and intentionally conspire to transport and move such aliens within the United States by means of transportation, for the purpose of commercial advantage and private financial gain and in furtherance of such violation of law, contrary to Title 8, United States Code, Sections 1324(a)(1)(A)(ii).

(Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i))

In or about and between 2010 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAN ZHONG and LANDONG WANG, together with others, did knowingly and intentionally conspire to utter, use, attempt to use, possess, obtain, accept, and receive one or more documents prescribed by statute or regulation for entry into and as evidence of authorized stay and employment in the United States, which defendants knew to be procured by means of a false claim and statement and otherwise procured by fraud and otherwise unlawfully obtained, contrary to Title 18, United States Code, Section 1546(a).

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI") and have been involved in the investigation of numerous cases involving the illegal activities of aliens in the United States. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

A. The Construction Business

2. This investigation has focused on the activities of employees of a construction business (the "Construction Business") based in the People's Republic of China (the "PRC") which performs construction work on PRC governmental facilities in the United States, including the Permanent Mission of the PRC to the United Nations ("PRC Mission"), the Embassy of the PRC to the United States, and PRC consulates in the United States. Workers employed in the United States by the Construction Business include PRC nationals who are brought by the Construction Business into the United States for this specific purpose.

3. The Construction Business workers who are PRC nationals enter the United States pursuant to A2 or G2 visas issued by the U.S. Department of State, pursuant to an agreement between the United States and the PRC to permit such PRC nationals to enter the United States to perform construction work on PRC diplomatic facilities.[2] See COCA II § 9.5. As explained by the U.S. Department of State, "[a]ll foreign personnel assigned to official duty at bilateral diplomatic or consular missions in the United States would have A-

---

[2] See Agreement Between the Government of the United States of America and the Government of the People's Republic of China on the Conditions of Construction of Diplomatic and Consular Complexes in the People's Republic of China and the United States of America T.I.A.S. No. 09-820 (Aug. 20, 2009) (hereinafter "COCA II").

category visas. G-category visas are issued to foreign personnel assigned to duty at an international organization in the United States or at a foreign country's mission to such organization." See U.S. Dep't of State, Bureau of Diplomatic Security, Diplomatic and Consular Immunity, Guidance for Law Enf't and Judicial Auths., Dep't of State Publ'n 150546 at 17, n.6 (2015). Bearers of such visas may include individuals "who are not accredited to the United States or to international organizations and who therefore enjoy no privileges and immunities in the United States." Id. at 17.

4.      Under the United States' agreement with the PRC, PRC construction workers admitted to the United States under A2 or G2 visas for the purpose of performing construction work on PRC diplomatic facilities "shall be restricted to project-related work and shall leave the [United States] upon conclusion of the project," except that "a limited number of [PRC] personnel . . . shall be permitted to remain in the [United States] . . . for the sole purpose of correcting any construction defects and establishing maintenance and operation procedures." COCA II § 9.4.

5.      Similarly, A2 and G2 diplomatic visas issued to the Construction Business workers do not permit independent contracting work at non-PRC facilities. Under 8 U.S.C. § 1227(a)(1)(C)(i), "[a]ny alien who was admitted as a nonimmigrant and who has failed . . . to comply with the conditions of any such status, is deportable." Thus, Construction Business workers holding A2 or G2 visas who perform private contracting work while in the United States are in violation of the conditions of their immigration status in the United States.

B.     The Illegal Scheme

6.     To date, the government's investigation has revealed that, among other things, Construction Business workers who were PRC nationals, and who were admitted to the United States for the sole purpose of performing construction work at the PRC Mission or other PRC diplomatic facilities pursuant to A2 or G2 visas, instead performed private contracting work at other sites not owned by the PRC.   These non-PRC-owned buildings included a private residence in Old Brookville, New York (the "Old Brookville Residence") and a private residence in Fresh Meadows, New York (the "Fresh Meadows Residence"), among numerous other locations.

