UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA        *     Case No. 16—MJ—1000(PK)
                                *
                                *     Brooklyn, New York
                                *     November 17, 2016
        v.                      *
                                *
DAN ZHONG,                      *
                                *
            Defendant.          *
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *

        TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
           BEFORE THE HONORABLE RAMON E. REYES, JR.
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:             ALEXANDER A. SOLOMON, ESQ.
                                DOUGLAS PRAVDA, ESQ.
                                Asst. United States Attorney
                                United States Attorney's Office
                                271 Cadman Plaza
                                Brooklyn, NY 11201


For the Defendant:              THOMAS FITZPATRICK, ESQ.
                                500 Fifth Avenue
                                33rd Floor
                                New York, NY  10110

Certified Interpreter:          MR. JOHN LIU




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 12:29 a.m.)

2          THE CLERK:  Criminal cause for detention hearing,

3    case no. 16-1000M.  United States vs. Dan Zhong.  Counsel,

4    please your name for the record.

5          MR. SOLOMON:  Alex Solomon for the government.

6    Good afternoon, Your Honor.

7          MR. FITZPATRICK:  Good afternoon, Your Honor.

8    Thomas Fitzpatrick for the defendant, Mr. Zhong.

9          THE COURT:  Good afternoon.

10         THE CLERK:  Also present is Mandarin interpreter,

11   John Lu, previously sworn.

12         THE COURT:  I have to admit that I have not had the

13   full opportunity to read the letters of -- I think they were

14   today or yesterday. I was just made aware of them at like 11

15   o'clock when I was coming to the hearing that you saw before.

16         So I skimmed as much as I could. I did read the

17   transcript of the hearing in front of Judge Lindsay and the

18   government's initial letter -- was it -- November 12th.

19         So I have some understanding of what's going on

20   here, but Mr. Fitzpatrick, do you have a package to present?

21         MR. FITZPATRICK:  Your Honor, we delivered a -- I

22   had a letter delivered to you today which includes a bail --

23   a memorandum or a bail package and background information on

24   the private security firm that we would like to monitor Mr. -

25   - confine Mr. Zhong to his home.  And it was delivered later

3

1   than it should have been, Your Honor.  We expected it to be

2   delivered at 8:30. I understand it didn't get here until

3   about 10:30.  That I apologize, but I would --

4          THE COURT:  Yes, but it also takes time to work its

5   way up from the mail room, so --

6          MR. FITZPATRICK:  Your Honor, I would, if possible

7   --

8          THE COURT:  Mr. Richardson emailed it to me at

9   11:00 and so I have it here on my computer.  I'm going to

10  pull it up.  All right.

11         So --

12         MR. FITZPATRICK:  Your Honor, I would ask, if

13  possible, that we have a brief adjournment so that you could

14  fully read all of this material.

15         THE COURT:  I don't think we need to adjourn.  Home

16  confinement, a million dollar bond secured by his home in

17  Livingston, New Jersey, which has 500,000 in equity.

18         Pretrial Services supervision -- this is what

19  you're proposing, not necessarily what I'm agreeing to. I'm

20  just reading a letter. Electronic monitoring, private

21  security firm to monitor the home 24/7.  That's the package?

22         MR. FITZPATRICK:  It is, Your Honor, but this is

23  not just any security firm.  This is not some storefront

24  security operation.

25         And if I may, I'd like to have the opportunity to

4

1    describe this company a little more.

2              THE COURT:  Go ahead.

3              MR. FITZPATRICK:  Your Honor, may I also indulge

4    you. Mr. Zhong is the president and owner U.S. Rilin

5    Corporation, one of the major focuses of this complaint.

6              He is -- his company has been represented by a firm

7    for at least the last year.  They know far more about it than

8    I do.  I've worked closely with them.

9              Would you mind if Ms. Fleming, a former AUSA in

10   Newark, and counsel for U.S. Rilin, comes up here in case I

11   have to confer with her?

12             MR. SOLOMON:  Your Honor, I don't think we have a

13   problem with whom Mr. Patrick -- Mr. Fitzpatrick chooses to

14   confer. I think we do have an issue if Ms. Fleming is, in

15   fact, representing this defendant, because I do think there

16   would be a clear conflict of interest.

17             MR. FITZPATRICK:  Your Honor, I'm not saying she's

18   representing him in his individual capacity, but the other

19   day before Judge Lindsay I had to ask for a brief adjournment

20   to go back there and talk to her.  It just makes it a little

21   easier.  That's all I'm asking.  She's not entering an

22   appearance on his behalf.

23             THE COURT:  Why don't you try to do it flying solo

24   and then if we need Ms. Fleming's help, we'll reach out to

25   her.

1          MR. FITZPATRICK:  Fair enough, Your Honor.

2          THE COURT:  So tell me about this firm, this

3     security firm.

4          MR. FITZPATRICK:  Guidepost Security, Your Honor,

5     is a global company that is run by a group of distinguished

6     former federal prosecutors.

7          The CEO who wrote the proposal letter, which Your

8     Honor has, Julie Meyers Wood, not only clerked for the Eighth

9     Circuit, she was an assistant United States attorney here in

10    the Southern Eastern District.  She went on to become become

11    assistant secretary of Homeland Security and ran its division

12    of -- called ICE, Immigration and Custom Enforcement.  She

13    ran that huge organization.

14         The other principals of the company are Bart

15    Schwartz, who's a former AUSA in Southern --

16         THE COURT:  I know him.

17         MR. FITZPATRICK:  A former chief of the criminal

18    division, as I was many years before him.

19         In addition, three other AUSA's from Southern -- or

20    two others, Andrew O'Connell and Joseph Jaffe.  Mr. Jaffe is

21    here in court today, Your Honor.  He and I served together in

22    the U.S. Attorney's Office, in fact, in the early '70's.

23    I've known him for over 40 years. I have enormous respect for

24    him.

25         They have provided this type of security several

6

1   times before.  They have been monitors on numerous occasions.

2   As I said, it's a global security company with a myriad of

3   former federal agents who work for them.

4            If they are given this assignment, they have been

5   out to the house, they've inspected it, they know what is

6   needed.  They will install alarms, sensors, monitors.

7            They will have two guards outside the house, front

8   and back, 24/7 in 12 hour shifts.  They will give the names

9   of those security officers to the government.  Nobody will be

10  allowed into the residence unless that visitor is pre-

11  approved by the court.

12           And anybody visiting has to surrender his or her

13  cell phone, will be searched and cannot enter the house with

14  more than $200 in cash. Mr. Zhong and his family will not be

15  allowed to have unauthorized electronic devices.

16           Your Honor, this is a very elaborate and expensive

17  operation, but it's that important to them to get Mr. Zhong

18  released from custody.

