DMP:AAS/ICR
F. #2015R01787

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                         Docket No. 16-CR-614 (DLI)

DAN ZHONG,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS PRETRIAL MOTIONS *IN LIMINE*


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Alexander A. Solomon
Douglas M. Pravda
Ian C. Richardson
Nicholas J. Moscow
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 2

    I.      The Defendant's Role in the Forced Labor Scheme Since 2001 ............................ 2

    II.     Evacuation of Potential Witnesses by Rilin ........................................................ 4

    III.    The Redfield Affidavit ...................................................................................... 9

    IV.   Arguments by Defense Counsel Concerning the Forced Labor Scheme .............. 12

ARGUMENT ................................................................................................... 13

    I.      The Court Should Admit Evidence of the Defendant's Participation in the Forced
        Labor Scheme Occurring While He Was an Accredited PRC Diplomat ......................... 13

           A.    Legal Standard ................................................................................. 13

           B.    Proof of the Defendant's Conduct Before November 2009 Is Direct
                Evidence of the Charged Forced Labor Scheme ...................................... 15

           C.    Proof of Earlier Criminal Conduct Is Admissible Under Rule 404(b) to
                Show Intent, Plan and Knowledge ........................................................ 17

    II.     The Court Should Admit PRC Legal Documents as Verbal Acts ........................ 18

    III.    The Court Should Preclude Introduction of Evidence or Argument Regarding the
        Legality of Forced Labor or of Debt Bondage Contracts in the PRC ............................ 19

    IV.   The Court Should Permit the Victims to Testify Using Pseudonyms .................. 22

    V.     The Court Should Admit Copies of Documents in the Possession of Victim
        Workers as They Were Evacuated from the United States ................................ 27

    VI.   Evidence of Obstructive Conduct Is Admissible to Show Consciousness of
        Wrongdoing .................................................................................................. 28

    VII.   The Court Should Permit Redfield to Testify About the Circumstances
        Surrounding the Creation of the Affidavit ......................................................... 29

    VIII.  The Court Should Preclude Defense Exhibits Not Produced in Reciprocal
        Discovery .................................................................................................... 29

CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

Brady v. Maryland, 373 U.S. 83 (1963) ................................................................. 26

Butler v. United States, 992 F. Supp. 2d 165 (E.D.N.Y. 2014) ............................... 20

Delaware v. Van Arsdall, 475 U.S. 673 (1986) ..................................................... 25

Giglio v. United States, 405 U.S. 150 (1972) ......................................................... 26

Mueller v. Abdnor, 972 F.2d 931 (8th Cir. 1992) ................................................... 19

Rovario v. United States, 353 U.S. 53 (1957) ........................................................ 23

Swarna v. Al-Awadi, 622 F.3d 123 (2d Cir. 2010) ................................................. 16

United States v. Ahmed, No. 14-CR-277 (DLI), 2016 WL 8732355 (E.D.N.Y. June 24, 2016) . 20

United States v. Altman, 48 F.3d 96 (2d Cir. 1995) ................................................ 22

United States v. Ashburn, No. 11-CR-303 (NGG), 2015 WL 5098607 (E.D.N.Y. Aug. 31, 2015) ............................................................................................................... 19

United States v. Boulware, 384 F.3d 794 (9th Cir. 2004) ....................................... 18

United States v. Carboni, 204 F.3d 39 (2d Cir. 2000) ....................................... 13, 16

United States v. Celis, 608 F.3d 818 (D.C. Cir. 2010) (per curiam) ........................ 23

United States v. Chalmers, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) .......................... 20

United States v. Colon, 880 F.2d 650 (2d Cir. 1989) ............................................. 15

United States v. Concepcion, 983 F.2d 369 (2d Cir. 1992) ..................................... 14

United States v. Dupree, 706 F.3d 131 (2d Cir. 2013) ...................................... 18, 19

United States v. El-Mezain, 664 F.3d 467 (5th Cir. 2011) ...................................... 24

United States v. Everett, 825 F.2d 658 (2d Cir. 1987) ............................................ 14

United States v. Fiumano, No. S3 14-CR-518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ............................................................................................................... 20

United States v. Germosen, 139 F. 3d 120 (2d Cir. 1998) ...................................... 14

United States v. Gigante, 166 F.3d 75 (2d Cir. 1999) .................................................. 27

United States v. Guinand, 688 F. Supp. 774 (D.D.C. 1988) ........................................ 16

United States v. Gutierrez de Lopez, 761 F.3d 112. (10th Cir. 2014) .......................... 24

United States v. Inserra, 34 F.3d 83 (2d Cir. 1994) ..................................................... 14

United States v. Kaiser, 609 F.3d 556 (2d Cir. 2010) .................................................. 28

United States v. Khan, 591 F. Supp. 2d 202 (E.D.N.Y. 2008) ..................................... 13

United States v. Levy, 731 F.2d 997 (2d Cir. 1984) ............................................... 14, 15

United States v. Machado-Erazo, 951 F. Supp. 2d 148 (D.D.C. 2013) ....................... 24

United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995) ........................................ 28

United States v. Martino, 759 F.2d 998 (2d Cir. 1985) ............................................... 17

United States v. McCallum, 584 F.3d 471 (2d Cir. 2009) ............................................ 17

United States v. Mercado, 573 F.3d 138 (2d Cir. 2009) ......................................... 17, 18

United States v. Mickens, 926 F.2d 1323 (2d Cir. 1991) ............................................. 15

United States v. Naseer, No. 10-CR-19 (S-4) (RJD) (E.D.N.Y. Jan. 26, 2015) ..................... 24, 26

United States v. Ortiz, 857 F.2d 900 (2d Cir. 1988) .................................................... 15

United States v. Paris, 2007 WL 1484974, at *2 (D. Conn. May 18, 2007) ................. 25

United States v. Ramos-Cruz, 667 F.3d 487 (4th Cir. 2012) ....................................... 23

United States v. Reyes, 157 F.3d 949 (2d Cir. 1998) ................................................... 28

United States v. Roberts-Rahim, No. 15-CR-243 (DLI), 2015 WL 6438674 (E.D.N.Y. Oct. 22, 2015)................................................................................................................. 19

United States v. Robinson, 635 F.2d 981, 986 (2d Cir. 1980) ..................................... 29

United States v. Sinclair, 119 F. App'x 304 (2d Cir. 2004) ......................................... 28

United States v. Tapout, No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) 21, 22

United States v. Thai, 29 F.3d 785 (2d Cir. 1994) ....................................................... 13

United States v. Towne, 870 F.2d 880 (2d Cir. 1989) .................................................. 13

United States v. Triumph Capital Group, Inc., 544 F.3d 149, 160 (2d Cir. 2008) ...................... 28

United States v. Wade, 512 F. App'x 11 (2d Cir. 2013)................................................. 21

United States v. Weeks, 716 F.2d 830 (11th Cir. 1983) ............................................... 13

