1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 16-CR-614(DLI)
                               :
                               :
                               :
      -against-                : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
                               : Wednesday, June 20, 2018
DAN ZHONG,                     :
                               :
          Defendant.           :
                               :

- - - - - - - - - - - - - X

      TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
          BEFORE THE HONORABLE DORA L. IRIZARRY
        UNITED STATES CHIEF DISTRICT COURT JUDGE

                A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE, ESQ.
                    Acting United States Attorney
                    Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                    BY:  ALEX SOLOMON, ESQ.
                      DOUGLAS PRAVDA, ESQ.
                      NICHOLAS MOSCOW, ESQ.
                      ELIZABETH MACCHIAVERNA, ESQ.
                      Assistant United States Attorney

For the Defendant:   ROBERT CLEARY, ESQ.

                     DIETRICH SNELL, ESQ.

                     BRITTANY BENAVIDEZ, ESQ.

Court Reporter:   Richard W. Barry, RPR
                  Official Court Reporter
                  E-mail: rwbarrycourtreporter@gmail.com

          Proceedings recorded by computerized stenography.
          Transcript produced by Computer-aided Transcription.

- Proceedings -                                      2

1        COURTROOM DEPUTY:  United States, docket 16-CR-614,

2   United States versus Dan Zhong, please state appearances.

3        MR. SOLOMON:  Good morning, Your Honor, Alex

4   Solomon, Doug Pravda, Nick Moscow for the government.  We are

5   also joined by a member of the privilege review team,

6   Elizabeth Macchiaverna.

7        THE COURT:  Good morning to all of you.

8        MR. CLEARY:  Robert Cleary for Mr. Zhong, also

9   appearing with me are Dietrich Snell and Brittany Benavidez.

10  Mr. Zhong is in court with an interpreter sitting next to him.

11       THE COURT:  Good morning to all of you.

12       May we have, please have the name of the Mandarin

13  language interpreter?

14       INTERPRETER:  John Lau.

15       THE COURT:  Good morning, may we have the oath

16  administered to Mr. Lau.

17       (Interpreter sworn by Courtroom Deputy.)

18       THE COURT:  So, there was quite a bit of motion

19  practice with respect to the Frank's motion, the motion is

20  denied.  I do have a draft of the order.  I have to make a

21  determination as to whether or not the entire memorandum and

22  order will be filed under seal, given the way the motions were

23  made.  At least at this point in time, it is possible that at

24  the end of the case, that all of these things can be unsealed.

25  And whether or not a redacted form can be posted on the public

- Proceedings -                                          3

1   docket.  So, the decision will be forthcoming shortly.

2          Now, in connection with the various motions in

3   limine, I have to say it was not-- it was very cumbersome the

4   way that these motions were filed.  I don't know why the

5   defense didn't just file everything altogether, the way that

6   the government did.  Especially given since all of those

7   motions were filed under seal anyway.  So it would not have

8   made any difference one way or the other.

9          I am going to reserve decision on the motions in

10  limine, in part because I do have some questions or

11  clarification that I wish to seek from the parties today,

12  based on my review of your papers.

13         So I have got them separated in groups.  I do not

14  have any questions in connection with the defendant Zhong's

15  motion in limine with respect to the search warrant.  I don't

16  have any questions about that.

17         So I'm going-- the questions that I do have relate

18  to the government's motions in limine and the defendant's

19  motions in limine regarding pre-2010 acts, and the non A-2 or

20  G-2 visas.  To a certain extent the government has made cross

21  motions in relation to that.

22         As an initial matter, because it is relevant to the

23  question of when the defendant had diplomatic immunity,

24  because the government-- well, on the one hand, and I do have

25  questions for the government.

- Proceedings -                                    4

1        On the one hand, it seems that at least in the

2   government's omnibus motion, as part of footnote 6, on page

3   16.  The government does not concede that the defendant is

4   immune from criminal prosecution for acts committed prior to

5   November 2009.  This is in connection with the government's

6   application to introduce prior bad acts, if you will, in

7   connection with not only the issuance of the same types of

8   visas that are at issue here, the A-2 or G-2 visas, but also

9   non-- different kinds of visas from those, and there are a

10  variety of them.

11       It is not clear from some of the responses that the

12  government made, whether the government is in fact contending

13  that the defendant did not have diplomatic status at all, at

14  any point in time.

15       If you can answer that, I need some clarification

16  about that.

17       MR. SOLOMON:  Yes, Your Honor.

18       I think our position is, we are not contending at

19  this point that the defendant lacked diplomatic immunity.  But

20  another way, we are not seeking to prosecute the defendant for

21  pre-November 2009 conduct.

22       We concede that it is a closer call, whether the

23  acts committed between 2001 and 2009, constitute official acts

24  within the defendant's capacity.

25       THE COURT:  Let me clarify.  I do not like double

- Proceedings -                                    5

1    negatives, they are always confusing.

2              MR. SOLOMON:  Sure.

3              THE COURT:  So, is the government conceding that the

4    defendant had diplomatic status prior to 2009?

5              MR. SOLOMON:  Prior to--

6              THE COURT:  Or November-- at least up to

7    November 2009, and I do have questions about that date.  But

8    let me address that separately.

9              MR. SOLOMON:  If I can actually address both

10   questions in one answer, Your Honor?

11             THE COURT:  Okay.

12             MR. SOLOMON:  According to the records of the United

13   States Department of State, the Chinese government notified,

14   officially notified the State Department that the defendant,

15   would be registered as administrative and technical staff for

16   the embassy in Washington, D.C., the PRC, and that time period

17   was between February 2006 and November of 2009.

18             So it is our viewpoint that before November of 2009,

19   the defendant in fact did have diplomatic immunity.

20             THE COURT:  But the defendant was present in the

21   United States in 2010, still connected with the PRC mission,

22   the PRC, referring of course to the People's Republic of

23   China.

24             MR. SOLOMON:  Yes, the issue there is that the State

25   Department did not receive official notification, that he

- Proceedings -                                         6

1   would be-- his association either with the embassy in

2   Washington, D.C. or with any diplomatic facility here in New

3   York would continue.

4           We are happy to provide additional briefing on that

5   subject.  That subject was the subject of extensive briefing

6   on related Grand Jury litigation both before Judge Gleeson and

7   before the Second Circuit.

8           THE COURT:  Because the indictment charges acts from

9   January 2010 until November 2016, it seems fairly clear from

10  the exhibits that were provided by the government in its

11  opposition memorandum to defendant's motion in limine, with

12  respect to the visas, right?

13          And prior to 2010 acts.  There was-- there were

14  documents related to Mr. Zhong's application for, as we say

15  colloquially, a green card, for permanent resident status in

16  the United States, which was filled out on May 3rd, 2010.

17          And that contains what is called an I-508 waiver of

18  rights privileges, exceptions and immunities form, where the

19  defendant states that he waived all rights, privileges,

20  exceptions and immunities that would otherwise accrue to him

21  under any law or executive order by reason of such

22  occupational status.

23          In other words, in the paragraph before that, he

24  claimed to have an occupational status entitling him to non

25  immigrant classification.  Essentially as a representative of

- Proceedings -                                7

1   a foreign government.

2             MR. SOLOMON:  Yes, Your Honor.

3             So our position is twofold.  First of all, it is our

4   viewpoint, and this is shared by the Department of State, that

5   diplomatic privileges and immunities only accrue to those

6   staff and personnel of diplomatic missions, consulates and

7   embassies, who are officially notified to the United States

8   government as occupying such position.

9             That notification applied between the period of

10  February 2006, November 2009.

11            Secondly, to the extent that he had any privileges

12  and immunities, that remained after that point, in particular

13  for official acts that he committed between February of 2006

14  and November 2009, it is our viewpoint, he waived them in

15  applying for a green card.

16            THE COURT:  Are you arguing that he waived them

17  retroactively by virtue of his application for permanent

18  resident status?

