UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA, :
 :
 :
 :
  -against- :
 : **OPINION & ORDER**
 :
DAN ZHONG, : 16-cr-614 (DLI)
 :
   Defendant. :
------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

Defendant Dan Zhong ("Defendant") currently awaits trial on charges arising out of his alleged involvement in a forced labor conspiracy. On April 27, 2018, Defendant filed two separate briefs containing four motions *in limine* (collectively, "Defendant's Motions *in Limine*"). Mot. *in Limine* ("Def.'s Visa Mot."), Dkt. Entry No. 116; Supplemental Mot. *in Limine*, ("Def.'s Warrant Mot."), Dkt. Entry No. 117. The same day, the government filed a single brief containing eight motions in limine (collectively, the "Government's Motions *in Limine*"). First Mot. *in Limine* ("Gov't Mot."), Dkt. Entry No. 115. The government opposed each of Defendant's Motions *in Limine* on May 11, 2018. Mem. in Opp. ("Gov't Opp. to Visa Mot."), Dkt. Entry No. 121; Mem. in Opp. ("Gov't Opp. to Warrant Mot."), Dkt. Entry 122. Defendant opposed the Government's Motions *in Limine* on the same day. Mem. in Opp. ("Def.'s Opp."), Dkt. Entry No. 119. Defendant filed his replies to Defendant's Motions *in Limine* on May 18, 2018. Reply to Resp. ("Def.'s Visa Mot. Reply"), Dkt. Entry No. 123; Reply to Resp. ("Def.'s Warrant Mot. Reply"), Dkt. Entry No. 125. The government filed its reply to the Government's Motions *in Limine* the same day. Reply to Resp. ("Gov't Reply"), Dkt. Entry No. 124. The Court heard oral argument on June 20, 2018 (the "Oral Argument") on the Defendant's Motions *in Limine* and the Government's Motions *in*

*Limine.* Dkt. Entry No. 129. The Court addresses each of Defendant's Motions *in Limine* and the Government's Motions *in Limine* as follows.

Defendant moves, *in limine*, to preclude the government from offering: (1) evidence or making any argument relating to any alleged conduct by Defendant from 2001 to 2009, while he allegedly enjoyed diplomatic immunity; (2) evidence relating to allegedly false or fraudulently obtained visas that are not A2 or G2 visas; (3) evidence or making any argument relating to any and all allegations referenced in the redacted portions of the search warrant affidavit for Defendant's email account; and (4) evidence or making any argument suggesting that U.S.-based affiliates of China Rilin do not engage in legitimate business. *See generally,* Def.'s Visa Mot. and Def.'s Warrant Mot.

The government moves, *in limine* to: (1) admit evidence of Defendant's participation in the alleged forced labor scheme while he was an accredited diplomat of the People's Republic of China ("PRC"); (2) admit PRC legal documents as verbal acts or business records; (3) preclude the introduction of evidence regarding the legality in the PRC of forced labor or debt bondage contracts; (4) permit victims of the alleged forced labor conspiracy to testify using pseudonyms;[1] (5) admit into evidence copies of documents that were in the possession of victim workers when were evacuated from the United States; (6) admit evidence of obstructive conduct to show Defendant's consciousness of wrongdoing; (7) permit government witness Mark Redfield to testify about the role and statements of Defendant's prior counsel in drafting an affidavit signed by Redfield; and (8) provisionally preclude Defendant's introduction of documents or other

---

[1] This motion *in limine* was decided previously by the Court. *See* Summary Order, Dkt. Entry No. 168. Accordingly, this Opinion does not address the government's motion *in limine* to permit victims of the alleged forced labor conspiracy to testify using pseudonyms.

exhibits that have not been provided to the government as reciprocal discovery from Defendant. *See generally,* Gov't Mot.

## BACKGROUND[2]

On November 9, 2016, the government filed a criminal complaint (the "Complaint") against Defendant and codefendant Landong Wang ("Wang") that alleges Defendant and participated in a forced labor conspiracy and visa fraud scheme, among other illegal activities. *See* Compl. ("Compl."), Dkt Entry No. 1.[3] The Complaint describes a construction business based in the PRC ("Rilin") that performs construction work on PRC governmental facilities in the United States, including work for the Permanent Mission of the PRC to the United Nations ("PRC Mission"), the Embassy of the PRC to the United States, and PRC consulates in the United States. *Id.* ¶ 2. By agreement between the United States and the PRC, PRC nationals enter the United States pursuant to A2 or G2 visas issued by the U.S. Department of State to perform construction work on PRC diplomatic facilities. *Id.* ¶ 3. The construction workers who enter the United States pursuant to A2 or G2 visas to perform construction work on PRC diplomatic facilities are restricted to work only on project-related construction work and are not permitted to work independently on non-PRC facilities. *Id.* ¶¶ 4-5.

At the time the government filed the Complaint against him, Defendant was in charge of Rilin's U.S. operations. *Id.* at 8. Between 2001 and 2006, Defendant was an accredited diplomat to the PRC consulate in New York City. *Id.* Between 2006 and November 2009, Defendant was an accredited diplomat to the PRC Embassy in Washington D.C. *Id.* Defendant became a United States permanent resident in May 2010 after he signed an I-508 form, which waived all rights,

---

[2] Familiarity with the facts and circumstances of this case is assumed and is based on various documents filed with the Court as described below.

