Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

January 11, 2019

**By ECF**

Robert J. Cleary
Member of the Firm
d +1.212.969.3340
f 212.969.2900
rjcleary@proskauer.com
www.proskauer.com

The Honorable Ann M. Donnelly
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *United States v. Dan Zhong*
               Criminal Docket No. 16-614 (AMD)

Dear Judge Donnelly:

    We write concerning the Court's suggestion that the parties consider whether they can reach a stipulation on the testimony by the witnesses who are the subject of Mr. Zhong's pending motion for Rule 15 depositions. To facilitate discussions with the government, the defense has provided the government with the attached proposed stipulation of Rule 15 witness Kezi Wang's testimony.

    If the government is willing to proceed by stipulation with respect to Mr. Wang, we will provide comparable outlines for the other witnesses.

                                                            Respectfully submitted,

                                                            */s/ Robert J. Cleary*
                                                            Robert J. Cleary

cc:    AUSA Alexander A. Solomon (by ECF)
        AUSA Ian C. Richardson (by ECF)
        AUSA Craig R. Heeren (by ECF)

Encl.

## DRAFT PROPOSED STIPULATION

## KEZI WANG

If called as a witness, Kezi Wang would testify substantially as follows:

1. He has been employed by China Rilin as a driver since approximately 2007.

2. His job includes driving China Rilin employees to and from construction work sites.

3. He fulfilled two tours of employment for China Rilin in the United States, the first from approximately May 2007 to January 2009; the second from approximately July 2010 to May 2015.

4. He became interested in working for China Rilin in the United States based on his understanding that such employment would enable him to earn more money than he otherwise would earn working for China Rilin in Dandong, People's Republic of China (the "PRC").

5. By working in the United States, he earned approximately three times more money than he would have earned had he remained in Dandong.

6. Both of his tours of employment in the United States were positive experiences for him.

7. Prior to departing for the United States, in both 2007 and 2010, he participated in mandatory orientation programs. Approximately 13-14 people attended these programs, all of whom eventually would accompany him to the United States.

8. The orientation programs instructed him about the need to maintain the confidentiality of national secrets to which he would be exposed as a result of working for China Rilin in the United States.

9. The orientation programs also instructed him about the need to obey both United States and PRC law.

10. China Rilin assisted him in obtaining the passport and visas he needed in order to be able to work in the United States.

11. Dan Zhong played no role in the visa application process.

12. Kezi Wang had an employment contract for each of his tours of employment in the United States. He voluntarily signed each contract after reading it and satisfying himself that he understood all of its terms. He understood that by signing each contract, he was agreeing to all of its terms.

13. He ultimately was paid more than the amounts stated in his two employment contracts. Specifically, whereas the first contract stated that he would receive RMB 3,000 per month, he actually was paid RMB 5,500 per month; whereas the second contract stated

that he would receive RMB 8,000 per month, he actually was paid RMB 9,300 per month.

14. In addition to his salary during both tours of employment in the United States, he received various monetary stipends, including for meals. His rent and travel expenses were paid for by China Rilin.

15. Had he remained in Dandong working for China Rilin during the period covered by the second contract, he would have been paid between approximately RMB 2,200 and RMB 2,600 per month.

16. For both tours of employment in the United States, he instructed China Rilin to pay part of his monthly salary to his family. During his first tour, this amounted to monthly payments of approximately RMB 3,000; during his second tour, this amounted to monthly payments of between approximately RMB 3,000 and RMB 5,000.

17. While in the United States, he was permitted to travel freely, as he chose. In particular, he went on sightseeing and recreational trips to various tourist destinations, including in Washington, DC, Chicago, Atlantic City, West Point, and the Hollywood Walk of Fame in California.

18. Exhibit A hereto is a collection of photos that fairly and accurately depict himself and certain of his China Rilin colleagues during sightseeing and recreational trips he and his colleagues took during his tours in the United States.

19. During his tours of employment for China Rilin in the United States, he enjoyed watching movies.

20. He did not post any security deposit in connection with his first tour of employment for China Rilin in the United States.

21. For his second tour of employment, he posted a security deposit of RMB 150,000, funds that belonged to him. China Rilin deposited the security deposit into an interest-bearing bank account, and returned the security deposit to him upon the completion of his tour in the United States.

22. During both of his tours in the United States, he gave his passport to Landong Wang in order to prevent it from being lost or stolen.

23. He was always able to obtain his passport from Landong Wang, upon request. Dan Zhong played no role in handling the passport.

24. Prior to his departures for the United States, he was notified where he would be working: the PRC Embassy for the first tour and the PRC Mission to the United Nations for the second tour.

25. His boss during both tours of employment in the United States was Landong Wang, who gave him his assignments. Dan Zhong never assigned him any work.

26. During his first tour, he lived at a hotel in Washington, DC, where he shared a room with three other workers; he and each of his colleagues had keys and access to a telephone, the Internet and email; he also had a cellphone.

27. During his second tour, he lived at the PRC Consulate in New York City and at 349 Summit Avenue, Jersey City, NJ. At the Consulate, he shared a room with one other worker; at 349 Summit Avenue, he had his own room; at both the Consulate and 349 Summit Avenue, he and his colleagues had keys to the premises, a phone, and Internet and email access.

28. He is familiar with a house where other China Rilin workers resided, located at 210 Pavonia Avenue, Jersey City, NJ. On occasions when he visited 210 Pavonia Avenue, he was able to enter and exit the building freely.

# EXHIBIT A





