588

1    UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                              16-CR-614(AMD)
3    UNITED STATES OF AMERICA,
                            United States Courthouse
4         Plaintiff,          Brooklyn, New York
5         -against-           March 8, 2019
                            9:30 a.m.
6    DAN ZHONG,
7         Defendant.
    ------------------------------x
8
             TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
9           BEFORE THE HONORABLE ANNE DONNELLY
             UNITED STATES DISTRICT JUDGE
10                BEFORE A JURY
11   APPEARANCES
12   For the Government:     UNITED STATES ATTORNEY'S OFFICE
                        Eastern District of New York
13                  271 Cadman Plaza East
                        Brooklyn, New York 11201
14                  BY:  ALEXANDER A. SOLOMON
                          IAN CRAIG RICHARDSON
15                          CRAIG HEEREN
                      Assistant United States Attorneys
16
    For the Defendant:     PROSKAUER ROSE LLP
17                  Eleven Times Square
                      New York, New York 10036-8299
18                  BY:  ROBERT J. CLEARY, ESQ.
                          DIETRICH L. SNELL, ESQ.
19                          SAMANTHA SPRINGER, ESQ.
                          BRITTANY BENAVIDEZ, ESQ.
20
    Also Present:        HEATHER BUTLER, PARALEGAL
21                  S.A. RYAN CAMPBELL
22
    Court Reporter:      LINDA D. DANELCZYK, RPR, CSR, CCR
23                  Phone:  718-613-2330
                      Fax:    718-804-2712
24                  Email:  LindaDan226@gmail.com
25   Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    589

1            (In open court.)

2            THE COURTROOM DEPUTY:  All rise.

3            THE COURT:   Everybody can have a seat.

4            Are we ready for the jury?

5            MR. RICHARDSON:  Yes, Your Honor.

6            MR. SNELL:  Your Honor, I have something I'd like to

7    raise.

8            THE COURT:  Okay.

9            MR. SNELL:  As the Court will recall yesterday when

10   we broke, there was a discussion about the next witness, Luis

11   DeBaca, who the government would like to call and present

12   expert testimony through.

13           We've been in correspondence with the government

14   since the day before yesterday.  I think as Your Honor will

15   remember this came as a surprise to us that he was going to be

16   testifying today and we want to get more information about the

17   nature of his testimony from the government, which the

18   government graciously supplied us with.

19           And having reviewed that, and also the information

20   we have about Mr. DeBaca, we believe a *Daubert* hearing is

21   necessary.  I informed the government of our position late

22   last night, and I understand that they posed the request and

23   that --

24           THE COURT:  It's not science though, I mean --

25           MR. SNELL:  Judge, under Rule 702 and *Daubert* and

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS

1     its progeny, it doesn't matter if it's not science.

2               THE COURT:  I know that, but the proper expertise --

3     go ahead.

4               What do you think would happen in a *Daubert* hearing,

5     which is not -- which I'm not doing -- I mean, how can we do a

6     *Daubert* hearing in the middle of a trial?

7               MR. SNELL:  Well, I think it certainly can be done.

8               THE COURT:  I should stop saying things like that.

9               I have the basic fundamental knowledge that it's

10    something I can do.  But go ahead, tell me what you wanted to

11    say.

12              MR. SNELL:  It certainly is not my first choice,

13    believe me.  I'm very much aware we have a jury and we don't

14    want to keep them waiting, I certainly do not.

15              But the procedural posture here is that last week

16    Your Honor ruled that this was an appropriate area for expert

17    testimony, the subject matter.

18              THE COURT:  Yes.

19              MR. SNELL:  And we're not seeking to relitigate

20    that.  We have our exception on that, which Your Honor

21    recognized.

22              But what was not addressed in the ruling last week

23    was the qualification of this particular individual to testify

24    as an expert.

25              THE COURT:  Didn't he have -- didn't you have a CV

PROCEEDINGS

1   for him?

2          MR. SNELL:  We had the CV that -- and some other

3   material, too -- that was not very enlightening, and that was

4   why we needed the additional information that we requested

5   from the government last night.

6          Now that we have it --

7          THE COURT:  All right.  Let me -- I'm cutting you

8   off because I'm trying to think of the most efficient way to

9   handle this.

10          Do you have something you want to say?

11          MR. HEEREN:  Yes, Your Honor.  Just that I think

12   there is a way to handle this that I think perhaps meets their

13   needs.

14          While Your Honor is correct it's discretionary, I

15   think we can do effectively a *Daubert* hearing by my

16   foundational questions before the jury.  We don't have to do

17   the same questions twice, because I think the foundational

18   questions will establish it.  If they want a few minutes to

19   *voir dire* on his expertise, that's fine.

20          THE COURT:  Is that the question, is it this

21   particular witness' expertise, or is it whether the subject

22   matter generally is something about which an expert can

23   testify?

24          I'm just trying to make sure I understand what

25   you're objecting.  You're objecting to this guy as an

PROCEEDINGS

592

1    expertise -- as an expert?

2            MR. SNELL:  Yes.

3            THE COURT:  I don't know if we need a hearing for

4    that.  If his qualifications aren't established in front of

5    the jury, then I won't find him an expert and the party is

6    over.

7            MR. SNELL:  Judge, in the process of -- I don't know

8    what the government's Q and A is going to be for the

9    qualifying testimony.  But my position is that just the

10   questions and the answers he will give are sufficiently

11   prejudicial and that this should be done outside the presence

12   of the jury.  I think that that's contemplated by the rule.

13           THE COURT:  I mean -- having had the experience in

14   front of the jury of having a judge say your expert wasn't an

15   expert, I mean, it's prejudicial all right, but it's not to

16   you.

17           So if the person were to testify and I were to say,

18   no, he's not an expert.  I mean, I'm going to go out on a limb

19   here and say that the side that would be bad for would be the

20   government and not you.

21           So I don't really see how that's particularly

22   inflammatory.  I guess for me, again being the person who

23   knows the least about what the person is going to say, I mean

24   I have a general idea, I just think this kind of a classic

25   cross-examine the person or do a *voir dire* of him, and if he

PROCEEDINGS

593

1   isn't sufficiently learned in the area about which he's

2   proffered as an expert, then he won't be an expert.

3          I mean, isn't that the way this is traditionally

4   done?

5          MR. SNELL:  Well, I think traditionally it's

6   actually done where the government or the proponent of the

7   expert well in advance of the trial provides a clear summary

8   of what the testimony is going to be.

9          I actually have from the government now a long list

10  of bullets, which I'm happy to supply to the Court now.

11         THE COURT:  What will be the best -- he's not your

12  first witness; is he?

13         MR. HEEREN:  He is, Your Honor.

14         THE COURT:  Oh, damn.

15         All right.  So why -- I think the best thing for me

16  to do would be to hear from the government what the proffer --

17  what his testimony is going to be.  You tell me what you don't

18  like about it.  But I think unless he's, you know -- I mean,

19  unless he is just so wildly unqualified that I can tell from

20  this conversation, my inclination is just to do it the old

21  fashion way.  But let's hear what you have to say.

22         MR. HEEREN:  Yes, Your Honor.

23         I can tell you about his qualifications in a moment,

24  but I'm also happy to supply you with the list of his opinions

25  that we provided them.

PROCEEDINGS                          594

1          THE COURT:  Okay.

2          MR. HEEREN:  Just to clarify how that came through.

3   I know you said we didn't need to provide them our direct

4   examination --

5          THE COURT:  Slow down.

6          MR. HEEREN:  Yes, Your Honor.

7          I did actually go through our direct examination.

8          THE COURT:  All right.

9          MR. HEEREN:  And give them the topics as well as

10  what we expect to elicit.

11         THE COURT:  No good deed goes unpunished.

12         MR. HEEREN:  Yes.  Yes.

13         In terms of his expertise, Your Honor -- bear with

14  me --

15         THE COURT:  Let me just -- that's okay.  While

16  you're looking for that, I just want to make sure that I

17  understand what the parameters of the objection might be.

18         You're not saying that there's no person in the

19  world that could testify to this list of things, right?

20         MR. SNELL:  I think we're past that, Your Honor.

21         THE COURT:  Right.  But you're just saying that this

22  is not the guy.

23         MR. SNELL:  Right.

24         THE COURT:  All right.  Go ahead.

25         MR. HEEREN:  So Your Honor, Ambassador DeBaca is

PROCEEDINGS                                    595

1    currently -- and I'm reading from the CV here -- the Yale

2    University fellow in modern slavery.  He also did some work

3    for the Open Society Foundation and for an independent

4    consulting practice that he owns on forced labor practices.

5             Prior to that, most significantly, he was the

6    ambassador-at-large to monitor in combat trafficking in

7    persons, and senior adviser to Secretary of State Hillary

8    Clinton on issues of forced labor practices and human

9    trafficking.

10            In that role, he helped edit and prepare what is

11   known as the Trafficking in Persons report.  This is a report

12   prepared every year since I believe 2001 that is effectively a

13   summary of two things.

14            One, the first half of it, which is essentially a

15   text on factors and issues that would go towards forced labor

16   practices and human trafficking practices.

17            The second half of it is an international survey of

18   the issues on an issue-by-issue basis related to forced labor,

19   effectively country reports.

20            THE COURT:  To what extent do the things that he

21   does relate to these particular topics, it's just doing it?

22            I mean, it's unsurprising to me that these would be

23   the topics, but the question about the types of -- I mean, the

24   types of people who might be targeted or who might -- that the

25   characteristics of people who become victims.

PROCEEDINGS

596

1    What's his -- I think that's -- I'm going to suggest

2    that might be what your problem is, right?

3         MR. SNELL:  That's part of it, yes.

4         THE COURT:  All right.

5         MR. HEEREN:  Sorry, Your Honor.

6         THE COURT:  No, no, no.  That's all right.

7         So a lot of times, for example, in sex abuse cases,

8    you'll have somebody talk about why victims don't report or

9    something like that.  This is in the nature of that kind of

10   testimony.

11        So what -- I get the -- what qualifications do we

12   have to talk about those things?

13        MR. HEEREN:  Yes, Your Honor.

14        In addition to his expertise on the issues relating

15   to the victims, in China specifically, and more broadly in the

16   United States and internationally, which he has through the

17   work in the Department of State, he was also a member of

18   Department of Justice, their civil rights division.  He was --

19   I believe his last role was as the chief counsel to the human

20   trafficking prosecution unit.

21        I forget the exact number, but he said something in

22   the order of hundreds of victims that he's dealt with.  And so

23   he has experience both with hundreds of victims as well as a

24   myriad variety of practical experiences with forced labor

25   schemes and organizers.

PROCEEDINGS                          597

1      THE COURT:  Okay.  What's your objection to him?

2      MR. SNELL:  Our objection is that the man is

3  essentially an advocate, not an expert to testify in a federal

4  criminal trial.  He has never been qualified to testify in any

5  court proceeding, as far as the government tells me.  If he

6  were, we would have a transcript that we could look at.

7      THE COURT:  Well, everybody's got to start

8  somewhere, right?

9      MR. SNELL:  True enough.

10     I don't think that the starting point should be

11 Mr. Zhong's trial in this case.  These are extremely broad and

12 inflammatory subjects, and I don't want to revisit that, but

13 given the sensitivity of this -- I mean, some of these other

14 subjects go straight to the facts of this case.  Some victims

15 are treated better than others as a deliberate method of

16 controlling the overall scheme.

17     We heard about that in the testimony already.

18     THE COURT:  Well, that's kind of a classic feature

19 of experts in this area.  So if you have, you know, a child

20 abuse case, you have people talking about grooming, experts

21 talking about grooming, because grooming might be a feature of

22 the particular of the fact pattern.  So that itself is not

23 unusual.

24     I mean, I think it would be an objection if it

25 weren't relevant to the fact pattern.  So I mean, experts

1    typically come in to talk about -- I mean particular types of

2    facts that are present in the kind of case.  I'm not quite

3    sure why that's an objection.

4           MR. SNELL:  Well, it's coupled with the fact that I

5    see no evidence that Mr. DeBaca has ever done any kind of

6    clinical analysis.  It's one thing to be a prosecutor and deal

7    with victims day in and day out, or sometimes people who turn

8    out not to be victims but claim they are.  It's another thing

9    to be a clinician or an academic.

10          He has no degree in psychology, that I'm aware of.

11   Has never studied the victimology; has no background of the

12   sort that the Rule 702 and *Daubert* contemplate.  That's

13   essentially our argument in a nutshell.

14          And I believe that on cross-examination in the

15   qualification stage, we will be able to demonstrate, very

16   convincingly, that his testimony has no place in this trial.

17          THE COURT:  Anything else you want to say?

18          MR. HEEREN:  Not unless you want me to be heard,

19   Your Honor.

20          THE COURT:  No, I think these questions about

21   qualifications and the person's ability to speak about certain

22   subject is really a classic area for cross-examination.

23          First in the area of a *voir dire*.  If a *voir dire*

24   establishes that he is not sufficiently qualified to be an

25   expert, then he won't be qualified as an expert.

PROCEEDINGS

1    Of course, I give jurors instructions about how they

2    are to evaluate expert testimony.  I will certainly give that

3    instruction.  One of those instructions is that they don't

4    have to accept the testimony of the person who's being

5    proffered as an expert, that they can reject it if they don't

6    find it persuasive.

7    So I give kind of a small instruction about that

8    before the witness -- if I qualify the witness as an expert --

9    and I'll give a more expanded version in my final charge.

10    Of course, your objection to this will be preserved.

11    But if there's any language that you want me to include in

12    that sort of instruction that I give, assuming that I find

13    that the person is qualified, I'll certainly -- if you want to

14    take a few minutes to suggest something additional to the

15    usual expert testimony instruction, I'll certainly do that.

16    But I think for purpose of -- this is really classic

17    cross-examination, so I'm going to deny your objection.

18    I'll give you a few minutes, if you want, if there's

19    something additional that you want me to say.

20    Just as a preview, what I usually say is, you know,

21    a person is permitted to testify as an expert if he or she has

22    knowledge in a particular field that most of us don't possess.

23    I tell them that I'll give them further instructions

24    at the end of the case, but that they are free to accept or

25    reject the person's testimony as they would any other witness,

PROCEEDINGS                                600

1    so...

2           So if you want to think about it and write something

3    up for me, I'll consider it.

4           MR. SNELL:  Sure.  I'd love to consult.

5           THE COURT:  Go ahead.

6           MR. SNELL:  But just so that I'm clear on the

7    timing, Judge, you're contemplating giving that instruction

8    once he is found to be qualified.

9           THE COURT:  That's right.  That's right.

10          MR. SNELL:  And the way we'll proceed in the

11   meantime is bring the jury in, the government will put on its

12   qualifying direct testimony.

13          THE COURT:  You can do a *voir dire*.

14          MR. SNELL:  And then I will *voir dire*.

15          THE COURT:  And then I can rule.

16          I mean, I don't know what my ruling will be because

17   I haven't heard it yet.  It could be that he's a quack, and

18   then you'll win.  But that's just the general procedure.

19          MR. SNELL:  Right.

20          And the entire qualifying testimony will be before

21   the jury?

22          THE COURT:  That's how it works usually, yeah.

23   Yeah.  So, okay.

24          Do you want to take a minute and think if there's

25   something else?

PROCEEDINGS                    601

1              MR. SNELL:  Sure.  That will be it great.  Thank

2    you.

3              THE COURT:  Sure.

4              (Pause.)

5              THE COURT:  Yes.

6              MR. SNELL:  I have one more application.  I've

7    consulted and with the instruction Your Honor describes is

8    fine --

9              THE COURT:  Okay.

10             MR. SNELL:  -- by the defense.

11             One other request, though.

12             I would ask that the Court direct that the witness

13   be referred to simply by his name rather than including the

14   ambassador title.  I don't think that's necessary or

15   appropriate.

16             THE COURT:  If he were a doctor, would we call him

17   doctor?  I'm not --

18             MR. SNELL:  He's retired.

19             THE COURT:  Oh, I see.  Well --

20             MR. SNELL:  He had the post for a certain number of

21   years and he is doing something else and is not in practice

22   now.

23             THE COURT:  Okay.  Do you care what we call him?

24             MR. HEEREN:  I don't, except I hope he is allowed to

25   testify that he was the ambassador-at-large.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    602

1          MR. SNELL:  Of course.

2          THE COURT:  I think that is fine.

3          I just want to say one thing further about this

4    issue in general.

5          You know, the government did provide, generally, a

6    description of what the testimony would be, my recollection

7    is, as well as who the person was.  And just as a matter of

8    timing, I think it's true that you might not have known that

9    he hadn't testified before, but you certainly knew who he was

10   and that he didn't -- wasn't a psychiatrist and all of that.

11         So I don't really see the issue of surprise as one

12   that's persuasive to me, in particular since the government

13   has now basically given you its direct examination.  So I just

14   wanted to make that clear.

15         So with that, let's get the jurors.

16         So is he mister?

17         MR. HEEREN:  Professor.

18         THE COURT:  Is that okay?

19         Is he cited as a professor?

20         MR. HEEREN:  He's a Yale -- Robina fellow at Yale.

21         THE COURT:  I've heard of that college.

22         MR. SOLOMON:  Your Honor, while we're still on the

23   record, the parties have agreed that Exhibits 311 through 318

24   inclusively should come into evidence.

25         THE COURT:  Okay.  Anything else generally that

PROCEEDINGS                                603

1    you've agreed on that should come into evidence?  Is this all

2    with this witness?

3                 MR. SOLOMON:  No, actually, that's with the next

4    witness.

5                 THE COURT:  Okay.

6                 MR. HEEREN:  Judge, as I think about it, I am fairly

7    certain that when we ask him his name that ambassador may come

8    out, so...

9                 THE COURTROOM DEPUTY:  All rise.

10               (Jury enters the courtroom.)

11               THE COURTROOM DEPUTY:  Please be seated.

12               THE COURT:  Good morning, everyone.

13               THE JURY:  Good morning.

14               THE COURT:  First of all, I want to thank you all

15    for being so prompt.  It's one thing that I don't have to

16    worry about trying to keep all these moving pieces going.  And

17    I know it must be frustrating to sit around and wait.

18    Sometimes we have to address legal issues, and with resolving

19    them, it actually makes the case move along faster.  But I

20    don't want you to think that we're all in here, you know, just

21    wandering in whenever we feel like it.  It's just sometimes

22    there's stuff that has to happen outside of your presence.  So

23    I very much appreciate your diligence and your patience with

24    us.

25                 We are ready to proceed with the trial and the

PROCEEDINGS

1   government's going to call another witness.

2          So go ahead and call your witness.

3          MR. HEEREN:  Yes, Your Honor.

4          The government calls Luis C. DeBaca.

5          THE COURTROOM DEPUTY:  Raise your right hand.

6          (Witness takes the witness stand.)

7   **LUIS C. DeBACA**, called as a witness, having been first duly

8   sworn/affirmed, was examined and testified as follows:

9          THE WITNESS:  I do.

10          THE COURTROOM DEPUTY:  Please state your name for

11   the record.

12          THE WITNESS:  My name is Luis C. DeBaca.

13          THE COURTROOM DEPUTY:  Have a seat, please.

14          THE COURT:  All right.  I'm going to ask you to do a

15   couple of things.

16          The first thing I want to make sure is that you

17   don't speak too quickly.  Our court reporter takes down

18   everything that witnesses say and it just makes it easier if

19   you take your time.

20          Whichever lawyer is questioning you, just let that

21   person finish asking before you start speaking so we don't

22   have cross-talk.

23          If there is something that you want to have repeated

24   or that you don't understand, let me know that, too, okay?

25          THE WITNESS:  Yes.

```
 1              THE COURT:  Go ahead.

 2   DIRECT EXAMINATION

 3   BY MR. HEEREN:

 4   Q     Good morning, sir.

 5   A     Good morning.

 6   Q     Sir, what do you currently do for a living?

 7   A     I'm a professor at Yale University, where I am the Gilder

 8   Lehrman Centers Robina Fellow in modern slavery.

 9   Q     And what did you do before that related to forced labor

10   practices and prevention?

11   A     I've had several positions with the United States

12   Government.  Most recently having to do with forced labor, is

13   that I served as ambassador-at-large for the United States.

14   The Office of Monitoring and Combating Trafficking In Persons.

15              THE COURT:  I'm going to ask to you slow down just a

16   little bit, all right?

17              Go ahead.

18   Q     And what did you do in that position?

19   A     As ambassador, I was the director of the Office to

20   Monitor and Combat Trafficking In Persons, which is the

21   coordinator of the United Stated government activities against

22   that particular crime.

23              I led U.S. diplomatic efforts around the world,

24   coordinated the cabinet meeting and the interagency bodies

25   within the U.S. government, and ran the office itself, which
```

DeBACA – DIRECT – MR. HEEREN                    606

1    worked on those issues.

2    Q    And forgive me if you said this, but were you an adviser

3    to anybody in that position?

4    A    Yes.  As ambassador, I was also the senior adviser to the

5    Secretary of State, both Hillary Rodham Clinton and

6    subsequently John Kerry.

7    Q    Do you have prior experience before that involving forced

8    labor practices and prevention issues?

9    A    I do.  I was senior counsel on the Judiciary Committees

10   of the House of Representatives where my portfolio involved,

11   in addition to some other issues of national security and

12   civil rights, involved sex trafficking and forced labor.

13   Q    Okay.  And prior to that, did you have any experience

14   or -- experiences related to forced labor practices and

15   prevention?

16   A    Yes, I was the chief counsel of the United States Human

17   Trafficking Prosecutions Unit, and before that was the

18   Involuntary Servitude and Slavery coordinator in the criminal

19   section of the Civil Rights Division of the Justice

20   Department.

21   Q    I just want to be a little more precise and clear here.

22        When I say "forced labor practices and prevention,"

23   what sort of experience, if any, did you have that included

24   experiences dealing with victims and different types of

25   victims involved in those issues of forced labor and human

1    trafficking?

2    A    Specifically, in my time in the Civil Rights Division, I

3    investigated and prosecuted cases of forced labor and sex

4    trafficking, which we tend to use, in relative terms, of

5    either forced labor, human trafficking, or in the 1990s

6    involuntary servitude and slavery.

7              In that role, not only did I supervise others in

8    their cases, but also did a lot of the hands-on work;

9    interviewing witnesses myself, leading investigations, working

10   with psychologists to bring people out of that situation, in

11   cases involving somewhere around 600 victims, and almost a

12   hundred defendants.