7.     The investigation has further revealed that these Construction Business workers are compelled to perform construction work on private construction projects instead of construction work on PRC diplomatic facilities by means of physical restraint, serious harm and threat of serious harm, and abuse and threatened abuse of law and legal process, in violation of United States law.   In particular, the investigation has revealed that the Construction Business maintains a policy of forcing workers it brings to the United States to work as directed by threatening them with the loss of their houses in the PRC as well as the loss of large cash deposits, both of which are pledged as collateral as a condition of their employment in the United States and forfeited if they fail to work as directed or escape from Construction Business custody.

8.     As revealed by subpoena returns from the Construction Business, the defendant DAN ZHONG is the principal of the Construction Business's U.S. operations. Between 2001 and 2006, DAN ZHONG was an accredited diplomat to the PRC Consulate in New York City; between 2006 and November 2009, he was an accredited diplomat to the

PRC Embassy in Washington, D.C. Thereafter, ZHONG became a U.S. permanent resident and lost any diplomatic privileges and immunities he previously held.

9. As further revealed by subpoena returns from the Construction Business, the defendant LANDONG WANG is a manager of the Construction Business's U.S. operations and, in particular, is responsible for the deployment of A2 and G2 visa holders to specific work sites. LANDONG WANG was an accredited diplomat to the PRC Embassy in Washington, D.C. beginning in April 2001. After LANDONG WANG relocated to the New York metropolitan area in 2007, he lost his diplomatic privileges and immunities. He is currently without status in the United States.

10. The investigation has uncovered multiple persons who entered the United States as Construction Business A2 or G2 workers and thereafter escaped from Construction Business custody (the "Escapees"). The Escapees have confirmed that the Construction Business maintains a policy of forcing construction workers brought to the United States to work as directed by threatening them with the loss of their houses in China and the loss of large cash deposits if they either fail to work as directed or run away. The Escapees understood that they were not permitted to leave their residences or workplaces in the United States without consent of the Construction Business. Further, the Escapees have confirmed that the Construction Business has made efforts to track escaped A2 or G2 workers in the United States in order to render them to Construction Business facilities.

11. According to the Escapees, DAN ZHONG is the principal of the Construction Business's U.S. operations and LANDONG WANG is the Construction Business manager responsible for their work deployment. In particular, the Escapees have informed that LANDONG WANG seizes the A2 and G2 workers' passports upon their arrival

in the United States at their port of arrival, such as John F. Kennedy International Airport in

Queens, New York ("JFK Airport"), to ensure that they do not escape.

12.     The investigation has uncovered a debt bondage contract (the

"Contract") between the Construction Business and a PRC national (the "Victim") dated July

25, 2012, which LANDONG WANG sent via email to DAN ZHONG.   In the Contract, the

Construction Business agrees to pay Victim "a base salary of RMB8000 per month" equal to

approximately $1,180 at current exchange rates.[3]   The Contract also requires the Victim "to

pay a cash deposit of RMB150,000," equal to approximately $22,000 at current exchange

rates, with the understanding that the money would be returned to the Victim "upon

completion of the project" if the Victim "has not violated any of the stipulations in the

contract."   Those stipulations included, among other things, the Victim's agreement to "not

escape [the Construction Business's] management control and flee to the U.S. or a third

country."

13.     The Contract between the Construction Business and the Victim further

provides that in any of ten listed situations, the Construction Business would "mete out

administrative punishment and economic penalties depending on circumstances and

consequences, including repatriation to [the PRC], all costs and economic losses stemming

from the situation (e.g., sending people to search, escorting back to [the PRC], transportation,

room and board, wages, various risks and other assorted fees) will be the responsibility of [the

Victim], and [the Victim] will also be investigated for legal liabilities."   Among other

situations, the Contract provides that the Victim would be subject to such discipline for

---

[3]     "RMB" stands for the PRC currency Renminbi.   Additionally, all translations of
Chinese documents and translations are in draft form and subject to change.