19           The very least of our problems is that he speaks

20  Mandarin.  He speaks no English.  It's going to be very

21  difficult for me to communicate with him and prepare his

22  defense, not to mention how difficult it is for him to live

23  at MDC.  He can't talk to anybody at MDC.

24           Your Honor, I submit that this company, Guidepost,

25  can do such -- such an adequate job that there is absolutely

1    no concern about his escaping.

2              Were he to find a way to do it, Your Honor, this

3    company's reputation would be ruined and they'd probably be

4    out of business.

5              THE COURT:  Oh, come on.

6              MR. FITZPATRICK:  This is the most --

7              THE COURT:  Come on.  That's overstating it.

8              MR. FiTZPATRICK:  Oh, really, Your Honor.  If he

9    were to --

10             THE COURT:  This prestigious group of former U.S.

11   Assistant U.S. Attorneys will be out of business.

12             MR. FITZPATRICK:  Your Honor, if they --

13             THE COURT:  I doubt it.

14             MR. FITZPATRICK:  If he managed to escape from that

15   house, Your Honor, because it's impossible for him to do it.

16   Impossible.

17             THE COURT:  What Mr. Richardson sent me does not

18   have the Guidepost proposal.

19             MR. FITZPATRICK:  It doesn't.

20             THE COURT:  No, no.  What he emailed to me, because

21   I haven't gotten the copy that you provided to the mail room

22   at 10:30.

23             MR. FITZPATRICK:  I can hand it up to you.

24             THE COURT:  All right.  Let me see.

25             MR. FITZPATRICK:  If it's going to be filed, I

8

1    asked that it be filed under seal.

2         (Pause.)

3              THE COURT:  All right.  What does this cost,

4    ballpark?

5              MR. FITZPATRICK:  About $144,000 a month, Your

6    Honor.

7              THE COURT:  Okay.  All right.  So doesn't that go –

8    – maybe I'm stealing your thunder, Mr. Solomon ––

9              MR. SOLOMON:  Go ahead, Your Honor. That's fine.

10             THE COURT:  But doesn't that –– and I read

11   somewhere that Mr. Zhong's family is going to pay for this.

12             But doesn't that undercut his –– what I sense is

13   he's trying to portray this modest –– you know, he's a man of

14   modest –– relatively modest resources.

15             He's got family that can pay $144,000 a month to

16   provide this security.  They could surely provide for him if

17   he uproots himself and his family elsewhere and loses the

18   house.  No big deal.  That's less than –– that's what?

19   That's three months?

20             MR. SOLOMON:  Yes, Your Honor.

21             THE COURT:  Four months, maybe.

22             MR. SOLOMON:  In terms of liquidity.

23             MR. FITZPATRICK:  Your Honor, he is, in fact, a man

24   of relatively modest means.  There's never been a dispute.

25   The government knows it.  We've never disputed it. He has

1    relatives in China of substantial wealth.  Correct.

2              Could one draw the inference that were he able to

3    escape and go back there they would presumptively support

4    him?  One could draw that inference, yes.  But he has to

5    escape, Your Honor.

6              This company is authorized to use all reasonable

7    force to stop him from escaping.  There is no reasonable way

8    he could escape.  There's just no way he could do it, Your

9    Honor.  So the wealth of his family in China I submit is

10   totally irrelevant.

11             MR. SOLOMON:  Your Honor, we do have concerns.

12             First of all, over this weekend Judge Lindsay did

13   indicate that she would be amenable theoretically to

14   releasing this defendant, should he be able to come up with a

15   proposal that called for a comprehensive system of home

16   confinement.

17             And we don't argue, necessarily, that that is what

18   Mr. Fitzpatrick is proposing.

19             However, we do have problems with the fact that

20   he's refusing, and has refused, to provide us information as

21   to who's actually paying these bills.

22             And this goes to the issue that Your Honor was

23   raising.  This defendant, in fact, have access to vast

24   resources.

25             As we outline in our letter on page 4 --

1          THE COURT:  Which letter?  The first letter or --

2          MR. SOLOMON:  This is the letter that we filed this

3     morning, Your Honor.

4          THE COURT:  Oh, okay.

5          MR. SOLOMON:  So just reading a few bullet points,

6     and this was the result -- this was the result of one or two

7     days of research, Your Honor.

8          So he's instructed a bank to transfer more than 3.5

9     million from a bank account of a limited liability company to

10    the bank account of an affiliated entity.

11         In September, 2015 alone he wired more than 6

12    million from the same bank account to Rilin in China.  He's

13    cashed numerous checks from Rilin, totaling at least $360,000

14    made out to cash, including $100,000 in February of 2015.

15         He's written many numerous checks out from Rilin,

16    this Chinese entity with whom he purportedly has no

17    affiliation, out to cash, $10,000 each. And writes rent

18    checks to the Chinese Consulate General.

19         Something Judge Lindsay was very concerned about

20    was the fact that should this defendant step into either the

21    Chinese Mission or the Chinese Consulate, there is nothing

22    that law enforcement can do about that, because those are

23    inviolate buildings that law enforcement from the United

24    States cannot enter.

25         And turning back to Judge Lindsay's directives, she

11

1   also was very concerned about encumbering and identifying --

2   identifying and encumbering assets that this defendant had.

3          And something that we're not satisfied at all with

4   is the identification of specific assets.  In fact, Mr.

5   Pravda's going to outline now specific concerns that we have

6   about disclosures that were made to pretrial services.

7          MR. PRAVDA:  Your Honor, in the Pretrial Services

8   report the defendant disclosed 150,000 in stocks, 70,000 in

9   savings retirement accounts and 100,000 (indiscernible) and

10  that totals is less than $350,000.

11         And yet in Mr. Fitzpatrick's letter, he proposes to

12  put up approximately $500,000, which he's represented is

13  coming from the defendant in a combination of cash and stocks

14  as part of a proposal to secure the defendant's release.

15         So the upshot here, Your Honor, is that the

16  defendant was not fully forthcoming in disclosing to Pretrial

17  Services what his assets are.

18         And he also reports $50,000 a month in income,

19  which is obviously quite inconsistent with this modest

20  lifestyle which he is supposed to be leading, together with

21  the financial picture that's presented here, as one of

22  somebody who doesn't have the kind of means either to pay

23  $144,000 a month for this private security, or to be able to

24  put up stocks and cash in an amount that would satisfy the

25  government's concerns.

12

1          So what Judge Lindsay instructed on Saturday was

2     that the defendant needed to identify all of those assets and

3     present a proposal by which his ability to access that money

4     would be restricted, such that the only access that he could

5     have would be for his personal living expenses.

6          And then he wouldn't be able to touch any of the

7     wealth that he or his family may control and that hasn't been

8     addressed at all.