United States v. Ying Lin, No. 15-CR-601 (DLI) (E.D.N.Y.)......................................... 7

United States v. Zelaya, 336 F. App'x. 355 (4th Cir. 2009)........................................ 23

<u>STATUTES</u>

Crime Victims' Rights Act, 18 U.S.C. § 3771.......................................................... 24, 25

<u>OTHER AUTHORITIES</u>

Vienna Convention on Diplomatic Relations (the "VCDR"), Art. 39(2) ..................................... 16

<u>RULES</u>

Federal Rule of Evidence 401 ...................................................................... passim

Federal Rule of Evidence 402.................................................................... 15, 19

Federal Rule  of Evidence 403.................................................................... passim

Federal Rule of Evidence 404(b) .................................................................. passim

Federal Rule of Evidence 801(c) .................................................................. 18

Federal Rule of Evidence 801(d)(2) ............................................................... 27

Federal Rule of Evidence 803(6) .................................................................. 27

PRELIMINARY STATEMENT

The government respectfully moves in limine to: (1) admit evidence of the defendant's participation in a forced labor scheme while he was an accredited diplomat with the People's Republic of China ("PRC") as direct evidence of the charges in this case and, in the alternative, in order to show knowledge and planning of the charged scheme and status of the victims of the charged scheme, pursuant to Federal Rule of Evidence 404(b); (2) admit PRC court orders and underlying contracts provided to the government by victims of the forced labor scheme that contemplate the forfeiture of collateral and real estate properties posted by the victims in the PRC prior to coming to the United States; (3) preclude argument, introduction of evidence, or cross-examination of government witnesses concerning the legality of the forced labor scheme under PRC law or the treatment of victim workers in the United States compared to similarly situated workers in the PRC; (4) permit victims of the forced labor scheme who escaped from custody of the defendant's company ("Rilin"), as well as any testifying family members of victim witnesses, to testify under alias pursuant to a proposed protective order; (5) admit copies of documents in the possession of victims of the forced labor scheme as the victims left the United States on October 8, 2015; (6) admit evidence of obstructive conduct by the defendant and his co-conspirators to show consciousness of guilt; (7) permit government witness Mark Redfield to testify on redirect examination about the role and statements of the defendant's prior counsel in drafting an affidavit signed by Redfield; and (8) provisionally preclude introduction of documents introduced by the defense that have not been provided pursuant to reciprocal discovery.

FACTUAL BACKGROUND

I.    The Defendant's Role in the Forced Labor Scheme Since 2001

The defendant was an accredited diplomat to the PRC Consulate in New York City between 2001 and 2006.  Between 2006 and November 2009, he was an accredited diplomat to the PRC Embassy in Washington, D.C.  Thereafter, he became a U.S. permanent resident and lost any privileges and immunities he may have previously held.  (Compl. ¶ 8).  The investigation has revealed that, during the period that he was an accredited diplomat, the defendant helped orchestrate a forced labor scheme involving debt-bonded workers brought from the PRC ostensibly to work on PRC establishment buildings but who were instead deployed to perform private contracting work.  The defendant continued to act as a principal of this scheme after becoming a U.S. permanent resident and losing any diplomatic status he may have possessed.

During the investigation, the government has identified and met with numerous individuals who escaped from forced labor conditions while working for Rilin in the United States, as well as the widow of another escapee from Rilin custody.  With one exception occurring in 2010, most of the escapes from Rilin custody occurred in 2001 and 2002—at a time when the defendant was an accredited PRC diplomat.  The government expects to call one or more of these victims to testify about the forced labor scheme and the defendant's role in the scheme, including his efforts to force the victims to return to Rilin custody.

In particular, multiple victim witnesses who escaped in 2001 and 2002 have informed the government that Rilin required cash collateral of 50,000 RMB[1] from each victim before their travel to the United States for Rilin, while another victim witness who escaped in

---

[1]    Renminbi, commonly abbreviated "RMB," is the official currency of the PRC.

2010 has informed the government that Rilin required cash collateral of 150,000 RMB. Some of these witnesses were also required to post as collateral real estate property. Most of the victims described to the government how, after arriving in the United States, Rilin personnel—most notably codefendant Landong Wang—seized their passports. Also according to all of the victims, because of their escapes from Rilin custody, Rilin obtained judicial rulings from PRC courts holding that the victims had breached their contracts, resulting in judgments against the victims and the seizure of any posted real estate property. Three victims have provided copies of these PRC judicial rulings forfeiting collateral, as well as the underlying contracts with Rilin; the victims obtained these documents from family members who continue to reside in the PRC.[2]

Several victims who escaped in 2001 or 2002 described to the government how Rilin sent rendition squads to locate and force the victims to return to Rilin custody. One of the victims incurred a laceration on his back from a ceramic tool as Rilin personnel attempted to abduct the victim into a vehicle during an incident occurring in the streets Queens; in another episode in the streets of Queens, a group of Rilin personnel physically similarly beat a second victim as they attempted to abduct him into a vehicle. A third victim described how the defendant and other Rilin principals located him in a boarding house in Queens. The defendant persuaded this third victim—who told the defendant he would not return because he feared for his life—not to contact the police, before warning him that he would lose the pledged collateral and that Rilin would seize his and his mother's houses through legal proceedings if he did not return to Rilin custody. In fact, Rilin forfeited both the pledged collateral and real estate properties posted by the third victim.

---

[2]    Pursuant to the Court's protective order dated March 16, 2017, these PRC legal documents have not yet been provided to the defense in Rule 16 discovery.

Two confidential sources with reliable information have corroborated the victims' information. According to one confidential source, the defendant reported that he and codefendant Landong Wang participated in a search party to locate and abduct Rilin workers who escaped from Rilin custody in the United States. The defendant told the source that the defendant and Landong Wang had found an escaped Rilin worker and forced him to return to the PRC Consulate in New York, but that the Rilin worker had later escaped again. This information corroborates information provided to the government by a victim who escaped from Rilin custody in or around 2001. Similarly, another confidential source has informed the government that the defendant stated that he had sent a search team to look for the escapee in 2010 and that the search had failed.

The information provided by the victims was further corroborated by materials found during the search in November 2016 of a premises on Pavonia Avenue in Jersey City, New Jersey (the "Pavonia Avenue Premises"), used by the defendant and other Rilin principals to house Rilin PRC workers and later as office space. During the search, agents recovered among other items, documents reflecting a list of escapees from Rilin's custody.

II.    Evacuation of Potential Witnesses by Rilin

On June 26, 2015, a special agent of the FBI observed several Chinese-speaking construction workers performing construction work at a house located at a residence in Old Brookville, New York (the "Old Brookville Residence"). A worker approached the FBI agent but could not communicate with the agent because the agent spoke only English and the worker spoke only Chinese. A grey Ford Econoline registered to West Legend (a U.S. affiliate of Rilin) was parked at the Old Brookville Residence. After the special agent observed codefendant Landong Wang enter the area, the van was moved behind the house, likely so that it would not be visible from the street.