19            MR. SOLOMON:  Yes, it is our view he waived any

20  residual immunities that he was still entitled to, I think as

21  the--

22            THE COURT:  Well, still entitled to, meaning

23  prospectively, not retroactively.

24            MR. SOLOMON:  I understand, Your Honor.

25            THE COURT:  I don't see anything in this document

- Proceedings -                                        8

1   and that is part of the argument raised by the defense, that

2   just reading the plain language of the form, which seems to

3   bear the defendant's signature, nobody is contesting that that

4   is his signature.  That this is a prospective waiver, not a

5   retroactive waiver.

6            MR. SOLOMON:  I understand.  I think I would just

7   direct Your Honor to the policy statement of the Department of

8   Homeland Security, which is referenced on page three of our

9   opposition papers, to the defendant's pretrial motions in

10  limine.

11           Stating that, in relevant part, an alien cannot hold

12  both lawful permanent resident status and diplomatic immunity.

13  And towards that end, the defendant--

14           THE COURT:  Sorry, say that again.

15           MR. SOLOMON:  An alien cannot hold both lawful

16  permanent resident status, and diplomatic immunity.

17           THE COURT:  But that is prospective.  I don't think

18  the defense is arguing-- I don't think they can argue in the

19  face of the plain language of that form, that I-508 form, that

20  the defendant did not waive any diplomatic immunity, residual

21  or otherwise, that he might have had prospectively from the

22  signing of that document.  Right?

23           Because he is doing it as you analogized, in

24  consideration for getting the green card, which often times is

25  the precursor to, I think green card colloquially, you

- Proceedings -                                    9

1  understand what I mean, the permanent resident alien status,

2  just as a shortcut.

3              MR. SOLOMON:  Yes.

4              THE COURT:  Which usually is a precursor to

5  attaining citizenship status.

6              So you are-- he is giving up something in return for

7  that.  But prospectively.  I don't see how you can have a

8  reading that that applies retroactively.  It doesn't say, I

9  waive the rights that-- and immunities and privileges that I

10 may have had before the signing of this document.

11             MR. SOLOMON:  Your Honor, we understand that

12 reading.  I would just note that we have not charged the

13 defendant with pre-2010 conduct.  And, you know--

14             THE COURT:  I understand.  To me there is a

15 disconnect with the position that you take in your opposing--

16 in your moving papers on page 16, in that footnote, despite

17 the fact that you are not proceeding with a prosecution for

18 anything that happened prior to 2010.

19             I see your position as saying that the government

20 has exercised its prerogative, as it has, to not to bring

21 charges for the defendant's conduct prior to 2010, but not

22 because you contend he has diplomatic immunity, residual or

23 otherwise, because you're still maintaining that he is not

24 immune for criminal prosecution or the acts committed before

25 2009.  That is different.

1          You know to say, okay, we are exercising our

2   charging prerogative, which prosecutors have to bring some

3   charges and not others.  For whatever the reason.  That is

4   different from taking the position that he is immune from

5   prosecution for whatever acts he committed prior to 2010, when

6   he had diplomatic status.  At least up to November of 2009,

7   assuming that the position of the Department of State is

8   correct, and the government's position is correct.  Which you

9   didn't argue in your papers, which I don't understand why.

10         I was not privy to any litigation before Judge

11  Gleeson, or the Second Circuit.

12         MR. SOLOMON:  Sure, Your Honor.  I understand and I

13  apologize for not addressing that in our papers.  That wasn't

14  raised by the defense, the notion that the defendant

15  maintained diplomatic privileges and immunities through May of

16  2010, until their final papers.

17         THE COURT:  No, but that is not what we are talking

18  about here.  We are talking about prior to that.  You are

19  mixing up the two, the two things.

20         MR. SOLOMON:  I apologize for any ambiguity.  Let me

21  try to restate the--

22         THE COURT:  That is part of the problem here, nobody

23  is really coming forward and stating, you know, face forward,

24  exactly what it is that you are seeking here.  There is a lack

25  of specificity in a lot of what has been asked for here.  As

1    that is part of the problem that I have --

2              MR. SOLOMON:  We apologize.

3              THE COURT:  -- with this.

4              MR. SOLOMON:  I will attempt to clarify.

5              So our position is, the defendant was registered as

6    a diplomat through November of 2009.  For the period between

7    roughly 2001 and November of 2009, the only privileges and

8    immunities which accrued to the defendant were for official

9    acts that he took on behalf of the PRC.

10             After that period, the only immunity that he still

11   retained was residual immunity as to his official acts between

12   roughly 2001, and November of 2009.

13             That is our position.  You know, I think we can put

14   the green card application to the side, because that is

15   somewhat of an extraneous data point.

16             THE COURT:  Not all that extraneous, because the

17   defendant's position is, and again this is why the argument

18   about what the position of the State Department is, in

19   connection with who is recognized as having any kind of

20   privileges and immunities, depends on notifications from the

21   sending country as the term is used.

22             MR. SOLOMON:  Correct.

23             THE COURT:  The defense is arguing that even the

24   time in the indictment is too early.

25             Correct me if I am wrong, Mr. Cleary.  I read the

- Proceedings -                                    12

1    argument that has been raised in your opposition papers, as

2    saying, that the-- even the time in the indictment contains a

3    period of time prior to May 3rd of 2010, when he formally

4    waived any privileges and immunities he may have had, as a

5    foreign dignitary, to keep it simple, between that January and

6    that May 5th period, correct?

7              MR. CLEARY:  That's correct, Your Honor.

8              THE COURT:  Right.

9              So, but you have just raised a different argument

10   that wasn't briefed, which is this notice issue, and what

11   effect that has for that period of time.  At least the period

12   of time for the indictment between January and May 3rd.

13             MR. SOLOMON:  Correct.

14             THE COURT:  Of 2010.

15             That is contained in all of the charges, in the

16   indictment.

17             MR. SOLOMON:  If it would assist the Court, we are

18   happy to provide additional letter, providing certification

19   from the State Department as to the relevant period for which

20   the defendant was notified by the sending state as a

21   registered diplomat.

22             Additionally, I would note that to the extent the

23   defendant was registered to the U.S. embassy, but was

24   performing acts in connection with the consulate, the PRC

25   consulate in New York City, I believe the State Department's

- Proceedings -                                           13

1   view would be he was not properly notified for that period

2   either.  To the extent he was only working in New York City

3   and any acts he committed in New York City would not be

4   official acts.

5             Lastly, Your Honor, I would note--

6             THE COURT:  So we need to have some discussion, we

7   need to have some discussion about that.  I would like some

8   more clarification as to why it is the government's position,

9   given what he was -- appears to have been tasked to do, maybe

10  I am incorrect, an incorrect understanding of what he had been

11  tasked to do, which was to provide workers to do construction

12  work at the PRC mission.

13            Is that everybody's understanding of what he was

14  supposed to be doing?  Mr. Cleary?

15            MR. CLEARY:  That's correct, Your Honor.

16            THE COURT:  So, why is-- what is the government's--

17  what is the basis of the government's contention that whatever

18  acts he engaged in, were outside of what he was tasked to do

19  for the PRC mission, which was to get laborers for the PRC

20  mission.

21            MR. SOLOMON:  It is our view that he was improperly

22  notified.

23            First of all, during the period April 2002 through

24  January of 2006, he was notified as a consular employee for

25  the PRC consulate in New York City.  Through the remaining

- Proceedings -                    14

1   period, he was notified by the sending state as a staff member

2   for the embassy in Washington, D.C..

3          Notably, the codefendant in this case--

4          THE COURT:  But what does that mean?  What was he

5   supposed to be doing in those capacities?

6          MR. SOLOMON:  He was supposed to be working at the

7   embassy, the PRC embassy in Washington, D.C..

8          THE COURT:  Doing what?

9          MR. SOLOMON:  I would have to-- the only information

10  I have in front of me today, he was notified as a staff

11  member.  I can gather additional information that we can

12  provide to the Court.