[3] The Complaint and the case were unsealed by Court order on November 12, 2016.

privileges, exemptions, and immunities that would otherwise accrue to him because of his prior occupational status. *Id.*; *See also*, Gov't Opp. to Visa Mot. at Ex. B. Wang was the manager of Rilin's U.S. operations and was responsible for Rilin workers' deployment to the United States. Compl. ¶¶ 9-10.

According to the Complaint, Rilin construction workers who were admitted to the United States pursuant to A2 or G2 visas to work at the PRC Mission or other PRC diplomatic facilities instead performed private contracting work at other sites not owned by the PRC. *Id.* ¶ 6. The Rilin workers were compelled to perform construction work on private construction projects "by means of physical restraint, serious harm and threat of serious harm, and abuse and threatened abuse of law and legal process . . . In particular, . . . [Rilin] maintains a policy of forcing workers it brings to the United States to work as directed by threatening them with loss of their houses in the PRC as well as the loss of large cash deposits, both of which are pledged as collateral as a condition of their employment in the United States." *Id.* ¶ 7. The government's investigation into Defendant's alleged criminal activities uncovered multiple A2 or G2 workers who escaped from the custody of the forced labor conspiracy. *Id.* ¶ 10. With the exception of one worker who escaped in 2010, most of the escapees fled from the labor conspiracy's custody in 2001 and 2002, while Defendant was an accredited PRC diplomat. Gov't Visa Opp. at 2. The government alleges that, during the period Defendant was an accredited diplomat, Defendant helped orchestrate the forced labor scheme. Gov't Mot. at 2. The government further alleges that Defendant continued to act as a principal of the forced labor scheme after he was no longer an accredited diplomat. *Id.*

According to the government, victims have informed the government that Rilin personnel, including Wang, seized the victims' passports after they arrived in the United States. *Id.* at 3. The government further submits that Rilin obtained judicial rulings from the PRC government holding

that the victims breached their contracts with Rilin, resulting in judgments against the victims and seizure of the victims' posted collateral.  *Id.*

On December 1, 2016, a federal grand jury returned an indictment (the "Indictment") charging defendant with: (1) forced labor conspiracy in violation of 18 U.S.C. §§ 1589(d) and 1594(b); (2) forced labor in violation of 18 U.S.C. § 1589(a), (b), and (d); (3) concealing passports and immigration documents in connection with forced labor in violation of 18 U.S.C. §§ 1592(a); (4) alien smuggling conspiracy in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); and (5) visa fraud conspiracy in violation of 18 U.S.C. § 1546(a).  Indictment, Dkt. Entry No. 20.

## DISCUSSION

### I.  Legal Standard

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence.  *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); see also *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996).  Evidence generally should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.  *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998); *Nat'l Union Fire Ins. Co.*, 937 F. Supp. at 287.  Courts considering a *motion in limine* may reserve judgment until trial so that the motion is placed in the appropriate factual context.  *See Nat'l Union Fire Ins. Co.*, 937 F. Supp. at 287.  Alternatively, a judge is "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling," particularly in the event that, "when the case unfolds . . . the actual testimony differs from what was contained in the [movant's] proffer."  *Luce*, 469 U.S. at 41-42.

## II.   Motions *in Limine*

### A.   Defendant's Diplomatic Immunity

Defendant moves to preclude the government from offering evidence or making any argument to any of Defendant's alleged conduct from the period in which Defendant enjoyed diplomatic immunity as an accredited diplomat. *See* Def.'s Visa Mot. at 1-5. The government conversely moves to admit evidence of Defendant's participation in the alleged forced labor scheme while he was an accredited diplomat. *See* Gov't Mot. at 13-18.

### 1. Applicable Law

Former diplomats retain limited immunity for their official acts as diplomats, pursuant to the Vienna Convention on Diplomatic Relations ("VCDR") article 39, which provides in pertinent part:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

VCDR, art. 39(2). Thus, article 39 of the VCDR:

> provides for so-called 'residual' immunity, which is a less expansive immunity that remains with the former diplomats for certain acts committed during their occupation of the diplomatic station. Specifically, once a diplomat becomes a 'former' diplomat, he or she is not immune from suit for prior acts unless those acts were performed 'in the exercise of [the former diplomat's] functions as a member of the mission.'

*Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (quoting VCDR art. 39(2)) (alteration in original). The prior acts protected by residual immunity include "only such acts as are directly imputable to the state or inextricably tied to a diplomat's professional activities." *Id.* at 135. Residual immunity does not extend to "acts that are peripheral to official acts." *Id.* at 136-37.