13   Q    Do you also have experience -- do you have specific

14   experience with the analysis of factors or issues relevant to

15   forced labor practices?

16             And when I say, just to be clear for the record, do

17   you understand when I say "force labor practices," I mean

18   including issues relating to the victims of forced labor as

19   well?

20   A    Yes.

21   Q    And -- sorry, let me reask that first question then.

22             Do you have experience with the analysis of factors

23   relevant to forced labor practices?

24   A    I do.  In my role as ambassador, one of the things that

25   we -- that my office did, and one of the things I was

1    responsible for, was funding research into exactly that;

2    whether it was the psychological response of people to having

3    been held in such a situation, whether it was what best

4    practices would be from governments in identifying people who

5    have been in that situation, and then what to do with them

6    thereafter.

7           But also being able to then transmit that out and

8    work with the business community so that they could recognize

9    the signs and they could make sure that this didn't happen

10   within their own supply chains.

11          So both with funding, with working through these

12   things at the United Nations, with business groups and others

13   to try to really bore down into the experiences of people who

14   have gone through this.

15   Q    What about any -- have you had any involvement in the

16   preparation or publication of materials associated with the

17   analysis of forced labor practices?

18   A    Yes, I have.

19   Q    And can you -- is there any in particular that you have a

20   fair bit of experience dealing with?

21   A    So each year the Office to Monitor and Combat Trafficking

22   In Persons at the State Department puts together what's called

23   a trafficking persons report.  And if I forget myself, I will

24   call it the TIP report, which is what it is called for short.

25          THE COURT:  What do you call it?

1            THE WITNESS:  The TIP report, Trafficking in

2    Persons.

3            THE COURT:  TIP report?

4            MR. HEEREN:  TIP.

5            THE WITNESS:  TIP.  T-I-P.

6            So if you hear me say that, that's what I'm

7    referring to.

8            THE COURT:  But you're going to say it slowly,

9    right?

10            THE WITNESS:  I will say is slower than I am.

11            THE COURT:  All right.  Good.

12   A    So that each year the office puts together a snapshot of

13   what's happing around the world, this issue.  And again, when

14   I say "human trafficking," it's the umbrella term that is

15   often used for whether it's forced labor or sex trafficking.

16            The TIP report each year both does that deep dive

17   into the particular countries, but then it also sets forth the

18   analytical framework of with which we're dealing.

19            The United States has a set of standards that were

20   articulated in the Trafficking Victims Act of 2000.  And that

21   set of standards each government is supposed to be assessed

22   by, including our own government, and each year my office

23   would go out and look at that.

24            But so that it wasn't simply a grading system, the

25   other thing that the TIP report does, it identifies those best

DeBACA – DIRECT – MR. HEEREN                    610

1    practices.  It identifies what are the things that we were

2    seeing across the different countries.  What are the

3    commonalities of whether it's in victim identification,

4    whether it's in challenges to victim care, whether it's in

5    gaps in coverage around the world.

6            And each of those concepts were then tended to be

7    published in every year's TIP report in the introductory

8    parts, which is the analytical framework.  In many ways it's a

9    textbook for that year on what were the issues that were being

10   seen.  What were the emerging issues.  Maybe countries that

11   haven't been thought of as having a trafficking problem, or

12   sectors in the economy that hadn't been thought of or hadn't

13   been recognized as much as others have.

14           So each year that analytical framework as well as

15   the diplomatic and the country snapshot is something that I

16   was responsible for.

17   Q    And so I want to focus your attention now on the part you

18   referred to as the country snapshot.

19           It sounds from your testimony like there was a

20   review of different countries around the world in the

21   Trafficking in Persons report?

22   A    Yes, there is.

23

24           (Continued on next page.)

25

DeBACA – DIRECT – MR. HEEREN                611

1    DIRECT EXAMINATION (Continued)

2    BY MR. HEEREN:

3    Q    Did that include research and review on China?

4    A    It did.  Since the coverage of the report over the years

5    throughout, especially after some changes to the law in 2008,

6    and so different countries have been on the report for longer

7    than others, specifically, countries that were known to have a

8    trafficking problem at the beginning of the reporting

9    requirement in 2001.  And China has been in the report since

10   that initial report.

11        The report itself brings in information from our

12   embassy staff, from China watchers, from nongovernmental

13   organizations, from other Governments, from the Chinese

14   Government itself, the information that it provides.  And each

15   year it ends up being a very in-depth snapshot as to what's

16   happening.

17        Around these minimum standards that I had mentioned,

18   but especially around this concept of prevention, protection

19   and prosecution.  What is a country doing on those items?  And

20   so that was the lens through which we looked at China each

21   year.

22   Q    And what sort of -- what sort of role or how detailed was

23   your involvement in the preparation of the Trafficking In

24   Persons report, both the analysis section you described and

25   the country reports, specifically China?

1    A     Well, there's a team in the human trafficking office that

2    is the report's team that also does a lot of the hands-on

3    diplomacy and they have information fed up to them through our

4    embassy staff.  In China, there are not just the embassy in

5    Beijing, but there are consulates around the country as well,

6    information from other Government agencies as well as I

7    mentioned non-Governmental organizations, international

8    organizations, and the Chinese Government.

9           Each country narrative then is written along those

10   analytical lines of the minimum standards assessing

11   prevention, protection and prosecution.  A baseline between

12   our officer and the lead officer in the embassy in the country

13   in question then is established as to how the country is

14   doing.  A numeric rank is given.  It's Tiers 1, 2, Tier 2

15   Watchlist and Tier 3.  So it's a three-tier system with four

16   tiers on it, which is typical for the Government.

17          Tier 2 Watchlist is the kind of literally what it

18   says, it's watch out.  You might be a Tier 2 country, but

19   you're very close to being on the bottom of the rankings.  And

20   those rankings are very much looking to see what is the

21   Government doing.

22          So each year then, at that point, the discussion has

23   been largely at the staff level.  A draft is proposed.  Over

24   the course of 190 or so countries, all of the countries in the

25   world at this point, with some exceptions for war torn

DeBACA – DIRECT – MR. HEEREN                613

1    countries like Somalia or Haiti after the earthquake.  That

2    initial draft, then, would come to me and my leadership staff.

3    We would review it so that we knew that it was being done

4    against those standards and that it was being done uniformly.

5    In many ways because each of the teams was working on one

6    specific region of the world.

7            So I needed to make sure, for quality control, that

8    the African team was using the same analytical approach and

9    the same evidentiary standards as, say, the team that works in

10   the western hemisphere.

11           The countries that we could agree upon with the

12   counterparts at the embassy, or in the regional bureaus of the

13   State Department which deals kind of the big geopolitical

14   issues, and that is the bulk of the countries.  We all could

15   look at that and say, well, that's clearly a Tier 1 country.

16   It's got victim identification standards.  It actually arrests

17   people for this crime and sentences at a level commensurate

18   with other serious crimes.  It has prevention.  We'd all look

19   at that and say, okay, clearly it's a Tier 1 country.

20           There are other countries, though, that there would

21   be differences of opinion.  And so in those countries, and

22   they are often the most strategic countries, or the ones with

23   the most complex human trafficking cases, we would then end up

24   having a further review with me and the relevant assistant

25   secretary from that regional bureau.

VB          OCR          CRR

DeBACA – DIRECT – MR. HEEREN          614

1          And so in kind of the large strategic countries, my

2     involvement would end up being much deeper than in a country

3     that we would come to a very quick decision just by looking at

4     it.

5     And China was typically one of those countries.

6     Q     And so would any of these reports, when you were the

7     ambassador and in that position, would any of these reports go

8     out the door without your final review and approval?

9     A     None.

10    Q     Do you have any expertise or experience related to the

11    history of forced labor and practices that are precursors to

12    the modern concepts of forced labor?

13    A     Well, that's what I'm teaching right now at Yale, the

14    history of the 13th Amendment up to modern slavery and the

15    13th Amendment to the U.S. Constitution, which makes chattel

16    slavery illegal in the United States, also then makes what's

17    called in it involuntary servitude, the use of other coercive

18    means, other than big legal chattel slavery of African

19    Americans, to try to continue that type of practice.

20          So that is kind of the root at what I am researching

21    and teaching, but because the 13th Amendment was actually

22    drawn from language from the Northwest Ordinance, my work on

23    this goes all the way back to the colonial era and the work

24    that Jefferson was doing wrestling with this problem.

25    Q     And I take it in your position as a prosecutor, it sounds

DeBACA – DIRECT – MR. HEEREN                    615

1    like you dealt with a wide variety of cases as well, and

2    practical experiences?

3    A    I did.  And of course one of the things that I'm doing at

4    Yale and in the class is looking at this kind of interplay

5    between the types of coercion and the forms of coercion that

6    were used say, for instance, after the Civil War during

7    sharecropping days and things like that.  And then what's

8    happening in the modern era and of course I draw on my own

9    experiences having investigated cases, having spent time with

10   not this 600 odd victims in the cases that I did, but the

11   defendants and other people who have been involved as well.

12          Plus, then the work that I've done out in the world

13   with the United Nations and otherwise.  So that we're seeing

14   the commonalities across not just the United States

15   perspective, but what is happening in different parts of the

16   world; how does it manifest differently in northern India than

17   it does in Cypress?  How does it manifest differently in South

18   Africa than it does in Honduras?

19   Q    And we don't need to get into it in detail, but just

20   generally speaking, it sounds like you have other experiences

21   in which you can testify to related to forced labor practices?

22   A    Yes, I've testified in a number of different settings,

23   not in a criminal trial before, but in a number of different

24   settings.

25   Q    Were those Government proceedings in the U.S. or

1   otherwise?

2   A     Yes.  In the United States when I was ambassador, I

3   testified regularly before the Congressional committees.

4             In Congress, it's -- different committees handled

5   this, so Foreign Affairs Committee, obviously, in both the

6   State -- excuse me, both The Senate and The House.  But at the

7   same time, the Judiciary Committee in both The Senate and The

8   House.

9             There's also a special committee that what's called

10  the Helsinki Commission that and the Human Rights Committee.

11  Those two special committees often would hold hearings on

12  this.  And I testified regularly in those settings before the

13  United States Congress.

14  Q     Okay.  Are you receiving any payment for your time today?

15  A     I am.

16  Q     Generally speaking, what are you receiving payment for?

17  What types of things?

18  A     So reviewing documents, rendering an opinion upon what I

19  reviewed, looking to see kind of the parameters of forced

20  labor, looking at the situation in China, et cetera.

21  Q     And just to be clear, though, are you being paid to

22  render a particular or specific opinion?

23  A     Not at all.

24  Q     The rates you're charging, based on your experience, are

25  they consistent with the rates charged by others of

1   commensurate experience in your field?

2          MR. SNELL:  Objection.

3   A    Yes.

4          THE COURT:  Overruled.

5   A    Yes, when I set these rates coming out of the Government

6   at the end of Obama Administration, all of the political

7   appointees from one administration to another end up rotating

8   out in the U.S. system.

9          When I set these rates, I very much looked at what

10  other former ambassadors in their consulting practices set

11  their rates at, and also, frankly, looked at what lawyers and

12  big law firms charge.

13         MR. HEEREN:  I'm showing you what's marked for

14  identification only as Government's Exhibit 2008.  It should

15  show up on your screen and let me... let's focus.

16  Q    Do you see it on your screen, sir?

17  A    I do.

18  Q    I'm just going to briefly kind of scroll down, but are

19  you already familiar with this document?

20  A    I am.  I prepared that document.

21  Q    What is this document?

22  A    This is my resume.

23  Q    Do you recall how recently updated it's been?

24  A    I tend to update it kind of quarterly.  So I would think

25  that this is probably from January or so, to remind me that I

DeBACA – VOIR DIRE – MR. SNELL                    618

1    probably should put dates on these things.

2    Q    Fair enough.

3                MR. HEEREN:   Your Honor, at this time -- first, the

4    Government would move to admit Government's Exhibit 2008 into

5    evidence.

6                THE COURT:   Any objection?

7                MR. SNELL:   Yes, Your Honor.

8                THE COURT:   About what we talked before?

9                MR. SNELL:   Yes.

10               THE COURT:   All right.   The objection is overruled.

11   Do you have something else you want to ask me?

12               MR. HEEREN:   Yes, Your Honor.

13               The Government would move, pursuant to Rule of

14   Evidence 702, to qualify Luis DeBaca as an expert on forced

15   labor and human trafficking.

16               (Exhibit published.)

17               THE COURT:   Do you have any voir dire you would like

18   to do?

19               MR. SNELL:   Yes, I do, Your Honor.

20               THE COURT:   Okay.

21   VOIR DIRE EXAMINATION

22   BY MR. SNELL:

23   Q    Good morning, Mr. DeBaca.

24   A    Good morning.

25   Q    My name is Dietrich Snell.   I am representing Dan Zhong

1    in this case.  And I have a few questions for you just about

2    the qualifications that you were just asked about by the

3    Government.

4    Sir, could you tell us a little bit about your education?

5    A    Yes.  I did my undergraduate work at Iowa State

6    University, looking at international agricultural development

7    and graduated with a degree in political science.

8              From there I went to the University of Michigan law

9    school where I graduated with a law degree.  And from there

10   went into practice.

11   Q    You have no other graduate degrees, do you?

12   A    I do not.

13   Q    You have no degree in psychology?

14   A    I do not.

15   Q    No degree in human behavior?

16   A    No.

17   Q    Have you ever studied clinical psychology?

18   A    I have not studied it as a course of study, no.

19   Q    Do you know the field victimology?

20   A    I do.

21   Q    What is victimology?

22   A    Victimology is a type of psychology that looks at how

23   people respond to crimes committed against them, looks --

24   draws from sociology, draws from psychology, draws from

25   anthropology, and can either be in a very particularized look

DeBACA – VOIR DIRE – MR. SNELL          620

1    at a particular victim, or it can look at larger victim

2    classes.

3    Q     You would agree with me, would you not, that victimology

4    relies heavily on clinical work?

5    A     Clinical work moves up into victimology just as it does

6    criminology and other parts of the social sciences, yes.

7    Q     And clinical work is where social sciences typically

8    gather data from the field in order to determine whether there

9    are certain conclusions that can be drawn; is that correct?

10   A     Well, clinical work is typically working with a

11   particular patient or a particular person.  Whereas data

12   gathering, data analysis, survey work, ends up being something

13   that gets done in the social sciences.  They often will happen

14   together, if you're trying to look at something that flows out

15   of a particular people's experiences.

16   Q     You mentioned on your direct testimony something about

17   the Trafficking in Persons report; did you not?

18   A     I did.

19   Q     And I think you said that that report is an annual,

20   potentially an annually-compiled review of the state of

21   trafficking within countries around the world?

22   A     That's correct.

23   Q     And it receives information from a whole wide range of

24   sources, some governmental, some nongovernmental; correct?

25   A     That's correct.

DeBACA – VOIR DIRE – MR. SNELL                    621

1   Q    And those sources get their information from places that

2   are unknown to you; is that right?

3   A    There are some sources that get their information from

4   places unknown to us.  There are other sources who come in

5   with very detailed recitations of where they're looking.

6           So, for instance, if we were to look at a human

7   rights report, we wouldn't simply take it on faith that a

8   particular human rights organization had done so.  We would be

9   looking at who their sources were, what their bibliography

10  was, what kind of field interviews they had actually done, how

11  reputable they are, who the actual reporter was who was out

12  there doing that.

13          Pretty much the same as what we do if the Government

14  gave us sources.  We'd go kick the tires on that and typically

15  would go back and ask the Government for the raw data.  So it

16  wasn't simply a diplomat putting -- pardon my French -- spin

17  on the numbers but rather that we can actually see the

18  numbers.

19  Q    In describing this work that you've just told us about,

20  you used the word we.  Who do you mean by we.

21  A    So what I mean we, I'm talking about my team at the State

22  Department, both the Office to Monitor and Combat Trafficking

23  and the folks out in the field at the embassies.  And of

24  course I'm talking about them in the we, as far as the years

25  that I was the publisher of that particular report.

DeBACA – VOIR DIRE – MR. SNELL                   622

1    Q      You were the publisher; correct?

2    A      I was the editor, publisher and issuer of that report.

3    Q      You were not the researcher, were you?

4    A      No, the researchers are the combination of the field

5    workers, the folks at the embassies, and even the information

6    that was coming in.

7               As ambassador, I was, I guess for lack of a better

8    word, at the top of the pyramid aggregating everything that

9    was coming in from our folks around the world.

10   Q      But you, yourself did not have any role in gathering the

11   data that was being assembled to form the basis for the

12   conclusions in the report, did you?

13   A      I was not gathering the data.  I was certainly using it.

14   Q      So you were relying on the work of a lot of other people,

15   most of whom you had no idea who they are; is that right?

16   A      I knew their roles in that I knew that they were

17   diplomats and analysts from the State Department and other

18   Government agencies.

19   Q      Now, the trafficking in human person --

20            MR. SNELL:  I'm sorry -- withdrawn.

21   Q      The Trafficking in Persons report is essentially a policy

22   review; is it not?

23   A      Yes.

24   Q      I think you testified it purports to rank countries

25   according to certain tiers, four numbers, one with two

1    subdivisions?

2    A     That's correct.

3    Q     And the purpose of the report is to inform everyone who

4    reads it as to how countries, all countries, stack up in terms

5    of the three Ps that you identified; correct?

6    A     That is one of the purposes.  That's an external purpose

7    that you describe.  There are internal purposes as well.

8    Q     And the upshot, it is your hope, is it not, is that

9    greater attention will be paid throughout the world to the

10   problem of human trafficking; correct?

11   A     Well, the recommendations that are put into each of the

12   country narratives seek to do that and that's specific to the

13   countries.  Saying, you know, we recommend this for this

14   particular country.

15              As far as the kind of broader, you know, what is the

16   state of the field and would the world end up responding to

17   those, that typically was either done in the introduction

18   sections, the analytical sections that I described, or in the

19   United States multilateral diplomacy at the United Nations at

20   other levels.

21              As far as the country narratives in the TIP report,

22   the hope of the country narratives, and the intent with the

23   country narratives, is very much to have that bilateral

24   dialogue between the United States and that particular

25   country.  And it then would inform our diplomacy throughout

DeBACA – VOIR DIRE – MR. SNELL                    624

1    the rest of the year as to what were the issues that we would

2    end up raising with them.

3           So that might be a bit of a nuance in that what

4    you're describing is part of the mission located in maybe a

5    different part of the TIP report.

6    Q    And how countries come out in this report is very

7    important to those countries; is it not?

8    A    It is.

9    Q    It's a matter of international relations; isn't it?

10   A    It is.

11   Q    And there's a heavy political component to it; isn't

12   there?

13   A    I wouldn't say there's a heavy political component.

14   There is a geopolitical component to it as far as balancing

15   United States interests.  But at the same time, being accurate

16   and looking to the facts on the ground.

17   Q    Because in your -- your goal, is it not, is to have

18   country measure up to certain standards that the Department of

19   State and Congress have decided should be adhered to

20   worldwide; isn't that right?

21   A    Well, so Congress decided that the minimum standards for

22   combatting trafficking is what countries should be assessed

23   against.  The three Ps and the United Nations Palermo

24   protocol, which the countries sign up to, is the thing that

25   they are to adhere to.

1           We certainly feel at the United States Government --

2   again, I use we to describe when I was there -- we certainly

3   felt that the minimum standards, when applied, would give

4   countries road maps as to where they were, as far as complying

5   with their responsibilities under the United Nations protocol.

6   Q    You don't think that the concept of forced labor

7   worldwide is broadly defined enough, do you?

8   A    I do.

9   Q    You believe that in every country in the world the

10  concept of forced labor is understood uniformly?

11  A    I do not.

12  Q    So you think in some countries there should be greater

13  attention paid to this concept of forced labor; correct?

14  A    Yes.

15  Q    And that's, in fact, the purpose of this ranking system

16  or tier system; correct?

17  A    It is, I think, an underlying assumption of the ranking

18  system.  The framers of the ranking system in 2000, I think,

19  were looking for a way in which they would be able to assess

20  how these countries were doing, but I don't think it was

21  necessarily about just the definitional issues.

22          If you look at what the minimum standards are, they

23  are very much about victim care, prevention efforts and

24  prosecution.

25  Q    Now, you mentioned that you testified in a number of

DeBACA – VOIR DIRE – MR. SNELL                626

1    settings.  I think you said before Congress, for example?

2    A    Before Congress here in the United States, before

3    Parliament in England and Australia, yes.

4    Q    None of that testimony had anything to do with forced

5    labor of the sort that has been charged in this case; did it?

6    A    I have to admit, I haven't gone back and reviewed all of

7    the testimony that I've given over the years in Congress.  And

8    so I can't answer that question.

9    Q    Have you -- do you have copies of that testimony?

10   A    There are copies of that testimony online and I

11   occasionally would go look at them if I needed to, but I

12   haven't reviewed those really since I actually testified.

13   Q    Did you provide copies of that testimony to the

14   Government?

15   A    The Government has access to that testimony.

16   Q    That's not my question.

17   Did you provide?

18   A    I didn't -- I did not provide copies myself.  I told them

19   that it was online on the Congressional websites.

20   Q    And there's nothing in that testimony that referred to

21   collectively that, in your mind, relates specifically to the

22   charges in this case; is that right?

23   A    I recall there being questions that I was asked in

24   Congress about China, but as far as the charges in this

25   particular case, no, not at all.

DeBACA – VOIR DIRE – MR. SNELL                627

1   Q    You were asked about your resume and the description of

2   the various positions that you've held.

3   Does the word China appear in your resume?

4   A    I would have to go back and review it to see.

5            MR. SNELL:   Your Honor, I'd just like to give the

6   witness a chance to review the -- I don't have the exhibit

7   number handy, but I think it's been marked for identification.

8            THE COURT:  His resume?

9            MR. SNELL:  Yes.  Thank you.

10           MR. HEEREN:  It is in evidence.

11           MR. SNELL:  Oh, that's right.  Government's

12  Exhibit 2008, for the record.

13           (Pause in the proceedings.)

14  A    China is not specifically referenced in the resume.

15  Q    It's not referenced at all; is it?

16  A    There are a number of cases, multilateral institutions in

17  references to the various travel that I took as ambassador.

18  That would include travel to China, working with China in

19  ASEAN, A-S-E-A-N, which is the Association of Southeastern

20  Asian Nations, et cetera.  Some of the cases that are

21  discussed without talking about where the victims came from,

22  would involve cases that had originated in China.