"[w]ords or deeds detrimental to national prestige of [the Construction Business's] reputation that have harmful effects," "[s]ecretly liaison with overseas connections (or organizations)," "[s]ecretly working with a third party," "[s]ecretly leaving the Consulate General or the worksite or living quarters," "[f]leeing to the U.S. or third country," and "[s]pilling . . . [the Construction Business's] commercial secrets."

14.     The Contract also provides that if the Victim violates any of these specified items in the contract, the Construction Business "will no longer assume responsibility for [the Victim's] personal or political safety, [the Victim] will answer for all the consequences." The Contract also requires the Victim to agree that, in the event of any violation, "[the Construction Business] has the right to not return the entire amount of the cash deposit plus interest," "[the Construction Business] will no longer pay any further wages," and the Victim will be required to "compensate[] the fees paid by [Construction Business] for processing [the Victim's] exit and entry."

15.     The investigation has also uncovered numerous electronic communications further showing DAN ZHONG and LANDONG WANG's awareness that the Construction Business has been improperly utilizing A2 and G2 visa holders to perform contracting work. For example, on December 10, 2014, LANDONG WANG wrote to DAN ZHONG with the subject line "Planned demand for personnel and rotation request." In his email LANDONG WANG addressed DAN ZHONG as "Chief Zhong" and sought DAN ZHONG's help to obtain additional workers, noting that "The Project Office agrees to help us with a batch of invitation letters for personnel." Attached to the email was a memorandum on Construction Business letterhead signed by LANDONG WANG for the "Project Department, New York, USA" and addressed to the Construction Business "General

Manager," in which LANDONG WANG explained that "[o]ur company's Project Department stationed in the U.S. has a current staff of 46, with 35 in New York," and explained that 16 of the workers had been working in the United States for over four years and were asking to return to the PRC. In the memorandum, LANDONG WANG listed the construction projects that the Construction Business was working on in the United States at various PRC diplomatic facilities and then stated that "[i]n addition, the Project 304 that our company develops on New York's 5th Avenue has entered the renovation stage and personnel have been arranged to work on the renovation, resulting in a severe shortage of manpower." In context, there is probable cause to conclude that this is a reference to the project to construct a high-rise building at 304 Fifth Avenue in Manhattan for which a U.S. affiliate of the Construction Business was ostensibly the general contractor.

16. LANDONG WANG then asked "[i]s it possible to arrange for the five people in China who have already had their visa to come to the U.S as soon as possible to continue with the rotation process?" The memorandum continued, explaining that "The Project Office of the PRC Mission has agreed to arrange for another group of people from our company to come to the U.S. The Project Department has submitted to China its planned demand for people of all types of specialized work; don't know if the company has readied the manpower that's required by the Project Department. If so, please submit your notification as soon as possible, for the purpose of furnishing invitation letters." Based on the context of the memorandum, I believe that LANDONG WANG was explaining to the Construction Business management in the PRC that the Construction Business workers present in the United States on diplomatic visas were being used to perform construction work on a building on Fifth Avenue in Manhattan, and that LANDONG WANG had requested that

the PRC Mission provide invitation letters to the U.S. Department of State to obtain A2 or G2 diplomatic visas that would authorize the Construction Business to bring additional PRC construction workers to the United States to work on the site at Fifth Avenue, among other projects, even though the site at Fifth Avenue was not a PRC diplomatic facility.

    C.    The Housing Inspections

    17.    In 2011, housing authorities conducted several inspections of sites where the Construction Business houses its A2 and G2 workers. These inspections demonstrated the defendants' role in the forced labor conspiracy outlined above.