9          THE COURT:  He and his immediate family.

10         MR. SOLOMON:  Correct.

11         THE COURT:  I mean, that doesn't -- I hear what

12    you're saying, Mr. Pravda, but that doesn't answer the

13    question of -- that the larger family, the extended family

14    that's going to be paying for this $140-whatever-thousand

15    dollars per month in security expenses.

16         There was something in one of the -- I think the

17    initial letter that the government wrote about a $2 million

18    payment --

19         MR. PRAVDA:  Yes, he wrote two checks, Your Honor,

20    totaling approximately $2 million to put just three, four

21    apartments in the Time Warner Center in Manhattan.

22         THE COURT:  And who are those apartments for?

23         MR. PRAVDA:  Well, Your Honor, the government's

24    understanding is that no one is currently living in those

25    apartments.

1          THE COURT:  And so he owns them is your

2  understanding?

3          MR. PRAVDA:  I think that he --

4          THE COURT:  You don't know.

5          MR. SOLOMON:  Your Honor, to be clear, his family

6  and the company own these apartments through a series of

7  straw companies.

8          MR. PRAVDA:  They're limited liability entities,

9  which he wrote those two checks for the part of the down

10  payment for the purchase of those apartments.

11          THE COURT:  And the checks were drawn on --

12          MR. SOLOMON:  On Rilin accounts.

13          THE COURT:  Rilin accounts.

14          So your concern is he has access to Rilin's

15  capital.

16          MR. SOLOMON:  He has access to tens of millions of

17  dollars in Rilin capital and we don't know how that would be

18  used.

19          MS. FLEMING:  Your Honor, may I be heard on the

20  company's account, because we've taken steps on the company

21  accounts.

22          MR. PRAVDA:  Those are assets that could be used,

23  for example, not only to aid in his flight -- not only to aid

24  in his flight, but also potentially to compensate any suretor

25  that might be required to put up money as part of a release

1    package.

2            As Your Honor noted, you know, given the

3    significant wealth this family has, you know, posting the

4    house, if he were to choose to uproot himself and go back to

5    China with his family, the value of the house is going to be

6    meaningless in terms of keeping him here, because that's

7    something he can afford to lose based on the value of the

8    assets that are accessible to him by virtue of his family's

9    significant wealth.

10            THE COURT:  Why don't you come on up, Ms. Fleming.

11            MS. FLEMING:  Thank you, Your Honor.  Cathy Fleming

12   of Fleming Ruvoldt.  I do represent U.S. Rilin, which has

13   been cooperating and produced many documents in response to

14   grand jury subpoenas.

15            The apartments in question are owned by a company –

16   – that owns them it is their family members. The company is

17   owned by his cousin and his aunt, who are over in China, and

18   they own those apartments.

19            What the company has done, and I have not had the

20   opportunity since he's been at the MDC to talk to him, but

21   what the company is putting in place and planning to do is

22   that while these charges are pending, Mr. Zhong will not be a

23   signatory on any account and he will not be actively running

24   the company.

25            He will be informed on what's going on, but we are

1    taking steps and we've already drafted trust instruments.  I

2    was planning to speak with them.

3              It's been a busy week, but I was planning to speak

4    with them and work in with counsel who would be an

5    appropriate trustee to take over and would be acceptable.

6    He will not have access to any accounts that are on the Rilin

7    name.

8              When the package was being put together, we were

9    being asked -- the reason I believe that it's reflected

10   mechanics to be discussed, is because of the accounts.

11             It was figured out that we could figure out how to

12   do it and pledge them in such a way that the government would

13   be comfortable no one would have access to the personal

14   accounts that are there. And part of the problem simply was

15   in the time to figure out what was where.

16             But in terms of all company accounts, he is going

17   to be taken off as a signatory on any account. So he will not

18   have access to any of those funds.

19             In terms of who's going to pay, it hasn't been

20   worked out.  They are in China.  He has family members, many

21   of whom are very wealthy.

22             Whatever mechanic comforts the court in terms of

23   doing that, we can satisfy.  There's a huge enterprise in

24   China called Rilin Enterprises.  They own many industries in

25   China.  There's a ship building business.  There's a major

1      construction business.

2              There's a huge Swabian business that does --

3      Swabian factory that makes oil and does a byproduct for a

4      very large (indiscernible) products that are over there.  It

5      is a very large -- they own a port across from North Korea,

6      interestingly enough.  They have real estate throughout

7      China.

8              Whatever satisfies the court, I believe that in

9      terms of if the court wants the family to post security, I'm

10     sure the family would be willing to do that.

11             The feeling I believe was that because there is

12     wealth the private security was the way to assure the court -

13     - and I know Mr. Jaffe's here in court, and can to talk to

14     the court about how it works, but I believe the feeling was

15     that that would the most amount of security to the court.

16             But in terms of bank accounts and the rest of if,

17     Mr. Zhong is not going to have active control of it and the

18     company is not going to have him having any signatory

19     authority over it at all.

20             So I can represent that to the court and we are

21     going to work with the government and let them know who will

22     be taking over and a trust instrument that will be in place

23     with that.

24             MR. PRAVDA:  Your Honor, I think that's something

25     that needs to happen before we should come back here and

17

1    discuss the potential of the defendant's release on bail.

2             Just to put in -- maybe just to crystalize a little

3    bit why the government's so concerned about the source of the

4    money and the defendant's refusal to acknowledge it is that

5    the defendant's uncle, (indiscernible) Wong, is the principal

6    of the construction business that referenced in the

7    complaint.

8             He is the one who has these vast sums of wealth. He

9    is also connected obliquely to the security firm that the

10   defendant is proposing to use in that the husband of the CEO

11   is (indiscernible) Wong's attorney.

12            He has represented to the United States Attorney's

13   Office that he represents the defendant's uncle and so that

14   presents a significant concern for us as to who's actually

15   going to be controlling the security company.

16            That's why we repeatedly asked Mr. Fitzpatrick who

17   was putting up the money to pay for the security company.  In

18   fact, Mr. Fitzpatrick refused to tell us.  That was a

19   significant concern for us because we feel like we're not

20   really getting full visibility.

21            THE COURT:  Is this --

22            MR. PRAVDA:  I'm sorry?

23            THE COURT:  Is this a bailable case?

24            MR. PRAVDA:  Your Honor, I think in the

25   government's view there is no combination of conditions that

1     would permit the defendant's release on bond.

2               MR. SOLOMON:  I think one thing to keep in mind,

3     Your Honor, is you know, first of all, these are extremely

4     serious charges.

5               The defendant's facing a significant period of

6     incarceration.  We're talking about forced labor, the use of

7     forced labor to do construction work -- you know, contracting

8     work competing against U.S. workers here in the U.S.  This is

9     a very serious set of charges.

10              And if we look at the co-defendant, who was given

11    the opportunity to stay and address the charges or flee to

12    China, he chose to flee.

13              We believe that Mr. -- the defendant in this case

14    would do exactly the same thing.