During the morning of October 8, 2015, FBI agents observed the same van at a house located in Fresh Meadows, New York (the "Fresh Meadows Residence"). Agents observed several individuals who appeared to be Asian disembark the van and go into the Fresh Meadows Residence, before the van departed.

Later in the morning of October 8, 2015, HSI agents went to the Fresh Meadows Residence. There, agents observed Chinese-speaking construction workers performing construction work on the residence. Agents approached the workers and identified themselves as law enforcement. In response to requests for the workers' identification, five workers stated, in sum and substance, that they were citizens and nationals of the PRC employed by a construction company known as "Rilin" and were present at the location to renovate the first floor of the Fresh Meadows Residence. One of the workers additionally stated that they were members of the PRC "delegation." The workers stated that their identification was at the "delegation," but none of the workers had a means of contacting the "delegation" to retrieve the identification.

After the workers denied having a means of contacting the "delegation," a woman came out of the Fresh Meadows Residence, identified herself as "Ying Lin," provided a New York State Driver's License as proof of her identity, and stated that she was the owner of the Fresh Meadows Residence. Agents identified themselves as law enforcement and Ying Lin stated, in sum and substance, that five of the workers were employees of "Rilin" who were renovating the first floor of the Fresh Meadows Residence. Ying Lin further stated that she had obtained the services of the workers through her friend "Wang" who she identified as the "owner" of "Rilin," and stated that she had hired "Rilin." Ying Lin later clarified that the work was a "courtesy," that she was paying only for the materials used, and that there was no contract for the work at the Fresh Meadows Residence.

5

Ying Lin thereafter called a person she identified as "Wang" and asked him to bring the workers' passports to provide to the "police."  Approximately one and a half hours later, a silver minivan arrived at the Fresh Meadows Residence and one of the occupants identified himself to agents as "Landong Wang" and presented a U.S. Department of State issued Driver's License as proof of his identity.  This individual was codefendant Landong Wang, who stated in sum and substance that the workers were employees of "U.S. Rilin Construction/China Rilin" and members of the "Chinese delegation" present in the United States to perform construction work at the PRC Mission.  Landong Wang further stated that he was the workers' supervisor.

Landong Wang stated that the Fresh Meadows Residence was not owned by the PRC Mission and that the construction work was being performed out of "friendship," for "no charge," and that "no permits" had been obtained for the work.  Landong Wang provided agents with four of the workers' PRC Passports and a copy of the fifth worker's PRC Passport, each of which contained A2 or G2 diplomatic visas issued by the U.S. Department of State.  Each of the five workers' diplomatic visas stated "CONSTRUCTION WORKER FOR CHINESE MISSION TO UN RENOVATION PROJECT" and "RILIN CONSTRUCTION GROUP CO., LTD."  A review of the associated applications for the visas indicates that Landong Wang was the point of contact for each application.

Notably, law enforcement records indicate that Ying Lin is a naturalized United States citizen, that Ying Lin is not registered with the U.S. Department of State as a diplomat of

6

the PRC, and that the Fresh Meadows Residence is not registered with the U.S. Department of State as a PRC diplomatic facility.[3]

Later in the evening of October 8, 2015, special agents of the FBI interviewed codefendant Landong Wang.  During the interview, Landong Wang stated, in sum and substance and in part, that Rilin only does projects at the PRC Mission and PRC Consulate in New York and does not do outside projects, but that "Rilin USA" is a subsidiary of the main company based in China.  Landong Wang stated that work at the Old Brookville Residence was a "Rilin USA" project.  He admitted, however, that some of the workers that he utilized for the Old Brookville Residence and Fresh Meadows Residence were Rilin employees.

According to a confidential source who has provided reliable information, following this interview of Landong Wang by federal agents, the defendant and Landong Wang moved potentially incriminating materials from the Pavonia Avenue Premises to PRC diplomatic facilities in New York City, where they would be secure from potential searches by U.S. law enforcement.

About a week later, on or about October 19, 2015, law enforcement learned that six Rilin employees present in the United States on diplomatic visas, including two of the Rilin employees who had been interviewed by law enforcement at the Fresh Meadows Residence, were booked on an Air China flight scheduled to depart from Terminal One of JFK Airport to Beijing, China the same day.  Agents conducted interviews at Terminal One of JFK Airport of the six Rilin employees booked on the flight (the "Passengers").

---

[3]        Ying Lin has been charged in a superseding indictment with acting as an agent of a foreign power, conspiracy to commit wire fraud, obstruction of justice, conspiracy to obstruct justice, and structuring of financial transactions to avoid currency reporting requirements.  See United States v. Ying Lin, No. 15-CR-601 (DLI) (E.D.N.Y.).

7

During the interviews, each of the Passengers identified their employer as Rilin and identified Landong Wang as their boss. The Passengers further stated that Landong Wang confiscated their passports when they arrived in the United States and kept the passports while they remained in the United States. One of the Passengers whom agents had observed working at the Fresh Meadows Residence on October 8, 2015, stated that he lived at a three-story home in New Jersey with 12 other Rilin workers supervised by Landong Wang. The Passenger further stated that he had not intended to return to China so soon, but that Landong Wang had told him that he would be returning to China approximately five or six days before the date of the interview. Agents photocopied Chinese-language documents that the Passengers were carrying with them. The documents are printouts of electronic time sheets of work performed by the Passengers in the United States; codefendant Landong Wang signed these documents in his capacity as "project manager."

While the Passengers were being interviewed, the Air China flight on which they were booked departed for Beijing. Following the interviews, agents served each of the six Passengers with subpoenas requiring them to appear and testify before a grand jury in the Eastern District of New York on Wednesday, November 4, 2015. However, the next day, October 20, 2015, the same six Passengers boarded a flight departing from Newark International Airport in Newark, New Jersey ("Newark Airport") to Beijing, China. Notwithstanding service of the subpoenas, the six Passengers have not returned to the United States.

In late February and early March 2016, counsel to Rilin asked the government for permission for three Rilin workers to leave the country on March 3, 2016 from Newark Airport because the workers had medical emergencies they needed to attend to in the PRC. On March 3, 2016, agents met the three workers before their scheduled flights. The workers admitted, in sum,

in substance, and in part, the following: (1) one of the workers had performed work at the Old Brookville Residence at the direction of codefendant Landong Wang; and (2) a second worker was a "supervisor" of other Rilin workers and had performed work at the Old Brookville Residence and the Fresh Meadows Residence.

Notably, a confidential source who has provided reliable information informed the government that, during the approximate time of the evacuation of Rilin workers from the United States in October 2015, Dan Zhong and Landong Wang were very worried that they were in legal trouble because they had used Rilin employees to work on outside projects at private residences. Moreover, Landong Wang was worried that he would lose his diplomatic position and employment with Rilin, because of his conduct. A confidential source also informed the government that, in March 2016, Landong Wang was furious when he learned that at least one of the Rilin workers had spoken to law enforcement prior to his departure from Newark Airport because Wang had instructed the workers not to speak to anyone before boarding the flight.