13         But I would like to note--

14         THE COURT:  If you are-- this is in-- I think in

15  part at least forms, would inform the Court's decision on the

16  cross motion of the government to permit the government, for

17  the Court to permit the government to introduce evidence of

18  what the government is alleging prior bad acts, the obtaining

19  of visas, to bring people to the United States to do work

20  under the same forced labor types of contracts, that are

21  alleged in the indictment.  Post 2010.

22         MR. SOLOMON:  I would just point Your Honor to the

23  State Department's decision with respect to the codefendant,

24  Wang Landong.  This was the subject of the Second Circuit's

25  opinion in the Grand Jury litigation.  That case, Landong was

1   notified as a diplomat to the United States-- to the PRC

2   embassy in Washington, D.C. and had been doing work only in

3   New York City with respect to the consulate, the mission.

4           The State Department's view, and this was affirmed

5   by the Second Circuit and by Judge Gleason was that he was not

6   properly notified, so he did not have diplomatic immunity for

7   that time period.

8           THE COURT:  Do you wish to be heard on any of these

9   issues that I have been making inquiry of?

10          MR. CLEARY:  I think Your Honor understands our

11  position.

12          Just in brief response to what Mr. Solomon said,

13  this whole issue of notification and Wang Landong case, before

14  the Second Circuit, none of that was briefed.  So I'm not

15  prepared to respond to that.

16          THE COURT:  I'm not-- I would not be faulting you

17  for that, because I am not prepared to-- I'm not quite sure

18  even what follow up questions to ask, because I'm not familiar

19  with that, and to the extent that the government seems to be

20  relying on that, on the position that it is taking, I think it

21  would have been relevant to include that.

22          In fact, I would not have relegated the government's

23  position that the defendant is immune for criminal prosecution

24  for acts committed before November of 2009, to a footnote.

25  That is important.  That is not a footnote.  That is not a

- Proceedings -                                    16

1    footnote position.  That is a major position.

2          The moving-- moving on to another question that I

3    have for the government, in terms of-- let's just call it the

4    404(b) or 404.3 evidence, about the other visas prior to 2010.

5    Okay.

6          The government has mentioned visas that were

7    obtained and contracts that were obtained in 2001, and 2002.

8    As I understand it, they are seeking to introduce it on a

9    number of basis, that if true, might make such evidence

10   admissible.  For example, to show the scheme or the plan, the

11   defendant's knowledge, his intent.  The motive and so on.

12         The problem that I have is that there is this huge

13   gap between 2001 and 2002, and then the acts that are alleged

14   in the indictment for 2010.  So, it is not like the government

15   has described a continuum of activity, that went from 2001 to

16   2003 and continued in-- I mean 2001, 2002, but then continued

17   on through 2003, 2004, 2005, 2006, 2007, 2009.  At least I'm

18   not seeing it in the papers.

19         I mean if the government has proof of that, then it

20   would have been helpful to know whether that is the case.  To

21   show that, you know, this was a pattern of conduct that does

22   show, you know, a continuing scheme, if you will.

23         And to show that it is inextricably intertwined with

24   the scheme that is alleged in the indictment.  But there is a

25   gap.  There is a gap of eight years.  I just don't see how you

- Proceedings -                                        17

1  make a connection between, okay, this happened way back then,

2  and now all of a sudden, we are jumping to-- jumping to 2010.

3  I think that is one of the arguments that was also raised by

4  the defense, that there is-- it is not recent enough to be

5  able to be interconnected.  At least not based on the

6  arguments raised by the government or what you seem to be

7  seeking to introduce.

8              MR. SOLOMON:  Yes, Your Honor.

9              I apologize to the extent we didn't-- our proffer

10  was not as fulsome as perhaps it should have been.

11             Our evidence shows that beginning in 2001, 2002,

12  China Rilan, together with this defendant, entered into debt

13  bondage contracts with workers from China and brought them

14  here, and forced them to do work as directed, less they lose

15  their pledged collateral in China.

16             In 2001, 2002, there are a rash of victims who

17  escaped and who are hunted down.

18             THE COURT:  I read all that.

19             MR. SOLOMON:  Yes.

20             THE COURT:  I understand all of that, and I

21  understand that the conduct alleged here is similar.  But, you

22  are only talking about-- you are talking about conduct that

23  occurred a good eight years prior to the conduct that is

24  alleged here.

25             MR. SOLOMON:  Your Honor, I was about to get to

- Proceedings -                              18

1   that.

2           THE COURT:  Okay.

3           MR. SOLOMON:  So, because of the rash of escapees in

4   2001, 2002, China Rilan raised the collateral required of

5   people coming to work in the United States.  Between 2002, or

6   2003, going onwards, until this case was taken down, the

7   pledged collateral was much higher.  That was to prevent

8   people from escaping.  So the debt bondage practice continued

9   unabated between 2001, until this case was taken down in 2016.

10          There was one additional escapee in 2010, and in

11  that person's contract, there are increased collateral

12  obligations of that particular escapee, with respect to the

13  escapees from 2001, and 2002.

14          Our proof will consist of testimonial evidence

15  regarding the continuous nature of this debt bondage practice

16  between 2001, going onwards to 2016.  Either by confidential

17  sources or by people with knowledge as to China Rilan.

18          THE COURT:  So the evidence that the government

19  purposes or seeks to introduce also concerns these contracts

20  that were entered into between 2002 and 2010?

21          MR. SOLOMON:  That's correct, Your Honor.

22          THE COURT:  Would you like to respond to that?

23          MR. CLEARY:  Thank you, Your Honor.

24          As I analyze this, this evidentiary issue, I look at

25  it as two different pieces of pre-charged evidence they are

- Proceedings -                              19

1   trying to get in.  I think analytically they should be kept

2   separate.

3           The first is the one or two incidents of physical

4   restraint which took place allegedly in 2001, and 2002.  There

5   is no allegation of any acts of physical restraint from that

6   period of time, 2001, 2002, all the way to eight years later,

7   to 2010, during the indictment phase.

8           So I think the physical restraint, there is enormous

9   gulf between the two incidents they refer to on the physical

10  restraint side and the charged period of time.  It is

11  inadmissible on that basis.

12          The second piece of evidence, second bucket of

13  evidence are these contracts, the employment contracts that

14  the government refers to.  They have represented to the Court

15  that those contracts run throughout the pre-indictment period.

16          We have no idea what that evidence is, Your Honor.

17  They have not provided any of those contracts to us.

18          We have one contract and one contract only, and it

19  is during the indictment period.  We have not seen a single

20  contract from the pre-indictment period.  They have not

21  alleged it in any pleading or affidavit.  It is not in the

22  indictment.  It is not in the Complaint.  It is not in the

23  search warrant affidavit.

24          All they have done is made relatively vague

25  references to those supposed contracts.  In their motion in

- Proceedings -                                    20

1    limine and as amplified by Mr. Solomon today.  We don't know

2    who the contracting parties are.  We don't know if the

3    contracts were executed at all.  We don't know what the terms

4    are.

5         So I think it is inappropriate on a motion in

6    limine, with all of those unanswered questions, which could be

7    outcome determined, for the Court to grant a ruling that any

8    of this pre-charged conduct is admissible.

9         THE COURT:  Let me hear from the government about

10   the later point that was made by counsel.

11        MR. SOLOMON:  By the later point being that--

12        THE COURT:  About the discovery concerning-- and no

13   discussion about any of the labor bondage contracts between

14   2002 and 2010.

15        MR. SOLOMON:  Correct, Your Honor.

16        First I would note that the contracts, the labor

17   contracts with the escapees are the subject of the Court's

18   March 2017 Rule 16(d)(1) order, which permits us to disclose

19   those contracts to the defense 120 days before the trial.