Both diplomatic immunity case law and the VCDR suggest that a diplomatic officer cannot waive diplomatic immunity because the ability to waive diplomatic immunity is the prerogative of the foreign state, not the individual. *See, e.g., Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n.41 (11th Cir. 1999) ("Diplomatic immunity, like sovereign immunity, belongs to the foreign state and may only be waived by the state itself."); *Logan v. Dupuis*, 990 F. Supp. 26, 31 (D.D.C. 1997) ("[Defendant] thus has no authority to waive his immunity from civil jurisdiction; that is the prerogative of the government of Canada . . ."); *See also,* VCDR art. 32 ("The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under Article 37 may be waived by the sending State.").  Although these examples do not address residual immunity under article 39, but rather diplomatic immunity under articles 31 and 37 of the VCDR, the same policy considerations apply for former diplomats' immunity for official acts performed by the diplomats in the exercise of their functions as members of the mission, because those official acts are attributable to the foreign state. *See United States v. Al Sharaf*, 183 F. Supp.3d 45, 50-51 (D.D.C. 2016) (quoting *Boanan v. Baja*, 627 F. Supp.2d 155, 165 (S.D.N.Y. 2009) ("These prior official functions constitute 'in law the acts of the sending State.'" ).

The VCDR defines the functions of a diplomatic mission as, *inter alia*:

(a) Representing the sending State in the receiving State;
(b) Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;
(c) Negotiating with the Government of the receiving State;
(d) Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;
(e) Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

VCDR art. 3(1).

2.  The Parties' Arguments

Defendant argues that, by setting the indictment period to begin in 2010, the government

has acknowledged implicitly that pre-2010 evidence should be excluded.  *See* Def.'s Visa Mot. at 1; *See also,* Def.'s Opp. at 4-5.  In seeking to preclude the government's introduction of evidence before the indictment period, Defendant argues that he is entitled to residual diplomatic immunity, and the acts the government seeks to introduce fall within the scope of his official duties as a diplomat.  *See* Def.'s Visa Mot. at 3.  Defendant contests the government's position that Defendant's alleged pre-2010 conduct is direct evidence of the charged forced labor scheme.  Def.'s Opp. at 5-7.  Finally, Defendant argues that evidence related to the pre-2010 acts should be excluded under Federal Rules of Evidence 401, 403, and 404 because such evidence would be irrelevant and unduly prejudicial.  Def.'s Visa Mot. at 4-5; Def.'s Opp. at 7-10.

The government seeks to introduce evidence of Defendant's conduct before the indictment period, arguing that those uncharged acts are direct evidence of the charged forced labor conspiracy.  *See* Gov't. Mot. at 15-17.  In the alternative, the government maintains that the pre-2010 acts should be admitted under Federal Rule of Evidence 404(b) to prove Defendant's intent, planning, and knowledge of the charged criminal conduct.  *Id.* at 17.  In opposing Defendant's motion to preclude this evidence, the government argues that Defendant waived any claim of immunity when he applied successfully for permanent residence in the United States.  Gov't. Opp. to Visa Mot. at 3-4.  The government contends that Defendant is estopped from claiming immunity because in his signed Form I-508 Waiver of Rights, Privileges, Exemptions and Immunities, Defendant attested:

> I seek to acquire or retain the status of an alien lawfully admitted for permanent residence and hereby waive all rights privileges, exemptions, and immunities that would otherwise accrue to me under any law or executive order by reason of such occupational status.

*Id.* at Ex. B.

The government also further maintains that neither the VCDR nor any bilateral treaty

8

between the United States and the PRC affords an evidentiary privilege to preclude the introduction of evidence of Defendant's acts from the time period in which Defendant was an accredited diplomat when the government does not seek to prosecute Defendant for those acts. *Id.* at 1-2. In support of its argument, the government refers to an unpublished case from the Eastern District of Wisconsin, *United States v. Ning Wen*¸ No. 04-CR-24, slip op. (E.D. Wis. Sept. 12, 2005). In *Wen*, the court held that evidence of a former diplomat's prior bad acts while he was a diplomat was admissible to prove the former diplomat's knowledge of an alleged crime. *Id.*, slip op. at 2-3. The government argues that, as in *Wen*, the Court should permit the government to introduce evidence of Defendant's prior acts to demonstrate Defendant's knowledge of the goals of the alleged forced labor conspiracy pursuant to Federal Rule of Evidence 404(b). Gov't Opp. to Visa Mot. at 2-3.

At the oral argument on the motion, the government raised arguments regarding Defendant's diplomatic status based on official notice to the United States Department of State (the "DOS"). The Court directed the parties to file letter briefs to supplement the parties' positions in the Government's Motions *in Limine* and the Defendant's Motions *in Limine* as to Defendant's diplomatic status from 2001 until he became a permanent U.S. resident in May 2010. The government filed its supplemental letter brief on July 18, 2018. *See* Letter Br. Regarding Diplomatic Immunity ("Gov't. Letter"), Dkt. Entry No. 130. The government attached a certification from the Office of Foreign Missions, DOS, dated July 17, 2018 (the "Certification") to its letter brief. *See* Certification of the Office of Foreign Missions ("Certification"), attached as Ex. 1 to Gov't Letter.