23           So China specifically is not named in the resume,

24  but experiences that I've had that had Chinese aspects to them

25  run throughout the entire document.

VB          OCR          CRR

DeBACA – VOIR DIRE – MR. SNELL                    628

1    Q     You've never done any work in Dandong, China; have you?

2    A     I have not gone to that part of China.

3    Q     By that part you mean northeastern China?

4    A     That's correct.

5              MR. SNELL:  No further questions on this stage.

6              THE COURT:  Okay.

7    So do you object to the Government's application?

8              MR. SNELL:  I do.

9              THE COURT:  All right.

10             The objection is overruled.

11             The witness will be permitted to testify as an

12   expert in the particular areas that the Assistant

13   United States Attorney mentions.

14             I am going to give you a further instruction about

15   this in my final charge, but generally, a witness is permitted

16   to testify as an expert when that witness possesses knowledge

17   that most of us do not also possess.  It is going to be up to

18   you at the end of case to determine whether you accept or

19   reject the expert's opinion, but that is the reason why we

20   permit expert testimony.

21             So whenever you are ready, Counsel.

22             MR. HEEREN:  Thank you, Your Honor.

23             THE WITNESS:  Your Honor, may I have some more

24   water.

25             THE COURT:  Oh, sure.

1          Do we have water for the witness?

2          (Pause in the proceedings.)

3     DIRECT EXAMINATION (Continued)

4     BY MR. HEEREN:   (Continuing)

5     Q    Mr. DeBaca, are there different forms or types of forced

6     labor?

7     A    There are.  In this kind of umbrella term of human

8     trafficking that we touch upon a little bit earlier, the kind

9     of two main things, types of compelled service that are looked

10    at in the United States and around the world, are forced labor

11    on the one hand, and sex trafficking on the other.  I'm not

12    going to address sex trafficking.  That's very much outside of

13    what we're here today on.

14          Forced labor is both a specific form of compelled

15    service and often is used as an umbrella term itself.  It

16    encapsulates a number of different concepts that have been

17    kind of generated over the years in the national and the

18    international context, and those concepts then end up having

19    labels ranging from involuntary servitude, practices similar

20    to slavery, contemporary forms of slavery, forced labor,

21    compelled service, indentured servitude, peonage, debt bondage

22    and document servitude.  All of those are loosely kind of

23    thought of under the rubric of forced labor for the purposes

24    of this kind of modern antihuman trafficking effort.

25    Q    And is there any sort of common element that runs through

1   these various different types of forced labor?

2   A    All of them, as with sex trafficking, are defined by the

3   use of some type of coercive means to hold someone, and by

4   hold I mean to either reduce them to or maintain them in, a

5   condition of compelled service.  In other words, that they

6   feel that there's no reasonable alternative but to remain in

7   service or serious harm would occur.

8         And then all those different labels that I mentioned

9   a second ago, involuntary servitude, peonage, et cetera, those

10  often then end up mainly looking to see kind of what type of

11  coercion was used.  And so that's kind of those gradations

12  amongst the different types within the phenomenon of forced

13  labor.

14  Q    Are you familiar with different types of groups and

15  organizations that have participated in forced labor?

16  A    Yes, I am.

17  Q    Based on your experience, what, if anything, can you tell

18  us about the size and sophistication of groups that engage in

19  forced labor schemes or practices?

20        MR. SNELL:  Objection.

21        THE COURT:  Overruled.

22  A    So one of the things that very much is recognized in both

23  in the international and the American context, is that the

24  scope of compelled service runs the gamut.  Everything from an

25  individual actor all the way to a very organized criminal

1    enterprise.  For lack of a better term, a Mafia or an

2    organized crime family.

3              It even can go to the state level, as we see with

4    North Korea, Eritrea, et cetera, where you have very

5    specifically set up states forced labor schemes.  But

6    typically it's something that is done by nonstate actors,

7    individual actors.

8              In forced labor, you're talking about a business

9    proposition.  And so that can go everything from a small mom

10   and pop shop to a medium sized farm factory or construction

11   site, all the way to a transnational business that might end

12   up having this in their supply chain, whether it's in

13   construction, fisheries, agriculture, et cetera.

14   Q    Focusing on businesses and their role in forced labor for

15   a second, why do businesses get involved in forced labor?

16              MR. SNELL:  Objection.

17              THE COURT:  Overruled.

18   A    Well, at the end of day forced labor is a problem of the

19   combination of vulnerability and greed.  If you have a

20   vulnerable population and greedy folks, whether those are the

21   labor recruiters or the final employers, then you have a ripe

22   situation for that type of exploitation.

23              Based on my experiences at all the different levels,

24   it appears that there's a combination of profit maximization

25   on the one hand, and almost a pleasure that is taken in being

1    able to have this type of control over other people.  And so

2    some of it is kind of a very twisted, rational economic

3    decision, and then some of it as well ends up being a much

4    more personal relationship between the employer and the folks

5    that they're holding in forced labor.  And those kind of wash

6    around within the same relationship at times.

7    Q    Are you familiar, as a general matter, with the concept

8    of visa fraud?

9    A    I am, yes.

10   Q    In your experience, does visa fraud have any connection

11   to forced labor practices?

12   A    I mentioned, I think a minute ago, labor recruiters.  And

13   labor recruiters tend to be the way that a lot of people get

14   to their jobs in the international economy and when people are

15   traveling for work overseas.

16        And one of the things that we see is that visa fraud

17   is often a tool of the labor recruiters and the transporters

18   as they're moving people into the beginnings of that

19   employment relationship.

20        One of the things that fraud in that moment does is

21   that it not only helps provide the worker, but it starts to

22   wrap the bands of compulsion or coercion around the worker, to

23   some extent, because if the worker knows that the visa that

24   was obtained for him was fraudulent, or later is doing things

25   that are not under the terms of the visa that they were

1    brought in, then they know that they are committing a crime,

2    that they are violating the terms of their visa.  And it makes

3    them almost a co-conspirator in that they aren't going to

4    necessarily then go seek help, because they think that they're

5    going to get in trouble for this crime of visa fraud.

6             So visa fraud has this kind of two-fold impact.

7    It's a way to get somebody into a country to do the things

8    that you really know that you want to do, and at the second

9    time, it's also a way to make it so that they will not run to

10   the authorities because they know that they have done

11   something, or that something has been done in their paperwork,

12   that could get them in trouble.

13   Q    And are you familiar as a general matter with the concept

14   of alien smuggling?

15   A    I am.

16   Q    Similar question.

17   Does that have any connection to forced labor practices?

18   A    It does.  And for many of the same reasons that I just

19   mentioned.  Alien smuggling doesn't look at the

20   misrepresentation to the recipient government the way that

21   visa fraud does.  Visa fraud is much more about fraud that was

22   committed to get the visa.

23            Alien smuggling then is bringing someone into that

24   destination country without authorization.  And it could be

25   that it's completely without inspection, which is a fancy way

DeBACA – DIRECT – MR. HEEREN                634

1    in the United States of saying just crossing the border.  It

2    can be with right to enter and then hold them over later.  So

3    that would be something going to port of entry, having

4    documents, coming in and then staying.  The colloquial term

5    for that is overstaying visa.

6              Or it could end up being someone who is brought in

7    totally legitimately.  Everything is fine and then later

8    something happens that keeps them in the United States with no

9    longer having status, perhaps after their status is expired.

10   So all of those are the different types of alien smuggling.

11             And they, too, very much have that effect.  When

12   someone knows that they are out of status, I typically hate to

13   use the term, but the common term is that they are an illegal

14   alien.  They will very much then make their decisions as to

15   whether they want to come out of the shadows; whether they

16   want to seek help; who they want to confide in about their

17   situation.

18             And so again there's that kind of balance of it's

19   both a way to get people in, or have them remain here, but it

20   also then sets them up as particularly vulnerable.

21   Q    I want to change topics to the victims of forced labor.

22             Are you familiar with the groups or types of people

23   that are commonly victims of forced labor?  And can you tell

24   us, based on your experience, what groups or types of people

25   that typically is?

DeBACA – DIRECT – MR. HEEREN                    635

1    A    So one of the things that I think we've –– that the field

2    has seen kind of emerge over the last 20 years is a better

3    understanding of kind of the idea of excluded and vulnerable

4    groups.

5              It's often in a country –– I'll start with kind of

6    internal trafficking and then move out.  Within a country it's

7    typically going to be language minorities, religious or ethnic

8    minorities.  It's often based on, especially in Latin America

9    on indigeneity, and people who are from the native American

10   communities, are more likely to be victimized than people who

11   are more of European ancestry.

12             In the international setting, what we see is that

13   that vulnerability is not necessarily as tied to kind of the

14   social status of that person's ethnicity or religion, and

15   rather is more about the fact that they are a foreigner.  If

16   you have somebody who is in the United States on or in any

17   other country really, it's not limited to the U.S., who is not

18   speaking English, who's newly arrived, who's dependant upon

19   their employer for a place to live, place to work,

20   transportation, kind of cut off and vulnerable, in that they

21   don't have access to the rest of the communities that are out

22   there, those vulnerable communities then, it's –– they're not

23   vulnerable necessarily for the same reasons for internal

24   trafficking.  The fact that they are foreign in a different

25   place and an isolated work site is more of what makes them

1   vulnerable.

2          Then when you put on top of that things that might

3   be present in the home country, whether it's that they're from

4   a poverty stricken area, or a group that lives in poverty,

5   whether they're from a rural area or a small city in the

6   Hinterlands, as opposed to the kind of main parts of the

7   country, all of those things can go into rendering someone

8   vulnerable to forced labor.  It doesn't mean that they are in

9   forced labor, but it certainly puts them squarely within

10  vulnerabilities.

11  Q    Based on your experience, are there any particular

12  industries where there is a greater risk of individuals being

13  compelled into forced labor?

14  A    So there are a number of industries that have been

15  pointed out regularly in the analytical portion of the

16  trafficking report, as well as being looked at at the U.N.

17  level and otherwise, that keep coming up kind of repeatedly

18  because they're seen in all regions of the world as being a

19  place that forced labor continues to be found.

20          And those, in a nutshell are -- and this is in no

21  particular order -- sex trafficking, obviously, the sex

22  industry and having those off to the side.  But the places

23  that we're seeing a lot of this are in fishing and forestry,

24  agriculture, electronics manufacturing, construction and

25  domestic service.  Those seem to be some of the places that,

DeBACA – DIRECT – MR. HEEREN                    637

1    just by their very nature, that those particular sectors of

2    the economy are the ones that are receiving a lot more

3    attention.

4         And they're receiving attention not only from

5    governments and regulators and the public, but they're

6    receiving attention from their industry groups, as well, as

7    they recognize the risk that is in their supply chain.

8    Q    Is there any particular areas of the construction

9    industry where forced labor is a particular problem or

10   vulnerabilities exist?

11   A    There are several, but one stands out.  There are people

12   who are looking at materials purchasing and sourcing within

13   materials, everything down to gravel and concrete.  But the

14   biggest risk input for construction around the world is

15   migrant labor.  So migrant construction labor.  For some of

16   the reasons that I mentioned earlier, as far as being a

17   language minority, often in a tenuous situation with your

18   immigration and dependant upon the job and the work site as

19   far as where you are in that country.

20        So within the construction industry, the labor input

21   is head and shoulders above the rest as being the risk.

22   Q    And just to be clear, when you a migrant construction

23   worker, you mean a construction worker who's come from one

24   country to another to do construction work?

25   A    That's correct.

DeBACA – DIRECT – MR. HEEREN          638

1   Q    Are people who come from certain countries or countries

2   with certain political or economic issues more susceptible to

3   coercion into forced labor?

4   A    Yes.  One of the things that we've seen is that there are

5   kind of a correlation between types of Government and some of

6   the forced labor practices.  And specifically, we've seen that

7   in the Asian region with communist autocratic governments

8   where the power of the -- the course of the power of the state

9   ends up being something that the business owners can turn to

10  because there's kind of a shared understanding of people's

11  relationship with the government and what happens to someone

12  who gets out of line.

13  Q    In your experience, when there are multiple victims of a

14  forced labor scheme in one single scheme, are those victims

15  typically all treated the same way?

16  A    No.  One of the things that we've seen, especially when

17  you get larger groups, and by larger I mean kind of more than

18  10 or 15, when you get larger groups, even though it's a

19  forced labor situation, the management techniques end up

20  starting to mirror management techniques of a nonforced labor

21  situation, and so you'll end up having people who are kind of

22  the trusted confidant of the manager.

23       Some folks will even use incentive contests.

24  There's a case in New York a few years ago where the people

25  who earned the most within this particular scheme, it was a

DeBACA – DIRECT – MR. HEEREN                    639

1   begging ring.  The one –– the people who earned the most by

2   begging on the streets would actually then get a field trip to

3   the Statue of Liberty.  So then the other workers that knew

4   that they should try to meet those same targets.

5          The flip side of it is the people who didn't get to

6   go to the Statue of Liberty, were confined, locked in.  The

7   worst sellers were actually physically punished.

8          But that notion of kind of using almost the same

9   management techniques that you'd use with any other business,

10  to reward your folks who are not troublemakers, who are doing

11  a good job for you, et cetera, and to punish those who aren't

12  doing their good job.  It just ends up being done with a

13  different set of tools than hopefully we would experience in

14  our own work places.

15

16          (Continued on following page.)

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continued)

2    DIRECT EXAMINATION

3    BY MR. HEEREN:

4    Q    So in addition to victims getting different sets of

5    treatment, either benefits and punishment, are victims

6    sometimes put in charge or responsible for other victims?

7    A    Yes.  In fact, sometimes put in charge while the employer

8    or while the boss is even out of the country, this trusted

9    level of victim.  And that actually, in a historical context,

10   was very common as well with the trustee system under convict

11   labor in the United States.  Men who themselves had been sold

12   into that situation or were in a sharecropping situation

13   having to basically be the bosses for the other victims who

14   were in the similar circumstances.

15   Q    And I take it, based on what you're saying, would it be

16   your opinion that individuals who are in that position --

17   those positions who receive benefits or who are supervising or

18   providing security over other victims, they themselves can

19   still be the victims of forced labor?

20              MR. SNELL:  Objection.

21              THE COURT:  Sustained as to form.

22   Q    What's your view on whether or not the victims in the

23   positions you described -- individuals in the positions you

24   described are victims of forced labor?

25              MR. SNELL:  Objection.

DeBACA – DIRECT – MR. HEEREN                    641

1        THE COURT:  Overruled.

2   A    So this issue of kind of the combination of culpability

3   and victimhood is just something that not only have I

4   experience in and wrestled with over the years, but it is

5   something that folks in the United Nations system under the

6   Palermo Protocol and under the law that comes out of it have

7   wrestled with, and that idea of having you deal with somebody

8   who might have some culpability while at the same time

9   recognizing that they were victimized in that way.

10       What happens as far as the outcome is concerned is

11  something for law enforcement and for that particular

12  government and I don't really have an opinion on what the most

13  just outcome is, but in all of those conversations it flows

14  out of an understanding that I share that one can be a victim

15  and have at times either no longer have the compulsion put

16  against you or even might end up doing things on behalf of the

17  employer.  It certainly doesn't make you a victim in the same

18  sense that your fellows might be, but if you're just looking

19  at was this person held in compelled service, that's something

20  you have to take into account when you're figuring out what

21  you do about that particular person.

22  Q    Based on your experience with victims, are victims

23  sometimes -- do victims sometimes -- withdrawn.  What has been

24  your experience with victims' views of their experience in a

25  forced labor or coercive environment?

1              MR. SNELL:  Objection.

2              THE COURT:  Overruled.

3    A    So if I might, I'd maybe like to go just a little bit in

4    the historical because of something that came up in my class

5    this year.  In that we were looking at some cases from the

6    1970s and the men in the fields in the south were basically

7    trying to describe what it was -- to The New York Times trying

8    to describe what they had gone through.  They basically said

9    we knew something was wrong, we just didn't know what to call

10   it.  I think that that really, to me, sums up my experiences

11   with survivors of this and with folks around the world as to

12   how things present.  That there is a strong sense of fairness

13   and strong sense of right and wrong, but very few people will

14   necessarily automatically put it into an context of slavery or

15   forced labor, relatively technical terms that people don't

16   necessarily go through their lives thinking of on a daily

17   basis.  So sometimes it will manifest itself as, you know, we

18   couldn't go outside, or we didn't get paid what we were told,

19   or, you know, I felt like I couldn't leave because something

20   might happen.  But not necessarily having the kind of right

21   words to describe or to come forward and say I'm a victim of

22   this particular offense.

23             That does happen sometimes and typically it happens

24   when people have had access to other members of the community,

25   whether it's a community group, non-governmental organization,

1    a Legal Aid provider who works in that immigrant community,

2    those are the places where people then tend to learn about

3    their labor rights and other rights that they might have in

4    the United States or in other countries.  And so access to

5    those types of groups for migrant labor, especially on

6    government programs, like guest worker programs, ends up being

7    very important because it gives them kind of the vocabulary

8    with which to say something more than just I knew something

9    bad was happening but I didn't really know what that was.

10   Q    So I want to turn now to a different topic.  Are you

11   familiar with different ways or methods in which a person can

12   be compelled to engage in forced labor?

13   A    I am.

14   Q    At the highest level, can you just briefly summarize, are

15   there different -- are there different ways and what are they

16   very briefly?

17   A    So there's a number of gradations and some of them come

18   back to that umbrella term I mentioned earlier where you end

19   up having some of them described based on, say, how much

20   physical force was used, that would probably be involuntary

21   servitude, or whether something was more structural, document

22   servitude comes to mind.  Each of them tried to kind of

23   identify the commonalities of compelled service, but at the

24   same time to then look at what the different types of

25   compulsion are that were used.  As you can expect then, it

DeBACA – DIRECT – MR. HEEREN                644

1    runs the gamut from full on locked up, beaten, punished, et

2    cetera, involuntary servitude, to the kind of scheme, plan or

3    pattern and use of these ominous harms that might happen for

4    forced labor, or the structural things, document servitude

5    which come from the taking and holding somebody's identity

6    documents.  All of those are kind of the different types of

7    compulsion that can be used to hold people in this kind of

8    umbrella term of forced labor.  And I apologize, the umbrella

9    term is actually one of the terms within it.  This has kind of

10   developed over time with no rhyme or reason in the

11   international sphere.  But for a lack of better term, all of

12   these are types of compelled service.

13   Q    And you mentioned document servitude a number of times,

14   what is document servitude?

15   A    Document servitude is a form of forced labor in which the

16   compulsive means are that taking and keeping of the identity

17   documents of a person.  Those identity documents could range

18   from everything from a very formal, like a passport or a birth

19   certificate, to things that we would think of as being less

20   formal.  A lot of cases involving people from Mexico whether

21   in the United States, Canada or other countries, it's taking

22   their voter registration card, because the voter ID card in

23   Mexico is kind of a functional equivalent of our driver's

24   licenses.

25            In cases involving United States citizens in the

1    United States, especially in sex trafficking, pimps will often

2    take the driver's license or even school IDs from their

3    victims.  But it's also other forms of identification.  So if

4    you have things like diplomas or other key documents in your

5    life, taking and holding those end up having a similar

6    compulsive effect.  Because unless you know that you have

7    these things that are descriptors of your life, you're not

8    going to want to leave or maybe you can't leave, in the form

9    of a passport, without them.

10   Q    Can you please elaborate on that last point about a

11   passport.  How does -- well, explain further about the

12   document servitude related to a passport?

13            MR. SNELL:  Objection.

14            THE COURT:  Overruled.

15   A    Well, the passport does a couple of things.  The passport

16   is an identification, it says who you are, has a picture of

17   you, but it also says where and to whom you belong.  You are a

18   member of that citizenship.  You are from that country.  So a

19   passport can say whether you're legal in the United States.

20   It has your visa in it typically, if you came in on a visa.

21            If you are from a country that doesn't require a

22   visa the fact that you have one of those passports

23   automatically shows to people that you are legal.  So if

24   you're from the United Kingdom or one of the visa waiver

25   countries, for instance, the fact that you have that EU

DeBACA - DIRECT - MR. HEEREN                    646

1    passport or that British passport sends that signal

2    immediately.  So it's a marker of one's legal status.  It's

3    often the only thing that you have to show that you are you,

4    because don't necessarily carry your birth certificate with

5    you when you travel, but then also it is what unlocks your

6    ability to take advantage of your right to travel.

7              The United States doesn't have exit visa

8    requirements like a number of countries do.  A number of

9    autocratic countries, not just dictatorships, but a number of

10   autocratic countries have exit visa requirements.  Where you

11   can't even leave your own country if you don't have a

12   passport.  The United States doesn't have exit visa, you don't

13   have to apply to the government to be able to leave.  But at

14   the same time, if you go to get on a plane to leave and you

15   don't have a passport, the carriers will not let you on

16   because they know that they'd have to fly you back if you get

17   to that other country and you don't have a passport to enter.

18             And so, knowing that you don't have a passport takes

19   away your ability to get home on your own.  The only way you

20   can get home is through the good offices of whoever had your

21   passport and if it's your employer or your recruiter, then

22   your dependency upon that particular entity just grows and

23   grows.  So you, in effect, will do what you need to make sure

24   that one day you'll see your documents again.

25   Q    Have you dealt with cases involving document servitude in

1    your past experience?

2    A    I have.

3    Q    Have you ever heard any reasons for why an organization

4    or an individual is holding another person's passport?

5    A    Yes.  I mean -- and that's not only in my personal

6    experience as far as dealing with victims and employers, but

7    also in dealing with, say, factory owners and others as we did

8    the work at the state department and since with businesses.

9    Factory owners or others may end up saying, well, I was

10   keeping their passports for safekeeping or even they wanted me

11   to keep their passports for safekeeping.

12           And one of the things as far as looking at what the

13   best practices are for an employer holding passports -- first

14   of all, the best practice is to not have employers hold

15   passports, but if you're in a place where maybe that is a more

16   common practice or people actively want someone to hold their

17   passports, what we're seeing is the companies that want to

18   make sure that the passport is actually being kept rather than

19   confiscated and held will end up having ways for the workers

20   to access their own passports.  So at the housing, if it's

21   company housing, having a set of lockers, kind of things like

22   we had to put our cell phones in, or at least some of us did

23   when we came in the courthouse today, you know, but so that

24   it's there but you can get it when you need it.