    18.    For example, on or about February 9, 2011, members of the Jersey City Mayor's Task Force, including members of the Jersey City Police Department, Fire Department, Housing Code Enforcement, the U.S. Department of Homeland Security, Immigration and Customs Enforcement, and other agencies (collectively, the "inspectors"), responded to a single-family attached row house located at Pavonia Avenue in Jersey City, New Jersey (the "Pavonia Avenue Premises"), in response to a complaint about potential alien trafficking involving a white van that retrieved ten to twelve Asian men every morning at 8:00 a.m. from the Pavonia Avenue Premises and returned ten to twelve Asian men to the Pavonia Avenue Premises every evening at approximately 8:00 p.m. In anticipation of inspecting the Pavonia Avenue Premises, an inspector performed physical surveillance and observed that after multiple Asian males were dropped off at the Pavonia Avenue Premises by a van, the Pavonia Avenue Premises was locked from the outside by a deadbolt, trapping these Asian males inside.

    19.    During inspection of the Pavonia Avenue Premises, inspectors observed that the Pavonia Avenue Premises was divided into sleeping quarters to accommodate 28

boarders.   The basement was converted into 12 computer work stations with what appeared to be homemade electrical wiring.   Among the housing and fire code violations observed were the means of egress locked from the outside by double-key cylinder locks.   During the inspection, inspectors encountered 14 adult Asian males.   All of the Asian males claimed not to speak English and were not in possession of any forms of identification.   After inspectors contacted the PRC Consulate General in New York and the Construction Business, the defendant LANDONG WANG and several other Construction Business employees arrived with passports belonging to the Asian males.   The bearer of the passports indicated that he had been sent personally to the Pavonia Avenue Premises by DAN ZHONG.   The passports reflected that the residents of the premises were all PRC nationals, holders of A2 or G2 United States visas and employed by the Construction Business.

20.     One Construction Business employee, who appeared visibly nervous, identified himself as an employee of a U.S. affiliate of the Construction Business and admitted that he occupied the upper bedroom at the Pavonia Avenue Premises, where he occasionally slept.   According to this employee, all of the Construction Business workers were lawfully present in the United States and working at the PRC Consulate in New York. The employee claimed that he was unaware that the conditions of the Pavonia Avenue Premises violated any applicable housing or fire codes.   He further identified the other Construction Business personnel present, including LANDONG WANG as a manager for the Construction Business, and stated that DAN ZHONG is the point of contact for the Construction Business.

21.     Due to the hazardous condition of electrical wiring and outlets, inspectors deemed the Pavonia Avenue Premises uninhabitable and requested that all tenants

vacate immediately. Before he left, LANDONG WANG took possession of the passports of the 14 Construction Business workers who were residing at the Pavonia Avenue Premises. All 14 residents then departed in a Construction Business van.[4]

22.     Similarly, on or about February 20, 2013, inspectors assigned to the Jersey City Mayor's Task Force performed an inspection of a series of apartments located at Summit Avenue, in Jersey City, New Jersey (the "Summit Avenue Premises"). During the inspection, inspectors encountered multiple single residence occupancy apartments housing multiple Chinese workers employed by the Construction Business. The inspection revealed numerous housing violations, including overcrowding, an illegal cellar occupancy, and multiple beds located in kitchens of the apartments. Records of the inspection of the Summit Avenue Premises reflect that inspectors were met by two Construction Business employees.

D.     The Old Brookville Residence and the Fresh Meadows Residence

23.     On or about June 26, 2015, a special agent with the Federal Bureau of Investigation ("FBI") observed several construction workers who appeared to be Asian performing construction work at the Old Brookville Residence. A worker approached the special agent but could not communicate with the agent because of a language barrier. The

---

[4]     The next day, on February 10, 2011, the Jersey City Mayor's Task Force inspectors executed a judicially authorized search warrant at a residence on Wayne Street in Jersey City, New Jersey. During the search, members of law enforcement encountered 15 adult Asian males who were preparing to depart in a van waiting outside. None of these residents appeared to speak English. All of the residents were in possession of Chinese passports indicating that they were A2 or G2 visa holders employed by the Construction Business. Inspectors did not encounter any other tenants and deemed the premises uninhabitable, due to the hazardous conditions. At the direction of law enforcement, all of the residents left in the van that was waiting outside.

agent observed a grey Ford Econoline van bearing New York State license plate number DZL-4291 (the "DZL Van") parked at the Old Brookville Residence.