15              MS. FLEMING:  Your Honor, I can address that as

16    well, because we've been working on the case.

17              And what the government hasn't told the court, and

18    a lot of it's under seal, but there is active litigation

19    that's currently pending in the Second Circuit relating to

20    the issue of whether the Chinese workers -- and Mr. Dan is

21    not a Chinese worker.

22              He was when he initially came over.  He got

23    permanent status here.  He doesn't work at China Rilin.  He

24    doesn't have an office in the China Mission. He works at U.S.

25    Rilin. Regardless of whether the families have related

1    businesses, he is not in the same position.

2         The Chinese workers that live in the mission and

3    live in homes that work in the mission and those other

4    places, including the co-defendant, come in and they have

5    diplomatic visas, A2 and G2 visas.  They have asserted

6    immunity.

7         There have been communications between the State

8    Department and China as to whether they -- China has asserted

9    immunity.  The State Department may have (indiscernible).  We

10   are actively litigating in on behalf of some of the workers.

11        The workers have independent counsel, Marjorie

12   Pierce.  She came into court today because they arrested one

13   of them at the airport leaving yesterday.

14        On November 9th, the State Department delivered

15   letters to the -- to China saying that Landong, the co-

16   defendant and the other worker's status changed.

17        Landong as of -- I think he had a day's notice and

18   the other workers as of tomorrow. They are in a completely

19   different position.

20        So they were told that their status would change as

21   of the end of this week and that the United States would no

22   longer given them the ability to assert immunity.

23        It's a completely different situation here and it's

24   really unfair to suggest that because Landong did this and

25   met with them. I understand they pitched him on staying.  He

1   declined to do so. It's very different and it's really unfair

2   to say apples and oranges. It's completely different.

3          MR. SOLOMON:  Again, with all due respect, we

4   question whether Ms. Fleming is representing the company, or

5   the company and the defendant in this case.  That is a

6   serious concern here.

7          MS. FLEMING: I'm an officer of the court.  And I

8   think the facts should be out before the court.

9          He is the owner of the company I represent.  We are

10  taking the steps to do what we need to do with this company,

11  and I think that we are taking the responsible steps.

12         This is the gentleman who has instructed the

13  company to comply with all the subpoenas as recently as a

14  week ago, when they asked us to comply with a subpoena over a

15  weekend and we did.

16         I think it's fair for me as an officer of the court

17  to stand here and correct facts.

18         THE COURT:  Mr. Zhong has how many children?  Two

19  adult children?

20         MR. PRAVDA:  He has three children.

21         MS. FLEMING:  He has three, Your Honor.

22         MR. PRAVDA:  Three children.  Two adult children

23  and one living in the house with him.

24         MS. FLEMING:  There's an eight year old daughter,

25  who's an American citizen born here, and he has two older

1  children.  One attends NJIT and one is in NYU Dental School.

2  His daughter at dental school I believe is an American

3  citizen.  His eight year old's an American citizen. I believe

4  his stepson, I think it is, is a green card holder, as is he

5  and his wife.

6        MR. PRAVDA:  Again, Your Honor, Ms. Fleming did not

7  represent this defendant, so we object to her arguing on

8  behalf of this defendant at the bail hearing.

9        She represents the company.  She has told this

10  court just now that U.S. Rilin and  China Rilin entirely

11  separately businesses.

12        That's contradicted by significant documentary

13  evidence that the government has obtained, including the fact

14  that Mr. Zhong, who according to them, is the principal of

15  U.S. Rilin, is writing all of the these checks on the

16  accounts of China Rilin.

17        MS. FLEMING:  I think we'll fight about that at

18  another time, Your Honor, but we've provided the

19  documentation from New York State showing U.S. Rilin as a New

20  York corporation.

21        We'll argue later as to whether they think they've

22  pierced a corporate veil or whether they're related companies

23  or affiliates.  But they are separate corporations.

24        MR. PRAVDA:  And they are operating together

25  through numerous shell companies, numerous limited liability

1   companies.

2           THE COURT:  So --

3           MR. PRAVDA:  Money is flowing through the bank

4   accounts to all of these companies.

5           MR. SOLOMON:  I think turning back to your initial

6   question, Your Honor --

7           THE COURT:  Is there anything -- yes.  My initial

8   question is this a bailable case?

9           MR. SOLOMON:  We don't think so, given the

10  seriousness of the charges, given the fact that the co-

11  defendant fled when given an opportunity to stay and fight

12  the charges.

13          Given the fact that all of these workers have been

14  fleeing the country the last several days, who are all

15  subject to grand jury subpoenas.

16          We have every concern that should this defendant be

17  given the opportunity, however narrow, to escape, he will.

18          And also we don't have any feeling of security that

19  we have a full handle on all the defendant's wealth and that

20  the defendant's wealth should be encumbered before he is

21  allowed to be released on bond.

22          MR. PRAVDA:  And he doesn't have to flee the

23  country to escape, Your Honor.  He could walk into the

24  Chinese Consulate or the Chinese Mission and the government

25  would have no ability to recapture him.

23

```
1              MR. FITZPATRICK:  Your Honor, on the question of
2    this Landong who fled, the government says he fled.  As I
3    understand it, Ms. Fleming pointed out to you he was told
4    that in 24 hours, as I understand it, his diplomatic immunity
5    was going to be withdrawn.
6              I also understand that he met with the prosecutors
7    with counsel and they offered him certain conditions by which
8    he could stay in this country or he could choose to go home
9    and he chose to go home and they knew it.
10             So I think it's a gross distortion of the record to
11   say he fled and these employees chose to leave.  The
12   government knows everyone who's leaving.  They go to the
13   airport to question them.  These people did not flee.  They
14   chose to go back to China.  And that's a total distortion.
15             And secondly, Your Honor, the question of his
16   wealth, there's no dispute his family has money.  We don't
17   dispute that.
18             But they're claiming that if you let him out, he
19   walks into the Chinese Mission, that doesn't cost him
20   anything more than a PATH trip to get over here to do that.
21   But that's got nothing to do with his wealth.  His wealth is
22   irrelevant if he can't get out of his house.
23             And this particular company is guaranteeing that
24   the can't escape from that house even if he were inclined to.
25             MS. FLEMING:  Your Honor, it's probably also worth
```

1    pointing out that during the time of the this investigation,

2    while the company was producing records, Mr. Zhong went to

3    China and came back.  Gave notice of his trips, dates when he

4    was going, dates when he was coming back to the government.

5    He was interviewed at the borders both ways.

6           He went.  He came back.  He chose -- it is a factor

7    that the court should know.

8           And this access to wealth, if the company takes

9    away his ability to have access of the company bank accounts,

10   any of them, any company bank accounts, I don't understand

11   how they think he's going to get access to his

12   (indiscernible).