III.    The Redfield Affidavit

On or about February 9, 2011, members of the Jersey City Mayor's Task Force reported to the Pavonia Avenue Premises in response to a complaint about potential alien trafficking. During inspection of the Pavonia Avenue Premises, inspectors observed that the Pavonia Avenue Premises was divided into sleeping quarters to accommodate 28 boarders and that the basement was converted into 12 computer stations with apparent homemade electrical wiring. Among the housing and fire code violations observed were the means of egress locked from the outside by double-key cylinder locks. During the inspection, inspectors encountered 14 adult Asian males, all of whom claimed not to speak English and all of whom lacked any form of identification. After inspectors contacted the PRC Consulate in New York, several Rilin employees, including codefendant Landong Wang, arrived with passports belonging to the Asian

9

males; they later left the premises while still in possession of the Asian males' passports.  Due to the hazardous fire safety conditions, inspectors deemed the Pavonia Avenue Premises uninhabitable and requested all tenants to vacate immediately.

The next day, on February 10, 2011, the Jersey City Mayor's Task Force inspectors executed a judicially authorized search warrant at a residence on Wayne Street in Jersey City, New Jersey (the "Wayne Street Premises").  During the search, members of law enforcement observed an illegal hasp on the exterior of the residence that could lock the occupants inside.  There, members of law enforcement encountered 15 adult Asian males who were preparing to depart in a van awaiting outside.  None of these residents appeared to speak English.  All of the residents were in possession of Chinese passports indicating that they were A2 or G2 visa holders employed by Rilin.  Inspectors deemed the premises uninhabitable, due to the hazardous conditions.  At the direction of law enforcement, all of the residents left in the van awaiting outside.

Both of these events were described in the criminal complaint (the "Complaint") for the defendant's arrest.  (Compl. ¶ 17-22).  Following the defendant's arrest in November 2016 in this case, the defendant repeatedly sought pretrial release.  In support of these unsuccessful bail applications, the defendant argued that numerous allegations contained in the Complaint concerning the living conditions of the PRC workers were false.

In particular, in anticipation of a January 9, 2017 hearing regarding the defendant's request to reopen bail proceedings, prior defense counsel provided to the government an affidavit (the "Affidavit") of Mark Redfield dated January 6, 2017.  Redfield, who served on the Jersey City Mayor's Task Force before recently retiring, was a witness present for the inspection and search warrant execution at the Pavonia Avenue Premises and the Wayne

Street Premises summarized above.  According to the Affidavit, Redfield did not "observe any indicia of individuals being locked into the [Pavonia Avenue Premises] such as a deadbolt or a double-key cylinder locks [sic] that were locked from the outside) or being held in custody against their will."  (Aff. ¶ 4).  In other words, the Affidavit seemingly calls into question the Complaint's allegation regarding the use of double-key cylinder locks at the Pavonia Avenue Premises.

Upon receipt of the Affidavit, the government interviewed Redfield, who made the following statements in sum, in substance, and in part.  Shortly before Christmas of 2016, former defense counsel and a defense investigator arranged to meet with Redfield.  During the meeting, the defense team asked Redfield to sign an affidavit for use in a bail hearing; Redfield asked for compensation and was told to generate an invoice for time expenditures.  The defense team then inquired whether Redfield had seen occupants of the Pavonia Avenue Premises or the Wayne Street Premises locked in the buildings.

Subsequently, Redfield and the defendant's prior counsel exchanged a series of emails and telephone calls whereby prior counsel drafted and edited a proposed affidavit for Redfield to sign.  As the initial draft incorrectly indicated that there was no evidence indicating that occupants could be locked inside either premises,[4] Redfield explained to prior counsel that he distinctly recalled an illegal hasp on the exterior of the entrance to the Wayne Street Premises that would indeed prevent occupants from exiting.  Prior defense counsel then removed any reference to the Wayne Street Premises, telling Redfield that he did not "want to confuse people with the word 'hasp.'"  Notwithstanding the final language of the Affidavit—which reflects that

---

[4] This initial draft of the Affidavit, which the government received from Redfield, is attached hereto as Exhibit A.

11

Redfield did not observe any evidence of occupants being locked inside the Pavonia Avenue Premises—Redfield believed that the potential existed for occupants to be locked inside, in light of the off-site sequestration of identification and travel documents for fourteen adult males, as well as the "shantytown" appearance of the living space.  Moreover, while the Affidavit states that Redfield did not observe double-cylinder locks at the Pavonia Avenue Premises, Redfield did not have a precise recollection at the time he executed the Affidavit and had no opportunity to review his notes of the inspections before executing the Affidavit.  Notably, the official report of the incident at the Pavonia Avenue Premises reflects the use of double-cylinder locks at the Pavonia Avenue Premises.   Redfield explained that prior defense counsel rushed him into executing the Affidavit—likely because of the pending hearing before this Court—and called Redfield at least three times on the date of the Affidavit's execution to seek his signature.

IV.    Arguments by Defense Counsel Concerning the Forced Labor Scheme

In oral argument and in court filings, defense counsel has repeatedly argued that the debt bondage contracts between Rilin and PRC construction workers who work in the United States are legal under PRC law and that the victims of the forced labor scheme were willing participants.  For example, in a December 6, 2016 letter motion for pretrial release, the defendant argued that the contracts "were for highly desirable positions that paid three to five times more than what workers could earn in their home provinces in the PRC doing comparable work." (Dec. 6, 2016 Ltr. at 5).  Similarly, in a December 8, 2016 reply letter in support of the defendant's motion for pretrial release, the defendant wrote, "[T]he so-called bondage contracts addressed in the indictment were in fact standard Chinese employment contracts that provided a comparatively generous compensation package."  (Dec. 8, 2016 Ltr. at 2).  Finally, current defense counsel recently proffered to the Court:

> And what Your Honor is going to find when we try this case, that the contractual obligations, the contracts that are the underpinning of the forced labor charges, were entered into voluntarily by the individual and on multiple occasions, Your Honor, people went back to China and then chose to come back and work here under those contracts because the conditions were preferable to their work in China.  That's what the evidence is going to show.

(Dec. 18, 2017 Tr. at 19).