20   They are also the--

21        THE COURT:  That is for the escapees, okay.

22        MR. SOLOMON:  Correct.

23        THE COURT:  But, we are talking about a period of

24   time where there may not have been any escapees, but still

25   workers who entered into these bondage contracts, correct?

- Proceedings -                    21

1          MR. SOLOMON:  That's correct, Your Honor.

2          THE COURT:  From 2002 to 2010.

3          MR. SOLOMON:  During that--

4          THE COURT:  We are talking about a number of

5    different groups here, right?  So there are the escapees, are

6    there any additional escapees between 2002 and 2010?

7          MR. SOLOMON:  No, the only escapees that occurred

8    are 2001, 2002, and 2010.

9          THE COURT:  Okay.

10          MR. SOLOMON:  And as I mentioned, the evidence

11    regarding the use, the continued use of debt bondage contracts

12    between 2002 and 2010, is testimonial in nature.  There will

13    be no Rule 16 disclosures in that regard.

14          THE COURT:  Say that again to me.

15          MR. SOLOMON:  The evidence regarding the continued

16    use between 2002 and 2010 of the bondage contracts, is

17    testimonial in nature.  There will be no Rule 16(d)

18    disclosures of additional contracts during that period.

19          THE COURT:  There is no physical documents?

20          MR. SOLOMON:  There are no physical documents.

21          The physical documents that we have, and we obtained

22    judicial authorization to delay discovery of, are the

23    contracts relating to the escapees, the ones from 2001, 2002,

24    2010.

25          Lastly, I would note that Mr. Cleary argues that

- Proceedings -                                    22

1   there are two different strands of conduct here.  It is our

2   view, it is one in the same.

3           The use of the bondage contracts, was throughout.

4   And, the persons, the escapees who are the subject of

5   rendition efforts by the defendant, and other members of China

6   Rilan, entered into the same bondage contracts that the

7   workers who did not escape between 2002, and 2010, entered

8   into.

9           Moreover, in 2010, when one of the workers escaped

10  again, the evidence will show that this defendant sent a

11  rendition squad to attempt to locate the escapee.

12          The mere fact that the rendition squad was

13  unsuccessful in locating the escapee, does not mean that the

14  conduct in 2001, 2002, is more inflammatory than what occurred

15  in 2010.

16          THE COURT:  I have a question for Mr. Cleary or

17  anybody on the defense team who wants to answer it.

18          The government has provided a decision from a court

19  of concurrent jurisdiction, from Wisconsin, on a rather

20  similar issue in connection with the introduction of alleged

21  prior bad acts, that were alleged to have occurred when the

22  defendant in that case, had diplomatic immunity.  There was no

23  question in that case, everyone agreed that at the time in

24  question, that defendant had diplomatic immunity with the PRC.

25          It appears that the-- and granted that that is a

- Proceedings -                                23

1    court of concurrent jurisdiction, it is not a published

2    opinion.  So, it has perhaps some persuasive value, although

3    it is not binding precedent.

4            Nonetheless, it appears that the crux of that ruling

5    is that there is nothing in the consular convention between

6    the United States and the PRC, that serves as an evidentiary

7    exclusionary rule, with respect to the acts that were alleged

8    to have occurred in a prosecution that occurs after the

9    termination of diplomatic immunity for conduct after the

10   termination of diplomatic immunity in this-- at least in the

11   situation where-- as that court found that the-- the acts were

12   pertinent to the acts in question in the prosecution.

13           I looked through the language that was cited in the

14   opinion and some of the language that has been cited by the

15   government.  Where in the ruling or where in the convention

16   is-- do you find language that lends support to your

17   contention that the fact of diplomatic immunity serves as an

18   exclusionary rule for evidence?

19           MR. CLEARY:  I find-- our argument, Your Honor, is

20   based upon the notion and the objectives and purposes of the

21   diplomatic immunity doctrine.  I can explain that to you if

22   you would like.

23           So our position is that during the pre-2010 period,

24   as you know, our position is that he-- Mr. Zhong enjoyed the

25   protection of diplomatic immunity and the government tries to

- Proceedings -                                    24

1    get around that by arguing as they have, that he was not

2    charged, Mr. Zhong was not charged for pre-2010 conduct, so

3    evidence of pre-2010 conduct is admissible.  That is the

4    government's position.

5            There are two problems with that argument, Your

6    Honor.  They are going to be offering, they are trying to

7    offer, concededly immunized acts, in order to prosecute Mr.

8    Zhong for the charges in the indictment, and that attempt lies

9    in the face of the notion of diplomatic immunity.

10           He cannot be prosecuted based on immunized conduct,

11   and if that evidence comes in, that is exactly what would

12   happen.

13           The second problem with the government's argument,

14   is that one of the main purposes of diplomatic immunity--

15           THE COURT:  Well, except the government is

16   contending, argues for example that even though a person

17   cannot be prosecuted for a murder, for example, while that

18   person has diplomatic immunity, if the murder is committed

19   after immunity privilege has ended, but it was planned before

20   immunity ended-- for example, let's say it is a contract

21   killing and the contract was negotiated and paid for at least

22   in part, I give you some money up front to kill this person, I

23   will give you the rest of the money after the murder has been

24   done.  They argue that they should be entitled to introduce

25   that evidence, because obviously it is extractably

- Proceedings -                                    25

1    intertwined, it helps complete the story, it helps explain the

2    defendant's state of mind, his intent, his knowledge and so

3    on.

4            But in addition, it is arguably outside the kind of

5    conduct, unless it was done at the direction of the sending

6    company, country, that is-- let's leave that complication to

7    the side.  I watch way too many spy things.

8            But, their argument is, that that would be outside

9    of the duties, right, that the person now accused of the

10   murder who had immunity was tasked with.

11           What I am hearing the government say now, which

12   wasn't fully fleshed out in their papers, is that the

13   defendant's acts were not acts that were consistent with the

14   duties that he was actually immunized for in connection with

15   the mission, the PRC mission.

16           Either during the time that he was in New York City

17   or the time he was in Washington, D.C..

18           MR. CLEARY:  On that argument, Your Honor, we

19   believe-- we just disagree with the government.  We believe

20   these were official acts and the reason we believe these were

21   official acts, is at the pre--- during the pre-indictment

22   phase, Mr. Zhong was here, the whole purpose of him being in

23   the United States, was as an employee of China Rilan, Chinese

24   company, doing their work in these construction projects at

25   the diplomatic facilities that you have heard about.  That is

1    the only reason he was here.  That is what he was sent here to

2    do.

3           The acts that the government complains of, the

4    pre-charged conduct, they are trying to get into evidence, is

5    all activities that Mr. Zhong engaged in as part of those job

6    responsibilities, working to get workers at the diplomatic

7    facilities and to keep them working at the diplomatic

8    facilities.  That is his job.  So they are official acts.

9           As to the argument, that the government's argument,

10   that the immunized, those official acts, those immunized acts

11   are admissible in charging and prosecuting Mr. Zhong for a

12   period of time where he is not immunized.  The problem with

13   that is, if there is a conviction, it will be because that

14   immunized conduct was introduced into evidence at trial.  And

15   therefore, he would be convicted based on immunized acts.

16          That we believe is impermissible by the whole

17   notion, the doctrine of diplomatic immunity.

18          The other problem with the government's argument,

19   Your Honor, is that one of the main purposes of diplomatic

20   immunity, is to afford foreign diplomats who are here, and

21   U.S. diplomats who work abroad, to afford them a zone of

22   completely protected conduct.  This way, they can exercise the

23   diplomatic powers, without fear of immediate interference,

24   like being arrested, and without fear of subsequent reprisal.

25   That is being prosecuted for their diplomatic acts when they

- Proceedings -                                          27

1   are no longer diplomats.

2          And both of those risks, and this immediate

3   punishment or interference and the risk of subsequent

4   reprisals are equally harmful and would have the same chilling

5   effect, on the unbiased and unfettered exercise of diplomatic

6   power.