The Certification verifies that the DOS was notified of Defendant's status as a consular employee at the PRC Consulate General in New York, New York entering his duties on April 3,

2002. *Id.* On February 15, 2006, the DOS was notified that Defendant's functions as a member of the consular post ended on January 15, 2006. *Id.* On February 21, 2006, the DOS was notified that Defendant was an administrative and technical staff member of the PRC Embassy in Washington, D.C. *Id.* The DOS subsequently was notified that Defendant's functions as a member of the administrative and technical staff of the Embassy ended on November 27, 2009. *Id.* The Certification further provides that the DOS customarily affords privileges and immunities to a member of a diplomatic or consular mission for thirty days after termination. *Id.* After termination, "the former member of the diplomatic mission enjoys solely residual immunity as to any acts performed in the exercise of his functions during the relevant periods." *Id.*

In its letter, the government recognizes that Defendant is entitled to residual immunity for any of his "official conduct" occurring between April 3, 2002 and November 27, 2009. Gov't Letter at 1. However, the government contends that the evidence it seeks to introduce is not evidence of Defendant's official conduct, but instead is evidence of Defendant's "repeated participation in kidnapping and abducting unwilling victims—as opposed to any crimes he may have committed while performing ministerial duties as a diplomatic or consular officer on behalf of the [PRC]." *Id.* The government again argues in its letter that residual immunity does not confer an "evidentiary privilege" to bar the government from introducing evidence of Defendant's acts because the government is not prosecuting Defendant for those acts. *Id.* at 5-6.

Defendant replied to the government's letter on July 25, 2018. *See* Letter Br. in Opp. to Gov't Letter ("Opp. Letter"), Dkt. Entry No. 133. Defendant counters that, contrary to the position the government originally took in its opposition to Defendant's motion to preclude evidence of Defendant's acts while he was an accredited diplomat, the government now concedes that Defendant is entitled to residual diplomatic immunity. *Id.* at 1. Defendant further emphasizes

that, in the government's letter, the government concedes that, at least some of the acts at issue, such as Defendant's ministerial decisions, constitutes Defendant's professional responsibilities as an accredited diplomat. *Id.* at 2. Defendant maintains that all of the conduct the government seeks to introduce falls within Defendant's professional responsibility, and Defendant's attempts to find Rilin workers who absconded from their duties did not exceed his official duties. *Id.*

Defendant further opposes the government's argument that evidence of Defendant's pre-2010 acts are necessary background to the charged forced labor conspiracy and maintains that *Wen* does not apply in this case. *Id.* at 3-4. Specifically, Defendant argues that *Wen* contains "virtually no analysis" and neither is controlling nor on point. *Id.* at 4. Contrary to the facts here, the government in *Wen* sought to introduce evidence directly preceding the indictment period and that pre-indictment evidence has no prejudicial impact under Federal Rule of Evidence 403. Defendant contends it instead "represented a classic example of demonstrating background and showing a defendant's knowledge under Rule 404(b)." *Id.* The government replied to Defendant's letter on August 1, 2016, opposing each of Defendant's arguments. Letter Reply Br., Dkt. Entry No. 135.

3. Analysis

There is no dispute that Defendant was an accredited diplomat from April 3, 2002 until January 15, 2006 and February 21, 2006 until November 27, 2009. *See* Certification. Thus, Defendant is entitled to residual diplomatic immunity for his official acts as an accredited diplomat during those periods. *See* VCDR art. 309(2); *See also, Swarna* 622 F.3d at 134. The Court finds the government's argument that Defendant waived any claim of residual immunity when he applied to become a permanent resident of the United States unpersuasive. Instead, as diplomatic immunity case law and the VCDR suggest, a diplomatic officer cannot waive diplomatic immunity because the ability to waive diplomatic immunity is the prerogative of the foreign state, not the

individual.  *See supra,* Part II.A.1.  Accordingly, Defendant did not waive residual immunity when he applied successfully for permanent residence in the United States.  The government does not contend that the PRC waived Defendant's residual immunity at any time.

Although Defendant is entitled to residual immunity from prosecution, the government may admit evidence of Defendant's acts while he was an accredited diplomat as direct evidence, and to prove Defendant's intent, planning, and knowledge of the alleged forced labor conspiracy. As the government argues, and *Wen* supports, neither the VCDR nor any bilateral treaty between the United States and the PRC provides a privilege to former diplomats to preclude the introduction of evidence of former diplomats' acts for which they are not prosecuted.  Thus, the government may introduce evidence that is "inextricably intertwined" and "arose out of the same transactions" as the conspiracy charged in the indictment, *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000), even if such evidence is of Defendant's acts while he was an accredited diplomat.  Evidence that is "inextricably intertwined" and "arose out of the same transactions" as the conspiracy charged in the indictment is direct evidence of the charged conspiracy.  *Id.* ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (citations and internal quotation marks omitted)); *See also, United States v. Escalera*, 536 Fed. App'x 27, 32 (2d Cir. 2013) (summary order) ("Even if the sales were not inextricably intertwined, the district court would have had the discretion to admit them as background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed, and how [the defendant's] role in the conspiracy evolved.").

Here, Defendants actions, including the alleged kidnapping and abduction of victim

laborers, as an accredited diplomat, provide necessary background information to the conspiracy.