25           And that's one of the things that looking at whether

DeBACA - DIRECT - MR. HEEREN                    648

1   a passport is locked up, whether it's kept offsite, whether

2   it's kept in a company office somewhere, whether the person

3   has to justify why they need it, as opposed to simply saying,

4   you know, maybe I just wanted to touch my passport for no

5   apparent reason but it is my passport.

6          Your passport really is you in so many ways.  So

7   that's one of the things that that we're seeing in kind of where

8   are the passports, how accessible they are, for what reason

9   are they accessible and you have kind of a general spirit

10  within the company as far as, you know, we're keeping this for

11  you as opposed to things that evince the fact that we're

12  keeping this from you.

13  Q    I believe you mentioned earlier on a concept called debt

14  bondage.  Are you familiar with the concept of debt bondage?

15  A    I am.

16  Q    What is it?

17  A    Debt bondage, put the most simply, is that it's compelled

18  service for the purpose of paying off debt.  And it has

19  several different manifestations.

20          In the United States, the predominant form of debt

21  bondage historically was something called peonage,

22  P-E-O-N-A-G-E, which is a word that is taken from Spanish and

23  it was a practice in northern Mexico at the time the United

24  States came over and took that part of Mexico.

25          In other parts of the world, debt bondage can be

1    multigenerational.  We see this in parts of India, we see this

2    in parts of West Africa, et cetera.  So you could be paying

3    off a debt that your grandparents had been taken off, but by

4    and large debt bondage in the modern context is not those big,

5    long family, multigenerational structural things, it instead

6    is typically a particularized debt and that debt is often tied

7    to the labor recruiting process.  Whether it's a debt for the

8    cost of the ticket, the cost of administration functions,

9    anything that you do that basically requires that debt and

10   then have to be paying it off over time.  And debt doesn't

11   necessarily have to be directly to the person who is holding

12   you in compelled service, it can be to a third party.

13        Back in sharecropping days in the United States that

14   debt was often something that the farmer had gone into the

15   sheriff and paid off somebody's criminal fine and so the debt

16   was technically related to the sheriff, but then the boss ends

17   up using the debt holding it over them so that they could turn

18   them back in if they needed to.

19        In many cases around the world debt bondage ends up

20   being present, the debt might not be to the employer, it might

21   be to local loan sharks or even to family members.  If you

22   have to borrow the money for upfront costs, for the cost of

23   travel, the cost of recruiting, security deposits, et cetera,

24   you have to go out and get that money and then it's kind of a

25   race between are you able to work for long enough to repay

1    those debts versus might something happen so that you can't

2    earn that money.  And that debt is still going to be there

3    even if you end up leaving service.

4    Q    In your experience, does the debt that you've identified,

5    does it have to be, for lack of a better term, real or even

6    legitimate?

7    A    No, it's just has to be a perceived debt that the person

8    continues to strive towards.

9    Q    Are you familiar with a concept or an idea, a topic

10   called punishment clause?

11   A    Yes.

12   Q    What is a punishment clause?

13   A    So a punishment clause is kind of like a security deposit

14   I guess.  It's basically within a labor contract that sets a

15   amount of damages that would kick in were the person to leave

16   service, if they were to leave work before the contract term

17   had expired.  And one of the ways to see if something is a

18   punishment clause as opposed to simply a surety contract, is

19   to see whether it's reasonably related to anything.

20            Just like with recruitment fees.  If the recruitment

21   fee is $5,000 to go from Bangladesh to the Persian Gulf, yet

22   the tickets and everything else only cost $450, it's clear

23   that that recruitment fee is not just a profit-taking

24   exercise, but it ends up being so onerous that the person can

25   never repay it.

DeBACA - DIRECT - MR. HEEREN          651

1        So you're looking at some of these things like, are

2    there aspects of that contract that are there to just cover

3    the costs of recruiting, or are there aspects of that contract

4    that are there for a different purpose to basically put that

5    web of dependency and coercion to create that climate of fear

6    around that person.

7    Q    You just mentioned the term "climate of fear," is that a

8    particular term you're familiar with?

9    A    Yes.

10   Q    Can you elaborate on what that term means as you

11   understand it based on your experience?

12   A    Well, so the climate of fear is kind of another way to

13   describe the overbearing of someone's will.  You can do that

14   certainly by just an overt threat, you know, gun to the head

15   work for me or else.  But most people don't do that, that's

16   very clumsy and that's just not how compelled service works in

17   the modern era.  But rather there is that idea of whether the

18   circumstances within the employment relationship are such that

19   a reasonable person would feel like they don't have any choice

20   but to continue to perform.

21        And so when you're looking at that it becomes -- you

22   should end up looking to see what the worker knew, not just

23   about their own experiences but what had happened to other

24   workers.  What the rumor mill said about what had happened to

25   other workers.  Everything from, you know, a suitcase of old

1    clothes that gets pointed to and saying, oh, yeah, that was so

2    and so's zeros, but we turned him over to the police because

3    he tried to run away.  Something ominous.  It may or may not

4    have even happened but it becomes part of the lore of that

5    work site.  It helps to create that overarching climate of

6    fear.

7              Of course, the effective way to do that is to

8    invocate the fear not by running around using force or threats

9    against all 50 or a hundred or 300 people in the garment

10   factory, but instead making an example of a few them so it

11   becomes part of the story that even new people come into the

12   workplace start to say, well, don't cross so and so because

13   you remember what happened to this other person.

14             So this climate of fear is a concept that kind of

15   aggregates the experiences of people within that group of

16   employees.

17   Q    Do people who are forced labor sometimes get paid?

18   A    Yes.

19   Q    Are there ways in which payment or the lack thereof,

20   either, can be used to coerce labor?

21   A    Yes.  One of the most perverse ways to create this kind

22   of dependency is to withhold pay or to have the pay set in

23   relation to, whether it's security deposits, punishment

24   clauses or recruiting fees, such that the only way to repay

25   those is to continue to work.  And so people then end up being

1    afraid to leave early because then they wouldn't be able to

2    earn the money.  So being punished by not being allowed to

3    work that day is not being released from compelled service.

4    It's not saying you're free, go work for whoever you want,

5    it's you're confined to the barracks or you're confined to

6    quarters, which if I'm sitting here looking at a punishment

7    clause or if I'm sitting here looking at a recruitment fee

8    that I have to pay off, every day I'm not earning money ends

9    up being a day longer that I'm going to end up having to be

10   there.  And so, again, it's a way of control.  It's kind of

11   backwards though, right, it's you're saying don't work today

12   as a way to have them in forced labor and yet it seems to work

13   very effectively.

14   Q    Have you had any experience regarding the voluntariness

15   or lack thereof of people who join what you end up determining

16   is a forced labor scheme?

17   A    So one of the kind of core concepts in the international

18   sphere, the United Nations as well as the United States, is

19   this notion that initial voluntary engagement in the work --

20   either the type of work or working for that particular

21   employer does not then waive your rights to be free on whether

22   it's under the American 13th Amendment or Article 4 of the

23   Universal Declaration of Human Rights.  Those are unwaivable

24   rights and so the idea that I agree to go work on a particular

25   orange farm knowing that I'm going to pick oranges, and

1   knowing it's going to be hard work, does not then say that I'm

2   agreeing to be locked in to have my passport taken, et cetera.

3   Because you can't sell yourself into slavery.  That is about

4   as basic of a concept within, not just American law, but in

5   international law as anything.

6             And so that initial voluntariness, while it's

7   something that one should typically look at, it's something

8   that the modern anti trafficking regimes immediately look at

9   and then discount.  Because as the United Nations' language

10  would say, once the coercive means have been used, that

11  basically obviates any initial voluntariness.

12  Q    In your past experience, are you familiar with situations

13  where victims have even signed formal, contractual agreements

14  prior to working?

15  A    Yes.  And in the old days in the United States those were

16  called indenture contracts.  You hear people talk about

17  indentured servitude.  Again, kind of coming back to the

18  modern era and certainly the last 150 years, the idea of an

19  indenture contract is not a valid, legal instrument because

20  you can't sell yourself into slavery.

21  Q    What, if anything, have you observed when looking at the

22  contract forming experiences, what, if anything, have you

23  observed about the nature of that process that is relevant to

24  whether it's coercive or not?

25  A    Well, one of the things that I was taught, and I think

DeBACA – DIRECT – MR. HEEREN                      655

1   most of the lawyers in the room were taught in first year law

2   school is this idea of contracts are between equals who have

3   an arm's-length relationships and there is kind of equal power

4   between the two sides.  That's kind of how you're taught to

5   think about contracts.  The reality when you're talking about

6   vulnerable communities, when you're talking about the people

7   who are willing to stake several years of work on traveling

8   all the way around the world to do a really dirty and

9   dangerous job, those are not necessarily people who are at the

10  same level as the recruiting companies or the employing

11  companies.  So you already start with folks who are not kind

12  of that arm's length contract of equals that law school tends

13  to think about.

14          On top of that, then, you also have, because you're

15  talking about people who are coming from the provinces, you're

16  talking about people who are traveling maybe for the first

17  time, it may be the only time that they are going to be in the

18  offices of the recruiter or the employer, and that tends to be

19  when the contract gets signed.  By that time the money that's

20  been borrowed from the loan shark in the village or from your

21  family members all pooling their money, that's already been

22  done, you already told everybody you're leaving.  You're on

23  your way typically when you sign the contract.  There is a

24  kind of rushedness to the contract.  In some ways it is a

25  little bit akin to probably every time I click the Apple terms

1   of service box when I'm trying to log-in to something, these

2   are contracts that are being presented as you have to sign

3   this now or you can't get on the plane for this great

4   opportunity in Kuwait, in America, in London, et cetera.

5           So that notion of, you know, kind of are these

6   contracts that we see in international labor recruiting, are

7   they the types of contracts that we would think of as, you

8   know, an agreement between equals done with all due time and

9   ability to reflect, that's simply not the case.

10  Q    Are you familiar with instances where migrant workers who

11  are the victims of forced labor in the United States stayed in

12  the United States after the scheme is over?

13  A    Yes.

14  Q    In your experience, why did these -- why -- can you think

15  of some reasons why these workers stayed based on your

16  experience?

17          MR. SNELL:  Objection.

18          THE COURT:  The objection is overruled, but I think

19  this might be a good time for a break since you seem to be

20  moving on to another topic.

21          So, Jurors, 10 minutes or so.  Please don't talk

22  about the case.  We'll see you in just a few minutes.

23          THE COURTROOM DEPUTY:  All rise.

24          (Jury exits courtroom.)

25          THE COURTROOM DEPUTY:  You may be seated.

 1                THE COURT:  So we'll be in recess for about 10

 2    minutes.  Do you know how much longer you're going to be on

 3    direct?

 4                MR. HEEREN:  I would say about an hour, Your Honor.

 5                THE COURT:  Okay.

 6                MR. HEEREN:  Forty-five minutes.

 7                THE COURT:  Do you have a thought about how long

 8    your cross might be?  No pressure, just curious about

 9    scheduling.

10                MR. SNELL:  Understood.  I think it's one of those

11    situations where if I can work over lunch it might get shorter

12    than otherwise.

13                THE COURT:  So we'll see.  Just bear in mind,

14    everybody, that we are stopping today at 4 o'clock, okay.

15                MR. SNELL:  I promise I will be done well before

16    4 o'clock.

17                THE COURT:  All right, great.  Have a good break.

18                MR. HEEREN:  Thank you, Your Honor.

19                (Recess.)

20                THE COURTROOM DEPUTY:  All rise.

21                THE COURT:  Everybody can sit down.

22                The witness is on the stand already, let's get the

23    jury.

24                MR. SNELL:  Your Honor, could I raise one thing

25    quickly?

DeBACA – DIRECT – MR. HEEREN                    658

1          THE COURT:  Sure.  Yes.  I want to make sure the

2   jury doesn't come in while you're doing it.

3          Yes, what is it?

4          MR. SNELL:  Your Honor, I don't want keep objecting,

5   but I just want the record reflect I have a continuing

6   objection to this testimony.

7          THE COURT:  That's fine.  It's preserved.

8          All right.  We're good.

9          THE COURTROOM DEPUTY:  All rise.

10          (Jury enters courtroom.)

11          THE COURTROOM DEPUTY:  You may be seated.

12          THE COURT:  All right, everybody we're ready to

13   continue with the direct examination of the witness.

14          MR. HEEREN:  Thank you, Your Honor.

15          THE COURTROOM DEPUTY:  The witness is reminded he's

16   still under oath.

17          THE WITNESS:  Thank you.

18   BY MR. HEEREN:

19   Q    I believe where we left off, I believe the last question

20   I asked you, and I don't believe we got to an answer, was if

21   you are familiar with my migrant workers who escaped forced

22   labor schemes sometime stay in the United States?

23   A    Yes, I am.

24   Q    Can you elaborate on what you learned based on your

25   experience.

1    A    Well, there's a host of reasons, one of which is that

2    people want to stay in the United States to kind of get the

3    benefit of the bargain, to actually make the money that they

4    were hoping they would make when they came to the U.S. and so

5    staying here rather than going home reflects that.

6              There's also -- and as a result there are programs

7    and legal structures in place, there's also the fact that a

8    lot of times people are afraid to go back home and so that's

9    something we see not just with the United States but with

10   forced labor and sex trafficking around the world.  It's one

11   of the reasons why this three P's prevention, protection and

12   prosecution has victim protection built in to it so the

13   ability of a victim of that type of behavior can end up having

14   refuge, not having to go back to the home country and face

15   abuse perhaps from the loan sharks, from recruiters, from the

16   bosses or henchmen or even from governments.

17   Q    Do you recall testifying earlier about your knowledge of

18   how of the social costs for victims, how they have said

19   goodbye to their families already, do you recall that

20   testimony?

21   A    Yes.  At the beginning just for my own purposes of

22   getting us back to that, when I was talking about the

23   recruiting fees and kind of the contract and the being rushed

24   to get out the door, for lack of a better word, obviously the

25   decision to go work anywhere much less in another country is

1    not simply a personal decision to the one traveler, it's

2    something that is very much a familial decision, it's very

3    much a decision within the circle of friends, the village, the

4    community, the neighborhood, et cetera.  And typically, when

5    one leaves, people know that they are going to this great

6    opportunity.  And so there is shame, especially in countries

7    which are kind of shame-based cultures, that shame of coming

8    back as what technically, the international term would be

9    called coming back as a failed migrant or after a failed

10   migration, that is something that in and of itself just the

11   shame of having to go back and face that when you left, you

12   know, on the top of the world and everyone was excited perhaps

13   about or maybe even a little jealous as to your opportunity

14   and now you have to go back and face that.

15   Q    Does a company or organization's -- excuse me.  Are you

16   familiar with the way in which a company or organization may

17   associate itself with a particular government?

18   A    Yes.  And that happens around the world.  It happens in a

19   particular -- a little bit of a different context within

20   former communist states or current communist states given the

21   fact that the relationship between the state and private

22   companies is different in those political circumstances.  So

23   we've seen that, in my role as ambassador saw that with a

24   number of whether it's post-Soviet states or kind of Asian

25   communist countries, the relationship, these

1    interconnectedness between private enterprises and the state,

2    but especially around kind of keeping control over the

3    workers.

4    Q     And what, if any, connection is there between that

5    association or relationship and a worker's decision -- a

6    victim's decision not to return to that foreign country?

7    A     Well, one of the things that it does is that it makes the

8    attempts for self-help suddenly become something that is of

9    interest to the state.  One of the things that you'll see,

10   whether it's in cases with Vietnamese, North Korean or Chinese

11   workers overseas, is use of very politically-laden terms such

12   as causing trouble or stirring things up, being a

13   troublemaker.  Those are things that are kind of one level

14   down perhaps from being a political agitator or being a labor

15   agitator, which is the type of things that gets you sent to

16   the reeducation through labor camps in China, or prison in

17   Vietnam.

18            So people are very aware of not wanting to be

19   branded with those types of labels.  It makes standing up for

20   one's self, things that we would assume, especially for people

21   in the trades, that they be able to stand up for themselves,

22   form a union, you know, work together with their other

23   workers.  If that gets transmitted back home, the fear that

24   I've heard from a number of people around the world in the

25   various roles I've had, the fear ends up being that it's the

1    secret police or the local police who are going to be coming

2    and paying your parents a visit.

3    Q     Do victims of forced labor schemes always attempt to

4    escape?

5    A     No.

6    Q     Why not?

7    A     Well, it kind of comes down to rationality.  People,

8    especially if they have a contract, a debt, a recruitment

9    fees, et cetera, if they don't know where their documents are,

10   an escape attempt is an extremely risky item.  If they've

11   heard, there's been this climate of fear established, that

12   part of the concept of climate of fear, is that once a climate

13   of fear is kind of established, then escape is not -- is

14   recognized as not being something --

15            THE COURT:  Hold on for just a second.

16            (Phone interruption.)

17            THE COURT:  I did that once as a judge so.  It's

18   fine, just do me a favor just make sure it's off.  I was about

19   ready to yell at somebody and it turns out that it was me.

20            MR. HEEREN:  It might be the interpreters, Your

21   Honor.

22            THE COURT:  Okay.  No, problem at all.  Go ahead.

23   BY MR. HEEREN:

24   Q     Mr. DeBaca, I think you were explaining why victims try

25   to escape, do you mind backing up a few steps in that answer.

DeBACA – DIRECT – MR. HEEREN                663

1    A    Certainly.  So this idea of climate of fear, once there

2    is a climate of fear established, once you feel that there is

3    no reasonable alternative but to remain in service or there

4    would be serious harm to yourself or somebody you care about,

5    that makes it so that escaping or trying to escape ends up

6    being a very irrational choice.  The rationale choice in that

7    circumstance is to stay, it's the only reasonable thing to do,

8    and so that's typically the choice that people make.  You end

9    up having situations where folks say it's unfair, I wish that

10   I wasn't in this situation but I guess I just have to put my

11   head down usually because they know on that contract, you know

12   when my five years is up at least then I will be able to go

13   home.

14

15              (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continued)

2    BY MR. HEEREN:

3    Q    Do third parties ever come into play in this analysis of

4    whether or not to escape?

5    A    Well, I think especially this idea of what that serious

6    harm would be and to whom.

7            If you're thinking about kind of if I leave -- and

8    it runs the gamut.  So it could be everything from domestic

9    servitude counter-intuitively or not, it can even be, if I

10   leave, who will take care of the children?  Even if they're

11   doing this to mean I love these children, I'm raising them,

12   and something might happen to them, or at least they won't be

13   loved.

14           It can be as dramatic as the, you know, my cousin

15   put up the collateral to his house, signed over his house so

16   that I can get the fees to pay the recruitment company or to

17   pay the security deposits or things like that, and my cousin

18   will end up losing their house.

19           You know, so it can be kind of, you know, not just

20   the overt, you know, if you leave I will hurt this other

21   person; it can even be these things that are very much more

22   motivated by these feelings of love and dependency and

23   familial relationship.

24   Q    I'd like to turn your focus to forced labor issues

25   specific to or particularly problematic in China.

1          I believe you testified earlier you are familiar

2   with those issues?

3   A     That's correct.

4   Q     And I'd like to focus your attention to the time period

5   of 2010 through 2016.

6          Are you familiar with the issues, forced labor

7   issues in China in that time period?

8   A     I am.

9   Q     What sort of issues, based on your experience related to

10  force labor, did you see during that time period in China?

11  A     Well, there's a host of issues.  And I'm not going to

12  spend all day going through all of them.

13  Q     The ones that you think are relevant.

14  A     The ones that I think are relevant to some of the

15  materials that I reviewed here.

16         One of the things that we see in China with forced

17  labor is that, again, maybe the three Ps, prevention,

18  protection, prosecution, might be the way to not do this for

19  the next two hours.

20         The focus on prosecution is almost exclusively

21  until, actually, right near the time period you mentioned, has

22  almost exclusively been on sex trafficking.  And so the idea

23  of a boss being punished for forced labor in China is

24  something that wasn't really something that they can be afraid

25  of, even though these things are understood, et cetera, that

1    the way that the police were actually implementing the laws on

2    the books was very much toward the center of it.

3            To the degree that forced labor was dealt with, it

4    was typically during that time period when we were dealing

5    with cases that would force the government's hand, and usually

6    around disability rights.  And so you have, whether it was

7    people who were mentally challenged or whether it was people

8    who were physically challenged almost getting scooped up in

9    railway stations where they were begging and taken out to

10   brick kilns.

11           THE COURT:  Just --

12           THE WITNESS:  I'm sorry, am I a little too far?

13           THE COURT:  Little too far.

14   A    So they would be taken out to brick kilns or to other

15   very dangerous and dirty jobs.

16           But at the same time, and as was raised by the

17   United States and by various international observers, both in

18   the reports and then in our diplomatic conversations with

19   China, you had a series of forced labor cases around the world

20   with exported Chinese labor; you know, whether it was in the

21   Americas, whether it was in Africa, whether it was in

22   Southeast Asia, people who are working on construction

23   projects often, or in deficient fleets.

24           And these are not government projects.  These are,

25   you know, often maybe funded by the Chinese government, a dam

1    project, or a road building project, or something like that.

2    But it is with overseas Chinese men.

3           The plight of those men is something that was

4    continually raised by me, by my office, by others at high

5    levels within the U.S. government, because we were seeing

6    these cases around the world.  And frankly, other countries

7    were coming to us as well as sometimes escape workers were

8    coming to the United States embassies for help, because they

9    felt that the United States might do something to help them.

10          And so it certainly became something that in our

11   diplomacy with China that we were having to look at this

12   problem of the overseas Chinese labor trafficking problem,

13   just as much as we were talking to them about their

14   enforcement patterns within China itself.  And so that was one

15   of the things that we saw; again, whether it was in West

16   Africa, Latin America, Southeast Asia, all over the world, a

17   routine problem cropping up during that time period.

18   Q    And within that subset you just described, migrant

19   worker -- migrant Chinese workers in construction and other

20   fields, were there any common issues that you noticed or

21   observed in your experience?

22   A    Well, one of the issues that I observed was this problem

23   of leaving with the debt and the financial hardships built

24   into the relationship.  Typically through a contract.

25   Typically through a recruiting company, or the recruiting by

DeBACA – DIRECT – MR. HEEREN                    668

1    the company itself, that was taking you overseas.

2              And kind of series interlocking both debts and fees

3    such that before people even got on the plane, they already

4    knew what the serious harm would be that would come to pass

5    were they to insist on their way to freedom.