24.     Through this investigation, the government has obtained a copy of a "Proposal" for contracting conducted at the Old Brookville Residence sent in an email by LANDONG WANG on July 22, 2015 that sets forth the "scope of services" at the Old Brookville Residence.   In pertinent part, the "Proposal" provides: "No filing with the local department of buildings, No permits, No insurance or bond, No licensed plumbing and electrical trades will be used."   I believe that the "Proposal" explicitly provides that the local building or housing authority would be not notified of the construction work ("No filing with the local department of buildings, No permits") in light of the fact that the Construction Business workers were not permitted under the terms of their A2 or G2 visas to perform private contracting work.   Similarly, I believe that the "Proposal" excluded the participation of licensed workers ("No licensed plumbing and electrical trades will be used.") because of the potential that such persons, if present at the work site, would notify the relevant authorities of the misuse of Construction Business workers.   The investigation has shown that a U.S. affiliate of the Construction Business charged substantial sums for the contracting work at the Old Brookville Residence.   Specifically, in a June 24, 2015 letter from LANDONG WANG to the Old Brookville Residence's owner, WANG stated that the payment in the amount of $512,800 was overdue, which constituted 40 percent of what appears to be the overall charge of $1,282,000 for contracting work.

25.     On or about the morning of October 8, 2015, at approximately 8:29 a.m., FBI special agents observed a grey Ford Econoline van matching the description and bearing the license plate of the DZL Van arrive at the Fresh Meadows Residence.   Agents

observed several individuals who appeared to be Asian disembark from the DZL Van and go into the Fresh Meadows Residence. The DZL Van was then backed into the driveway of the Fresh Meadows Residence and seats were unloaded from the back of the van and placed in the driveway. The DZL Van then departed from the area at approximately 8:45 a.m.

26. Later in the morning of October 8, 2015, at approximately 10:00 a.m., HSI agents went to the Fresh Meadows Residence. There, agents observed construction workers who appeared to be Asian performing construction work on the residence. Agents approached the workers and identified themselves as law enforcement. In response to requests for the workers' identification, five workers stated in Chinese, in the presence of a Chinese-speaking linguist, in sum and substance, that they were citizens and nationals of the PRC employed by a construction company and were present at the Fresh Meadows Residence to renovate the first floor of the building. One of the workers additionally stated that they were members of the PRC "delegation." The workers stated that their identification was at the "delegation," but none of the workers had a means of contacting the "delegation" to retrieve the identification.

27. After the workers denied having a means of contacting the "delegation," a woman (the "Owner") came out of the Fresh Meadows Residence, provided a New York State driver license as proof of her identity, and stated that she was the owner of the Fresh Meadows Residence. A review of public records databases indicates that the Fresh Meadows Residence is in fact owned by the Owner. After agents identified themselves to her as law enforcement, the Owner stated, in sum and substance, that five of the workers were employees of the Construction Business, and that they were renovating the first floor of the Fresh Meadows Residence. The Owner further stated that she had obtained the services of

the workers through her friend "Wang," whom she identified as the "owner" of the Construction Business, which she had hired to perform this contracting work. The Owner later claimed that the work was being conducted at her home as a "courtesy," that she was paying only for the materials used, and that there was no contract for the work being done at the Fresh Meadows Residence.

28. The Owner thereafter called a person she identified as "Wang" and asked him to bring the workers' passports to provide to the "police." Approximately one and a half hours later, a silver minivan arrived at the Fresh Meadows Residence, and one of the occupants identified himself to agents as LANDONG WANG and presented a U.S. Department of State issued driver license as proof of his identity. LANDONG WANG, speaking in English, stated in sum and substance that the workers were employees of the Construction Business and members of the "Chinese delegation" present in the United States to perform construction work at the PRC Mission. LANDONG WANG further stated that he was the workers' supervisor.