13           MR. SOLOMON:  Well, there is the matter, Your

14   Honor, that should any members of the diplomatic mission or

15   the consulate community -- consulate community from the PRC

16   decide to visit this defendant at his home in New Jersey,

17   there's nothing that a private security firm can do to

18   prevent them from entering that house.

19           MR. FITZPATRICK:  There is, Your Honor, because you

20   have to okay it.  Nobody gets access unless approved by the

21   court.

22           THE COURT:  But they're entitled to immunity,

23   right?

24           MR. SOLOMON:  Yes.

25           THE COURT:  You're saying they can violate court

1    orders?

2            MR. SOLOMON:  Yes.

3            MR. FITZPATRICK:  They could what?  Get into the

4    house?

5            MR. SOLOMON:  Yes.

6            MS. FLEMING:  He would violate his bail condition

7    if that happened and they would tell on him.  They could call

8    the court. They could violate an order but he can't.

9            THE COURT:  Look.  This is interesting -- an

10   interesting dilemma.

11           I'm of the opinion, as I think Judge Lindsay was,

12   that this is a bailable case with the right conditions, the

13   right checks, but I don't -- I mean, I certainly don't see

14   them presented yet.  And I don't know how they would be

15   presented.

16           There are very serious charges facing Mr. Zhong.

17   Resources that are his disposal, apparently, that can make

18   him -- that can help him flee.

19           Those resources are not in his name necessarily,

20   but he has access to them so you could, at least -- the

21   resources you know about, the bank accounts you know about,

22   put something in place that shows that he can't access them

23   certified by the companies.  But you don't know what other

24   accounts there are out there. I don't know that the

25   government could ever, or the court could ever figure it out

1    for certain.

2           Part of a bail package is also to make it hurt, to

3    drive down the incentive the flee.  I don't know I could come

4    up with any amount that would make it hurt here.

5           The relatives in China apparently have a lot of

6    money at their disposal.  A $10 million bond?  They'd

7    probably laugh that off, right?

8           MR. SOLOMON:  We're talking about billionaires,

9    Your Honor.

10          THE COURT:  So --

11          MS. FLEMING:  How about surrendering his children's

12   passports?

13          THE COURT:  Well, I was going to say that part of

14   the package would be all of his children and his wife

15   surrender their passports, substantial cash put up front.  I

16   don't want to poo poo this security firm, because I think

17   that's a good condition to put on the package.

18          But I'm concerned about the things we don't know

19   about and how to guard against those assets being -- those

20   resources being utilized.

21          MR. JAFFE:  Your Honor, may I approach and address

22   that?  I'm Joseph Jaffe from the company. We have some

23   previous examples, one from this court, one from the Southern

24   District, that might give you some guidance here.

25          THE COURT:  All right.  Why don't you come on up.

27

1          MR. JAFFE:  Good afternoon, Your Honor.  Joseph

2     Jaffe, Guidepost Solutions, LLC.

3          Judge, we have been in this business since 1991 and

4     has provided this service to various courts in the Eastern

5     District, the Southern District, the Northern District.

6          The first one we did with any prominence was the

7     chief judge of the State of New York when he was arrested in

8     New Jersey and then confined on Long Island and we've had a

9     series since then.

10         Most recently in this court Jeffrey Webb was

11    released on bail.  We were selected by Webb, by the United

12    States Attorney's Office and approved by Judge Broderick.  We

13    confined him here in Brooklyn and then confined him in

14    Georgia until his bail terms were reduced and that type of

15    confinement was no longer necessary.

16         Mr. Webb posted more than $10 million in bail.

17    There were various surrenders of property that affected the

18    real hurt if he were to leave, and he had another inducement

19    and that was his family and the protection of the family.

20         A man named Ng, who's from Macau, who was a

21    billionaire held in New York, in the Southern of New York,

22    Judge Broderick wrote an opinion imposing conditions. I can

23    hand that up to you, if Your Honor wishes.

24         In that case there were multimillions of dollars

25    posted.  There was a PRB of about 50 million, with 20 million

1    in cash and assets posted.

2           He had slightly less connection to the community in

3    that this Mr. Ng has one small apartment in Manhattan.  We

4    did the same security work there.  We are present and still

5    on assignment there on a daily basis.

6           The issue in both of those cases, and I will point

7    out the one case in the Manhattan where this was rejected,

8    which was the Zarat (ph) case by Judge Berman, the difference

9    between Berman and all those other cases and this case is

10   real roots in this community.

11          There's a family that lives in a house that's

12   established.  The citizens have been part of the United

13   States --

14          MR. PRAVDA:  Your Honor, I apologize.

15          MR. JAFFE:   -- for --

16          MR. PRAVDA:  No, no, no.  Excuse me.  Excuse me.

17          THE COURT:  He's going to object.  He's going to

18   object to your argument.

19          MR. PRAVDA:  If you want to hear this presentation

20   to understand the adequacy of the security firm, that's one

21   thing.  And the government has no objection to that.

22          But for this individual to get up here and pitch

23   the court for the defendant's release on bond when first of

24   all, he's not an advocate for the party.  Second of all, he

25   has a private commercial interest in seeing his firm obtain

1    this contract.  That's inappropriate, Your Honor.

2         THE COURT:  I agree.  Tell me about --

3         MR. JAFFE:  We have provided monitorship services

4    and home security confinement services since 1991 at various

5    iterations.

6         We have been appointed monitors by this court, by

7    the Southern District of New York, by the United States

8    Securities Exchange Commission, by all the prosecutors,

9    federal prosecutors in the State of New York.  By all the

10   prosecutors and agencies in the City of New York.

11        No matter who pays for us, we report to the court.

12   We have allegiance only to the court.  Whatever condition the

13   court sets, we live by that condition.  In these situations

14   we usually report to Pretrial Services or to an agent or to

15   an assistant United States attorney.

16        We can on a daily basis provide logs of who's

17   there.  We can on a daily basis provide information about

18   what's going on there.  We are present inside and outside the

19   place where the home confinement exists.

20        There is monitoring going on electronically.

21   There's a bracelet that's worn which is provided by Pretrial

22   Services.  There are two shifts, 12 hours each.  If there's

23   any movement by anybody, there's an extra person in the car

24   added and a person at home to stand on to make sure it's

25   secure.

1             People are searched.  They have, as they did in the

2     Ng case, there's a Title 3 put up on the phone center there.

3     There's a key monitor on the computers that are there.

4        There's all kinds of electronic capability to know what

5     the defendant is doing on the one hand, and who's there on

6     the other hand, to make sure that it's regulated, to restrict

7     the traffic as to who's there, and in each of those cases

8     there's the consent by the defendant to use whatever lawful

9     force is necessary to keep him from escaping.