<u>ARGUMENT</u>

I.    <u>The Court Should Admit Evidence of the Defendant's Participation in the Forced Labor Scheme Occurring While He Was an Accredited PRC Diplomat</u>

    A.    <u>Legal Standard</u>

Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of the crimes charged in the indictment.  <u>See</u>, <u>e.g.</u>, <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000); <u>United States v. Thai</u>, 29 F.3d 785, 812 (2d Cir. 1994); <u>United States v. Towne</u>, 870 F.2d 880, 886 (2d Cir. 1989).  In <u>Towne</u>, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense:

> Evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'

<u>Towne</u>, 870 F.2d at 886 (quoting <u>United States v. Weeks</u>, 716 F.2d 830, 832 (11th Cir. 1983)); <u>see also</u> <u>Carboni</u>, 204 F.3d at 44; <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997); <u>United States v. Khan</u>, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (Irizarry, C.J.) (quoting <u>Carboni</u>).

Moreover, the Second Circuit has stated that evidence is "not other act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the

defendant's] propensity to commit a crime." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime." Gonzalez, 110 F.3d at 941. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Id.; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). Such evidence is also admissible to corroborate the testimony of accomplice witnesses. See United States v. Everett, 825 F.2d 658, 660-61 (2d Cir. 1987).

Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when offered for any purpose other than the defendant's criminal propensity. See, e.g., United States v. Germosen, 139 F. 3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed. R. Evid. 404(b); see also Levy, 731 F.2d at 1002.

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application. Levy, 731 F.2d at 1002 ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule. First, the evidence must be offered for a purpose

other than to prove the defendant's bad character or criminal propensity.  See <u>United States v. Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991) (citing <u>United States v. Colon</u>, 880 F.2d 650, 656 (2d Cir. 1989)).  Second, the evidence must be relevant under Rules 401 and 402 and more probative than prejudicial in accordance with Rule 403.  See <u>Mickens</u>, 926 F.2d at 1328 (citing <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988)); <u>Levy</u>, 731 F.2d at 1002.  Third, if the defendant requests a jury instruction as to the limited purpose for which the government's evidence is admitted, the court must furnish such an instruction.  See <u>Mickens</u>, 926 F.2d at 1328-29; <u>Levy</u>, 731 F.2d at 1002.

     B.    <u>Proof of the Defendant's Conduct Before November 2009 Is Direct Evidence of the Charged Forced Labor Scheme</u>

The defendant's participation in leading the forced labor scheme before he lost any diplomatic status he may have possessed and became a U.S. permanent resident in November 2009[5] should be admitted at trial as direct evidence of the charged forced labor scheme.  In sum, the defendant participated in an overarching forced labor scheme from in or about 2001, shortly after he arrived in the United States as a registered PRC diplomat working for Rilin, until the time of his arrest in November 2016, when he was a permanent U.S. resident still working for Rilin.  The defendant's conduct in bringing debt-bonded workers into the United States to perform private contracting work, in addition to work on PRC establishment facilities, spanned this entire period.  Expected testimony from the victims who escaped from Rilin custody in 2001 and 2002—much like the expected testimony of the victim who escaped in 2010—and from confidential sources confirm the defendant's active role in abducting and

---

[5]    In the indictment, the charged conspiracy is alleged to have commenced in January 2010—approximately one month after the defendant became a permanent resident of the United States.

rendering workers who escaped from Rilin custody when the defendant was an accredited

diplomat and following the loss of any diplomatic status.

In short, the illegal actions of the defendant and his coconspirators before

November 2009[6] are part of the same continuum of illegal actions that the defendant and his

coconspirators engaged in during the charged conspiracy. These acts "arose out of the same

transaction or series of transactions as the charged offense, [are] inextricably intertwined with the

evidence regarding the charged offense, and [are] necessary to complete the story of the crime on

trial." Carboni, 204 F.3d at 44.

---

[6]     The government does not concede that the defendant is immune from criminal
prosecution for acts committed before November 2009. Nor does the defendant's former
diplomatic status preclude introduction of such evidence against him at trial. Indeed, former
diplomats retain immunity only for their prior official acts, and the acts in question here are not
prior official acts. See Vienna Convention on Diplomatic Relations (the "VCDR"), Art. 39(2).
Article 39(2) of the VCDR provides:

> When the functions of a person enjoying privileges and immunities have come to
> an end, such privileges and immunities shall normally cease at the moment when
> he leaves the country, or on expiry of a reasonable period in which to do so, but
> shall subsist until that time, even in case of armed conflict. However, with
> respect to acts performed by such a person in the exercise of his functions as a
> member of the mission, immunity shall continue to subsist.

Id. (emphasis added).
        Article 39(2) further provides for limited immunity to former diplomatic officials, often
referred to as "residual immunity." Residual immunity:

> is a less expansive immunity that remains with former diplomats for certain acts
> committed during their occupation of the diplomatic station. Specifically, once a
> diplomat becomes a "former" diplomat, he or she is not immune from suit for
> prior acts unless those acts were performed "in the exercise of [the former
> diplomat's] functions as a member of the mission."

Swarna v. Al-Awadi, 622 F.3d 123, 134 (2d Cir. 2010) (quoting VCDR, Art. 39(2)). As
provided by the VCDR, comprehensive immunity ceases "at the moment when [the former
diplomat] leaves the country, or on expiry of a reasonable period in which to do so." VCDR,
Art. 39(2). A reasonable time for departure is "usually interpreted as thirty days." United States
v. Guinand, 688 F. Supp. 774 (D.D.C. 1988). The only immunity which remains after a
reasonable time for departure is residual immunity for acts performed in the exercise of official
diplomatic functions.

Moreover, the balancing test under Rule 403 does not militate against introduction of the pre-November 2009 conduct.   The defendant's earlier conduct, although involving two episodes of physical violence against victims of the forced labor scheme, has direct parallels in the charged conduct, in which the defendant sent a rendition team to abduct the escape occurring in 2010.  Moreover, trial evidence will establish that, as observed by Redfield, an illegal hasp was used to lock workers inside the Wayne Street Premises as recently as 2011.  Accordingly, the earlier conduct is no more "inflammatory," "sensational," or "disturbing" than the charged conduct, see United States v. Mercado, 573 F.3d 138, 145 (2d Cir. 2009), and the Court should allow evidence of this pre-November 2009 conduct as direct evidence of the charged offenses.

C.    Proof of Earlier Criminal Conduct Is Admissible Under Rule 404(b) to Show Intent, Plan and Knowledge

In the alternative, the defendant's pre-November 2009 conduct should be admitted under Rule 404(b) to prove intent, planning, and knowledge of the charged criminal conduct.  In this case where the government intends to offer evidence of acts committed by coconspirators such as codefendant Landong Wang, who maintained the travel documents of PRC workers to prevent them from fleeing, as well as the members of the rendition teams that sought to abduct escaped workers, the issue of the defendant's intent and knowledge is "squarely placed in issue," and accordingly the government is "entitled to offer this prior similar act evidence to aid the jury in assessing [the defendant]'s intentions." United States v. Martino, 759 F.2d 998, 1004-05 (2d Cir. 1985).  Moreover, the charged conduct stems directly from the earlier conduct, thus satisfying the Second Circuit's test for admissibility that the government "identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act." United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009) (quoting United States v. Garcia, 291 F.3d 127, 137 (2d Cir. 2002)).  Indeed, the defendant's

17

conversations with one victim in 2001 or 2002 in which he threatened financial harm if the victim did not return to Rilin custody demonstrates the defendant's knowledge and direction of the forced labor scheme. Finally, as discussed above, the probative value of the prior conduct is not substantially outweighed by the danger of unfair prejudice, where the uncharged and charged conduct are substantially similar in nature. See Mercado, 573 F.3d at 145.