7          So, in short, the government's position would

8   undermine the very purpose and objective of the diplomatic

9   immunity doctrine, including through U.S. diplomats, former

10  U.S. diplomats who have served our country abroad.

11         THE COURT:  The government want to respond to that?

12         MR. SOLOMON:  Yes, I think it is important to note

13  that diplomatic immunity offers immunity from prosecution for

14  the time period when a person is an accredited diplomat.  It

15  is not an evidentiary privilege that precludes the government

16  from introducing acts occurring during the time period when a

17  person is a diplomat.

18         The defendant offers no statute, no treatise, no

19  case, or rule evidence that supports this notion that anything

20  that he did, cannot be used.  All we are seeking to do here is

21  to use it.

22         THE COURT:  But, it goes back to the very foundation

23  of diplomatic immunity, right?  The whole point is to provide

24  mutual protection, right?  To our country as a sending

25  country, if we send people abroad.  If we have people going to

- Proceedings -                                    28

1    the PRC and vice-versa, to provide them that zone of

2    protection.

3           And, I think the logical extension of the argument

4    that the defense is making, is that absent this absolute zone

5    of immunity, would have a chilling effect.  You would not get

6    people who would want to serve on the diplomatic service, if

7    they were afraid that even a mistake, could be conceived as,

8    you know, violative of the law of the country that they are in

9    at the time.

10          MR. SOLOMON:  I think in this case--

11          THE COURT:  And then you would have the problem

12   where no country could be guaranteed the safety of their

13   diplomats short of just pulling them out immediately prior to

14   any termination of service.  Assuming that there is no

15   extradition.

16          MR. SOLOMON:  In this case, we are not seeking to

17   prosecute the defendant for conduct being committed between

18   2001 and November of 2009.  We are seeking to introduce

19   evidence of what he did during that time period, to show that

20   between 2001, and 2016, he was a principal of China Rilan.

21   That he arranged these contracts.

22          When people escaped, he organized crews to run after

23   them.  So that we don't end up with a trial that shows, in

24   2010, he is principal of China Rilan, the jury doesn't

25   understand how that happens.  They don't understand how he

- Proceedings -                                        29

1    negotiated for these debt bondage contracts.

2           He is going to argue and he has argued repeatedly

3    the acts of other China Rilan employees, and representatives

4    were acts he had no knowledge of.  So when-- an escapee from

5    2010 testifies, we expect them to argue and they have

6    indicated through the papers, they will argue, that escapee is

7    not to be believed.

8           So it is absolutely critical, that for the jury to

9    understand the entire story of what happened here, the

10   defendant was the principal beginning in 2001, that continued

11   unabated until his arrest in 2016.

12          THE COURT:  Mr. Clearly why wouldn't, if the Court

13   were to permit the government to bring in this evidence, why

14   wouldn't a limiting instruction to the jury suffice to protect

15   any prejudice to the defendant?

16          MR. CLEARY:  Because Your Honor--

17          THE COURT:  In terms of, you know the effect on

18   diplomatic immunity.

19          MR. CLEARY:  Well, for two reasons.

20          First of all, if that were the instruction, that

21   they should not be considering the pre-charged conduct for

22   purposes of prosecuting him, reaching a guilty verdict for the

23   charged conduct, then that pre-charged conduct is completely

24   relevant.  Number one.

25          Number two, I believe it would be an impossible task

- Proceedings -                              30

1    for any juror--

2            THE COURT:  Not necessarily.  We give limiting

3    instructions all the time, admitting-- and the government had

4    a number of cases as examples, where this type of conduct has

5    been admitted, to complete the story.  To show relationships

6    between people.  To show-- to put things in context, to

7    complete the story.

8            MR. CLEARY:  I think--

9            THE COURT:  As opposed to proving that the defendant

10   actually committed the acts charged within the period of time

11   specified in the indictment.  Otherwise the jury is left to

12   wonder, well, how did the defendant get involved in this

13   company.

14           MR. CLEARY:  I have no problem with that concept.

15   What makes this different is the conduct we are talking about,

16   is immunized conduct.  So it is one thing to tell a jury when

17   you are not talking about immunized conduct.  One thing to

18   tell the jury, you can use this evidence as the Court

19   instructs them for a limited purpose as the case maybe.  It is

20   another matter entirely I believe to tell the jury, they can't

21   consider this evidence for any purpose in convicting the

22   defendant, because if they did that, consider the pre-charged

23   conduct, for any purpose, plan, scheme, motive, continuing

24   act, whatever it may be, for purposes of convicting him on the

25   charged crimes, we would have run a foul of diplomatic

- Proceedings -                                        31

1   immunity because by its very definition, the immunized conduct

2   would be used to prosecute the defendant.  That is what makes

3   this different, Your Honor.

4            THE COURT:  Do you wish to respond to that Mr.

5   Solomon?

6            MR. SOLOMON:  One moment, please, Your Honor.

7            THE COURT:  Sure.

8            (Pause.)

9            MR. SOLOMON:  Just briefly, Your Honor.

10           I think Mr. Cleary is conflating the notion of what

11  evidence can be used to convicted the defendant in this case,

12  that evidence is all post January 2010 evidence.

13           The earlier evidence is merely to show the

14  background of the conspiracy, to show the defendant's

15  knowledge of the scheme, and the relationship between the

16  defendant and the various actors in this case.

17           I think as Your Honor noted, limit-- the Second

18  Circuit has repeatedly approved of limiting instructions and

19  with respect to both 404(b) evidence and also evidence of

20  background to the conspiracy.

21           THE COURT:  Let's move on to another question that I

22  have in connection with alleged false statements by the

23  defendant in non A-2 and G-2 visas.

24           The government has represented that it will not

25  introduce evidence in its case in chief or make arguments in

- Proceedings -                                    32

1   its case in chief, at trial, concerning any other types of

2   visas including B1, B2, H1B, and F1 visas.

3           However, what the government is requesting that it

4   is, if the defendant chooses to testify in his defense at

5   trial, then the government would want to cross examine the

6   defendant about false statements in these other visa

7   applications.  And the A-2 and G-2 visa applications are the

8   subject of Count Five of the indictment.

9           First of all, I am not sure what these other visas

10  were issued in connection with, and whether they are false

11  statements of the defendant himself or false statements of

12  other people.

13          MR. SOLOMON:  Mr. Pravda will answer this.

14          THE COURT:  It is a compound question, I apologize.

15          MR. PRAVDA:  Your Honor, the government's intent is

16  only to introduce false statements by the defendant in

17  connection with cross examining him.  We would only impeach

18  the defendant with his own false statement, not with false

19  statements made by anyone else in connection with other visa

20  applications.

21          THE COURT:  What were these other visas in

22  connection with?

23          MR. PRAVDA:  So, for example, Your Honor, one piece

24  of information that the government has in this case is that

25  certain visas were requested by U.S. Rilan, the defendant's

- Proceedings -                              33

1    company, not for any legitimate purpose within that company,

2    but simply to allow relatives of the owner of China Rilan, who

3    is the defendant's uncle, Wong, to come into the United

4    States.

5              So there were false statements made in connection

6    with visa applications, that represented those individuals

7    would be coming in for purposes that were false.  And the

8    defendant signed one of these visa applications that the

9    government has information, that is false.  That is an example

10   of something that the government would cross examine the

11   defendant about, should he choose to testify at the trial.

12             THE COURT:  You wish to respond to this?

13             MR. CLEARY:  Just briefly, Your Honor.

14             I don't really know what these visa applications are

15   beyond what Mr. Pravda just described to us.

16             I think this is an issue that probably is

17   inappropriate for an in limine ruling.  As we sit here today,

18   I mean we don't know whether Mr. Zhong is going to testify or

19   not.  And if he did, you know, we can take it up at that

20   period of time.