The Court does not find compelling Defendant's argument that Defendant's participation in the alleged forced labor scheme as an accredited diplomat and employee of China Rilin is irrelevant to Defendant's charged participation in the alleged forced labor scheme as an employee of U.S. Rilin. *See* Def.'s Opp. at 5-6. The government indicates that it intends to prove that Defendant's coercive techniques and practices as a China Rilin employee were the same as those Defendant used as president of U.S. Rilin during the charged conspiracy. Gov't Reply at 2-3. The Court need not address the government's alternative theory of relevance, *i.e.*, evidence of "other acts" under Rule 404(b). *See United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1987) (distinguishing between uncharged conduct that is intertwined with charged conduct and uncharged conduct that is admissible under Rule 404(b)).

Evidence of Defendant's acts while he was an accredited diplomat is not unduly prejudicial under Federal Rule of Evidence 403. Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Here, the probative value of Defendant's conduct, which provides the necessary background to the alleged conspiracy, including the kidnapping and abduction of victim laborers as a China Rilin employee, is not outweighed by the danger of any potential prejudicial effect such evidence may have.

Accordingly, Defendant's motion to preclude the admission of evidence from the time period in which Defendant enjoyed diplomatic immunity is denied. The government's motion to admit evidence of Defendant's participation in the alleged forced labor conspiracy while he was an accredited PRC diplomat is granted.

## B.    Fraudulently Obtained Visas

Defendant moves to preclude the government from offering evidence of allegedly fraudulent visa applications other than the A-2 and G-2 visa applications at issue in this case.  *See* Def.'s Visa Mot. at 5-6.  The government responds that it will not introduce evidence or make any argument in its case-in-chief at trial concerning visas other than A-2 and G-2 visas.  Gov't Opp. to Visa Mot. at 5.  The government does seek to introduce evidence of false statements made by Defendant in allegedly fraudulent visa applications, if Defendant testifies at trial.  *Id.* at 5-6.  The government seeks permission to introduce such evidence pursuant to pursuant to Federal Rule of Evidence 608(b).  In Defendant's Visa Motion Reply, Defendant argues that Rule 608(b) permits cross-examination concerning only specific instances of a witness's own conduct.

Federal Rule of Evidence 608(b) provides: "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness."  Fed. R. Evid. 608(b).  False statements may be the basis for questioning under Rule 608(b).  *See Hynes v. Coughlin*, 79 F.3d 285, 293-94 (2d Cir. 1996) (determining that cross-examination regarding witness filing a false workmen's compensation claim properly related to witness's character for truthfulness); *United States v. Jones,* 900 F.2d 512, 520-21 (2d Cir. 1990) (approving cross-examination regarding false statements made on applications for employment, an apartment, a driver's license, a loan and membership in an association under Rule 608); *United States v. Triumph Capital Group, Inc.*, 237 Fed. App'x 625, 629 (2d Cir. 2007) (summary order) ("This Court has held that it can be appropriate to introduce false statements, especially false sworn statements, under Rule 608(b)(1) to shed light on a witness' credibility.").

The allegedly fraudulent visa applications that the government seeks to introduce, signed by Defendant under penalty of perjury, are admissible on cross-examination as Defendant's false statements relevant to Defendant's character for truthfulness if the Defendant testifies at trial. Furthermore, the Court will give a limiting instruction to the jury that it only may consider the evidence of Defendant's false statements in relation to Defendant's character for truthfulness in order to avoid any unfair prejudice should the government introduce such evidence. *See United States v. Dupree*, 870 F.3d 62, 77 (2d Cir. 2017) (affirming a district court's finding that, with a contemporaneous limiting instruction, the probative value of admitted testimony was not unduly prejudicial under Rule 403); *see also,* Fed. R. Evid. 403.

Accordingly, Defendant's motion to preclude evidence of allegedly fraudulent applications other than the A-2 and G-2 visa applications at issue in this case is denied.

### C.      Email Search Warrant Affidavit

Defendant moves to exclude any evidence or argument relating to allegations referenced in the redacted portions of a search warrant affidavit to search Defendant's email address (the "Email Warrant Affidavit"). *See* Def.'s Warrant Mot. at 1-3. The government does not object to Defendant's motion to the extent it seeks to preclude evidence of the allegations referenced in paragraphs 12 and 51-62 of the Email Warrant Affidavit. *See* Gov't Opp. to Warrant Mot. at 2. Accordingly, that portion of Defendant's motion is granted.

The government opposes Defendant's motion to the extent that it seeks to preclude the government from offering evidence or making any argument relating to Defendant's alleged obstructive conduct. *See* Gov't Opp. to Warrant Mot. at 2-5. In its own Motions *in Limine*, the government moves to admit evidence of Defendant's alleged obstructive conduct to show his consciousness of guilt. Gov't Mot. at 28-29. The government seeks to admit evidence that Wang

arranged for Rilin workers to depart the United States to prevent their testimony in this case. *Id.* at 28. The government submits that its witnesses will testify that codefendant Wang could not take such action without Defendant's approval. *Id.* The government also seeks to admit evidence that Defendant hid potentially incriminating material and directed family members to hide evidence and possibly assets. *Id.*

Defendant argues that the Court should preclude the introduction of evidence regarding Defendant's obstructive conduct because such evidence might result in unfair prejudice, the presentation of cumulative evidence, and jury confusion. *See* Def.'s Warrant Mot. at 2 (citing Fed. R. Evid. 403). Defendant also argues that the evidence the government seeks to admit is irrelevant and prejudicial because the proposed evidence consists mostly of acts attributable to Wang. *See* Def.'s Opp. at 21-22.