6    Q    And do you recall previously testifying about debt

7    bondage and punishment causes?

8    A    Yes.

9    Q    Did you ever see those two elements in these practices

10   you're describing?

11   A    Yes, those two practices, and then a third one that was

12   reflected in our bilateral diplomacy, but also is in some of

13   the reports kind to the end of the time period that other

14   entities, such as the Global Cyber Index and the International

15   Labour Organization, this idea of holding people's salary in

16   arrears.

17             So you have three different things.  You have the

18   debts.  You've got the punishment clauses that would kick in

19   if you were to try to leave.  And then also the fact that you

20   aren't getting paid, that that payment is being held for you,

21   almost as a secondary security clause, but a secondary

22   security deposit that's building up over time as you work,

23   such that you would only get the money if you go back home or

24   you'd only get the bulk of the money if you successfully made

25   it back to China at the end of the term.  That assumes that

 1   there is a term blanket.

 2   Q    What about document servitude.  Is that an issue that you

 3   observed in particular in China?

 4   A    It is.  And one of the things that we would see is

 5   document servitude very much overlapping with a household

 6   registration scheme that's called Hukou.  There's no real good

 7   way to spell Chinese words in the English language, but

 8   typically it's H-U-K-O-U is how it's trying to be written down

 9   in English.

10           And that is basically a system in which when you

11   come back from somewhere, or if you move from place to place,

12   you need to register with the security police.  And so that

13   idea that you would then have to go in and report these

14   things.  And you have to have all of your documents,

15   everything has to be perfectly in order upon return from

16   overseas.

17           So that notion of having somehow gotten the black

18   mark on your record while you were gone, the Hukou system ends

19   up being a problem for overseas workers, just as it's the

20   system for Chinese workers trying to move within China.

21           And all of that is in the context of an existing

22   force labor scheme that's pointed out in our diplomacy and

23   otherwise to the Chinese and has been one of the more

24   troubling aspects of modern China, which is that reeducation

25   through labor camps, large prison systems set up -- a lot of

1  attention in recent times but specific ones for the Muslim

2  community from the Uighur subgroup, which is U-I-G-H-E-R, I

3  think.

4          But either before these camps for the Uighurs, this

5  idea of reeducation through labor camps has a system of

6  state-sponsored forced labor, often with electronics being

7  manufactured or other manufacturing for export factories

8  surrounded by the camps themselves.

9          This is something that the official ending of that

10  program is something that was then reflected in an upgraded

11  China from Tier 3.  I can't tell you exactly what year it was.

12  And yet even with that, continued reporting afterwards

13  demonstrated that this practice was not ending immediately,

14  but was still going on, even victims of forced labor and sex

15  trafficking being put into these situations under the guise of

16  rehabilitating them from what they have gone through and

17  simply being in another forced labor situation.

18  Q    I think you just answered some of my next question, which

19  is:  You mentioned these tier ratings a number of times.

20          In the relevant time period, 2010 to 2016, do you

21  have a recollection of the tier or tiers that China was in?

22  A    During that time period -- I'd have to refresh my

23  recollection to give you an exact.  But during that time

24  period, China was either in Tier 3 or Tier 2 Watchlist, which

25  is the, you're almost on Tier 3 portion, in all of those

1   years.  China has not been higher than that for quite some

2   time.

3   Q     And can you explain in summary what did that mean?  What

4   does being on Tier 3 and then separately what does being on

5   Tier 2 Watchlist mean?

6   A     So largely the Tier 3 is a country that is not complying

7   with the living standards of the -- set forth in the

8   Trafficking Victims Protection Act, and is not taking steps to

9   come into compliance.

10          And it can be that they are needing to take steps or

11  when they kick their tires, it certainly looks like that's not

12  happening.

13          If you look at a Tier 2 Watchlist, it basically says

14  that they're taking some steps, but they've been ineffectual,

15  that they actually are getting worse over time.  That it is

16  something you can't confirm.  It's a whole host of kind of

17  what would go into this Tier 2 Watchlist situation.

18          And so that's been kind of where we see with the

19  Chinese government.  It will take years to come out with an

20  actual plan of action, and then when that actual plan of

21  action happens, the disconnect between what's being said at

22  Beijing versus what's being done out in the cities, as far as

23  what actually happens to trafficking victims.

24          The continued use of the frame of trafficking being

25  something that is only about sex and something, and only about

1    women, and having all of the victim care and victim services

2    run through a state-controlled non-governmental organization.

3          Because you don't have true NGOs in China.  All the

4    All-China Women's Federation, which is during this time

5    period, the only place you could go to to get some kind of

6    help if you were -- had been subjected to forced labor,

7    whether in China or otherwise.  And if you didn't fit their

8    profile, if you weren't a female, the All-China Women's

9    Federation was not going to provide services or help to you as

10   a trafficking victim.

11         So all of those, ground prevention, protection and

12   prosecution could go into that particular frame and scheme.

13   Q    I'd like to turn your attention now to a different topic.

14         Have you had -- in your preparation, have you had

15   the opportunity to review contracts that you understand to be

16   relevant to this case?

17   A    I have.

18   Q    Okay.

19         MR. HEEREN:  At this time I'd like to know what's

20   been admitted into evidence as Government Exhibit 103.

21         Actually, before I do that, I'm sorry, I'd like to

22   show just the witness that's been marked for identification as

23   Government's Exhibit 101.

24   Q    I'm just going to turn -- this is a document that

25   includes both the translation and the original Chinese.

1        Mr. DeBaca, do you speak Chinese?

2   A    I do not.

3   Q    I'm going to turn to the attachment of the document.

4   There's an email in the attachment.

5        Do you recognize this document?

6   A    Yes, I do.

7   Q    Is this one of the contracts you've reviewed?

8   A    It is.

9        MR. HEEREN:  Your Honor, at this time I'd move to

10  admit Exhibit 101 subject to connection.

11       THE COURT:  Any objection?

12       MR. SNELL:  No, Your Honor.

13       THE COURT:  All right, that will be in evidence.

14       (Government's Exhibit 101, was received in

15  evidence.)

16       (Exhibit published.)

17  BY MR. HEEREN:

18  Q    I'd like to show you now both Exhibits 101 and 103.

19       I'll just turn to 101 briefly to show the jury.

20       When is this -- I'll turn to the last page.

21       When is this contract from?

22  A    This contract is from the 25th of July in 2012.

23  Q    And turning to Government's Exhibit 103.  This is a

24  contract to Sheng Liu, the party B?

25  A    Yes, Sheng Liu.

1  Q    And party A, Liaoning Rilin Construction Group?

2  A    That's correct.

3  Q    And this contract —— when was this contract from?

4  A    This is from May of 2001; May 12th, specifically.

5  Q    I apologize, I should have asked you about this for

6  Government's Exhibit 101.

7           Who is party A in this contract?

8  A    Rilin Construction Group.

9  Q    And who is party B in this contract?

10 A    Tang Dehuai.

11 Q    And I take it in the American style his name would be

12 Dehuai Tang?

13 A    That's correct.

14 Q    Have you had the opportunity to closely review these two

15 contracts?

16 A    I have.

17 Q    We're going to talk about some of the details of the

18 clauses, or I'm going to ask you some questions about some of

19 the details of the clauses in Exhibit 101 in a minute, but

20 first I'd like to ask you about the two of them compared to

21 each other.

22           Have you had an opportunity to compare the two

23 documents, Exhibits 103 and 101?

24 A    I have.

25 Q    And before you even start talking about that, I should

1    probably give you a copy of both.

2              MR. HEEREN:  Sorry, Your Honor, bear with us one

3    moment.

4              THE COURT:  No, that's okay.

5              (Counsel approaching the witness.)

6    Q    Mr. DeBaca, do you now have Government's Exhibits 101 and

7    103?

8    A    I do.

9    Q    So what I'd like to ask you is first -- I forget your

10   answer to this, forgive me -- but did you compare these two

11   documents, these two contracts?

12   A    I did.

13   Q    Generally speaking, have you seen contracts similar to

14   these types of contracts before?

15   A    I have.

16   Q    Have you seen terms similar to these terms before in your

17   past experience?

18   A    I have.

19   Q    Do you have a general impression -- excuse me, withdrawn.

20            In looking at the 2001 contract, Government's

21   Exhibit 103, versus the 2012 contract, Government's

22   Exhibit 101, what, if anything, did you observe or notice

23   about the changes to the contract that you found to be

24   relevant based on your expertise?

25   A    Well, the contract in Exhibit 101 --

DeBACA – DIRECT – MR. HEEREN                    676

1   Q    I'm sorry.  Before you answer.  To help both the jurors

2   and the court reporter, if you can tell me where you're

3   looking at, I can then follow along on the screen up here.  I

4   apologize.

5   A    I apologize because I'm probably doing a lot of flipping.

6        In Exhibit 101 is the contract from 2012, and what I

7   noticed about that in comparison to the contract from 2001 in

8   Exhibit 103, is that the contract terms in 2012 are much

9   stricter; that there's a much higher security deposit; that it

10  says upfront that there's going to be strict management, which

11  is the first paragraph; that while there are many other things

12  that are very similar, especially around the relationship with

13  the company, not running away, et cetera, that the terms of

14  what will happen if someone is to run away ends up being much

15  more conex.

16       And I'm looking, for instance, at –– on what's

17  TR0011891, which would be the third page of that contract,

18  specifically in paragraph 10.  The fact of building in that

19  there will be people who will hunt them down and that they'll

20  have to pay for it.  So you're paying for your own search for

21  you when you run off.

22       So, too, you see in paragraph 9, the idea of paying

23  for escorts, multiple escorts, that would presumably be

24  sending you home if you were being sent home for being a

25  troublemaker, or a runaway, or one of those other things.

DeBACA – DIRECT – MR. HEEREN                    677

1          There's also, as I think I mentioned, the security

2     deposit is much higher.  And, in fact, the security deposit in

3     real terms, because the base monthly salary -- I very much

4     apologize, I'm jumping around a little bit, I know that it's

5     tough -- the base monthly salary of 8,000 yuan, which is in

6     paragraph 6, is in comparison to the 15 -- excuse me, the

7     150,000 yuan security deposit, that that is a different

8     percentage than in the earlier contract.

9          The earlier contract I think is, if I recall right,

10    3,000 yuan a month and only a 50,000 yuan security deposit.

11         So you're actually paying more under this contract

12    of a security deposit compared to how long -- or excuse me,

13    how much you're making every month.

14         The other thing that is interesting to me in

15    comparison of the two, is that there are more reminders in

16    paragraph 10, which has the various types of things that one

17    is not supposed to do; that there are more reminders of the

18    interplay between the company and the government.  It comes

19    off as -- in some ways as a bit more cautionary as far as

20    getting in trouble with the government is concerned.

21         It also continues a number of the same things that

22    we saw in the 2001 contract, as far as ganging up with others,

23    stirring up trouble, working for a third party, running away,

24    leaving without permission.  Those are kind of through lines

25    on these -- on these things.

DeBACA – DIRECT – MR. HEEREN                     678

1  Q    So let's walk through those a little bit more

2  deliberately so I can point them out to the jury.

3            In the Government's Exhibit 103, the first thing I

4  want to ask you to look at is the section called duration of

5  the contract.

6            Do you see that section, paragraph 1?

7  A    That's correct.

8  Q    What do you notice about that clause of the contract?

9  A    Well, it's totally open-ended.  There's -- I think I

10 mentioned earlier kind of the expectations that people go

11 through when they think about, you know, will I borrow money

12 to pay for recruiter fees and all these other things because I

13 think I'll get X amount when I'm in that other country, but at

14 least I know, even if it's bad, that I will get a payout when

15 my contract is up, and these are contracts that do not have

16 end dates.  And so that notion of when would I get to go back

17 to China, and then actually get this money that's being not

18 paid to me that's being collected over time, as well as being

19 able to get my security deposit back.

20           All of those things are not something that I or my

21 family can plan for at all.  I can't buy my way out of this

22 either, simply by saying I've decided that the most rational

23 thing for me to do is just pay the money.

24           It's one of these kind of the open-ended nature of

25 the contract to begin with, ends up sending up some major red

1    flags for me based on my experience in the field, when I'm

2    looking at this contract.

3    Q    And turning back to Government's Exhibit 101, the 2012

4    contract.  This is now, I believe, paragraph 2.

5         This clause stays the same?

6    A    Yes, it continues to have the relevant project being

7    ended.

8         What's interesting, of course, in number two is that

9    it actually, again, the 2012 contract, it seems to indicate

10   that there may be more than one relevant project, and so that

11   knowability of what is that I am particularly -- if I was

12   looking at this, what is that the worker is actually going to

13   be doing and when does it end.

14   Q    So in other words, not only do you not know the time

15   frame that's going to be ended, you actually don't know which

16   projects they're talking about?

17   A    That's correct.

18   Q    Turning back to the 2001 contract, Government's

19   Exhibit 103.  You mentioned the base pay.

20        Is that in paragraph 4 of the contract?

21        (Exhibit published.)

22   A    That is in paragraph 4, and I'll trust that you all have

23   learned how much yuan and dollars are from someone other than

24   me.

25        MR. HEEREN:  So that's actually a good point where

DeBACA – DIRECT – MR. HEEREN                680

1   I'd actually ask, pursuant to stipulation, Your Honor, if the

2   government could admit Government's Exhibit 2005, which is the

3   exchange rate.  I believe the parties have agreed on this.

4              THE COURT:  Sure.

5              Can I just see the parties at the side just a

6   second.  No need for the reporter.

7              (Government Exhibit 2005, was received in evidence.)

8              (Discussion was had off the record.)

9              THE COURT:  And also I just have say I have to

10  apologize for that noise before.  Believe me, you're not

11  missing a thing.

12             Go ahead.

13  BY MR. HEEREN:

14  Q    So just to get a frame of reference here, so the contract

15  authorized payment of 3,000 -- I'm going say "RMB," because I

16  could never say that word, the RMB.

17             You understand what I'm taking about?

18  A    Yes.

19  Q    And to get a frame of reference, pursuant to stipulation,

20  in 2001, you understand that the exchange rate between RMB to

21  the U.S. dollar was approximately 8, so 8 RMB and change to

22  the U.S. dollar?

23  A    Yes.

24  Q    So just doing the math quickly, you're just dividing

25  3,000 by 8, so a significant --

DeBACA - DIRECT - MR. HEEREN                    681

1   A    So, yeah, I mean, you're talking about -- yeah, a little

2   bit less than $400.

3   Q    And that's a monthly salary.

4   A    That's correct.

5   Q    Now, I want to turn to one last section on this contract,

6   well, couple others, just very quickly.

7            Section 7 is the security deposit portion of this

8   contract, Exhibit 103?

9   A    Yes.

10  Q    And it permits -- it requires a security deposit of

11  50,000 RMB?

12  A    Yes.  50,000.

13  Q    And this is the part you were talking about tripled in

14  the 2012 contract?

15  A    That's correct.

16  Q    And in 2012, it required 150,000 RMB?

17  A    Yes.

18  Q    Whereas the salary, which was originally 3,000, as you

19  pointed out, only increased to 8,000?

20  A    That's right.

21  Q    So there's not a commensurate tripling of salary here.

22  A    There's not.  And I am a little confused by the interplay

23  of paragraph 5, which is -- it appears to be a thousand RMB

24  worth of meals.

25            Those meal vouchers don't show up in 2012.  So if

DeBACA – DIRECT – MR. HEEREN                    682

1    one was going to factor that in, it looks as though 2012 is

2    even a greater differential than as far as its increase or

3    nonincrease from 2001.

4    Q    I want to turn back to 2012, and we're going to focus on

5    this now.

6              Actually, I'm sorry.  One last thing on 2003 -- or

7    2001.

8              There's a list of clauses at the end of

9    paragraph 10.  Do you see that?  And they are numbered 1

10   through 8.

11   A    Yes.

12   Q    In your view, is this a punishment clause?

13   A    Well, this is the things for which people will be

14   punished.

15             I think that it, when read in tandem with

16   paragraph 7, which is the security deposit, as well as not --

17   the security deposit is not simply money, it's also people's

18   professional identities.  They have to turn over their

19   academic records and their technical qualifications to the

20   employer as well.

21             When that then, the administrative punishments and

22   the rights to cancel, send people home, trigger the legal

23   liabilities that are set forth in the other portions of the

24   contract.  All of those together then end up being what I

25   would term the penalty clause.  These are the things that

DeBACA – DIRECT – MR. HEEREN                683

1    would trigger that -- those penalties.

2    Q    Okay.  And now turning to the 2012 contract.  I want to

3    identify a few specific ones and ask you your observations on

4    the terms of those contracts -- those clauses.

5    A    One thing that I think I missed, and I was suggesting as

6    I'm turning away from the other one, is that there are those

7    things that I had just mentioned, but there's also then a

8    separate paragraph that talks about compliance with the laws

9    and regulations of the United States, which could have been a

10   ninth portion of that.  But that would, to me, be also part of

11   the things that would end up triggering those penalties.

12   Q    Well, why would just telling somebody to comply with the

13   laws of United States be problematic?

14   A    Well, it shouldn't be.  But as I understand it, if people

15   are then working in an unauthorized work situation and that

16   that is part of what the company's having them do, then they

17   are automatically out of compliance with the laws and

18   regulations of the United States.

19          You're basically setting them up by saying don't

20   violate the laws of the United States.  If you do, not only

21   will these various punishments in the rest of the contract be

22   there, but you are then going to be assuming all of the risk.

23   If you are working on a project that's outside of the scope of

24   the laws and regulations of the United States, and now they

25   let you in, you, according to this contract, you know, if you

1    get hurt, those personal injuries are on you.  They're not

2    going to seen as work-related injuries, even if it's a job

3    site from this company, if it's not a job site that was

4    authorized by the terms of the United States.

5              So there's this burden shifting that happens in that

6    clause.  But it's the built-in burden shifting, given the fact

7    that it's the company that then puts them out of compliance by

8    putting them onto another job site.

9              That's why I find that particularly interesting in

10   light of the other materials that I have looked at.

11   Q    So turning to Exhibit 101, I just want to quickly point

12   to a couple of things you previously mentioned.

13             In paragraph 1, see where it says to accept strict

14   management?

15   A    Yes.

16   Q    What about in paragraph 5, do you see the portion that

17   says -- that warns people not to engage in anything

18   detrimental to the dignity of China as a nation and the

19   dignity of the Chinese people?

20   A    Yes, I see that.

21   Q    Does that have any relevance to you?

22   A    It does.  The notion, and we see this during this time

23   period in the other overseas Chinese communities that I was

24   mentioning, this idea that if one were to exist upon their

25   rights, if one does something that could be seen as labor

1    activism, if one runs to another country or officials of

2    another country for help, that all of those are things that

3    could be seen as being against the national interests of

4    China, embarrassing China, putting China in a bad position,

5    because it is a shameful thing to have the Chinese workers

6    doing that.

7              And so, again, it's kind of this intrusion in, in a

8    way that the other part of the clause about state secrets or

9    trade secrets does not necessarily.

10             Those are something that you can actually look at

11   and say that is a state secret or that is a trade secret,

12   impugning the reputation of China, or embarrassing China, or

13   doing something detrimental to the dignity of China, is

14   something that's much more in the eyes of the officials who

15   you are going to have to talk to you when you get back home.

16   Q    So that same clause also indicates that it's a violation,

17   or it says in the affirmative you will not, you will not

18   separate from party A's management and run away to the United

19   States or a third country.

20             Do you see that?

21   A    Yes.

22   Q    So in other words, is it correct for me to say that

23   that's saying that they are equating stopping working for

24   party A, Rilin, with running away to the United States?

25   A    That's correct.

1    Q    Turning to paragraph 9, I'm just pointing out this is

2    where you were talking about requiring workers to pay for

3    their own escort, multiple escorting personnel if they want to

4    return to China?

5              THE COURT:  You know, you kind of drawing a line

6    through it.

7              THE WITNESS:  Oh, I'm sorry.

8              THE COURT:  That's okay.

9    Q    And turning below that, there's a -- in that same

10   paragraph, paragraph 11, there's an additional clause, if

11   party B needs.

12             Do you see that one?

13   A    Yes.

14   Q    Is that another clause warning the worker not to leave

15   work?

16   A    Yes, that's not only warning them not to leave work, but

17   saying that people will be dispatched for the search.

18   Q    Now, I want to go back in this 2012 one, the 2012

19   contract, Exhibit 101, to -- sorry.  Withdrawn.

20             Paragraph 10 is where you see the portion that says

21   that you'll be paying for dispatching people to search for you

22   if you run away.  Is that right?

23   A    Yes.

24   Q    Now, turning to the things that can get you into trouble,

25   1 through 8.  I want to flag one in particular, or a few in

1    particular.

2              One of them includes number 3, communicating with

3    overseas relations or organizations without permission.

4              Do you see that?

5    A    Yes.

6    Q    What do you understand that to be saying?

7    A    Well, it's saying two things, both of which are

8    troubling.

9              The idea that one cannot call a family member or

10   communicate with somebody here in the United States, or I

11   guess in a third party as well, or a third country as well,

12   that idea of their inability to talk to family members or

13   extended family members, whether it's here in New York or

14   otherwise.  Again, it isolates them and cuts them off from

15   potential avenues in which they can learn that there might be

16   other options out there.

17             And then also having the organizations specifically

18   listed.  Again, the notion of whether it's the various Chinese

19   immigrant fraternal organizations; whether it's folks from

20   that particular region of China who might have a social club

21   here in the New York area; whether it's something that looks

22   to serve that community; whether it's for health issues;

23   whether it's for legal advice, even church groups, or others

24   that tend to come in under that.

25             And so that this idea of it's not just don't run

1    away or don't stir up labor agitation, it's even don't have

2    contact with the outside world, you need to be in this

3    hermetically-sealed bubble.

4    Q    And turning to number 5.  This is what you were referring

5    to before, as I believe your testimony was that, terms like

6    stirring up trouble and ganging up or particularly a concern

7    in former communist or current communist Asian countries?

8    A    Yes.  The other things that are not, as far as getting

9    drunk and fighting, I think we can probably all agree on that

10   is basic workforce expectations.  But this idea of ganging up,

11   stirring up, et cetera, in the communist or former communist

12   countries, those are very latent ways of describing what

13   workers might end up doing.