29. LANDONG WANG claimed that the Fresh Meadows Residence was not owned by the PRC Mission and that the construction work was being performed out of "friendship," for "no charge," and that "no permits" had been obtained for the work.

30. LANDONG WANG provided agents with four of the workers' PRC Passports and a copy of the fifth worker's PRC Passport. Each of the passports contained A-2 or G-2 diplomatic visas issued by the U.S. Department of State. Each of the five workers' diplomatic visas stated "CONSTRUCTION WORKER FOR CHINESE MISSION TO UN RENOVATION PROJECT" and the name of the Construction Business. A review of the

associated applications for the visas indicates that LANDONG WANG was the point of contact for each application.

31.     Notably, law enforcement records indicate that the Owner is a native of China and a naturalized United States Citizen, that she is not registered with the U.S. Department of State as a diplomat of the PRC, and that the Fresh Meadows Residence and the Old Brookville Residence are not registered with the U.S. Department of State as PRC diplomatic facilities.

32.     At approximately 1:26 p.m. on October 8, 2015, after agents had departed from the Fresh Meadows Residence, agents observed a van matching the description of the DZL Van arriving at the Fresh Meadows Residence.   The DZL Van then backed into the driveway.   At approximately 4:00 p.m. agents observed the five workers boarding the DZL Van, and the DZL Van left the Fresh Meadows Residence at approximately 4:13 p.m. A query of New York State Department of Motor Vehicles records for the license plate of the DZL Van returned a registration for a 2007 Ford Econoline Van, registered to the Construction Business.

33.     Later in the evening of October 8, 2015, special agents of the FBI interviewed LANDONG WANG at his home in Jersey City, New Jersey (the "Jersey City Address").   During the interview, LANDONG WANG stated, in sum and substance and in part, that the Owner works for an international airline company (the "Airline") and that WANG met her through his frequent travel between China and the United States on the Airline.   LANDONG WANG stated that the Owner helps him to transport goods to China that he purchases in the United States.   He stated that the Owner utilizes friends and Airline passengers to carry these goods back to China.   LANDONG WANG identified these goods

as medications and Construction Business documents, such as contracts and paperwork requiring certification.

34.     LANDONG WANG stated that the project on Long Island, referring to the Old Brookville Residence, was a project of a U.S. subsidiary of the Construction Business.   He admitted that some of the workers that he utilized for the Old Brookville Residence and Fresh Meadows Residence were employees of the Construction Business.   He further stated that the Owner was his point of contact for the Old Brookville Residence project and that the actual owner of the Old Brookville Residence was a rich PRC national.

35.     On or about October 19, 2015, law enforcement learned that six Construction Business employees present in the United States on diplomatic visas, including two of the Construction Business employees who had been interviewed by law enforcement at the Fresh Meadows Residence, were booked on an Airline flight scheduled to depart from JFK Airport to Beijing, China the same day.   At JFK Airport, agents, assisted by interpreters, conducted interviews of the six Construction Business employees booked on the flight (the "Passengers").

36.     During the interviews, each of the Passengers identified their employer as the Construction Business and identified LANDONG WANG as their boss.   The Passengers further stated that LANDONG WANG kept their passports while they were in the United States.   Additionally, two of the Passengers admitted that they had worked at the Fresh Meadows Residence, among other non-PRC-owned buildings.   One of the Passengers, whom agents had observed working at the Fresh Meadows Residence on October 8, 2015, stated that he lived at a three-story home in New Jersey with twelve other Construction Business workers who were supervised by LANDONG WANG.   This Passenger further

stated that he had not originally intended to return to China so soon and had learned about the return to China from LANDONG WANG only five or six days earlier. I believe the Construction Business arranged the return of these workers to the PRC immediately after learning of U.S. law enforcement interest in their activities.