10             We've done this for years in various iterations for

11     various judges.  If you want us to refer you to them, we

12     will, and other agencies where we have the independence to

13     achieve whatever the court orders.  Thank you for your time.

14          MR. FITZPATRICK:  Has any of your people very

15     escaped?

16          MR. JAFFE:  No, sir.

17      (Pause.)

18          MR. SOLOMON:  Your Honor, I don't think that

19     changes the analysis.  We're not necessarily impugning the

20     credibility of this firm.

21            What we're saying is there is so much that we don't

22     know at this point that can't get comfort that all of this

23     defendant's assets have been appropriately encumbered and

24     that appropriate measures will be taken so that he cannot

25     step into consular or diplomatic space.

1          MR. FITZPATRICK:  Your Honor, I --

2          THE COURT:  Real property in the name of Mr. Zhong,

3     or his children, or his wife. What real property is there

4     other than the house?

5          MR. FITZPATRICK:  They have that house and his

6     daughter owns a home that Mr. Zhong paid for -- at least paid

7     a substantial portion of it.

8          Those are the only properties in the United States

9     that I'm aware of.

10          MR. FITZPATRICK:  And again, Your Honor, his wealth

11     avails him nothing if he can't escape the custody of

12     Guidepost Solutions.  It's his body, not his wealth --

13          THE COURT:  Here's what we're going to do.

14          I'm willing to enter a $10 million bond.  How much

15     cash bond can you put up of that?

16          MR. FITZPATRICK:  Your Honor, we have access --

17          THE COURT:  How much does the family --

18          MR. FITZPATRICK:  -- right now to a million

19     dollars.

20          MS. FLEMING:  Your Honor, I'm sure that his

21     relatives from overseas would wire money in. I'm sure that

22     whatever the court would be comfortable with --

23          THE COURT:  How about 5?

24          MS. FLEMING:  I'm sure they would do it.

25          MR. SOLOMON:  Your Honor, that just underscores --

32

1          THE COURT:  I understand.  I understand.

2          MR. SOLOMON:  -- the issues that we outlined

3     before.

4          THE COURT:  That's the dilemma that I pointed out

5     before.  You know, it doesn't hurt --

6          MR. SOLOMON:  Five million, 10 million, 20

7     millions.  It doesn't mean anything.

8          THE COURT:  It doesn't hurt, right?  But --

9          MS. FLEMING:  But the -- Your Honor asked --

10          THE COURT:  Five million in cash, $10 million bond

11     secured by the house in Jersey, and the daughter's house.

12     Every passport from the family, all the children, his wife,

13     himself.  Pretrial Services supervision.  Guidepost

14     monitoring.  Home detention, electronic monitoring.  Hold on.

15     Where is that letter?

16     (Pause.)

17          Travel restricted to New York City and the District

18     of New Jersey when he's not on -- not required to be in the

19     home.

20          Do we have the passport?

21          MR. FITZPATRICK:  Yes, Your Honor.  Pretrial has

22     it.

23          THE COURT:  Now here's the kicker.

24          Before he will be released, we need proof of

25     divestment from U.S. Rilin and China Rilin, whether it's in -

1          — I don't really care about the form.

2                    I want to make sure that he does not have access to

3          bank accounts at all, and he's not involved in the business.

4                    You don't want him involved in U.S. Rilin, right?

5                    MS. FLEMING:  I don't want him involved in U.S.

6          Rilin and we will take care of that. China Rilin is a little

7          more difficult because I don't think he has signatory

8          authority on it now, but we will make sure whatever we do --

9                    THE COURT:  You're telling me he wrote checks --

10                   MS. FLEMING:  He did. He did in the past.  He

11         worked for China Rilin the past. I'm talking about now, but

12         we will check it out.

13                   MR. SOLOMON:  That's -- no, Your Honor.  That's

14         directly at odds with what was represented in court Saturday.

15         There were representations made that this defendant had no

16         connections with China Rilin and how that tune has changed.

17                   MS. FLEMING:  In the past.  In the past he worked

18         for them.

19                   MR. PRAVDA:  There was -- the representation was

20         made that he never had anything --

21                   THE COURT:  I'll leave it to you folks to work out

22         what that proof is, but I want to -- well, I'm not on -- I'm

23         on tomorrow morning.  I don't know if you can get it done by

24         then.

25                   MS. FLEMING:  I'm going to need him physically

1    somewhere in front of a notary, which I can't do at MDC.

2          So I'm going to have the paperwork and perhaps when

3    he's produced will you guys come and he can sign the trust

4    and stuff in front of a notary and then we can give it to the

5    court?

6          I can't -- I have to get it in front of a notary

7    that he's divesting and signing trust agreements, et cetera.

8          MR. SOLOMON:  Respectfully, Your Honor, if it's

9    more efficient, I think it is the government's intent to

10   appeal any ruling that this defendant is bailable.

11         So maybe we should do that first, rather than going

12   through all the trouble of executing the paperwork.

13         THE COURT:  This is only on a complaint, right?

14         MR. SOLOMON:  Right.

15         THE COURT:  It's not indicted yet.  So you appeal

16   to the miscellaneous --

17         MR. SOLOMON:  Miscellaneous district judge.

18         THE COURT:  Do we know who's on miscellaneous duty?

19         MR. SOLOMON:  It's Judge Chen, Your Honor.

20         THE COURT:  All right.  Well, can we have a bond

21   that she could look at?  Something else?

22         UNIDENTIFIED:  (Indiscernible)

23         THE COURT:  Oh, firearm.  Oh, yes.  Definitely

24   surrender a firearm.

25         (Pause.)

35

1          THE COURT:  All right.  10 million and I said five

2    million in cash.  Oh, you got that.  Sorry.

3          MR. SOLOMON:  Addresses on both properties.

4          THE COURT:  Okay.  We'll get the addresses on both

5    properties.  Proof of divestment from U.S. -- it's R-I-L-I-N?

6          MR. FITZPATRICK:  Yes, Your Honor.

7          THE COURT:  And China R-I-L-I-N.  All right.

8          And what about sureties?  We want his wife?

9          MR. SOLOMON:  Yes, Your Honor.  And to the extent

10   they are going to be sureties, we would want an opportunity

11   to interview them.

12         THE COURT:  Uh-hm.  His daughter is in -- she's in

13   school. She's the one with the apartment?

14         MR. FITZPATRICK:  Sorry, Your Honor?

15         THE COURT:  The adult daughter is the one with the

16   house?

17         MR. FITZPATRICK:  Yes, Your Honor.

18         THE COURT:  But she's in school too?

19         MR. FITZPATRICK:  Yes.

20         THE COURT:  All right.

21         MR. FITZPATRICK:  While she's in dental school I

22   believe she also has an apartment in New York City.  But the

23   home I believe is in Uniondale, Long Island.

24         THE COURT:  She rents her apartment in New York

25   City?

36

1          MR. FITZPATRICK:  I believe so, Your Honor.

2          THE COURT:  All right. So it's the wife and the

3     daughter, and the adult son, even though he's a student.  How

4     about avoiding contact with certain people?  Who would that

5     be?

6          MR. PRAVDA:  Your Honor, I think that he would not

7     have contact with anyone from the mission or the consulate or

8     U.S. or China Rilin?

9          THE COURT:  Or what?

10         MR. PRAVDA:  U.S. and China Rilin, as well.

11         MS. FLEMING:  Your Honor, how could he not have

12    contact with anyone connected with U.S. Rilin -- I'm counsel

13    for them.

14         MR. PRAVDA:  I'm talking about employees, Your

15    Honor. Not counsel.

16         MS. FLEMING:  Well, or I mean -- all right.  There

17    may business decisions he has to be consulted on.  He's not

18    going to have any access to money, but he is going to have to

19    be consulted --

20         MR. SOLOMON:  I thought Ms. Fleming just

21    represented that this defendant will not have any future

22    place at U.S. or China Rilin.  And then she's just indicating

23    that he will be making decisions?

24         MS. FLEMING:  I thought what I said was he would

25    have no access to any money.  We might be consulting him on

1    business or transition, et cetera.

2           How about if there's any business it will be

3    conducted in the presence of counsel? If there's anything

4    that needs to be discussed, it will be with counsel present.

5        (Pause.)

6           THE COURT:  All right.  There you go.

7           You're going to go see her today?

8           MR. SOLOMON:  We're going to attempt to, Your

9    Honor.  She's been made aware of this application.

10          THE COURT:  You gave her a warning?

11          MR. SOLOMON:  We gave her a warning that there was

12   the possibility the defendant would be bailed out.

13          THE COURT:  All right.  Oh, yes.  Okay.  Anything

14   else?

15          MR. SOLOMON:  Yes, Your Honor. A couple of other

16   things.

17          First of all, there's the matter of a preliminary

18   hearing.

19          THE COURT:  Do you want a preliminary hearing?

20          MR. FITZPATRICK:  I'd love one Your Honor, but

21   they're going to indict him before we get to it, so can I

22   just explain to my client what he may be waiving at the

23   moment?

24          THE COURT:  Yes.

25          MR. FITZPATRICK:  Thank you.  May we step aside for

38

1    a moment?

2              THE COURT:  Sure.

3              MS. FLEMING:   Your Honor, I'll step back.  Thank

4    you.

5         (Pause.)

6              THE COURT:  Oh, did we have Guidepost monitoring on

7    that?

8              MR. PRAVDA:  I have a copy of it, Your Honor.   No

9    I don't --

10             MR. SOLOMON:  And also it doesn't indicate that

11   he's not allowed to go to the PRC Mission or the PRC

12   Consulate.

13             THE COURT:  Defendant must avoid all contact with

14   the following persons or entities.

15             MR. SOLOMON:  And then no. 3, the defendant must

16   avoid and not go to the any of the following locations.

17             THE COURT:  Oh.

18        (Pause.)

19             THE CLERK:  All right.  We're still on the record.

20             MR. FITZPATRICK:  Your Honor, on the advice of

21   counsel, Mr. Zhong waives a preliminary hearing.

22             THE COURT:  Okay.  All right.  Anything else?

23             MR. PRAVDA:  Your Honor, just a couple of things.

24             One on the release order, I assume that we can

25   represent to Judge Chen that the defendant would not actually

39

1    be released until all of these conditions are satisfied, like

2    the posting of the house, the daughter's house, and removing

3    him as the signatory on various bank accounts.

4              THE COURT:  Yes.

5              MR. PRAVDA:  Okay.  And the second thing is, Your

6    Honor, the government detained an individual on a material

7    witness warrant last night, or perhaps more accurately, early

8    this morning, who is a witness against the defendant.

9              The government had discussed this with Mr.

10   Fitzpatrick.  We're requesting that the court order a 415

11   deposition to take place today.

12             The witness was en route to China.  The government

13   had no wish to keep him in the country any longer than

14   necessary.  The idea is that the 415 deposition can take

15   place.  The government will then let the witness depart.

16             We have advised Mr. Fitzpatrick of exactly the

17   questions that the government intends to ask during this 415

18   deposition and giving him the -- we'll provide any necessary

19   documents to him that he needs to review, a small quantity,

20   Your Honor. It might be two or three documents.

21             And I know Mr. Fitzpatrick had concerns about that

22   he wanted to raise to the court.

23             MR. FITZPATRICK:  Your Honor, I have great sympathy

24   for people being held in custody, but I don't know who this

25   gentleman is.  They have told me the questions they want to

1   ask. Indeed they've accommodated me to the point of

2   suggesting some questions on cross examination. I'm very

3   appreciative.

4           But I don't know exactly how relevant this

5   gentleman's testimony is and what affect it would have on my

6   client at trial.

7           I cannot consent to participate in a Rule 15

8   deposition today.

9           MS. PIERCE:  Your Honor, if I may, Marjorie Pierce.

10          THE COURT:  Come on up.

11          MS. PIERCE:  I apologize for my attire.  I was in

12  my office kind of casual.

13          I have been asked to represent the witness,

14  Marjorie Pierce of Ballard Spahr.  So I'm introducing myself

15  to you.

16          And so if I can have an opportunity to consult with

17  my client when he arrives here. I understand he's en route,

18  and then we can discuss the scheduling of the deposition.

19          MS. FLEMING:  Let me just give you background, Your

20  Honor.

21          On behalf of the company, I told you there's a lot

22  of litigation going on with other grand jury subpoenas. There

23  were other people who left and went to China.

24          The company's position has consistently been --

25  this is China Rilin.  This is not U.S. Rilin.

1              But the company's position has consistently been

2     when a court issues an order, the company complies with court

3     orders.  Period.  And we have taken what we believe to be

4     appropriate steps in doing that.

5              We also believe it was appropriate to make

6     available to anyone who wanted to speak with independent

7     counsel, as opposed to company counsel with our advice, what

8     their rights were, somebody who looked only for their

9     individual interest, completely free of being tainted or

10    feeling that there's any pressure from the company if they

11    tell us about -- although I am a sweetheart, no one would

12    ever of accuse me of asserting any undue influence.

13    So Marjorie Pierce has been available to other witnesses.

14             We don't have a dog in this fight except to advise

15    the court there is ongoing litigation. It has been the

16    position of China and we have on behalf of the people, even

17    on behalf of those people, those we accept it without waiving

18    anything and asserting on their behalf their immunity.

19             And this is one of the people I understand who's

20    been advised by the department -- the State Department that

21    his time will run out tomorrow.

22             So I don't know if he's one of the people that had

23    a subpoena accepted or not, with a physical delivery, but if

24    it is, it's somebody where immunity was asserted.  Just so

25    you know, it is independent counsel.  The company doesn't

42

1    take a position, other than making that available and making

2    the court aware of the position of China and the other people

3    with regard to this and this ongoing dispute with the State

4    Department and China.

5              THE COURT:  So Ms. Pierce, you wanted to talk with

6    your client.

7              MS. PIERCE:  If I may, Your Honor.

8              THE COURT:  Is he on his way to the courthouse?

9              MR. PRAVDA:  Your Honor, he is currently at our

10   offices.

11             If I may, Your Honor, if the court wishes to

12   appoint independent counsel, we would recommend CJA counsel

13   be appointed for the defendant.  Obviously, nothing against

14   Ms. -- I apologize.

15             MS. PIERCE:  Marjorie Pierce.

16             MR. PRAVDA:  But quite clearly, she was brought on

17   by company counsel.  The company's interest is significantly

18   different from the interest of the individual workers.

19             So our recommendation would be that CJA counsel be

20   appointed to represent the witness so that he has truly

21   independent counsel.

22             MS. PIERCE:   Your Honor, I actually take some

23   great umbrage at that.  I am independent counsel for this

24   individual, as well as other employees. I have been involved

25   in this matter.  I think counsel was informed of my

1    involvement months ago.

2           I met with several of the employees and I am

3    independent counsel. I am not representing China Rilin.  I do

4    not represent U.S. Rilin.  I don't represent the entities.  I

5    represent the individuals and I would like an opportunity to

6    consult with this individual.

7           If he decides he doesn't want me to represent him,

8    then the court can appoint CJA counsel.  But I think it's his

9    entitlement to consult with me and then a decision to be

10   made.

11          And I do take some umbrage at it being suggested I

12   would not honor my obligations as an attorney.

13          MR. PRAVDA:  Your Honor, searches were executed

14   approximately a week ago upon two locations in New Jersey

15   where China Rilin was housing some of these workers who have

16   now departed from the country, despite having been served

17   with grand jury subpoenas.

18          Approximately, 20 workers were interviewed by law

19   enforcement agents and nearly all of them presented agents

20   with Ms. Fleming's business card, Ms. Fleming and counsel for

21   China Rilin and identified her as their lawyer.

22          MS. PIERCE:  The six individuals that I have

23   represented, Your Honor, are in China. So I have not met with

24   anybody.  Nobody has my card.  They're people that are here

25   in the states.

44

1          THE COURT:  All right.  I'll give Ms. Pierce the

2     opportunity to meet with the witness.

3          If he decides he wants someone else, he'll let us

4     know and we will appoint CJA counsel.

5          So you want to talk to him to find out whether to

6     go forward with the deposition?

7          MS. PIERCE:  I'd like to talk to him first to

8     introduce myself and to find out if he does want me to

9     represent him.  And assuming that he does want me to

10    represent him, then I will talk with him about the Rule 15

11    deposition.

12         I understand Mr. Fitzpatrick's position about the

13    timing of it. I do undersatnd also that his status expires

14    tomorrow.  And so I do want an opportunity to talk with him.

15    I would need the interpreter to assist me with that.

16         MR. SOLOMON:  Your Honor, in the interest of full

17    disclosure, we had already reached out to CJA counsel for

18    tomorrow, Ms. Ellen Nelson.  She is at our office presently

19    attending to this individual.

20         THE COURT:  Now?

21         MR. SOLOMON:  Yes.

22         MS. PIERCE:  Before being appointed.

23         THE COURT:  Why don't you get on over there and

24    talk to him?  Can you do the deposition tomorrow?

25         MR. SOLOMON:  Your Honor --

1          THE COURT:  -- to give Mr. Fitzpatrick a little

2     more time?

3          MR. SOLOMON:  We could do it tomorrow.  There's

4     been a lot of international pressure to allow this witness to

5     return to China as quickly as possible. We're available

6     tomorrow.  But I understand the witness really desires to

7     return to China today. And we also understand speaking to Mr.

8     Fitzpatrick that he's available.

9          Our questions as to this witness are quite simple.

10    We have a debt bondage contract with this witness' name on

11    it.

12         Our questions will simply be is -- there are

13    fingerprints on this contract.  Are those fingerprints yours?

14    Is this your contract?  Do you work for Rilin?  And who

15    pledged the collateral to assure your return to China upon

16    your completion of your work?  That's basically it.

17         We provided those questions to Mr. Fitzpatrick. I

18    don't think there's a lot of preparation required to defend

19    that deposition or to cross examine that witness.

20         THE COURT:  It's not heavy lifting.

21         MR. FITZPATRICK:  Your Honor, they know a lot more

22    about this case than I do, and he's going to be back in China

23    when they offer that Rule 15 deposition at trial.

24         I'm not going to participate in something like that

25    until I know exactly what that witness represents. I don't

46

1      even know how the testimony would be admissible. I haven't

2      even figured that out yet.

3                THE COURT:  If it's not admissible, it's not

4      admissible and it's just wasting their time.

5                MR. SOLOMON:  It's not admissible. He can still

6      make those arguments to the district judge.

7                THE COURT:  All right.  The deposition will go

8      forward.

9                MS. PIERCE:  When, Your Honor?

10               THE COURT:  Today.

11               MR. SOLOMON:  Thank you, Your Honor.

12               THE COURT:  If it's as simple as that.  If you're –

13     –

14               MR. SOLOMON:  It is as simple as that.

15               THE COURT:  If you're getting --

16               MR. FITZPATRICK:  Your Honor, they say --

17               THE COURT:  -- into 7 o'clock at night, you know,

18     I'll adjourn it until the next day.

19               MR. FITZPATRICK:  Your Honor, they say it's that

20     simple.  How do I know how that's going to impact Mr. Zhong

21     at trial when this guy's back in China?

22               THE COURT:  I think you can figure it out.

23               MR. SOLOMON:  Then the company can bring him back.

24               MS. FLEMING:  He might not have status to come

25     back.

47

1          THE COURT:  Yes.  All right. Anything else?

2          MR. SOLOMON:  No.  Thank you, Your Honor.

3          MS. FLEMING:  Thank you, Your Honor.

4          THE COURT:  Thanks.

5          MR. FITZPATRICK:   Thank you.

6      (Proceedings concluded at 1:58 p.m.)

7

8      I, CHRISTINE FIORE, court-approved transcriber and

9  certified electronic reporter and transcriber, certify that

10  the foregoing is a correct transcript from the official

11  electronic sound recording of the proceedings in the above-

12  entitled matter.

13

14

15  _____          November 18, 2016

16      Christine Fiore, CERT

17

18

19

20

21

22

23

24