II.    The Court Should Admit PRC Legal Documents as Verbal Acts

As discussed below, the Court should admit as verbal acts PRC legal documents such as forfeiture judgments and underlying employment contracts between Rilin and the victim workers.

As the advisory committee notes to Federal Rule of Evidence 801(c) make clear, verbal acts, meaning statements affecting the legal rights of parties, are excluded from the definition of hearsay:

> If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. . . . The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

Fed. R. Evid. 801(c) advisory committee's note; see United States v. Boulware, 384 F.3d 794, 806 (9th Cir. 2004) ("A prior judgment is not hearsay . . . to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties.")." In United States v. Dupree, 706 F.3d 131 (2d Cir. 2013), the Second Circuit held that a restraining order was not inadmissible hearsay, where "the Order's relevance lies not in its legal effect . . . but in the fact that the Order issued in connection with [a] suit against [the defendant] and in the fact that [the defendant] had knowledge of the Order." Id. at 137. The Court further explained, "Even if the Order's relevance did lie in its legal effect, moreover, no hearsay problem would ensue, as the

18

question whether a court's command imposes legal obligations on a party is outside the hearsay rule's concerns." Id.; see United States v. Ashburn, No. 11-CR-303 (NGG), 2015 WL 5098607, at *47 (E.D.N.Y. Aug. 31, 2015) (citing DuPree). Similarly, the Eighth Circuit has held that a contract is "a form of a verbal act to which the law attaches duties and liabilities and therefore is not hearsay." Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992).

In this case, the orders from PRC courts forfeiting collateral posted by the victims, as well as the underlying contracts between Rilin and the victims, should be admitted as verbal acts with legal effect. Indeed, the government will not offer these documents for the truth of the matter asserted, but rather for their legal impact on the victims of the forced labor scheme in which Rilin arranged for the victims to post substantial collateral to ensure that they would not escape and PRC courts then forfeited the collateral after the escapes.

III.    The Court Should Preclude Introduction of Evidence or Argument Regarding the Legality of Forced Labor or of Debt Bondage Contracts in the PRC

For the reasons discussed below, the Court should preclude introduction of evidence or argument concerning the legality under foreign law of forced labor or of debt bondage contracts as irrelevant and likely to cause juror confusion.

Evidence of the status of a defendant's misconduct under foreign law, like all evidence, is governed by Federal Rules of Evidence 401, 402, and 403. Evidence is "relevant" and thus presumptively admissible if it bears on a fact that "is of consequence in determining the action." Fed. R. Evid. 401(b). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Even if relevant, evidence may be excluded if its probative value is "substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury." Fed. R. Evid. 403. Under these guidelines, the Court may preclude the introduction of evidence, even if used to further a purported defense theory. See United States v. Roberts-Rahim, No. 15-CR-243 (DLI), 2015 WL

6438674, at *9 (E.D.N.Y. Oct. 22, 2015) (precluding introduction of evidence that would "only mislead or confuse the jury, as it does not provide a defense to the violation of the statute"); see also United States v. Fiumano, No. S3 14-CR-518 (JFK), 2016 WL 1629356, at *6 (S.D.N.Y. Apr. 25, 2016) (precluding evidence of non-reliance on fraudulent misstatements because "such a defense is irrelevant" to the wire fraud charge); United States v. Ahmed, No. 14-CR-277 (DLI), 2016 WL 8732355, at *3-5 (E.D.N.Y. June 24, 2016) (precluding evidence of victim's negligence as irrelevant to the fraud charge).

Here, whether the defendant's conduct violated PRC law is irrelevant to whether he committed the charged crimes under the laws of the United States.  See Butler v. United States, 992 F. Supp. 2d 165, 179 (E.D.N.Y. 2014) (Weinstein, J.) (explaining that proof of a violation of "foreign law" is not required to prove wire fraud); see also United States v. Chalmers, 474 F. Supp. 2d 555, 562 (S.D.N.Y. 2007) (holding that the court "need not make any determinations as to foreign law" to recognize that citizens of Iraq were cognizable victims under the wire fraud statute).  As such, the Court should preclude evidence of and reference to any foreign law.

Even if such evidence were to have some marginal probative value—which it does not—such value would be far outweighed by the danger of confusing and misleading the jury.  See Fed. R. Evid. 403.  The jury will be asked to decide the facts and apply the law based on the instructions provided by the Court.  If the jury believes the government has proved beyond a reasonable doubt that the defendant committed the acts outlined in the indictment, then he is guilty of U.S. crimes.  To introduce the question of whether such conduct violates or is

20

consistent with PRC law would only confuse the jurors and mislead them as to their task in this case.

Indeed, permitting introduction of evidence surrounding foreign law would amount to a "trial within a trial" that would veer far from the facts at issue at trial.  United States v. Wade, 512 F. App'x 11, 14 (2d Cir. 2013) (summary order) (upholding exclusion of defendant's proffered testimony because it "presented a risk of juror confusion and extended litigation of a collateral matter").  If the defendant were to introduce evidence of PRC law, the government would be free to respond with rebuttal evidence indicating, among other things, that the defendant's conduct did, in fact, violate the PRC law.  Such a detour into extraneous issues would confuse and mislead the jury and cause "undue delay [and] wast[e] time."  Fed. R. Evid. 403.  As such, the Court should preclude such evidence and argument.

In the FIFA prosecution, a court in this district recently addressed the admissibility of evidence of foreign law where the defendants were charged with, among other crimes, honest services fraud.  In United States v. Tapout, No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017), the court found that evidence or argument concerning foreign law, including the law on commercial bribery in foreign jurisdictions where the defendants worked and resided, was inadmissible with the exception that a testifying defendant could testify about his "beliefs about foreign law and how those beliefs influenced his understanding of the duties he owed to FIFA or another relevant soccer organization."  Id. at *9. As the court explained, evidence of foreign law was not relevant under Rule 401, because the scope of foreign law did not bear on the issue of whether the defendants conspired to "deprive FIFA and the other relevant soccer organizations of the fiduciary duties owed to those organizations, where it was reasonably foreseeable that the U.S. wires would be used in

21

furtherance of that conspiracy." Id. at *10.  Recognizing that a defendant's belief about foreign law may be relevant show "fraudulent intent and consequent lack of 'good faith' belief that the secret payments at issue were permitted under the codes of conduct applicable to him," Id. at *12, the court found that such evidence would only pass muster under Rule 403 balancing to the extent that a defendant testified that "he relied on foreign law to understand his relevant fiduciary duties [to] bridge the gap between the Defendant's belief about foreign law (which is not a material issue) and the Defendant's belief about his duties to FIFA or another soccer organization (which is a material issue)," Id. at *13.  In particular, the court found that evidence or argument concerning foreign law raised "an obvious risk of jury nullification," where "there is a substantial risk that the jury would improperly acquit Defendants if it believed that commercial bribery did not violate the laws of Defendants' home countries."  Id.

Applying Tapout to this case, this Court should exclude evidence or argument concerning PRC law, which raises the obvious risk of jury nullification.  Moreover, unlike the defendants in Tapout, the defendant in this case is not charged with a crime for which he could raise a defense of lack of fraudulent intent based on application or the defendant's understanding of foreign law.  See United States v. Altman, 48 F.3d 96, 101 (2d Cir. 1995) ("Proof of fraudulent intent is required" in an honest services fraud prosecution.).  Accordingly, the defendant should be precluded, should he take the stand, from testifying about his good faith belief of applicable PRC law.

IV.    The Court Should Permit the Victims to Testify Using Pseudonyms

The government seeks imposition of a protective order, attached hereto as Exhibit B: (1) allowing victim witnesses, as well as any testifying family members of victim witnesses, to testify pseudonymously and without revealing their names, home or work addresses, or dates and places of birth; (2) requiring the government to provide relevant criminal history

22

information, if any exists, as well as materials from the witnesses' immigration files sufficient for the defense to conduct effective cross-examinations at trial, as part of the government's Jencks Act disclosures; (3) limiting disclosure of the actual names of the victim witnesses and testifying family members of victim witnesses to defense counsel only; and (4) permitting the government to redact trial exhibits and witness statement disclosures referencing the actual names of the victim witnesses and family members, as well as other personal identifying information, and to replace these names with the pseudonyms used by the testifying witnesses.

The use of a pseudonym by a testifying witness is permissible when the government's interest in maintaining the anonymity of its witness outweighs the defendant's interest in confronting the witnesses without limitation. See Rovario v. United States, 353 U.S. 53 (1957). In particular, federal appellate courts have repeatedly approved restrictive measures adopted by district courts to protect witnesses who face reprisals for their trial testimony.

For example, in United States v. Ramos-Cruz, 667 F.3d 487 (4th Cir. 2012), the Fourth Circuit approved of the testimony of two El Salvadoran police officer witnesses in an MS-13 gang trial under pseudonyms and without revealing their names, home or work addresses, or dates and places of birth, where "the government disclosed to the defense details of these two witnesses before the trial [and] the defendants were able to effectively cross-examine those witnesses without threatening their safety." Id. at 501 (quoting United States v. Zelaya, 336 F. App'x. 355, 357-58 (4th Cir. 2009) (unpublished) (quotation marks omitted)). Similarly, in United States v. Celis, 608 F.3d 818 (D.C. Cir. 2010) (per curiam), the D.C. Circuit approved of the pseudonymous testimony of Colombian government witnesses in a narcotics importation trial involving a terrorist organization based in Colombia, where the district court had permitted the defense to conduct investigations using two of the protected witnesses' true identities pursuant to

23

a protective order.  Id. at 832; see United States v. Gutierrez de Lopez, 761 F.3d 1123, 1141 (10th Cir. 2014) ("[I]f the government provides defense counsel with sufficient background information on the anonymous witnesses (e.g. criminal history, nationality, etc.), then withholding the witness's name or address does not necessarily deprive the defendant of an opportunity for effective cross-examination, which is the touchstone of a Confrontation Clause inquiry."); United States v. El-Mezain, 664 F.3d 467, 492-93 (5th Cir. 2011) (approving use of pseudonyms by Israeli intelligence and defense witnesses in Hamas trial, where defense was permitted to cross-examine witnesses about background, training, legal education, and possible bias); United States v. Machado-Erazo, 951 F. Supp. 2d 148, 154 (D.D.C. 2013) (permitting El Salvadoran police officer to testify anonymously in gang trial);.

As Judge Dearie recently observed in permitting undercover officers from the United Kingdom Security Service to testify using pseudonyms in a recent trial:

> Here, the defendant will not be deprived of his right to confront these witnesses and cross-examine them—he will be free to cross-examine them on all topics other than their identity.  Nothing about the witnesses' true names goes to their credibility or knowledge regarding the subject of their testimony.  As in other cases where government officers were permitted to testify pseudonymously, here, an officer's "true name is immaterial to defendant's guilt or innocence."

United States v. Naseer, No. 10-CR-19 (S-4) (RJD) (E.D.N.Y. Jan. 26, 2015) (Dkt. Entry No. 382 at 6) (citation omitted).

In the context of victim witnesses, as in this case, there are even stronger public policy reasons for maintaining confidentiality of witness identities.  Indeed, the Crime Victims' Rights Act, 18 U.S.C. § 3771, requires district courts to implement procedures to ensure that crime victims are accorded, among other rights, "[t]he right to be reasonably protected from the accused," in addition to "[t]he right to be treated with fairness and with respect for the victim's

dignity and privacy." Id. §§ (a)(1), (a)(8). For example, "the public generally has a strong interest in protecting the identities of . . . victims so that other victims will not be deterred from reporting such crimes." United States v. Paris, 2007 WL 1484974, at *2 (D. Conn. May 18, 2007); see Doe No. 2 v. Kolko, 242 F.R.D. 193, 195 (E.D.N.Y. 2006) (courts have repeatedly permitted sex crimes victims to testify under alias in order to protect them "from the likely adverse personal, professional and psychological consequences of publicly linking their identities to their past lives as sex workers").

The proposed protective order is appropriate in light of the history of violent reprisals by Rilin, whose representatives have sought to abduct the victims after they escaped from Rilin custody, as well as to ensure the safety of the victims' families, many of whom continue to reside in the PRC. As detailed above, the investigation has revealed that Rilin has successfully retaliated against friends and family of the escapees who continue to reside in the PRC by initiating litigation to seize real estate properties they posted as collateral for the victims to travel to the United States. Additionally, one victim informed the government that the PRC government had temporarily ceased payment of his parents' retirement pension shortly after the victim fled from Rilin custody. Finally, the government has gathered information strongly suggesting that one of the defendant's family members is a member of the PRC judiciary who exercises jurisdiction in the geographic area where many victims' families reside and who has helped execute some of the forfeiture judgments against escaped victim workers.

While the Sixth Amendment guarantees defendants the right to cross-examine adverse witnesses, that right is not unlimited, and trial courts retain "wide latitude" to restrict cross-examination "based on concerns about, among other things . . . the witness's safety." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Here, there will be minimal impact on the

defendant's ability to cross-examine the victims as a result of not being permitted to inquire into the victims' true names and residences.  See Naseer, No. 10-CR-19 (S-4) (E.D.N.Y. Jan. 26, 2015) (Docket Entry No. 382 at 6) ("Nothing about the witnesses' true names goes to their credibility or knowledge regarding the subject of their testimony.").  At bottom, the defendant will be able to confront the victims or to challenge the substance of their testimony.  Indeed, because the government has and will continue to comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, including Giglio v. United States, 405 U.S. 150 (1972), and provide the defense with abundant information with which to cross-examine the victims witnesses, the defendant's case and ability to mount an effective cross-examination will suffer no prejudice.  Moreover, because the identities of witnesses will be disclosed to defense counsel, defense counsel will be able to conduct effective investigations to obtain cross-examination material.

As noted above, the use of pseudonyms rather than the victims' names will not deprive the defendant of the ability to confront the victims or to challenge the substance of the victims' testimony, nor will it deprive the Court or jury of the ability to evaluate the witnesses' demeanor.  In light of these measures, there will be no prejudice to the defendant, and the limited deprivation to the public is far outweighed by the government's interest in concealing the victims' identities.  For these reasons, the proposed protection of the victims' identities is "no broader than necessary" to protect the victims' safety, and the government is unaware of any reasonable alternative that will protect this important interest.[7]

---

[7] The government does not believe that having the victims testify either in disguise or behind a screen presents a reasonable alternative.  In Ayala v. Speckard, 131 F.3d 62 (2d Cir. 1997), the Second Circuit addressed these alternatives and found that the alternatives themselves pose "substantial risks to a fair trial for the defendant."  In discussing the "substantial objections" the alternatives raise, the Court opined that "disguising the witness risks lessening the [fact

V.    The Court Should Admit Copies of Documents in the Possession of Victim Workers as They Were Evacuated from the United States

Time sheets copied from victim workers at JFK Airport as they were caused to evacuate the United States to prevent them from testifying in the grand jury and appearing as witnesses in this prosecution should be admitted either as coconspirator statements of codefendant Landong Wang or under the business records exception to the hearsay rule.

To begin, each of the time sheets—many of which reflect that the Rilin workers worked almost every day of the year, including weekends—is signed by codefendant Landong Wang in his capacity as "project manager." As explained by government witnesses and the Passengers, victim workers must first submit the time sheets for months or years of completed work upon their return to the PRC before receiving compensation for such work. Accordingly, the signed time sheets at issue are coconspirator statements of Landong Wang in furtherance of the forced labor conspiracy and admissible as an exception to the hearsay rule. Fed. R. Evid. 801(d)(2); see United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) ("To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.").

In the alternative, these time sheets, which appear to be printouts of computer-generated information and then signed by Landong Wang, are admissible under the business records exception to the hearsay rule. See Fed. R. Evid. 803(6). The Second Circuit has held that record logs, such as the time sheets at question, are admissible under the business records

---

finder's] opportunity to observe the witness's demeanor and assess credibility, and a screen risks implying to the [fact finder] that the family or friends of the defendant in attendance are likely to be dangerous." Id. at 71-72.

27

exception.  See United States v. Kaiser, 609 F.3d 556, 574-75 (2d Cir. 2010) (holding that cooperating witness's notes of telephone conversations were admissible business records); United States v. Sinclair, 119 F. App'x 304 (2d Cir. 2004) (unpublished) (log maintained by Jamaican constabulary admissible foreign business record); United States v. Reyes, 157 F.3d 949, 951-52 (2d Cir. 1998) (prison visitor logbook); United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (phone logs).  The Court should apply the same analysis here to find the time sheets, which log the victim workers' work attendance, admissible.

VI.    Evidence of Obstructive Conduct Is Admissible to Show Consciousness of Wrongdoing

As described above, Landong Wang, acting in his capacity as the second-in-command of Rilin, arranged for the Passengers to depart the United States in order to prevent their possible testimony in this case.  Rilin later arranged for three more workers, including two witnesses with directly relevant information to this case, to depart the United States from Newark Airport on the basis of purported medical emergencies, and Landong Wang instructed those workers not to speak to the government before their departures.  In light of expected testimony from government witnesses that Landong Wang could not take actions without approval of the defendant, in his capacity as principal of Rilin, a reasonable juror could infer that the defendant directed such conduct.  Additional obstructive conduct by the defendant includes secreting potentially incriminating material in PRC diplomatic facilities in New York City and recorded calls while incarcerated in this case in which the defendant directed family members to hide assets and possibly evidence.  See Docket 89 at 16-18.  As the Second Circuit has repeatedly held, evidence of obstructive conduct is admissible to show consciousness of guilt. See, e.g., United States v. Triumph Capital Group, Inc., 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant's] efforts to obstruct the investigation evidence a consciousness of guilt that further supports the jury's verdicts."); United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995) ("This

28

testimony was direct evidence of [defendant's] obstruction of justice and of his consciousness of guilt of the other charges); United States v. Robinson, 635 F.2d 981, 986 (2d Cir. 1980) ("This evidence [of obstruction] was also admissible as evidence of the appellants' consciousness of guilt.").  So too should the evidence of obstructive conduct be admissible here.

VII.    The Court Should Permit Redfield to Testify About the Circumstances Surrounding the Creation of the Affidavit

            If the defense cross-examines Redfield concerning the statements made in the Affidavit, the government should be permitted to ask questions on redirect examination about the circumstances surrounding the creation of the Affidavit.  As drafted by prior defense counsel, the Affidavit intentionally omits salient facts from the heart of Redfield's expected trial testimony, in particular his recollection concerning the illegal hasp on the exterior of the Wayne Street Premises, to create a misleading impression of Redfield's recollections as a witness.  The government should be permitted to elicit statements made by prior defense counsel concerning the omission of the word "hasp" from the Affidavit, the omission in the Affidavit to payment by the defense, and the fact that Redfield did not have an opportunity to review his own notes of the events of 2011 before signing the Affidavit, to rebut any impeachment of Redfield's credibility based on statements contained in or intentionally omitted from the Affidavit.

VIII.   The Court Should Preclude Defense Exhibits Not Produced in Reciprocal Discovery

            Since the beginning of this litigation, the government has produced hundreds of thousands of pages of documents to the defense and has not received any documents from the defense, notwithstanding repeated requests for reciprocal discovery.  The government seeks to preclude the defense from offering any physical exhibits that were not previously produced to the government by four months from the date of any trial, so that the government may have sufficient time to investigate such materials.

<u>CONCLUSION</u>

For the reasons stated above, the Court should grant the relief sought herein

Dated: Brooklyn, New York
      April 27, 2018

                                 Respectfully submitted,

                                 RICHARD P. DONOGHUE
                                 United States Attorney

By:     /s/Alexander A. Solomon
                                 Alexander A. Solomon
                                 Douglas M. Pravda
                                 Ian C. Richardson
                                 Nicholas J. Moscow
                                 Assistant U.S. Attorneys
                                 (718) 254-7000