21             THE COURT:  I am not intending to delay the jury in

22   any way for the Court to be able to decide issues that I could

23   be deciding now.  Obviously whether or not Mr. Zhong decides

24   to testify is a choice that is up to him, and I would not be

25   putting his feet to the fire to decide that at opening

- Proceedings -                                    34

1   statements or even at any point in time during the

2   government's case.  Only until such time as it is the

3   defense's turn to decide whether or not it is going to put on

4   a case.  That is always a decision that I believe a defendant

5   has a right to make, only once it has seen the whole case in

6   chief.

7          So, I am not-- I don't mean by any consideration of

8   the government's request to in any way bind the defendant to

9   anything.  Just to be clear about that.

10          But to the extent that this is really a purely legal

11   decision as to whether or not any-- were these false

12   statements made under oath?  Were these false statements that

13   were made under oath?

14          MR. PRAVDA:  They were submitted, I believe under

15   penalty of perjury.  The application itself indicated that it

16   had to be signed under penalty of perjury.

17          THE COURT:  I think that that is purely a legal

18   decision that is made obviously contingent on whether or not

19   the defendant testifies.  The government would be precluded

20   from introducing that in its case in chief, and in fact, the

21   government has represented that it is not intending to use it

22   in its case in chief.

23          My question to you at this point is, is there any

24   legal basis for the Court precluding the government from using

25   those documents to cross examine the defendant, should he

- Proceedings -                                       35

1    decide to testify at the trial?

2              MR. CLEARY:  I would agree that you know false

3    statement made by a testifying witness is generally fair game

4    if it is a material false statement.

5              The only restriction on the use of the evidence that

6    I am aware of is under 608(b), where they can cross examine on

7    certain acts, but not introduce the underlying documents or

8    evidence.

9              THE COURT:  Bear with me for one second.

10             (Pause.)

11             THE COURT:  I just wanted to be clear about the

12   Redfield affidavit, this goes to the government's motion in

13   limine.  Is that as a response, if the defense calls him to

14   testify?

15             MR. SOLOMON:  No.  Only if-- we intend to call Mr.

16   Redfield to testify.  It is only if he is cross examined about

17   the specific affidavit that the defense drafted for him to

18   sign, that we would on redirect examination, seek to introduce

19   the circumstances surrounding creation of the affidavit.

20             THE COURT:  Do you wish to respond to that?

21             MR. CLEARY:  Just briefly, Your Honor.

22             I am not sure.  First of all, I am not sure we are

23   going to cross examine him on the affidavit.  If we did, and

24   the government made that application, I would want at the

25   time, I would encourage the Court to come up with a balancing

- Proceedings -                                          36

1   ruling on this, because the circumstances they are referring

2   to, were some activities by our predecessor counsel.

3             THE COURT:  I understand.

4             MR. CLEARY:  So I would want to make sure that there

5   is nothing that they elicit that will reflect negatively on

6   Mr. Zhong or us as counsel.  I might have a position on that

7   at the time.

8             THE COURT:  As I said, I will defer ruling on that.

9   I want to think about it some more.  But, it may very well be,

10  this maybe an application that maybe premature at this point

11  in time.  I will have to see how the testimony progresses

12  during the course of the trial.

13            I'm not saying that I would be precluding the

14  government from going into the circumstances of the

15  preparation of the affidavit.  But I think-- I think it is

16  just a little bit premature at this point until I actually see

17  how the testimony comes out both on direct and cross

18  examination.

19            But, I am glad that it has been raised now, so that

20  we can all think about it in advance and it doesn't quite take

21  everybody by surprise when and if the time comes in connection

22  with that.

23            So those are the questions that I had in connection

24  with the motions in limine.  I would like some additional

25  briefing on that issue that we discussed in connection with

- Proceedings -                                    37

1    the diplomatic immunity based on notice to the State

2    Department.

3           It is the government's position, so if we could

4    have-- I will take letter briefs as opposed to a formal

5    motion.

6           When can you have that for me?

7           MR. SOLOMON:  Your Honor, if I can ask for two weeks

8    simply because we would need an official certification from

9    the State Department.

10          THE COURT:  Is that going to give you enough time

11   given the fourth of July?

12          MR. SOLOMON:  That maybe a bit aggressive.

13          THE COURT:  Yes, kind of, I think.

14          How about July 11th?

15          MR. SOLOMON:  That is fine, Your Honor, thank you.

16          THE COURT:  How much time Mr. Cleary for your

17   response?

18          MR. CLEARY:  Just one second, Your Honor.

19          (Pause.)

20          THE COURT:  Do you have a citation to that Second

21   Circuit case?

22          MR. SOLOMON:  I don't with me, Your Honor.  I can--

23          THE COURT:  It will be helpful if-- I guess you will

24   discuss it in your papers anyway.

25          MR. SOLOMON:  I can also provide a letter today with

- Proceedings -                    38

1    a citation if that is helpful.

2              THE COURT:  That will be helpful, yes.

3              MR. CLEARY:  We have a week, Your Honor?

4              THE COURT:  Would you like time to reply to the

5    defendant?

6              MR. SOLOMON:  Sure.  If it is not necessary, we will

7    indicate to the Court that we are not replying.

8              THE COURT:  So, July 25th for reply.

9              There is one other-- I'm sorry, I did have a

10   question with respect to the government's request for

11   reciprocal discovery and preclusion.

12             Has any reciprocal discovery been made by the

13   defense?

14             MR. CLEARY:  It has not, Your Honor.

15             THE COURT:  The defense should understand that if

16   there should have been reciprocal discovery made, that was not

17   made, that the defense may find itself precluded from using

18   that evidence.  So as long as Mr. Zhong understands that and

19   counsel understands that.

20             MR. CLEARY:  We understand.  We are just-- so the

21   Court knows, we are not in a position right now to figure out

22   what documents we will be seeking to use in our case in chief.

23             And realistically, I don't think we will be in a

24   position to do that until we get full discovery from the

25   government.  Like the employment contracts have not been

- Proceedings -                                        39

1   produced to us yet.  There is pretty significant discovery we

2   don't have yet.

3          THE COURT:  I do understand that, to a certain

4   degree reciprocal discovery is tied to what the government

5   produces.  But, then again, with respect to anything that

6   might be in the defendant's possession that you have not

7   received yet from the government that clearly you have that--

8   might likely be used, then you might-- you are risking

9   preclusion if you don't turn that over and it should have

10  been.

11         MR. CLEARY:  Understood, Your Honor, thank you.

12         THE COURT:  So, the balance as I understand it, I

13  know that there has been some continuing Rule 16 discovery.  I

14  see the letters that have been going back and forth.  Not that

15  I feel that I necessarily want to see all of that clogging up

16  the docket.  Because it is -- I don't see the attachments, so

17  not that I'm interested in seeing the attachments either.

18         But, as far as I can tell what remains is the

19  discovery that is under the protective order, the timing of

20  which disclosure is dependent on setting of the trial date.

21  Correct?

22         MR. SOLOMON:  That's correct.  Mr. Pravda, I believe

23  will discuss some other discovery related issues.

24         THE COURT:  Why don't we discuss the other discovery

25  related issues first.

- Proceedings -                                40

1          MR. PRAVDA:  Sure.

2          In addition to the discovery, under the protective

3    order, meaning the category of outstanding material, Your

4    Honor.  There are some search warrant returns that we have

5    either very recently received or expect to receive from search

6    warrants of third parties that the government had served.  In

7    fact in some cases, years ago.

8          As the Court will recall, there were a number of

9    service providers, that in response to the Microsoft decision,

10   in the Second Circuit, declined to provide the government with

11   electronic data.  That was responsive to search warrants that

12   were stored outside of the United States.

13         With the recent enactment in Congress of a bill to

14   rectify that issue, the service providers have now been

15   producing to the government, responsive material from the

16   prior warrants, which the government in some cases has also

17   updated.

18         So, we received a production for example several

19   weeks ago, which we are in the process of going through.  We

20   are reviewing and a translation review, because that material

21   is in Chinese.  We will be providing some of those materials

22   to the defense shortly.

23         Then we still expect to continue to receive from

24   providers, additional responses, E-mails, so that is the

25   outstanding things at this point, other than what is subject

- Proceedings -                          41

1   to the protective order.

2          THE COURT:  Is there anything outstanding from the

3   taint team?

4          MS. MACCHIAVERNA:  No, Your Honor.  The taint team

5   has completed its review of all the materials it has received

6   from the prosecution team to date.  It sounds as if we will be

7   receiving some additional search warrant to go through filter

8   team.  We will complete the review of those materials

9   expeditiously and produce them to the prosecution on a rolling

10  basis.

11         THE COURT:  How long is the trial of this case

12  expected to take?

13         MR. PRAVDA:  We are expecting an approximately two,

14  perhaps three weeks for the government's case.

15         THE COURT:  And again, I don't like to hold the

16  defense's feet to the fire on this, but if you can give me

17  some sort of estimate.

18         Are you taking into consideration any potential

19  defense cross in the Government's estimate?

20         MR. PRAVDA:  I think we are, Your Honor.

21         MR. CLEARY:  I would estimate about one week for the

22  defense case, Your Honor.

23         When the Court is ready, I do have two follow up

24  issues on the discovery that you were talking to the

25  government counsel about.

- Proceedings -                    42

1        THE COURT:  Okay.

2        (Pause.)

3        THE COURT:  I am assuming that doesn't include jury

4   selection time and deliberation time.

5        MR. PRAVDA:  It doesn't, Your Honor.  But we are

6   taking into account the fact that a number of witnesses are

7   going to be testifying in Chinese, and so there will be

8   translation and that will slow down the testimony.  We have

9   taken that into account in our estimate.

10        THE COURT:  Yes, let me hear you about discovery.

11        MR. CLEARY:  Thank you, Your Honor.

12        Just two areas that I want to inquire about as to

13   when they are going to be produced to us.

14        One are the diplomatic notes.  This is the

15   correspondence related to the issuance of the visas.  That's

16   the correspondence between the Department of State, and the

17   embassy.  And we had requested that all of the diplomatic

18   notes for the indictment period, January 2010, till November

19   of 2016 be provided.

20        The government has only given us the diplomatic

21   notes for the very tail end of the indictment periods,

22   March 2016 through November 2016.  We have been back and forth

23   with the government on it.  I know they are dealing with the

24   Department of State, to try to fulfill our requests.

25        But our request has been pending since 2017.  These

- Proceedings -                                                        43

1    reviews have critical documents for Count Five, which is the

2    visa fraud count.

3              So, I would like to try to get the government to

4    produce the full range that we asked for as quickly as

5    possible.

6              THE COURT:  What is the status of that?

7              MR. PRAVDA:  Your Honor, the short answer is that we

8    have been working very closely with the State Department to

9    obtain those documents.  The State Department has gathered

10   relevant documents and they are in the process of

11   corresponding with the PRC government about this request.

12             Because these are diplomatic communications from one

13   country to another, there is a certain sensitivity that

14   requires the State Department to coordinate with the foreign

15   government prior to giving the Justice Department permission

16   to disclose those to a private, not a private, to a-- in the

17   discovery process.

18             So the State Department is going through that.  We

19   obviously have no control over how long that specific process

20   is going to take.

21             THE COURT:  Have they given you an estimate how long

22   it will take?  Can you get an estimate as to how long it will

23   take?

24             MR. PRAVDA:  Your Honor, given the caveats, Your

25   Honor, if all goes well, by which I mean, that there are no

- Proceedings -                    44

1   complications that arise from this conversation between the

2   State Department and the PRC, they are hopeful that they can

3   give them to us this summer.

4            But they have--

5            THE COURT:  What does that mean, the summer starts

6   tomorrow and continues until September.  So, what does that

7   mean?

8            MR. PRAVDA:  I'm thinking July, August, Your Honor.

9            However, they did caution that there are a number of

10  issues that can complicate that.  Including the current status

11  of the U.S. relationship overall.

12           So, that is the caveat that they offered me and so I

13  have offered that to the Court.

14           I will say, Your Honor, that we have-- are engaged

15  in weekly calls with the State Department to keep on top of

16  the progress.  They understand this is an important issue and

17  they are working toward doing that as quickly as they can,

18  given the reality of the factors that they are engaged in a

19  foreign government with this issue.

20           THE COURT:  What is your second?

21           MR. CLEARY:  The second and final one, Your Honor,

22  relates to translations in the December pretrial conference.

23  The government represented that it would provide the

24  translations of the Chinese language documents, that it

25  intends to use at the trial, as well as translations of the

- Proceedings -                                      45

1    prison phone calls that it intends to use at the trial, as

2    soon as those translations are ready.

3              And, I would like to get those as quickly as

4    possible, because our translations are not necessarily going

5    to be the same as theirs.  So I will have a back and forth

6    with the government to resolve those differences.

7              THE COURT:  When will those be turned over?

8              MR. SOLOMON:  Your Honor, we are working

9    expeditiously with F.B.I. linguists to finalize the documents

10   we intend to use at the trial.  It is my hope within

11   six weeks, we can turn everything over that we intend to use

12   at the trial, with the caveat that there may come, there maybe

13   some additional materials that come into the government's

14   possession as we receive them from service providers.

15             THE COURT:  Well, to the extent that there maybe

16   issues concerning translations, I don't know if you are

17   planning to use recordings, are you planning to use

18   recordings?

19             MR. SOLOMON:  The only recordings I'm aware of are

20   the prison calls, Your Honor.

21             THE COURT:  To the extent that there might be issues

22   concerning the accuracy of translations, or any audibility

23   issues, concerning any recorded conversations, I would want to

24   have a hearing on that sufficiently in advance of trial.  At

25   least a month or two prior to trial.

- Proceedings -                                        46

1        Just to give the parties enough time then to make

2    whatever corrections have to be made, if any.  And the Court

3    has to determine whether or not it will need its own

4    interpreter to review any items.

5        If the dueling interpreters cannot agree on a

6    particular phrase or language, and particularly, if it appears

7    to be material, and that could be a pretty tedious process,

8    and a difficult one.  Given that Mandarin language

9    interpreters are in very high demand in this particular area.

10   So, while there maybe several of them, they are in very high

11   demand.  So it is not an easy thing to get several Mandarin

12   interpreters for one proceeding.  I have had experience with

13   that in the past.  So, it is going to take some planning to do

14   that.

15       So, the government should plan on turning those over

16   by August 3rd, the translations I'm talking about to be clear.

17             MR. SOLOMON:  Yes, Your Honor.

18             THE COURT:  How long do you think it will take you

19   and your language experts to review anything and provide some

20   assessment as to whether or not a hearing is going to be

21   necessary?

22             MR. CLEARY:  I suspect that will turn on the

23   volumes, so maybe I can ask the government for just a ball

24   park estimate of hours of tapes, the numbers of documents.

25             THE COURT:  Do you have an idea at this point, if

- Proceedings -                                    47

1    you can estimate.

2           MR. SOLOMON:  I think it would be hard to estimate.

3    We can correspond with Mr. Cleary after I consult with the

4    F.B.I. today.  I don't believe the volume is overwhelming

5    though.

6           THE COURT:  Why don't I just give you an equal

7    six weeks to take a look at that, taking into account we are

8    going into summer, there is Labor Day intervening.  I think

9    the Jewish holidays come early this year as well.

10          So let's say September 12th, if you can-- defense

11   can provide a letter to the Court as to any issues that you

12   see with respect to the translations.

13          MR. CLEARY:  That is fine, Your Honor.

14          THE COURT:  I think with respect to the protective

15   order, correct me if I am wrong, the protective order provides

16   that the remaining Rule 16 discovery will be provided

17   four months prior to the trial date, correct?

18          MR. SOLOMON:  120 days, correct.

19          THE COURT:  120 days.

20          I would propose to set a trial date for January 7th,

21   because I think that way, we will build in the time to get the

22   discovery, the time to get the additional materials that the

23   government is getting now, based on the new legislation that

24   was passed by Congress in response to the Second Circuit's

25   Microsoft decision.

- Proceedings -                                        48

1          I assume some of those are going to be in Mandarin
2     as well, as it has been in the past.  It still has to go
3     through the taint team and there is also information that is
4     still pending from the State Department.

5               And, I also need time to give you-- get the
6     supplemental briefing for the motion in limine, and to get you
7     decisions on -- decisions on all the motions.  I expect to
8     have a separate decision on the Frank's motion and a separate
9     decision on the motions in limine.  But I will deal with all
10    the motions in limine together in one decision.  Okay.

11              I think however, that we-- is July 7th a good day
12    for everybody?

13              MR. SOLOMON:  January 7th.

14              THE COURT:  I'm sorry, January.  That would really
15    freak everybody out.  No, January 7th.  Is that good for trial
16    for everybody?

17              MR. SOLOMON:  Yes, Your Honor.

18              MR. CLEARY:  Fine, Your Honor, thank you.

19              THE COURT:  Then, the government will work backwards
20    from that, to provide counsel with the remaining discovery
21    that you will get.  But I would like to meet with the parties
22    before that.

23              It would be my-- I'm sorry.

24              MR. SOLOMON:  We are online.

25              THE COURT:  You are connected?

- Proceedings -                                49

1          MR. SOLOMON:  Yes.

2          THE COURT:  It would be my intention to refer the

3  jury selection to the Magistrate Judge, who is always selected

4  by random selection.

5          And in which case, any issues concerning jury

6  selection will be addressed to that Magistrate Judge.  But I

7  still would want to meet with the parties sometime way before

8  that to discuss any issues that might have arisen.

9          So, the government should be providing the protected

10 discovery by September 7th.  By September 12th, I will be

11 getting a letter from the defense counsel about translations.

12         So, perhaps maybe a time in October might be a good

13 time for us to meet?

14         MR. SOLOMON:  That's fine.

15         MR. CLEARY:  Could we do earlier in the month, Your

16 Honor?

17         THE COURT:  How is Wednesday, October 3rd.

18         MR. SOLOMON:  That is fine for the government.

19         MR. CLEARY:  And the defense as well, Your Honor,

20 thank you.

21         THE COURT:  10 o'clock is good for everybody?

22         MR. SOLOMON:  Yes, Your Honor, thank you.

23         THE COURT:  That will be for a status conference.

24 Obviously, the Court will make itself available to the parties

25 if issues should arise that you feel require an in person

- Proceedings -                                        50

1    conference.  Just coordinate that with my deputy.  It is

2    always helpful if we get something in writing that clarifies

3    for us what the issues are.  A simple letter will do in that

4    regard.

5             I will enter an order of excludable delay until

6    January 7th for the trial.  There is a substantial amount of

7    work that still needs to be done.  This is still a complex

8    case and as I said, if we do need to meet earlier, we will try

9    to accommodate the parties as best we can.

10            MR. CLEARY:  Your Honor, if I can raise a record

11   keeping matter.

12            THE COURT:  Yes.

13            MR. CLEARY:  I know there is a number of ex parte

14   applications and orders.  They are not-- a number of them are

15   not showing up on the public docket.  I am fine with that.  I

16   want to make sure those, the applications and for appeal

17   purposes are all filed.

18            THE COURT:  Everything has-- it appears on the

19   docket as an ex parte application, but it is on the docket.

20            COURTROOM DEPUTY:  They may not be able to see them.

21            THE COURT:  The public is not going to be able to

22   see it.

23            Again this is something that we need to explore

24   either at the end of the case or even pretrial, right?  To the

25   extent that the need for the ex parte submission has

- Proceedings -                                      51

1    dissipated, particularly once the trial is over, then that can

2    all be unsealed.

3            Some of the ex parte applications have to do with

4    trial strategy and so on.  So, in terms of applications for

5    certain discovery and so, obviously that may have to wait

6    until the end of the case.

7            MR. CLEARY:  That is fine Your Honor.  I wanted to

8    make sure that there is a record.

9            THE COURT:  There is always a record.  It is my

10   policy even if it is ex parte.  Nobody will be able to see it

11   but the filing is there.

12           MR. CLEARY:  And then related to that, the

13   government has in light of I think it is the March 2017

14   protective order, has the right to withhold in its entirety

15   some--

16           THE COURT:  March 2017?

17           MR. CLEARY:  March 2017, protective order.  They are

18   granted the right to withhold in its entirety certain

19   discovery, unspecified discovery.  If they are-- we don't know

20   whether they have done that or not.  If they are going to do

21   that, we ask that a record be made for appeal purposes, of

22   what it is that is discoverable but not being provided to us,

23   either in its entirety or because it is redacted.

24           THE COURT:  You are talking about CIPA material.

25           MR. CLEARY:  I'm not sure it is CIPA, in the order

- Proceedings -                          52

1   that the Court issued, unrelated to CIPA in March of 2017--

2           THE COURT:  That would be docket entry 39.  So that

3   we have a-- is that docket entry 39?

4           Yes.

5           MR. CLEARY:  It is.

6           THE COURT:  That is the order itself.  But that was

7   based on the government's ex parte motion which is docket

8   entry 38.

9           MR. CLEARY:  As Your Honor knows, that authorizes

10  the-- among other things, the government to withhold certain

11  discovery from the defense.  If they are doing that, we would

12  like a record for appeal purposes of what that discovery is.

13          THE COURT:  It is in the ex parte application.

14          MR. CLEARY:  Okay.  It is identified there.

15          THE COURT:  Yes.

16          MR. CLEARY:  Fine.

17          THE COURT:  Yes, it is identified there.  There are

18  a number of exhibits.

19          MR. CLEARY:  In that case, I have nothing further.

20          THE COURT:  Again it provides as well-- what the

21  government was requesting was delay of discovery to withhold

22  certain discovery and to provide redacted discovery.

23          So it is very likely just looking at this that some

24  of this-- that this will be moot later, because some of this

25  is going to have to be disclosed as 3500 material anyway.

- Proceedings -                                    53

1          MR. CLEARY:  Thank you, Your Honor, I have nothing

2     further.

3          THE COURT:  That is all been preserved.  Thank you.

4          MR. SOLOMON:  Your Honor, I'm sorry.  We have one

5     additional thing.

6          THE COURT:  Yes, I'm sorry.

7          MR. PRAVDA:  We have one additional point we would

8     like to raise Your Honor, as I think the Court will recall,

9     the defense has been asking us to identify by count, which

10    specific victims or which specific individual, visa

11    application was submitted, that the government intends to

12    offer proof of at trial.

13          We turned over yesterday to the defense, a list Your

14    Honor of approximately fifty individuals, with respect to

15    Counts One through Four, and possibly 25 individuals with

16    respect to Count Five.  So that has now been disclosed to the

17    defense Your Honor.

18          I wanted that to be on the record for the Court.

19          THE COURT:  Okay.

20          MR. PRAVDA:  We reserve the right to amend those

21    lists, Your Honor, to continue to prepare the case for trial.

22    This is our present intent with respect to the trial.

23          THE COURT:  Okay.

24          MR. SOLOMON:  Thank you Your Honor.

25          THE COURT:  Thank you very much.

1          MR. CLEARY:  Thank you.

2          THE COURT:  Marshals, you may take charge.

3          (Matter concluded.)

4

5          -  -  o o O o o  -  -

6

7    I CERTIFY that the foregoing
     is a correct transcript from
8    the record of proceedings
     in the above entitled matter.

9

     s/Richard W. Barry
10   _____

     Richard W. Barry, RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25