The Second Circuit has held that evidence of obstructive conduct is admissible to show a Defendant's consciousness of guilt. *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant]'s efforts to obstruct the investigation evidence a consciousness of guilt . . ."); *See also, United States v. Malpiedi,* 62 F.3d 465, 467 (2d Cir. 1995) ("This testimony was direct evidence of [defendant's] obstruction of justice and of his consciousness of guilt of the other charges."); *United States v. Robinson*, 635 F.2d 981, 986 (2d Cir. 1980) (finding evidence of a conspiracy's obstruction of the government's investigation admissible to show consciousness of guilt). Here, Defendant's own obstructive conduct, is probative of the Defendant's consciousness of guilt. With a limiting instruction to the jury, the probative value of the evidence of Defendant's obstructive conduct outweighs any potential risk of prejudice or jury confusion. *See Dupree*, 870 F.3d at 77.

Similarly, as Wang is a co-conspirator and the government has proffered that its witnesses

are expected to testify that Wang would not have engaged in obstructionist behavior without Defendant's approval, the probative value outweighs any potential prejudice to Defendant. *See* Fed. R. Evid. 403. Thus, such evidence is admissible. Again, a limiting instruction to the jury would be appropriate under these circumstances.

Accordingly, Defendant's motion to preclude evidence relating of allegations referenced in paragraphs 12 and 51-62 of the Email Warrant Affidavit is granted. To the extent that Defendant seeks to preclude evidence relating to Defendant's own and Wang's obstructive conduct, Defendant's motion is denied. The government's motion to admit evidence of Defendant's and Wang's obstructive conduct to show Defendant's consciousness of guilt is granted.

### D.     China Rilin Affiliates

In his final motion in limine, Defendant moves to exclude any evidence or argument that U.S.-based affiliates of China Rilin do not engage in legitimate business. Def.'s Warrant Mot. at 3-5. Defendant argues that such evidence is irrelevant to the charges against him. *Id.* at 3 (citing Fed. R. Evid. 401 and 402). Defendant also contends that evidence regarding the legitimacy of the U.S.-based affiliates may invite the jury to consider uncharged crimes or other bad acts. *Id.* at 4 (citing Fed. R. Evid. 404). The government opposes Defendant's motion, arguing that evidence that China Rilin's U.S.-based affiliates moved large amounts of cash between and among the affiliate companies and China Rilin is relevant to Defendant's knowledge that China Rilin's affiliate, U.S. Rilin, was an alter ego of China Rilin. *See* Gov't Opp. at 6-7. The government alleges that the U.S. affiliate of China Rilin "functioned in relevant part for the purpose of providing a cover for China Rilin's activities in the United States, including providing China Rilin construction workers to work on construction projects ostensibly under the banner of U.S. Rilin." *Id.* The government further contends that, "evidence that U.S. Rilin was merely an alter ego of

China Rilin tends to prove that the defendant continued to exercise control over the workers through his continued control and influence over the affairs of China Rilin in the United States." *Id.* at 7.

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, evidence that China Rilin's U.S.-based affiliates, of which Defendant was president, were alter egos of China Rilin, is relevant to the allegations of Defendant's involvement in the alleged visa fraud conspiracy. If, as the government suggests, the U.S.-based affiliate employees were admitted to the United States pursuant to A-2 and G-2 visas to conceal that the workers were in fact China Rilin employees, such evidence tends to prove the government's allegations. *See* Gov't Opp. to Warrant Mot. at 7. Evidence that the U.S.-based affiliates were alter egos of China Rilin also is relevant to Defendant's knowledge of the forced labor conspiracy because of his role as president of those alleged alter ego affiliates.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The government does not seek to introduce the evidence to question Defendant's character, but instead to support its allegations against Defendant and to demonstrate Defendant's knowledge.

Accordingly, Defendant's motion to preclude evidence or argument that U.S.-based affiliates of China Rilin do not engage in legitimate business is denied.

### E.     PRC Legal Documents

The government moves to admit PRC legal documents as verbal acts pursuant to Federal Rule of Evidence 801(c).  Gov't Mot. at 18-19.  Specifically, the government seeks to admit PRC forfeiture judgments and underlying employment contracts between Rilin and Rilin employees.  *Id.* at 18.  Defendant opposes the government's motion and requests that the Court defer its ruling until Defendant has had the opportunity to review the legal documents in order to decide whether Defendant will make any authenticity challenges.  *See* Def.'s Opp. at 10-11.  The government has not yet produced the documents to Defendant pursuant to a protective order that permits the government to delay certain discovery.  *See* Protective Order, Dkt. Entry No. 39; *See also*, Gov't Mot. at 3, n.2.  The Court defers its ruling on the government's motion to admit PRC legal documents until Defendant has had the opportunity to raise authenticity challenges to those documents.

### F.     PRC Law

The government moves to preclude Defendant from introducing evidence or argument relating to the legality of forced labor or debt bondage in the PRC.  Gov't Mot. at 19-22.  Specifically, the government argues that the PRC law is irrelevant and potentially confusing to a jury.  *Id.*  Defendant opposes the government motion, arguing that evidence of PRC law is probative of the forced labor charges against Defendant.  Def.'s Opp. at 12-15.  Specifically, Defendant argues that evidence of PRC law is probative of allegations that Defendant abused or threatened to abuse PRC law.  *Id.* at 13-14.  Defendant also argues that evidence of PRC law is probative of Defendant's knowledge and intent to participate in the forced labor conspiracy.  *Id.* at 14.  Defendant submits that evidence of PRC law, accompanied by limiting instructions, will neither confuse nor mislead the jury.  *Id.* at 14-15.  The Court finds Defendant's arguments

unpersuasive.

To support its argument, the government relies on Federal Rules of Evidence 401, 402, and 403. Rule 402 provides: "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Rule 401 states: "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. Finally, Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Application of this Rule requires a balancing analysis, and the trial judge has broad discretion to weigh the probative value of the evidence against the negative factors." *See Haynes v. Acquino*, 692 Fed.App'x. 670, 671 (2d Cir. 2017) (summary order) (quoting *Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998)).

The Court finds that the contested evidence of PRC law is inadmissible as irrelevant. *See* Fed. R. of Evid. 402. The requirements of PRC law and Defendant's belief about PRC law is highly attenuated from any element of any charge in the Indictment. *See United States v. Napout*, 2017 WL 6375729, at *12 (E.D.N.Y. Dec. 12, 2017) (holding that evidence regarding foreign law is "highly attenuated from any question of material fact in the case."). Moreover, to the extent Defendant suggests that the forced labor or debt bondage allegations underlying the charges against Defendant were legal in the PRC, there is serious risk of confusing the issues or misleading the jury leading to improper jury nullification. *See* Fed. R. Evid. 403; *See Id.*, 2017 WL 6375729, at *13 ("This genuine risk of jury nullification weighs heavily against allowing defense counsel to elicit evidence or make argument about foreign law.") (citations omitted). Additionally, if Defendant were to introduce evidence of PRC law, the government may respond, creating a

diversionary "trial within a trial" as to whether Defendant violated PRC law, leading to possible confusion and undue delay. *See United States v. Pepin*, 514 F.3d 193, 206 (citations omitted). The danger evidence of PRC law has of confusing or misleading a jury and creating undue delay outweighs the potential probative value of such evidence. Accordingly, the government's motion to preclude evidence of PRC law is granted.

### G. Victim Documents

The government moves to admit copies of documents in the possession of alleged victims of the forced labor conspiracy as coconspirator statements or as business records. Gov't Mot. at 27-28. Specifically, the government seeks to admit copies of time sheets that were in victim workers' possession when they fled from the United States as either coconspirator statements of Wang or under the business records exception to the hearsay rule. *Id.* at 27. Defendant opposes the government's motion, arguing that the government offers no basis on which it can authenticate the documents. *See* Def.'s Opp. at 20.

Out of court statements made by a party's coconspirator "during and in furtherance of the conspiracy" are admissible against that party for the truth of those statements. Fed. R. Evid. 801(d)(2)(E). Under Federal Rule of Evidence 801(d)(2)(E), a court may admit an out-of-court declaration that otherwise would be hearsay, if it finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (citation omitted). Here, the government has not yet provided a sufficient basis for the Court to determine that the statements it seeks to admit were "made during the course of and in furtherance of" the alleged conspiracy. *Id.* Without such a basis, the Court cannot find that the victim documents are

coconspirator statements.

Under Federal Rule of Evidence 803(6), business records may be admitted as a hearsay exception if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). The government has not yet provided sufficient information for the Court to determine that the documents it seeks to admit are business records that are exceptions to the rule against hearsay.

Because the government has not yet provided a sufficient basis for the Court to determine that the victim documents it seeks to admit are coconspirator statements or business records, the Court defers ruling on the government's motion to admit those documents until trial.

**H.    Mark Redfield Affidavit**

The government seeks permission for government witness Mark Redfield to testify about the circumstances surrounding the creation of an affidavit by Redfield (the "Redfield Affidavit") if Defendant cross-examines him about the statements made therein. Gov't Mot. at 29. Defendant argues that the Court should deny the government's motion as premature. *See* Def.'s Opp. at 23. The Court agrees that the motion is premature.

The Complaint alleges that, on February 9, 2011, members of the Jersey City Mayor's Task

Force responded to a complaint about potential alien trafficking involving a white van that picked up and dropped off Asian males from a row house located at Pavonia Avenue in Jersey City, New Jersey (the "Pavonia Avenue Premises"). Compl. ¶ 18. An inspector surveilled the Pavonia Avenue Premises and observed that it was locked from the outside by a deadbolt, trapping the males inside. *Id.* During inspection of the Pavonia Avenue Premises, inspectors observed that it was divided into sleep quarters to accommodate twenty-eight boarders in violation of housing codes. *Id.* ¶ 19. The Pavonia Avenue Premises' basement was converted into twelve work stations with apparently homemade wiring in violation of fire codes. *Id.* Inspectors observed that the means of egress in the Pavonia Avenue Premises were locked from the outside. *Id.* During the inspection, inspectors encountered Asian males who claimed not to speak English or possess any form of identification at the time of the encounter. *Id.* After the inspectors contacted the PRC Consulate General in New York, Wang and other Rilin employees arrived with passports belonging to the Asian males. *Id.* The bearer of the passports indicated that Defendant had sent him to the Pavonia Avenue Premises. *Id.* Due to the hazardous condition of electrical wiring and outlets, inspectors deemed the Pavonia Avenue Premises uninhabitable. *Id.* ¶ 20.

On February 10, 2011, Jersey City Mayor's Task force inspectors executed a warrant authorizing the search of a residence on Wayne Street in Jersey City, New Jersey (the "Wayne Street Premises"). *Id.* at n.4. During the search, members of law enforcement encountered Asian males who were in possession of Chinese passports indicating that they were A2 or G2 visa holders employed by Rilin. *Id.* The inspectors deemed the Wayne Street Premises uninhabitable due to the hazardous conditions. *Id.*

After Defendant's arrest in November 2016, Defendant repeatedly sought pretrial release from custody. In anticipation of this Court's January 9, 2017 hearing on Defendant's motion for

bond, Defendant's prior defense counsel provided the government with the Redfield Affidavit, dated January 6, 2017. *See* Gov't Mot. at 10. Redfield served on the Jersey City Mayor's Task Force before he retired. *Id.* at Ex. A ¶ 1. Redfield witnessed the Jersey City Mayor's Task Force inspections and searches of the Pavonia Avenue Premises and the Wayne Street Premises. *Id.* at Ex. A ¶ 2. According to the Redfield Affidavit, Redfield did not "observe any indicia of individuals being locked into the [Pavonia Avenue Premises] (such as a deadbolt or a double-key cylinder locks [sic] that were locked from the outside) or being held in custody against their will." *Id.* at 10-11.

After the government received the Redfield Affidavit, it interviewed Redfield. *Id.* at 11. According to the government, Redfield told the government that, shortly before Christmas of 2016, Defendant's former counsel and a defense investigator arranged to meet with Redfield. *Id.* During the meeting, the defense team asked Redfield to sign an affidavit for use in a bail hearing. *Id.* Redfield asked for compensation in return for the affidavit, and he was told to generate an invoice for his time expenditures. *Id.* Redfield and Defendant's prior counsel exchanged emails and telephone calls whereby Defendant's prior counsel drafted a proposed affidavit for Redfield to sign. *Id.*

According to the government's account of Redfield's statements, the initial draft of the affidavit indicated incorrectly that there was no evidence indicating that occupants could be locked inside either the Pavonia Avenue Premises or the Wayne Street Premises. *Id.* Redfield explained to Defendant's prior counsel that he distinctly recalled an illegal hasp on the exterior entrance to the Wayne Street Premises that would prevent occupants from exiting the premises. *Id.* Defendant's prior counsel then removed any reference to the Wayne Street Premises. *Id.* Although the Redfield Affidavit claimed that Redfield did not observe any evidence that occupants were

locked inside the Pavonia Avenue Premises, Redfield believed that the potential existed for occupants to be locked inside, in light of the offsite sequestration of identification and travel documents for fourteen adult males, as well as the "shantytown" appearance of the living space. *Id.* at 12. The Redfield Affidavit additionally stated that Redfield did not observe double-cylinder locks at the Pavonia Avenue Premises, but Redfield did not have a precise recollection at the time he executed the Redfield Affidavit. *Id.* Redfield also did not have an opportunity to review his notes of the inspections before he executed the Redfield Affidavit. *Id.*

The government seeks to admit testimony regarding the circumstances surrounding the creation of the Redfield Affidavit on redirect examination if Defendant cross-examines Redfield concerning the statements in the Redfield Affidavit. *Id.* at 29. Defendant indicated that he did not know, at the time of briefing, whether he would cross-examine Redfield about the contents of the Redfield Affidavit. Def.'s Opp. at 23. Because Defendant does not, at this time, intend to cross-examine Redfield about the contents of the Redfield Affidavit, the Court need not make its determination about the government's proposed testimonial evidence at this time.

Accordingly, the government's motion to permit Redfield to testify about the circumstances surrounding the creation of the Redfield Affidavit is denied as premature with leave to renew at trial.

## I.        Defendant's Reciprocal Discovery

In its final motion, the government moves to preclude defense exhibits that Defendant has not produced to the government as reciprocal discovery. Gov't Mot. at 29. On the date of the Court's Oral Argument on the parties' motions *in limine*, Defendant had not yet produced any reciprocal discovery to the government. The Court defers its ruling on the government's motion

until trial, but cautions that, if there should have been reciprocal discovery made prior to trial, Defendant may be precluded from using that evidence at trial or otherwise sanctioned.

## CONCLUSION

For the foregoing reasons, both the government's and Defendant's motions *in limine* are granted in part and denied in part as set forth above, or deferred.


SO ORDERED.

Dated:  Brooklyn, New York
       November 26, 2018

_____
/s/
DORA L. IRIZARRY
Chief Judge