14        And it's typically -- I recall one particular case

15   where a woman was arrested and sent back and met by the

16   Vietnamese secret police because she had been elected by the

17   other workers to go ask for some chicken to be added to their

18   rice, because they were all losing weight, and because she had

19   done that, she was seen as stirring up trouble.

20   Q    Now, looking at 7, 8 and 9, all three of these have to

21   deal with stopping working and leaving in some fashion; is

22   that fair to say?

23   A    That's correct.

24   Q    So this is yet, again, additional warnings or

25   instructions that you have to keep working; is that fair to

1    say?

2    A    That's right.

3    Q    And the last thing I want to point out is paragraph 12.

4         Do you see paragraph 12?

5    A    Yes.

6    Q    And this paragraph indicates that if you're gone or if

7    you leave the consulate or work site or living quarters for

8    more than one day without written approval, you'll be deemed

9    to be leaving without permission, and all these clauses will

10   come into effect.

11   A    That's correct.

12   Q    And with the payment clause, does it indicate when the

13   parties will be paid?

14   A    So the parties but for a little bit of draw that the

15   family members would be able to do throughout the terms, or

16   throughout the term of the work, the money itself, the bulk of

17   the wages, are going to be held in arrears to be given back to

18   a worker upon their successful arrival back in China.  Because

19   if you end up running away or going back to China on your own

20   without their permission, et cetera, then you would end up

21   forfeiting that amount of money as well.

22         There this is little amount of money that your

23   family can draw.  I think in this contract it's 1500 RMB, and

24   then the previous contract, it's, I think, a thousand RMB,

25   also not really tied up as far as the three times expansion of

1    the security contract.

2              But it's only out of each two-month salary.  And so

3    if I've got the math right, if I'm looking at getting 16,000

4    RMB a month, and -- or excuse me, every two months -- and

5    every two months my family can go and get 1500 of my salary

6    out, but all the rest of it ends up staying in.

7              So it's not only a delayed salary, but that even

8    what my family can get ends up having this two-month delay and

9    lag time, and that is not nearly enough to do anything as far

10   as paying back or paying down the amount of that security

11   deposit.

12   Q    And that security deposit of 150,000 RMB based on the

13   stipulated exchange rate, that works out to roughly -- have

14   you done the math to establish what that works out?

15   A    The 150,000?  Again, I never hired myself to do math, but

16   I think that's around $23,000.

17   Q    Okay.

18   A    And the concern, again, if you translate that then from

19   money into months, I guess is the -- one of the concerns that

20   I have, is that if you're talking about your family members

21   back home, the only way that they can get anything approaching

22   150,000 RMB is if I work for 200 months.  Because they're

23   going to have to be able to get those 200 months, and

24   obviously, that's a lot of years.

25   Q    And then in paragraph 11, I just want to flag for you,

1    the contract indicates that if there's any violation of any

2    one of the items in Article 10 that we identified, party A

3    arriving, will no longer assume responsibility for party B,

4    the workers, personal and political safety.

5              Do you see that?

6    A    Yes.

7    Q    And that party B, the worker, shall be responsible for

8    all the consequences.

9              Do you see that?

10   A    Yes.

11   Q    Is that consistent with factors that -- in your

12   experience, is that consistent with factors relevant to

13   coercion and forced labor?

14   A    That is directly consistent.  The idea that we'll no

15   longer be responsible for your personal safety is, in and of

16   itself.  But then when one uses the term political safety in

17   the context of the Chinese, or any of the other nation

18   communist countries, the folks who grew up in that system know

19   exactly what that means.

20             Again, the notion of you or your people suddenly

21   coming to the attention of the security state.

22             MR. HEEREN:  Thank you, Your Honor.

23             No further questions.

24             THE COURT:  All right.  I think this is a convenient

25   breaking point.  So we'll break for lunch now.

PROCEEDINGS                                    692

1              If you could be back by 2:15, that would be great,

2     because we are going to finish at 4:00 today, so I'd like to

3     make the most of your time.

4              Please don't talk about the case at all.  Don't look

5     anything up on the internet.  Do have a good lunch, and I'll

6     see you this afternoon at 2:15.

7              THE COURTROOM DEPUTY:  All rise.

8              (Jury exits the courtroom.)

9              THE COURT:  Okay, we'll be in a lunch recess.

10             (Whereupon, a recess was taken at 12:56 p.m.)

11

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS
693

1      A F T E R N O O N   S E S S I O N

2           (Time noted:  2:30 p.m.)

3           (In open court.)

4           MR. SNELL:  I was going to request that the Court

5      deliver its usual limiting instruction with respect to

6      instructions upon the law coming from the Court alone because

7      there was a lot of testimony today involving legal concepts.

8           THE COURT:  I see.  I thought it was more in line

9      with the various positions that agencies and the Government

10     have taken rather than Court position, but I take your point.

11          Do you want me to do that now?

12          MR. SNELL:  Yes, please.

13          THE COURT:  Before you start your cross?

14          MR. SNELL:  Yes.

15          THE COURT:  And what do you want me to say?

16          MR. SNELL:  I think just the standard instruction

17     that is traditionally given by the Court along the lines of

18     what your Honor instructed the jury at the outset of the case,

19     that the instructions on the law come from your Honor alone.

20          THE COURT:  I think if it's okay, what I'll say is

21     to the extent there's been any reference to the law or

22     anything like that, I'll instruct them at the end and they

23     should just take it from me.

24          Is that all right?

25          MR. SNELL:  That's fine.  Thank you very much.

1          (Jury enters.)

2          THE COURT:  Welcome back.  I hope you had a good

3     lunch.

4          We're ready to proceed with the cross-examination

5     but this seems like as good a time as any to remind you that

6     I'm going to instruct you on what the law is at the end of the

7     case.  So, to the extent that a witness has referenced the law

8     or a lawyer mentions the law, you know this already, but I'll

9     give you the instructions on the law at the end of the case,

10    all right?

11         Go ahead.

12         MR. SNELL:  Thank you, your Honor.

13    CROSS-EXAMINATION

14    BY MR. SNELL:

15    Q    Good afternoon, Mr. DeBaca.

16    A    Good afternoon.

17    Q    You testified this morning about something you referred

18    to as the Asia region.

19         Can you tell us what you had in mind there?

20    A    The East Asian and Pacific region is one of the ways the

21    State Department organizes itself.

22    Q    And does the East Asian region include the country of

23    People's Republic of China?

24    A    It does.

25    Q    How many people reside in the East Asia region as defined

1   by the State Department?

2   A    I don't know the demographic numbers of the various

3   regions as far as that's concerned.

4         From my own personal experience, I know that a large

5   percentage of the population of the world resides in the

6   Pacific Rim.

7   Q    The population of the country of China is a little over

8   1.4 billion right now, isn't it?

9   A    Again, I don't have personal knowledge of that, but that

10  doesn't seem that far off from what my common knowledge is.

11  Q    That sounds fair?

12  A    That sounds fair.

13  Q    On direct examination, you shared with us a number of

14  indicators of what I believe you characterized as high risk

15  factors for forced labor; do you recall that?

16  A    Yes.

17  Q    And the high risk factors that you mentioned included

18  things like workers, employers, industries, economic sectors,

19  geographic areas, correct?

20  A    I mean, geographic areas not at the level of the regional

21  bureaus of the State Department -- I mean, those are entire

22  one-fifth of the world -- but all of those are things -- with

23  that caveat, all of those are things that one needs to end up

24  looking at.

25         But geographic areas per se is not necessarily

DeBACA – CROSS – MR. SNELL                    696

1    something that I tend to think of as one of the indicators of

2    trafficking or forced labor.

3    Q    I thought you did refer to certain geographic areas

4    within China, didn't you?

5    A    Well, locations within a country, places where people are

6    known to be trafficked from or trafficked to, that certainly

7    is something that one would necessarily look to.  But as far

8    as the broader geographic, I apologize if there's any

9    confusion as to whether I was talking about Asia as opposed to

10   Africa, European, Western Hemisphere, et cetera.

11   Q    You didn't mention anything about the province of

12   Liaoning, China, did you?

13   A    I don't think I mentioned any particular provinces, no.

14   Q    Would you agree with me that there are plenty of people

15   in what you characterized as high risk areas who are not

16   victims of forced labor?

17   A    Yes.

18   Q    Would you also agree with me that there are plenty of

19   people in those areas who are not perpetrators of forced

20   labor?

21   A    That's correct.

22   Q    In fact, to determine whether someone is a victim or a

23   perpetrator of a forced labor scheme, you would have to

24   carefully examine the specific facts and circumstances

25   involved; wouldn't you?

DeBACA — CROSS — MR. SNELL                 697

1   A     Yes.

2   Q     And to make that determination, you'd have to engage in a

3   pretty careful analysis of those facts and circumstances as

4   related to particular individuals; would you not?

5   A     To make the individual determination, yes.

6   Q     And as to those facts and circumstances that would have

7   to be analyzed in order to make the individualized

8   determination, as you put it, you would need to be able to

9   speak to the facts and circumstances, wouldn't you?

10  A     Yes, that seems fair, that you need to know the facts and

11  circumstances to be able to look at the individual as opposed

12  to a sector or other analysis.

13  Q     Now, if a particular individual or worker from Liaoning

14  Province working for a company in the United States, a Chinese

15  company that brought him to the United States to work, and

16  during his tour of employment encountered a family illness and

17  that worker requested permission from the employer to go back

18  to China to deal with the family emergency, would you agree

19  that that is a significant factor to consider as to whether

20  that person is involved as a victim of a forced labor scheme?

21         THE COURT:  I just want to make sure, I'm not sure I

22  understand the question.  Are you asking whether the

23  permission was granted or whether the person just asked?

24         MR. SNELL:  Thank you, your Honor, yes, whether

25  permission was asked and granted.

DeBACA - CROSS - MR. SNELL                    698

1          THE COURT:  Okay.

2   A    I'm trying to sort through the question as well.

3          So, the hypothetical that you've put forward is if

4   someone was able to go home because there was a family

5   illness, would that be indicative of or relevant in looking at

6   whether or not there was a forced labor situation?

7   Q    Sure.

8   A    I think it would be one of the many things that you'd

9   want to look at in the mix.  To me, it wouldn't necessarily

10  obviate any other factors that might be present, but, at the

11  same time, it also is something that you would want to look at

12  all of the interactions between those particular parties.

13  Q    Let me ask you to assume that the same worker actually

14  signed up for three tours with the same company.

15         Would that be a factor that you would consider

16  relevant?

17  A    It would be a relevant factor.

18         I recognize that there have certainly been cases

19  where people have gone, returned, et cetera, and that it did

20  not obviate the fact that they were being held in other forms

21  of compelled service.  I've seen that type of behavior in

22  other cases, where it was very clear that the people were

23  being held in compelled service --

24  Q    Let me ask the next question, if I could.

25         THE COURT:  I'll ask you both to do me a favor and

DeBACA – CROSS – MR. SNELL                    699

1    the court reporter a favor and let him finish before you start

2    asking a question.  Thank you.

3    Q    Sir, I'm going to ask you, actually, as many yes-or-no

4    questions as I can, and I'd appreciate if you could answer

5    them yes or no; is that okay?

6    A    Of course.

7    Q    If the same worker that we were talking about had posted

8    a security deposit along the lines of what you were discussing

9    this morning for his first and second tours, but for the third

10   tour that he then went on that requirement were waived, would

11   you consider that relevant?

12   A    Relevant, not determinative.

13   Q    Thank you.  You have no knowledge about any of the

14   specifics of specific circumstances involving any worker for

15   the China Rilin company between 2010 and 2016, do you?

16   A    I do not.

17   Q    And you don't have any knowledge about what working

18   conditions in his Dandong, China, were like during that

19   period, do you?

20   A    I do have information as to what working conditions in

21   Dandong and other cities in the northeast of China were based

22   on the reporting from my office and working with the embassy

23   in Beijing, yes.

24   Q    Not based on any work that you, yourself, have done in

25   the field; is that right?

*LAM        OCR        RPR*

DeBACA - CROSS - MR. SNELL                    700

1    A     That is work that I did in the field, but I guess in

2    that -- as I see it, it's work that came up to me.  So, my

3    understanding of Northeast China, more in Liaoning province

4    than in this province, frankly, but you are correct in that I

5    have not been to Dandong and I haven't seen it myself.

6    Q     You don't know what a typical salary for a carpenter in

7    Dandong would be, do you?

8    A     I do not.

9    Q     You were asked on direct about Government Exhibits 103

10   and 101, the two contracts; do you remember?

11   A     Yes.

12   Q     And there were some salary figures in there; is that

13   right?

14   A     There were.

15   Q     And you don't have any knowledge as to how those figures

16   compare with what the going salaries would have been for those

17   two workers in Dandong during the relevant period, do you?

18   A     I have general understanding of kind of the going rate

19   for manual laborers in China; but anything as specific as what

20   you're saying, no.

21   Q     You don't know that the rates that are quoted in those

22   contracts are significantly higher than the rates that were

23   being paid at the same time for the same kind of work in

24   Dandong?

25   A     There's no way for me to know that.

DeBACA – CROSS – MR. SNELL                701

1    Q    Do you know anything about the process for workers in

2    Dandong to apply for work –– to apply for the opportunity to

3    come to work in the United States?

4    A    With this particular company or in general.

5    Q    Yes, with China Rilin?

6    A    No, no.

7    Q    So, you don't have any insights into the motivation of

8    any particular worker who may have signed a contract with

9    China Rilin to come work in the United States, do you?

10   A    No.

11   Q    And you agree that that would be a relevant factor in

12   determining whether someone were a victim of a forced labor

13   scheme, don't you?

14   A    What their hopes and expectations were, it would be very

15   relevant.

16            As to their particular circumstances, I think that

17   would be something to look at as far as differential and

18   power.  But, otherwise, what they were hoping for is something

19   we would normally want to look at.

20   Q    There's a lot to consider, isn't there?

21   A    Very much so.

22   Q    Are you familiar with something that's called the report

23   of the Special Rapporteur on Contemporary Forms of Slavery,

24   issued by the United Nations Rights Council?

25   A    Yes.

*LAM       OCR       RPR*

1    Q    Do you consider that to be an authoritative document?

2    A    Yes, it's one of three rapporteurs in the area.

3         MR. SNELL:  Let me just ask if the witness could be

4    shown Defense Exhibit DX0122 for identification.

5    Q    Mr. DeBaca, do you recognize what I put in front of you?

6    A    I do.

7    Q    Is that the report that I just referred to by that long

8    title?

9    A    Yes, this is the report of the special rapporteur, and

10   it's from July 2016.

11   Q    That report includes a discussion of general principles

12   of debt bondage, doesn't it?

13   A    I haven't reviewed the report, but that's what it says,

14   among other things, that it's dealing with, yes.

15   Q    Can you please turn to Page 4 of the report and take a

16   look at it?

17        THE COURT:  Any particular part?

18   Q    Actually, the whole page, if you could read it.

19        (Pause in proceedings.)

20   A    I've read it.

21   Q    Thank you.

22        Directing your attention to the last part of the

23   first paragraph, do you agree with the statement that:  Work

24   or service which is exacted from any person under the menace

25   of any penalty and for which the said person has not offered

1    himself voluntarily is the definition of debt bondage.

2    A     No, that's the definition of forced labor from 1930.

3          In the International Labor Organization, the ILO,

4    Convention, the definition of debt bondage that's set forth

5    earlier in that paragraph is from a different convention.

6    Q     So, you disagree with that definition today?

7          You don't think that applies anymore?

8    A     The 1930 convention is not a debt bondage convention,

9    it's the forced labor convention under the ILO.  It's been

10   superseded in part by the trafficking protocol of 2000.  And

11   in the United States, the Trafficking Victim Protection Act of

12   2000 is what defines forced labor.

13   Q     But my question is, do you disagree with the statement

14   that debt bondage is work or service which is exacted from any

15   person under the menace of any penalty and for which the said

16   person has not offered himself voluntarily?

17   A     That is the definition of forced labor under the 1930

18   convention.

19         Debt bondage requires that there be a debt for the

20   purposes of that.

21         MR. SNELL:  Your Honor --

22         THE COURT:  I know you want him to answer yes or no,

23   but sometimes a witness has to explain a little more.  So, I'm

24   going to permit him to do that.

25         Go ahead.

Case 1:16-cr-00614-AMD   Document 252   Filed 09/09/19   Page 117 of 166 PageID #: 5512

1      MR. SNELL:  Thank you.

2    Q    In the next paragraph, there's a statement that says:

3    People enter the status or condition of debt bondage when

4    their labor or the labor of a third party under their control

5    is demanded as repayment of a loan or of money given in

6    advance, and the value of their labor is not applied towards

7    the liquidation of the debt or the length of service is not

8    limited and/or the nature of the service is not defined.

9         Do you agree with that statement?

10   A    As to debt bondage under international law, yes.

11   Q    But not as to debt bondage generally?

12   A    Debt bondage, in the way that this is being used for

13   bonded labor, is the practice of debt bondage that you see in

14   India, Pakistan, and other places where traditional debt

15   bondage systems that date back to the British Colonial Empire

16   end up happening.

17        So, the term "debt bondage" as just kind of a

18   general usage term is something that encompasses kind of

19   peonage and other forms of forced labor for the purposes of

20   debt.

21        Debt bondage, in the kind of official sense, as it

22   is ending up describing this idea of bonded labor, which I

23   think I had touched on briefly in direct, which is very much a

24   marker of the British colonialism.

25   Q    Don't you agree as a general matter that in order for

1   there to be debt bondage there needs to be a debt?

2   A     Yes, there needs to be a debt.

3   Q     Now, you testified this morning for a bit about some

4   provisions in the Government exhibits, the contracts, that

5   were shown to you; do you recall that?

6   A     Yes.

7   Q     And there were a number of rules that you testified

8   about; do you remember?

9   A     Yes.

10  Q     You don't have any knowledge as to whether any of those

11  rules actually were in force with respect to either of the

12  parties who signed those contracts, do you?

13  A     I do not.

14  Q     Would it make a difference to you in your analysis of

15  those contracts if you knew whether or not any of those rules

16  actually were not enforced in practice?

17  A     It would not make a difference in my analysis of the

18  contracts, no.

19  Q     What about as to whether the person, the worker, who

20  signed each of the contracts was a victim of a forced labor

21  scheme?

22  A     It would be irrelevant to determining whether or not they

23  were a victim of a forced labor scheme but in a way that's

24  separate from whether the four corners of those contracts

25  constitute a contracted indenture or something that would make

1    them vulnerable to forced labor.

2              THE COURT:  I want to make sure I understand, are

3    you asking whether it would make a difference if even though

4    somebody signed this contract, nobody did any of the things

5    that they said might happen?

6              MR. SNELL:  Yes.

7              THE COURT:  I see.

8              I hope I didn't unclarify the situation.  I wanted

9    to make sure I understood.

10   Q    Did Judge Donnelly's question or clarification affect

11   your answer?

12   A    No.  Hopefully, it made it more clear, though.

13             THE COURT:  I don't think it did that, but go ahead.

14   Q    Getting back briefly to the hypothetical worker we were

15   discussing a few minutes ago, would you agree that in order

16   for the worker to have returned to China in the first tour

17   because of a family emergency there must have been some sort

18   of communication with China?

19   A    Yes, someone would have to know that there was a family

20   emergency.

21   Q    Would that fact about communication with the family back

22   home be relevant to your analysis as to whether there was a

23   forced labor scheme afoot?

24   A    I would want to know who was communicating and how that

25   communication was done, but, yes, it would be relevant.

DeBACA – CROSS – MR. SNELL                707

1   Q    If the communications were directly with the family that

2   was involved, that would be significant, wouldn't it?

3   A    Not necessarily because phone calls to and from and to

4   families from people who are being held in forced labor

5   situations are increasingly common now that the price of phone

6   calls have gone down.

7        It used to be that if you had to go to the pay phone

8   that the bosses controlled, it was almost unheard of.  Now

9   people are getting calls right out on factory floors even as

10  something bad is happening.

11       So, I think it's certainly indicative and something

12  that should be looked at, but that one, it's not as relevant

13  as I think it might have been if I was looking at this case 15

14  years ago -- or your hypothetical situation, sorry, not this

15  case.

16  Q    But a communication back home with family is one of the

17  factors or the lack thereof is one of the factors I think that

18  you cited in your testimony this morning, isn't it?

19  A    My understanding of that contract was that it's family

20  members and organizations here in the United States that they

21  are not supposed to communicate with.

22  Q    I'm sorry, I wasn't referring actually to the contract,

23  I'm just talking about whether there would have been

24  communication back home to China with the family there.

25  A    That's something that, as I said, is becoming

*LAM       OCR       RPR*

DeBACA - CROSS - MR. SNELL                    708

1   increasingly more present in these cases as cellphones become

2   more present in migrant people's lives.

3   Q    I'm sorry, I don't understand, when you refer to "these

4   cases," what do you mean?

5   A    When one is looking to see what access people might have

6   to the outside world or in forced labor cases at large, the

7   presence of cellphone technology over the last ten years has

8   dramatically transformed people's ability to call home.

9          So, it's something that certainly is being seen but

10  it's not necessarily the same relevance as maybe 15 or 20

11  years ago, when calling home was something that you had to go

12  to the boss to be able to do or something like that.

13  Q    So, the fact that someone is able to call home and

14  communicate with the family at home is an indicator that it's

15  less likely that the caller from the United States is going to

16  be isolated and vulnerable the way you were positing this

17  morning; isn't that true?

18  A    I apologize for the confusion.  That is something that

19  would have been extremely relevant about 10 or 15 years ago,

20  but now that we have cellphone technology and people are

21  taking cellphones into these workplaces, contact with folks

22  back home ends up being much more common.

23  Q    And the fact that it's much more common means that the

24  people who were able to do it are less isolated than they

25  would have been 10 or 15 years ago; isn't that so?

*LAM        OCR        RPR*

1    A    They are more able to talk to their family.

2    Q    And that makes them less isolated, doesn't it?

3    A    Yes.

4    Q    Now, in your testimony this morning, you also referred to

5    some materials that you reviewed in connection with your

6    testimony here; do you recall that?

7    A    Yes.

8    Q    Could you tell us what those materials were?

9    A    So, in preparation for testifying, one of the things that

10   I looked at in addition to the materials from the case that

11   had been given to me -- the contracts, et cetera -- I went

12   back and I looked at the China narratives from the Trafficking

13   In Persons report to get kind of the full picture of 2001

14   through the end of the time period.

15   Q    And which materials were those?

16   A    Those were the country reports from Trafficking In

17   Persons reports.

18   Q    Did the members of the Government team provide you with

19   anything specifically?

20   A    The folks from the Government team provided me with

21   several exhibits, the contracts, et cetera, that I looked at

22   as I started to hone in on what were the issues that I saw

23   within those contracts.

24   Q    Was one of the documents that the Government provided you

25   a roughly 40-page typewritten narrative of what is the

DeBACA – CROSS – MR. SNELL                    710

1   Government's view of the facts of this case?

2   A    By that you mean the criminal complaint?

3   Q    Yes.

4   A    Yes.

5   Q    And you reviewed that document?

6   A    I did.

7   Q    And paid careful attention to what was being alleged in

8   that document?

9   A    I did.

10  Q    And considered the allegations in that document in the

11  course of preparing your testimony here?

12  A    To some extent.

13        I wasn't being asked to do anything within the four

14  corners of the criminal complaint.  Of course, the criminal

15  complaint is a recitation of known facts at the beginning of

16  the case and has been supplanted by other legal instruments --

17  Q    Actually, it's just a set of allegations.

18        THE COURT:  Well, let's not debate, shall we, about

19  what it is.

20        If you want to ask him questions about what he

21  looked at, that's fine.

22  Q    Sir, you said that they are known facts in a criminal

23  complaint, correct?

24  A    I'll actually go with you:  Those were alleged facts.

25  Q    How much time would you say you spent reviewing the

1    criminal complaint?

2    A    I didn't break down each thing that I looked at by

3    particular time periods, but I'd say over the course of a few

4    weeks, returned to it, looked at it probably two or three

5    times.

6              It didn't make up the bulk of my inquiry because I

7    wasn't looking at the specific facts of these particular

8    workers given that that wasn't going to be my role in

9    testifying today.

10   Q    When did you get contacted in connection with this case?

11   A    About a month, little over a month ago, month and a half.

12   Q    And during that time, have you pretty much been in

13   regular contact with the Government team?

14   A    Sporadic, with -- more regular in the last couple of

15   weeks as it became clear that this would be part of the case

16   presented in court.

17   Q    Telephone conversations?

18   A    Yes.

19   Q    Face-to-face meetings?

20   A    Yes.

21   Q    I think you testified on direct that in your present

22   business as a consultant, you have a standard fee schedule; is

23   that right?

24   A    That's correct.

25   Q    Isn't it true that for review of records, you charge at a

1    rate of $400 an hour?

2    A    That's correct.

3    Q    For remote preparation work, you charge at a rate of $500

4    per hour?

5    A    That's right.

6    Q    For in-person work -- in other words, like a face-to-face

7    meeting in the same room -- you charge at a rate of $2,000 per

8    day?

9    A    That's correct if I have to travel to someplace to

10   testify or to meet in person.

11   Q    And for giving court testimony, as you are today, how

12   much do you get?

13   A    That's $2,000 a day as well.

14   Q    So, for testifying here today, you're getting $2,000?

15   A    Yes.

16   Q    You also have a travel time charge?

17   A    That's correct.

18   Q    How much is that?

19   A    That's $200 an hour.

20   Q    Have you estimated at this point the total amount of

21   charges that you're going to be submitting to the U.S.

22   Government in connection with this case?

23   A    I haven't tallied up the hours yet, unfortunately, but I

24   think it's within the -- well within what the Government had

25   asked me to do, which was, I think, a maximum of 16 hours of

Case 1:16-cr-00614-AMD   Document 252   Filed 09/09/19   Page 126 of 166 PageID #: 5521

1    review, 16 hours of prep, and then courtroom time.

2    Q     One day of courtroom time?

3    A     God willing.

4              MR. SNELL:  Judge, may I have one moment?

5              THE COURT:  Sure.

6              (Pause in proceedings.)

7              MR. SNELL:  Nothing further, your Honor.

8              Thank you, Mr. DeBaca.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  Any redirect examination?

11             MR. HEEREN:  Briefly, if I may.

12             THE COURT:  Okay.

13   REDIRECT EXAMINATION

14   BY MR. HEEREN:

15   Q     Good afternoon.

16   A     Good afternoon.

17   Q     Do you recall being asked on cross-examination about your

18   opinion on whether the ability to go home to see a family

19   member who had an illness or -- forgive me if I got it

20   wrong -- the ability to go home for your own illness was a

21   consideration in your consideration of forced labor; do you

22   recall that question in your testimony?

23   A     Yes.

24   Q     If the person had returned home and had not been paid yet

25   by the company, would that be a factor in your analysis?

DeBACA – REDIRECT – MR. HEEREN                714

1  A     Yes, when there's a contract that has these arrears

2  clauses, that would definitely be a factor.

3  Q     If the person who returned home for an illness and had

4  not been paid went to management of that company and asked for

5  the security deposit back and asked to be paid and the

6  company's management refused, would that be relevant to your

7  analysis?

8  A     Yes.

9  Q     Why?

10  A     Because they would still be operating under the terms of

11  this -- both repayment of the outstanding fees or debts or

12  charges that had been done against them in the first place,

13  but they also would be in a position where they wouldn't be

14  able to retrieve their security deposit or have made enough

15  money to be able to decide to just forfeit it.

16         This idea of returning but not being let go is

17  continuing to be in service under the terms of that indenture.

18  Q     And if that worker who had returned home for an illness

19  who had not been paid could not receive their security deposit

20  back, if part of their security deposit were the deed to a

21  family member's home, would that be relevant to your analysis?

22  A     Yes.

23  Q     Why would that be relevant to your analysis?

24  A     I think I mentioned this earlier, the motivating factor

25  of something happening to someone who you care about is often

1   more of a motivating factor than what you might go through,

2   the idea that you wouldn't let your loved one or your friend

3   suffer on your behalf, say by losing a home, et cetera, even

4   if you would basically resign yourself to your fate otherwise.

5           That notion of other people that we love are

6   hostages to fortune is very much something we see when there's

7   that kind of third-party involvement in security deposits,

8   loans, et cetera.

9   Q    Do you recall defense counsel asking you a few questions

10  about a definition related to debt bondage that I believe your

11  testimony was that it came from a 1930s era document?

12  A    Yes.

13  Q    Is there a -- is there any other definitions of debt

14  bondage that you're aware of that's relevant to the U.S.

15  analysis of forced labor?

16  A    Well, the U.S. doesn't use the term "debt bondage" as far

17  as forced labor in America, again, because this concept of

18  debt bondage is very much coming out of the kind of British

19  colonial traditions of the 19th century and we had already

20  left the Commonwealth by that time.

21          So, in the United States, typically, in terms of

22  what in the international realm would be called debt bondage

23  get dealt with under this concept of peonage, which is the old

24  term from the Spanish because of the expansion of the United

25  States into Spanish territories.

DeBACA – REDIRECT – MR. HEEREN                716

1        So, while it's certainly relevant when dealing in

2   the United Nations context and relevant as a term so that

3   people understand it, because other countries don't understand

4   why we use a Spanish word, it sometimes ends up being easier

5   to use the term "debt bondage," as was done by the special

6   rapporteur in this particular matter when she was organizing

7   her thoughts about her inquiries around the world.

8        Now, her work, the way that it happens, she has to

9   be invited in by the country.  So, the country analysis that

10  she has in this document or other types of documents

11  necessarily have to be countries that are willing to be

12  examined by her.  And, so, her mandate, while it's global,

13  ends up being by invitation from the particular governments.

14  Q    And I believe -- do you recall being asked a question on

15  cross-examination about whether a debt has to be a real debt;

16  do you recall that question?

17  A    Yes.

18  Q    Would you consider turning over the deed to your family's

19  home a real debt?

20  A    Yes.

21  Q    Would you consider turning over multiple years' worth of

22  salary a real debt?

23  A    Yes.

24  Q    Do you recall cross-examination questions about workers

25  being able to call family members from abroad?

1    A     Yes.

2    Q     Do you recall your testimony, your related testimony on

3    direct, about isolating workers?

4    A     Yes.

5    Q     Can a worker still be isolated, geographically or

6    otherwise, if they're able to call their family members?

7    A     Very much so.

8    Q     How so?

9    A     So, again, drawing on what we see from countries around

10   the world as well as what happens in the United States or with

11   Chinese workers overseas, the fact now because of mobile

12   telephony, people are able to have these conversations with

13   folks back home.

14        If they continue to be subjected to the daily

15   isolation, you know, picked up and dropped off between

16   company-provided housing and the work site and never allowed

17   to see people from the outside, not allowed to partake in any

18   of the culturally-relevant festivals or not allowed to go down

19   to a cultural center or a place of worship, all of those

20   things continue to be isolation, on top of just the generalize

21   layings of being in an unfamiliar country, not knowing the

22   language, and maybe not even necessarily, if you're being

23   driven everywhere, not knowing where you are.

24        All of those things are still isolation and those

25   could happen even if somebody is having conversations with

DeBACA – REDIRECT – MR. HEEREN          718

1   someone back home.

2                MR. HEEREN:  One moment, your Honor.

3                (Pause in proceedings.)

4                MR. HEEREN:  Thank you, your Honor.  No further

5   questions.

6                THE COURT:  Any recross?

7                MR. SNELL:  Nothing further.

8                THE COURT:  Thank you so much.  You can step down.

9                THE WITNESS:  Thank you, your Honor.

10               (Witness excused.)

11               THE COURT:  Are you ready to call your next witness?

12               MR. SOLOMON:  Yes, your Honor.  The Government calls

13  William Crowe.

14               (Witness takes the witness stand.)

15  **WILLIAM BENJAMIN CROWE**, called as a witness, having been first

16  duly sworn/affirmed, was examined and testified as follows:

17               THE COURTROOM DEPUTY:  Please state your name for

18  the record.

19               THE WITNESS:  William Benjamin Crowe, C-R-O-W-E.

20               THE COURT:  Mr. Crowe, I want to make sure I

21  remember to tell you, that chair doesn't move.  So, if you try

22  to move it up, you'll be frustrated.  But the microphone does,

23  so, if you could, move it a little bit closer to you.

24               And I'm going to ask you to do a few things:  First,

25  don't speak too quickly, I want to make sure the court

1   reporter gets down everything that you have to say and that

2   the jury hears it; don't talk over whichever lawyer is

3   questioning you, let the person finish the question; and if

4   there's something that you need to have clarified or repeated,

5   let me know.

6           Go ahead.

7           MR. SOLOMON:  Thank you, your Honor.

8   DIRECT EXAMINATION

9   BY MR. SOLOMON:

10  Q    Good afternoon, sir.

11  A    Good afternoon.

12  Q    Where do you work?

13  A    At the Federal Bureau of Investigation.

14  Q    What is your job title?

15  A    I'm a special agent.

16  Q    And how long have you been a special agent with the FBI?

17  A    For approximately four years.

18  Q    I'd like to direct your attention to November 10 of 2016.

19          What did you do that morning?

20  A    That morning, I assisted another squad with a search at

21  349 and 351 Summit Avenue in Jersey City, New Jersey.

22  Q    What kind of premises is 349 or 351 Summit Avenue in

23  Jersey City?

24  A    They were apartment-like structures, kind of built into a

25  townhome-like facility.

1   Q     Were there multiple units within each of the structures?

2   A     Yes.

3   Q     And as part of the search, did you enter any of the

4   premises?

5   A     Yes, sir.

6   Q     Approximately how many beds were located in each of the

7   units?

8   A     Approximately one to two beds, I guess, per room.

9   Q     Per bedroom?

10  A     Per bedroom, yes, sir.

11  Q     And during the search, did you encounter any people who

12  appeared to live in the premises?

13  A     Yes, sir.

14  Q     What nationality were those persons?

15  A     They appeared to be Chinese.

16  Q     Did these Chinese people that you encountered appear to

17  be mistreated in any way?

18  A     No, sir, they did not.

19  Q     Did you observe any evidence of overcrowding in these

20  premises?

21  A     No, sir, I did not.

22  Q     Did the premises appear to be clean?

23  A     Yes, sir, they did.

24            MR. SOLOMON:  Your Honor, may I approach?

25            THE COURT:  Yes.

1          MR. SOLOMON:  Bringing to you what's already in

2     evidence as Exhibits 311, 312, 313, 314, 315, and 318.  I'll

3     direct your attention first to 311, this one here.

4               On the day of the search, were you the seizing

5     agent?

6     A    Yes, sir.

7     Q    Can you please explain to the members of the jury what

8     "seizing agent: means?

9     A    To be a seizing agent means I took physical possession of

10    the evidence and actually transported it back to 26 Federal

11    Plaza, which is where our FBI offices reside.

12    Q    Can you please open Exhibit 311?

13              (Exhibit published to the jury.)

14    Q    Directing your attention first to 311-1, what is that

15    item?

16    A    It appears to be a sign that we collected off of a wall.

17    I do not know what it states.  It appears to be written in

18    Chinese.

19    Q    Next I'll direct your attention to 311-2.

20              What does that appear to be?

21    A    It appears to be another Chinese paper, potentially one

22    of the signs on the wall as well, with numbered sentences.

23    Q    Did you observe similar signs to these throughout the

24    units that you searched on the morning of November 10, 2016?

25    A    Yes, sir.  I actually believe they were in every unit.

1  Q    And as part of the search, did members of the FBI take

2  photographs of the premises?

3  A    Yes, sir.

4  Q    Were you present when those photographs were being taken?

5  A    Yes, sir.

6  Q    Prior to testifying today, have you reviewed the

7  photographs that were taken of 349 and 351 Summit?

8  A    A handful of them, yes, sir.

9  Q    I'd like to show you what's in evidence, some photographs

10 from Government Exhibit 316.

11            (Exhibit published to the jury.)

12 Q    Can you please explain to the members of the jury what is

13 depicted in this photograph which is Bates stamped DZ60796?

14            It's the third page of the exhibit.

15 A    What you see in this photograph, you can see the deli at

16 the lower right.  If you look at little farther to the left,

17 you will see what appear to be townhome-like structures with

18 outfacing windows.  Those are 349 and 351 Summit Avenue, which

19 is the location where we performed our searches.

20 Q    Those are the edifices on the left side of this

21 photograph that I've just circled on the screen?

22 A    That is correct.

23 Q    Next, I'm showing you Page 16, which is Bates number

24 DZ060809.

25            Are these examples of signs that you saw that day?

CROWE – DIRECT – MR. SOLOMON          723

1   A      Yes, sir.

2   Q      I observe the top one is in English language.

3          Is that one of the signs that is 311-1 or 311-2?

4   A      No, sir.

5   Q      How about the bottom one that appears to be in Chinese

6   language?

7   A      Yes, sir, that is also collected and appears to be on

8   311-1.

9   Q      Next I'll direct your attention to Page 59 of 233,

10  DZ060852.

11         What is depicted in this photograph?

12  A      It appears to be a hallway in one of the residences.

13  Q      I'll circle what appear to be some documents on the wall

14  on the right-hand side.

15         Do you recognize what those are?

16  A      Yes, sir.  Those are the same signs that we saw on almost

17  every apartment.

18  Q      I'll zoom in a little bit so you can see.

19         Are the bottom two signs in Chinese language?

20  A      It's difficult to tell from the photo.  The one from the

21  right seems to be similar to what we saw in 311-1.  The one to

22  the left appears to be the one we would see in 311-2.

23

24         (Continued on the next page.)

25

*LAM      OCR      RPR*

1    BY MR. SOLOMON:

2    DIRECT EXAMINATION (Continued)

3    BY MR. SOLOMON:

4    Q     Next I'm showing you page 81.

5          Is this another example of the signs?

6          (Exhibit published.)

7    A     Yes, sir.

8    Q     Just a couple more.  Page 82.

9          What does that appear to you?

10         (Exhibit published.)

11   A     That appears to be an example of one of the signs that we

12   also saw.

13   Q     Is that 311-1 or 311-2?

14   A     It's 311-2.

15   Q     116.

16         What is depicted in this photograph?

17         (Exhibit published.)

18   A     The same signs.  What you see is 311-1 to the left, and

19   311-2 to your right.

20   Q     Page 129.

21         What is depicted in this photograph?

22         (Exhibit published.)

23   A     The same signs; 311-2 to the left, and 311-1 to the

24   right.

25   Q     Finally, 196.

1              (Exhibit published.)

2    A    The same signs.  Again, that's 311-2 to the left and

3    311-1 to the right.

4    Q    Sir, are you aware of whether the FBI prepared

5    translations of 311-2?

6    A    Yes, sir.

7              (Exhibit published.)

8    Q    Now showing you Exhibit 311-2, which is the translation.

9              Can you please read into the record the title of the

10   document.

11   A    Regulations for Employee Dormitory Management.

12   Q    And I'll ask you to read into the record items 7, 8 and

13   9.

14   A    Item 7:  Contacting local Chinese, overseas Chinese and

15   overseas Chinese students is prohibited.  Participating in any

16   type of parades and public gatherings, as well as accepting

17   any type of social surveys and free tickets, is prohibited.

18             Line item 8 states:  Signing any document in

19   unfamiliar situations is prohibited.  Contact the project

20   department immediately in case of emergency.

21             And line item number 9 reads:  Strictly follow our

22   national and local laws and regulations.

23   Q    Lastly, will you please item number 6 into the record.

24   A    Item number 6 states:  Go out with at least two other

25   people and report to the dormitory management personnel about

Case 1:16-cr-00614-AMD   Document 252   Filed 09/09/19   Page 139 of 166 PageID #: 5534

1    time and destinations.

2    Q    I'll direct your attention now to the other exhibits in

3    front of you.

4              Can you please open Exhibit 312.

5    A    Okay.

6    Q    What is item 312?

7    A    Item 312 appears to be a schedule.

8              MR. SOLOMON:  May I approach, Your Honor?

9              THE COURT:  Yes.

10             (Counsel approaches the witness.)

11             MR. SOLOMON:  Can I show it to the jury, please?

12             THE COURT:  Sure.

13   Q    Are there multiple pages of this document?

14   A    Yes, sir.

15   Q    Showing you the second page.

16             (Exhibit published.)

17             Showing you the second page.

18             (Exhibit published.)

19             It's a little wrinkled.

20             Showing you the third page.

21             (Exhibit published.)

22             Now, just quickly, sir, coming back to the second

23   page.

24             Are there some numerals you can read on the top of

25   that document?

1    A    Yeah.  I see a 4 and what appears to be a year, 2012.

2    Q    Correct.

3         And the next page?

4         (Exhibit published.)

5    A    That one also appears to be a year, 2013.

6    Q    And the last thing.  The first page of the document, do

7    you see what appears to be any handwriting on the bottom of

8    the document?

9         (Exhibit published.)

10   A    I do, yes, sir.

11   Q    On both sides of the document?

12   A    That is correct.

13   Q    And I'll direct your attention to Exhibit 313.

14        (Exhibit published.)

15   A    Okay.

16   Q    What is inside 312?

17   A    313?

18   Q    Thank you.

19   A    There are copies of what appears to be visas, some ID

20   badges, and what appear to be two notebooks.  One notebook and

21   one date book.

22        MR. SOLOMON:  May I approach, Your Honor?

23        THE COURT:  Yes.

24        (Counsel approaches the witness.)

25        MR. SOLOMON:  I will take the badges and the visas

CROWE – DIRECT – MR. SOLOMON                    728

1    from you.

2    Q    First directing to your attention to the badges.

3            How many badges are there?

4    A    There would be two badges.

5    Q    And are there photographs depicted in each of these

6    badges?

7    A    Yes, sir.

8    Q    And in back of one of the badges, the one that I'm now

9    putting on the screen.

10   A    Those appear to be hotel keys to a Waldorf Astoria in New

11   York.

12   Q    Is there a room number on one of them?

13   A    1-4-1-3.  That's 1413.

14   Q    Next for the visas, are these actual visas or copies?

15   A    They are copies of the visas.

16           (Exhibit published.)

17   Q    Can you please read the name into the record of the

18   person whose visa is depicted.

19           Do I need to zoom in more?

20   A    Yes, please.

21           Appear to be Shenyang, Yuan Tongwu.

22   Q    And is Shenyang the issuing post name?

23   A    Yes, sir.

24   Q    So is the surname Yuan and the given name Tongwu?

25   A    Yes, Yuan Tongwu.

1    Q     And behind that, what does that document appear to be a

2    copy of?

3              (Exhibit published.)

4    A     That happens be a copy of a passport.

5    Q     For the same individual?

6    A     Yes, sir.

7              (Exhibit published.)

8    Q     And next, can you please read the name of this

9    individual's visa?

10   A     Lian Zhang.

11   Q     And what is the annotation next to where I placed the

12   mark on the screen?

13   A     Construction worker for Chinese Mission to U.N.

14   renovation project.

15   Q     And what type of visa, next to where I placed the dot?

16   A     It's an A2 visa.

17   Q     And is there a similar type of passport for this

18   individual?

19   A     Yes, sir.

20             (Exhibit published.)

21   Q     And going back to the first visa.

22             Can you please read into the record, the annotation?

23   A     Construction worker for Chinese Mission to transformation

24   project.

25   Q     And is transformation misspelled?

1    A    Yes, sir.

2    Q    And what type of visa?

3    A    That is also an A2 visa.

4    Q    Next I'd like to direct your attention to Exhibit 314.

5    Can you please open that up.

6    A    Okay.

7    Q    What does it appear to be?

8    A    They appear to be copies of checks.

9              MR. SOLOMON:  May I approach, Your Honor?

10             THE COURT:  Yes.

11             (Counsel approaches the witness.)

12             MR. SOLOMON:  May I show it to the jury?

13             THE COURT:  Yes.

14             MR. SOLOMON:  Showing you one page first.

15             (Exhibit published.)

16   Q    What is the amount of the check?

17   A    The amount of the check is for $100.

18   Q    And who signed the check, as far as you can read it?

19   A    It appears to be Dan Zhong.

20   Q    And who is the payee?

21   A    The payee is NYC DOB.

22   Q    I show you the other page of checks.

23             (Exhibit published.)

24             Does the same person appear to have signed all three

25   checks?

1    A    It is difficult to tell in the middle one, but, yes, sir.

2    Q    And are all the checks made out to the same entity, NYC

3    DOB?

4    A    Yes, sir.

5    Q    Next I'll direct your attention to 315.

6    A    Okay.

7    Q    What appears to be inside Exhibit 315?

8    A    It appears to be more copies of visas and passports.

9    Q    Are there any actual visas or passports?

10   A    No, sir.

11   Q    Next I'll direct you or your attention to 318.

12        Well, actually, I'll momentarily retrieve 315 for

13   you.  So please take it out.

14   A    Okay.

15   Q    Thank you.

16   A    Okay.

17   Q    What is in 318?

18   A    It appears to be a copy of a visa and a copy of a

19   passport.

20        MR. SOLOMON:  May I approach, Your Honor?

21        THE COURT:  Yes.

22        (Counsel approaches the witness.)

23        MR. SOLOMON:  I'd like to retrieve 315 and 318 from

24   you.

25        THE COURT:  And you can show them, if you want.

1          MR. SOLOMON:  Okay.  Thank you.

2          First showing you 318.

3          (Exhibit published.)

4   Q    Can you please read the name of the person whose visa is

5   depicted here?

6   A    Liang Fenglin.

7   Q    And what's the annotation?

8   A    Construction worker for Chinese Mission to transformation

9   project.  Again, transformation is misspelled.

10  Q    And what type of visa?

11  A    It is an A2 visa.

12  Q    And that's 318.

13         Would you agree with me that 315 contains a

14  relatively large stack of photocopies of visas --

15  A    Yes, sir.

16  Q    -- and passports.

17         I'll first show you this one.

18         Can you read the name?

19         (Exhibit published.)

20  A    Sui Chundong.

21  Q    Annotation?

22  A    Construction worker for Chinese Mission to transformation

23  project.  Again, transformation is misspelled.

24  Q    And type of visa?

25  A    A2 visa.

CROWE – DIRECT – MR. SOLOMON                733

1   Q     Next I'll direct your attention to this person's visa.

2         (Exhibit published.)

3         Can you please read the name?

4   A     Wang Yuliang.

5   Q     And what's the annotation?

6   A     Construction worker for Chinese Mission to U.N.

7   renovation project.

8   Q     What's the name of the company under that project?

9   A     China Rilin Construction Group Company Limited.

10  Q     By the way, would you agree with me that these are

11  relatively high-quality photographs or copies?

12  A     Yes, sir.

13  Q     Next, who is depicted in this copy?

14        (Exhibit published.)

15  A     Zhang Guoquing.

16  Q     And what's the annotation?

17  A     Construction worker for China Mission to U.N. renovation

18  project.

19  Q     Is it also with the China Rilin Construction Group?

20  A     Yes, sir.

21  Q     What type of visa?

22  A     It's a G2 visa.

23  Q     Next, who is depicted in this photograph?

24        (Exhibit published.)

25  A     Zhang Baoan.

1   Q    And what's the annotation?

2   A    Construction worker for China Mission to U.N. renovation

3   project.

4   Q    What's the company?

5   A    China Rilin Construction Group Company Limited.

6   Q    And the type of visa?

7   A    It is also a G2 visa.

8   Q    Who is depicted in this photocopy?

9        (Exhibit published.)

10  A    Zhang Lian.

11  Q    What's the annotation?

12  A    Construction worker for Chinese Mission to U.N.

13  renovation project.

14  Q    And is it also "China Rilin"?

15  A    That is correct, sir.

16  Q    What's the type of visa?

17  A    An A2 visa.

18  Q    Who is depicted in this photocopy?

19        (Exhibit published.)

20  A    Yuan Tongwu.

21  Q    What does the annotation say?

22  A    Construction worker for China Mission to U.N. renovation

23  project.

24        Also with the China Rilin Construction Group Company

25  Limited.

1   Q     What type of visa, please?

2   A     That is a G2 visa.

3   Q     What is the name on this visa?

4             (Exhibit published.)

5   A     Wang Xingshi.

6   Q     And what is the annotation?

7   A     Construction worker for Chinese Mission to U.N.

8   renovation project.

9   Q     And is it also "China Rilin"?

10  A     Yes, that's correct.

11  Q     What type of visa?

12  A     That's an A2 visa.

13  Q     What's the name on this visa?

14            (Exhibit published.)

15  A     Wang Jun.

16  Q     And what's the annotation, please?

17  A     Construction worker for China Mission to U.N. renovation

18  project.  Also with the China Rilin Construction Group.

19  Q     And the type of visa?

20  A     That is a G2 visa.

21  Q     What's the name on this visa?  We're almost done.

22            (Exhibit published.)

23  A     Wang Xiaojun.

24  Q     And the annotation, please.

25  A     Construction worker for China Mission to U.N. renovation

1    project.

2            Also with the China Rilin Construction Group.

3            And it is a G2 visa.

4    Q    Okay.  Who's on this visa?

5            (Exhibit published.)

6    A    Chen Yan Kui.

7            Annotation states that it is a construction project

8    of new embassy complex.  And it is an A2 visa.

9    Q    Who's on this visa?

10           (Exhibit published.)

11   A    Yu Lei.

12   Q    What type of annotation?

13   A    Construction project of new Chinese embassy in Washington

14   DC.

15           The type of visa is an A2.

16   Q    And lastly, this visa.  What's the name?

17           (Exhibit published.)

18   A    Shan Qingdong.

19           The annotation states construction worker for

20   Chinese Mission to U.N. renovation project.

21           It appears to be for the China Rilin Construction

22   Group.  And the type of visa is an A2.

23   Q    Now, sir, did you find any actual passports or actual

24   visas during your search of 349 or 351 Summit?

25   A    No, sir, not to my recollection.

1    Q    And, sir, are you able -- is a person able to travel

2    internationally using a photocopy of a visa or photocopy of a

3    passport?

4    A    No, sir.

5            MR. SOLOMON:  Nothing else.  Thank you.

6            THE COURT:  All right.

7            Any cross-examination?

8            MR. CLEARY:  Yes, thank you.

9    CROSS-EXAMINATION

10   BY MR. CLEARY:

11   Q    Good afternoon, Agent Crowe.

12   A    Good afternoon, sir.

13   Q    My name is Robert Cleary and I represent Mr. Zhong.

14           I want to ask you some questions about the search

15   that you did.

16           The search team was authorized to look for and seize

17   anything that could have been used to commit, among other

18   things, the crime of forced labor, correct?

19   A    Yes, sir.

20   Q    And you understood at the time of the search that forced

21   labor included getting people to work by means of force or

22   physical restraint.  Am I right about that?

23   A    Yes, sir.

24   Q    And also getting them to work by either serious harm or

25   threat of any of those means, correct?

1    A     I can only assume through serious harm.

2    Q     Would you agree that the search called for by the search

3    warrant was extensive; the search that that you conducted, was

4    extensive?

5    A     Yes, sir.

6    Q     And you had two teams searching, one for 349 and a

7    separate team at 351 Summit Avenue?

8    A     If I recall correctly, it began that way.

9          I believe one search concluded earlier than the

10   other and we assisted with the other search.

11   Q     And where were you?  Were you in one of the those

12   buildings or were you in both of them?

13   A     I was in both of them.

14   Q     And on the time question that you just mentioned, am I

15   right in stating that the search of the properties overall,

16   the Summit Avenue properties, lasted about four hours?

17   A     If I recall correctly, yes, sir.

18   Q     And your role was to record the items on a schedule, the

19   items that were seized, in both of those searches, the 349

20   Summit search and the 351 Summit search?

21   A     My role was to assist with the search and take physical

22   possession of some of the evidence in order to transport it

23   back to 26 Federal Plaza.

24   Q     And the written record was kept of that evidence that

25   were seized, correct?

CROWE - CROSS - MR. CLEARY                    739

1    A    That is correct.

2    Q    And then also somebody -- there was two officers taking

3    the photographs?

4    A    Yes, sir.

5    Q    You were not the photographing agent?

6    A    No, sir.

7    Q    Just a couple of questions about the neighborhood that

8    the Summit Avenue properties were in.

9            It's a residential neighborhood?

10   A    Yes, sir.

11   Q    Densely populated?

12   A    I would assume so, yes, sir.

13   Q    Based on what you saw, it was closely packed, right?  I

14   think we saw a photograph.

15   A    Yes.  Yes, that is correct.

16   Q    Let me show you another photograph of the area.

17           This is from Exhibit 316, Government's Exhibit 316.

18   It's page number DZ17061 in evidence.

19           (Exhibit published.)

20           And I think we saw a different angle, but just to

21   put this in perspective, we see the deli, correct?

22   A    Yes, sir.

23   Q    And 351 is right next to the deli, correct?

24           Let me see if I can zero in on this.

25           351 is right there, right?

Case 1:16-cr-00614-AMD   Document 252   Filed 09/09/19   Page 153 of 166 PageID #: 5548

1    A    Yes, sir.

2    Q    And if we had it, we could extend the picture, we would

3    see 349 right over here somewhere where my pen is, correct, to

4    the left of 351?

5    A    Yes, sir.

6    Q    Okay.  The search that you conducted over the four hours,

7    you and your team, was a thorough search, correct?

8    A    Yes, sir.

9    Q    And there were six apartments at 349 that you searched?

10   A    I do not recall the total number.

11   Q    Certain number of apartments in 349, certain number of

12   apartments in 351 that were searched, correct?

13   A    Yes, sir.

14          It seems that six is correct.  I believe it was two

15   per floor.

16   Q    Do you recall it being six in 349 and five apartments in

17   351?  Does that sound right?

18   A    I'm not sure about that.

19   Q    And however many apartments there were, the agents were

20   able to get access to each of the apartments in both of those

21   buildings, correct?

22   A    Yes, sir.

23   Q    And the agents were able to access every room within each

24   of those apartments.  Am I correct about that?

25   A    Yes, sir.

CROWE - CROSS - MR. CLEARY                      741

1   Q    And the agents did search each and every room, right?

2   A    That is correct.

3   Q    Every bedroom?

4   A    Every bedroom.

5   Q    Every closet?

6   A    Every closet.

7   Q    Bathrooms, living rooms, dining rooms, et cetera?

8   A    Yes, sir.

9   Q    Okay.  And were there basements that got searched also?

10  A    I don't believe so.

11  Q    No basements in the building?

12  A    No basements that I know of.

13  Q    And you and the other agents in searching these various

14  rooms we talked about were looking for anything called for by

15  the search warrant, correct?

16  A    That is correct.

17  Q    Any evidence of forced labor, among other things.

18  A    Yes, sir.

19  Q    And anything you found that you thought related or the

20  other agents thought related to what the search warrant

21  authorized you to take, was photographed and seized by you and

22  your teammates, correct?

23  A    That is correct.

24  Q    And you found no evidence of physical restraints or

25  weapons or serious harm of any sort, right?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CROWE - CROSS - MR. CLEARY                742

1    A     No, sir.

2    Q     I want to take a couple of photographs, representative

3    examples of photographs of the search location.

4           Is there any way -- if I show you photographs of

5    different bedrooms, is there any way you can tell us which

6    apartment that is or at least which building it is?

7    A     To be honest, it's been about two-and-a-half years.  It

8    would be very difficult but we can give it a shot.

9    Q     Okay.  I don't want to press you on it, but you don't

10   have a schedule that would show by the numbers we have on

11   these, the Bates numbers, that would show which apartment

12   building the photograph is from?

13   A     Not in front of me.  I don't believe so.

14   Q     Okay.  We can -- we don't have to worry about that then.

15          I'm going to show you now what I believe is a photo

16   of apartment -- in 351, Apartment 3R.  And it's Exhibit 316,

17   page number DZ060848.

18          (Exhibit published.)

19   Q     Look like one of the bedrooms that you guys searched?

20          I'm sorry, one of the living rooms, common area

21   living rooms?

22   A     Looks like the common area, yes, sir.

23   Q     Table and chairs and a plant in the middle, right?

24   A     That is correct.

25   Q     And do you see the fishing net off to the right-hand side

1    in the corner?

2    A    Yes, sir.

3    Q    Am I correct in stating that during the course of your

4    search you saw a number of items of fishing gear in the

5    various different apartments?

6    A    That's difficult to recall.

7    Q    Okay.  See if we can refresh your memory in a moment.

8             I'm now showing you a page from Exhibit 316, 60849.

9             (Exhibit published.)

10            Do you recognize that as just a different angle of

11   the same living room we were just looking at?

12   A    Yes, sir.

13   Q    Do you remember the mahjong table at the back, right

14   about there (indicating)?

15   A    Yes, sir.

16   Q    Fully-equipped kitchen?

17   A    Yes, sir.

18   Q    And each of the apartments have a fully-equipped kitchen,

19   correct?

20   A    I believe so.

21            THE COURT:  You mean each of the buildings?

22            MR. CLEARY:  Each of the apartments in both

23   buildings.

24            THE COURT:  I see.

25   Q    Had fully-equipped kitchens, right?

1    A    I believe so, yes, sir.

2    Q    And you saw several computers also in the apartments,

3    right?

4    A    Yes, sir.

5    Q    Showing you now Exhibit 316, page number DZ60851.

6            (Exhibit published.)

7            Do you recognize that as one of the bedrooms in one

8    of the apartment buildings, I believe it's 351 Summit,

9    Apartment 3R.

10            Do you recognize that?

11   A    I do not recognize it as a bedroom.  Potentially of a

12   living area.

13   Q    Okay.  I think you're right, actually.

14   A    I believe that's a refrigerator to the right side of the

15   photograph.

16   Q    Yeah, I think you're right.

17            And you recognize the computer right there, correct?

18   A    Yes, sir.

19   Q    And one of several computers you saw in the various

20   different apartments, right?

21   A    That is correct.

22   Q    The computers had internet access?

23   A    I do not know.

24   Q    You personally did not check that?

25   A    That's correct.

CROWE – CROSS – MR. CLEARY                    745

1    Q    And do you know if there were other agents who checked

2    that to see what the access was, if any, of the computers?

3    A    I do not know.

4    Q    Okay.  I'm going to show you a picture of another one of

5    the bedrooms, Exhibit 316, number DZ60857.

6              (Exhibit published.)

7              Couple more computers in one of the bedrooms,

8    correct?

9    A    Yes, sir.

10   Q    And do you see here the remote and the TV -- the remotes

11   for TV and DVRs or DVDs, I guess they call them?

12   A    Yes, sir.

13   Q    And do you recall seeing TVs and DVDs in the bedrooms?

14   A    I recall seeing DVD players in the bedrooms.  I believe I

15   only saw a couple of the televisions.

16   Q    Okay.  You also saw during the search of the apartments

17   various different pieces of recreational items, like some of

18   the fishing equipment we saw earlier, correct?

19   A    Yes, sir.

20   Q    And bicycles.  You saw a number of bicycles, correct?

21   A    I don't recall.

22   Q    Okay.  Let's see if we can refresh your memory a little

23   bit.

24              In Exhibit 316, page DZ60803.

25              (Exhibit published.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1          A picture of one of the apartments, right, one of

2     the living areas?

3     A    It appears so, yes, sir.

4     Q    And you probably can't see this, but -- well, maybe you

5     can.

6          You see bicycles right there where I'm pointing to

7     the right of the refrigerator?

8     A    There appears to be two blue colored bicycles, yes.

9     Q    And over to the left of the refrigerator, more fishing

10    equipment?

11    A    That would be correct, fishing poles.

12    Q    And a fishing mural hung up on the wall there, right?

13    A    Yes, sir.

14    Q    Okay.  Showing you 316, page DZ60814.

15         (Exhibit published.)

16         More fishing equipment, looks like rods and reels

17    off to the back of the photo, right?  Right here?

18    A    Yes, sir.

19    Q    And then what is that?  Do you remember that being a

20    tackle box right there?

21    A    On top of what appears to be a small mattress, yes, sir,

22    that's correct.

23    Q    Those, I believe, were all 351 photos, photos from the

24    apartments in 351 Summit Avenue.

25         I'm going to now turn to photographs from what I

1    believe is 349, a few of those and I'll be finished.

2              These were fully-furnished apartments in 349, just

3    like they were in 351, correct?

4    A    I believe so, yes, sir.

5    Q    And with fully-furnished kitchens like we see in this

6    photograph here, which is Exhibit 316, DZ60908.

7              (Exhibit published.)

8              See if I can get this.  There we go.

9              Example of one of the kitchens in 3 -- 349 Summit,

10   right?

11   A    Yes, sir.

12   Q    And you see the plant there, some food, and a big bottle

13   of vodka, right?

14   A    Yes, sir.

15   Q    Okay.  And there were some bicycles in this building

16   also; weren't there?

17   A    I don't recall.

18   Q    You do not recall?

19   A    No, sir.

20   Q    Okay.  This is a photo I'm going to show you,

21   Exhibit 316, page DZ60907.

22             (Exhibit published.)

23             Photo of some more bicycles, different from the ones

24   we saw before in 351, correct?

25   A    Yes, sir, that is correct.

CROWE - CROSS - MR. CLEARY                          748

1    Q    We also saw some fishing equipment in 3 -- what am I on

2    now?  Fishing equipment in 341 also, correct?

3    A    I do not recall, sir.

4             (Exhibit published.)

5    Q    Okay.  We saw things like on page DZ60913, which I just

6    put on the monitor.  That's Exhibit 316.  Fishing net in one

7    of the apartments, right?

8    A    Yes, sir.

9    Q    And there was a modem in some of the rooms at 349 Summit

10   Avenue, correct?

11   A    I do not recall.

12            (Exhibit published.)

13   Q    Look at 316, page DZ60928.  Let me zero in on this a

14   little bit.

15            You see in the center of the picture, that item

16   there, that's a modem; isn't it?

17   A    Yes, sir, that's correct.

18   Q    Now, during the course of the search of the Summit Avenue

19   properties, do you recall that you and the other agents seized

20   approximately 13 cellular devices and three computers from the

21   two different apartments, two different apartment buildings?

22   A    I do not recall the number, but I do recall seizing

23   multiple cell phones and computers.

24   Q    And does it say like a dozen or so, something in that

25   ballpark?

PROCEEDINGS                                    749

1    A    That sounds approximate.

2    Q    And you said you had not checked -- I was asking you

3    about some computer earlier.  You said you had not checked the

4    internet connection.

5         Is that true for all of the phones and the

6    computers, you yourself did not check to see if any of them

7    were hooked up to the internet?

8    A    That is correct.

9    Q    Okay.  Are you aware that the apartments themselves were

10   wired for internet access?

11   A    I was not aware.  I can only make the assumption.

12   Q    Okay.

13        MR. CLEARY:  I have nothing further for you, Agent.

14        Thanks very much for your time.

15        THE WITNESS:  Thank you.

16        THE COURT:  Any redirect?

17        MR. SOLOMON:  We're all set.

18        THE COURT:  Thank you so much.  You can step down.

19        THE WITNESS:  Thank you, ma'am.

20        (Whereupon, the witness was excused.)

21        THE COURT:  Okay.  So we're almost at 4:00.  That

22   means we're going to break for the weekend.

23        And because we're going to be -- we're going to have

24   the weekend, I'm just going to remind you, as strongly as I

25   possibly can, not to talk about the case at all.

PROCEEDINGS                                    750

1          Do not look anything up on the internet about

2     anything having to do with this case.  I'm sure you have

3     things that can occupy your weekend that don't involve this

4     trial.

5          So please enjoy your weekend.  Relax.  Think of

6     something else.  And I will see you back here on Monday

7     morning at 9:30.

8          As I told you yesterday, we're moving along very

9     efficiently.  So -- so and part of that is because you all are

10    so prompt about being here on time, and I'm glad we can count

11    on you.

12         So do enjoy your weekend, and I'll see you Monday.

13         THE COURTROOM DEPUTY:  All rise.

14         (Jury exits the courtroom.)

15         THE COURT:  Okay, everybody, you can sit down.

16         Everybody have a good weekend.

17         I just want to get a sense -- I have another

18    proceeding that I have to handle here in a little bit.

19         What's our kind of rough estimate of how many more

20    witnesses you have?

21         MR. SOLOMON:  I can't say exactly how many

22    witnesses.  I think we have approximately a week left, or

23    maybe a little bit more than a week.

24         THE COURT:  Okay.

25         And, remember, we're off on Wednesday.

PROCEEDINGS                                          751

1          All right.  Anything else that we have to --

2          MR. CLEARY:  I'd like to follow up on what you just

3    asked.

4          If the government has about 30 witnesses on their

5    witness list, I gather from what they just said they're not

6    calling all of those.

7          I think it would be helpful if they can give us some

8    notice as to who they're not calling, or at least unlikely to

9    call, so we don't have to the spend time preparing 30

10   cross-examinations.

11         MR. SOLOMON:  We agree, Your Honor.  We're going to

12   make an effort over the weekend to figure out who we're

13   calling and who we're not calling.

14         We told defense counsel who we're calling on Monday

15   and Tuesday.

16         I can say that we are making efforts to streamline

17   this.  We will be cutting some people.

18         THE COURT:  Okay.  Great.  And if there's anybody

19   you can tell them now that you're definitely not calling, do

20   that.

21         MR. SOLOMON:  Sure.

22         MR. CLEARY:  In terms of what they told us for

23   Monday, Tuesday, one of them they just defined -- described as

24   one of the victims.  We don't know who that person is.  I'd

25   like to know who that person is.

PROCEEDINGS                              752

1            THE COURT:  So I'm assuming that you all seem to be

2      on speaking terms, and if you ask, he'll tell.

3            MR. SOLOMON:  Absolutely.

4            THE COURT:  I mean, if you need to involve me, go

5      right ahead, but it seems like you have a nice enough

6      relationship.

7            MR. CLEARY:  Consider yourself asked.

8            THE COURT:  All right.  No tattling.

9            All right, great.  Have a good weekend.

10            I do want to thank the marshals for all the work

11      they're doing.  And the court reporters.

12

13                    *     *     *     *     *

14            (Proceedings adjourned at 3:50 p.m. to resume on

15      March 11, 2019 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

753

```
 1                      I N D E X

 2    WITNESS                              PAGE

 3    LUIS C. DeBACA

 4    DIRECT EXAMINATION         BY MR. HEEREN    605
      VOIR DIRE EXAMINATION      BY MR. SNELL     618
 5    DIRECT EXAMINATION (Cnt'g) BY MR. HEEREN    629
      CROSS-EXAMINATION          BY MR. SNELL     694
 6    REDIRECT EXAMINATION       BY MR. HEEREN    713

 7    WILLIAM BENJAMIN CROWE

 8    DIRECT EXAMINATION         BY MR. SOLOMON   719
      CROSS-EXAMINATION          BY MR. CLEARY    737
 9

10                      E X H I B I T S

11    GOVERNMENT               PAGE
      101                      673
12    2005                     680

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*