37. Following the interviews, agents served each of the six Passengers with grand jury subpoenas requiring them to each appear and testify before a grand jury in the Eastern District of New York on Wednesday, November 4, 2015. While the Passengers were being interviewed, the Airline flight on which they were booked departed for Beijing. As the Passengers had missed their flight to Beijing, agents attempted to contact the Construction Business to secure transportation and lodging. At approximately 11:30 p.m., an employee of the Construction Business and a private investigator hired by the Construction Business arrived to retrieve the Passengers. Agents notified these individuals that the Passengers had been served with grand jury subpoenas requiring their appearances on November 4, 2015.

38. The next day, on October 20, 2015, agents learned that the six Passengers were all rebooked on a United Airlines flight from Newark Liberty International Airport ("Newark Airport") to Beijing departing at noon. Further investigation revealed that these tickets had been purchased on October 20, 2015. Agents at Newark Airport interviewed the Passengers before they boarded the flight and received assurances from each of the Passengers that they were aware of their obligations to appear in the grand jury and that they intended to return to the United States by November 4, 2015 to appear before the grand jury. The Passengers further stated that the defendant LANDONG WANG had purchased their airline tickets for October 20, 2015 after they missed their initial flight to Beijing, China. The Passengers have not yet returned to the United States.

39. Notably, one of the six Passengers who departed on October 20, 2015, was one of the individuals found to be located at the Pavonia Avenue Premises in February 2011. As described above, LANDONG WANG helped present and retrieve the A2 and G2 construction workers' passports to the housing inspectors during this incident. That same Passenger is a citizen and national of the PRC, who stated during his outbound interview with law enforcement that he had entered the United States as a Construction Business employee to work on the renovation of the PRC Mission but performed private contracting work at the non-PRC facility Old Brookville Residence.

40. According to records provided by the Construction Business pursuant to a grand jury subpoena, LANDONG WANG and the Construction Business have repeatedly used A2 and G2 visa holders, who are ostensibly employed by the Construction Business to work at PRC diplomatic facilities in the United States, to construct the building at 304 Fifth Avenue in Manhattan. According to visitation records provided by the Construction Business pursuant to a grand jury subpoena, DAN ZHONG visited this work site on numerous occasions.

41. Based on my training, experience, and knowledge of this case, I believe that LANDONG WANG knew that it would be illegal under U.S. law to use A2 and G2 visa holders to perform private contracting work in the United States. As noted above, a review of the associated applications for the visas for the Construction Business workers at the Fresh Meadows Residence indicates that LANDONG WANG was the point of contact for each application. The visas themselves, which were in LANDONG WANG's possession, indicated that the A2 and G2 visa holders were only entitled to work at the PRC Mission. Moreover, the investigation has uncovered communications between the Owner and

LANDONG WANG in which the Owner sought contracting work on the Fresh Meadows Residence, and LANDONG WANG responded that he would not be able to provide workers immediately, since he had to send a "group to go to Chicago to rebuild the Consul General's residence."

42.     Similarly, the investigation has uncovered numerous electronic communications during the summer and fall of 2015 between the Owner and DAN ZHONG in which the Owner requested deployment of Construction Business workers to the Fresh Meadows Residence or the Old Brookville Residence, and DAN ZHONG responded that he would send LANDONG WANG to address the situation or would personally verify the work status.   In another series of electronic communications, the Owner agreed to ship items for DAN ZHONG and the Construction Business through the Airline.   Additionally, DAN ZHONG agreed to accept a wire transfer of more than $100,000 through a third party so that he could later provide cash to the Old Brookville Residence's owner to use while in the United States.   In context, these electronic communications demonstrate DAN ZHONG's direction and control over, as well as knowledge as to, the illicit deployment of, A2 and G2 workers.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendants DAN ZHONG and LANDONG WANG may be dealt with according to law. I further request that this affidavit and the arrest warrants be filed under seal as disclosure of this application would give the targets of the investigation an opportunity to destroy evidence, harm, or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from or evade prosecution.

MATTHEW HARRIS
Special Agent, United States Department of
Homeland Security, Homeland Security
Investigations

Sworn to before me this
9 day of November, 2016

THE HONORABLE STEVEN L. TISCIONE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK